UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| DONNA GAVIN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C. A. No. 1:18-cv-10819-LTS |
| v. | ) | |
| | ) | |
| CITY OF BOSTON and MARK HAYES, | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF DONNA GAVIN'S OPPOSITION TO
## <u>DEFENDANT MARK HAYES'S MOTION FOR SUMMARY JUDGMENT</u>

## I.      INTRODUCTION

Plaintiff Donna Gavin ("Gavin") opposes Defendant Mark Hayes' ("Hayes") Motion for Summary Judgment ("Motion") (Docket No. 110).  The case against Hayes for discrimination and retaliation could not be clearer.  The same is true for the City of Boston ("City"), which has not moved for summary judgment.  Hayes avoids one of the central claims for discrimination and many of the ugly facts against him by incorrectly arguing that Gavin has only asserted retaliation claims against him and then selectively and impermissibly choosing the later of her complaints to minimize his retaliatory conduct.  The reality is Hayes discriminated against Gavin and inflicted a hostile work environment on her from the moment she was transferred as Lieutenant to the Family Justice Center ("FJC") in charge of two units there – the Human Trafficking Unit ("HTU") and the Crimes Against Children Unit ("CACU").  Hayes did not let up in his harassment of Gavin until, after Hayes's repeated requests, she was transferred out of the FJC to a dead-end position at the Boston Police Academy ("Academy").  This Court should deny Hayes's Motion.

## II.      BRIEF STATEMENT OF FACTS[1]

In May 2016, Gavin rose to the rank of Lieutenant ("Lt.") after thirty years with the Boston Police Department ("BPD") – and shortly thereafter earned the rank of Lieutenant Detective ("Lt. Det.").  SOF, ¶ 25.  Upon her promotion, she encountered the buzz-saw of Hayes's discrimination and hostility toward her as a senior female officer.  For the majority of her career – until her

---

[1] A fuller recitation of the relevant facts is included in Plaintiff's Responses to Hayes's Statement of Undisputed Material Facts in Support of his Motion for Summary Judgment and in Gavin's Statement of Additional Relevant Facts.  Gavin's responses and additional facts are referred to as "SOF."  In addition, concurrently with filing of this opposition, Gavin is filing a motion to file an unredacted copy of her opposition under seal as well as a motion to file **Exhibits G, H, S, U, & V** to the SOF under seal as the City has designated those documents, or portions thereof, as confidential.  Gavin has redacted references to those exhibits in this opposition, but also intends to file an opposition to challenge the City's designation.

retaliatory transfer to the Academy in March 2019 – Gavin investigated crimes as a detective or supervising detective in the Bureau of Investigative Services ("BIS").  SOF, ¶ 27.  She is a recognized expert in the field of human trafficking investigations and served as Sergeant Detective ("Sgt. Det.") in charge of BPD's HTU from 2009 to 2015.  SOF, ¶ 28.  Given her expertise, she was appointed the co-coordinator for the City's initiative to combat human trafficking, known as City Empowered Against Sexual Exploitation ("CEASE") for which BPD was awarded grant money.  SOF, ¶ 29.  She excelled in her work and had no performance issues until she was promoted to Lieutenant under Hayes. SOF, ¶ 30.

When she was promoted to Lieutenant and appointed to oversee both the HTU and CACU, she reported to Hayes who, as Captain Detective, supervised the Family Justice Center.  SOF, ¶ 31. Lt. Det. George Juliano ("Juliano") and Lt. Det. Mark Harrington ("Harrington") oversaw the other units in the FJC -- the Sexual Assault Unit ("SAU") and the Domestic Violence Unit ("DVU"), and also reported to Hayes.  SOF, ¶ 32.  Upon her arrival, Hayes treated her dismissively, announcing that her position had been "created by City Hall," and he let it be known that he considered City Hall involvement in police affairs as a negative.  SOF, ¶ 33.  He did not welcome Gavin or try to treat her with the same respect as the male Lt. Dets. at the FJC.   SOF, ¶¶ 34-41. Hayes forced Gavin to share a cubicle space with her direct subordinates, Sgt. Dets. Miller and Lembo, even though every Lt. Det. in the entire BPD has a private office.  SOF, ¶ 34.  Hayes left her for over a year in that cramped cubicle.  SOF, ¶¶ 35 & 42.  When Gavin requested a private office, he told her the position did not come with an office and falsely informed her that it was cost-prohibitive for her to have one.   SOF, ¶ 35.

From the moment she arrived as Lt. at the FJC, Hayes treated Gavin differently from the male Lt. Dets. in other ways too. SOF, ¶ 36.  He hyper-scrutinized and micromanaged her unit,

criticized her in front of her subordinates, denigrated her in emails and meetings in the presence of her male colleagues and direct reports, controlled the staffing of her units, ran case review meetings for her units, and interfered in her management of her detectives.  SOF, ¶ 36.  Shortly after she assumed her position, he began keeping a private log on her and informed the other male Lt. Dets. and Sgt. Det. Miller that he was secretly monitoring her activities.  SOF, ¶ 37.  Hayes did not subject his male Lt. Dets. to any of this hostile and harassing treatment.[2]  SOF, ¶ 41.

After nearly a year of mistreatment, on March 3, 2017, Gavin complained to Hayes that he was discriminating against her on the basis of her gender, and she complained to BPD's union – thus engaging in protected activity.[3]  SOF, ¶ 42.  After she engaged in protected activity, Hayes then emailed Gavin, copying her subordinates, criticizing her for seeking an office space comparable to the ones held by the male Lt. Dets., and taunting her that she should file with the Massachusetts Commission Against Discrimination ("MCAD").  SOF, ¶ 44. Hayes also began a secret audit of the HTU's files.  He told no one in the HTU other than Gavin's then immediate subordinate, Sgt. Det. Kathleen Doris ("Doris"), who kept the secret.    SOF, ¶ 45.  When Gavin eventually discovered that Hayes was surreptitiously entering her office and removing files, she realized that his campaign of harassment against her was intensifying following her first complaint.  SOF, ¶ 46.  Shortly afterward, on April 24, 2017, she submitted a complaint to Superintendent

---

[2]  Hayes also directed Gavin, who is a recognized expert in policing human trafficking, to take directives from a much junior male detective who had zero training in investigating human trafficking or other sexual assault crimes.  SOF, ¶ 39.  Hayes also repeatedly and publicly blamed Gavin for temporarily halting the transfers of two detectives ███████████████████████████████.  SOF, ¶ 40.

[3]   In fact, when Gavin raised this complaint, Hayes considered that Gavin was somehow psychologically unfit to be a police officer, which he recorded in the private log he was keeping on her.  SOF, ¶ 43.

("Supt.") Gregory Long ("Long") pursuant to Rule 114 which prohibits harassment and discrimination at the BPD – her second protected activity. *Id.*

On or about May 1, 2017, Hayes arranged for some of Gavin's subordinates to participate in a human trafficking sting operation and to hide their involvement from her. SOF, ¶ 48. At about the same time, Hayes handed Gavin a 17-page criticism of the HTU files, even though Hayes had required Gavin and HTU detectives to complete a review of 2 1/4 years of cases and a recent review with Hayes had gone well, which Hayes himself acknowledged at the time. SOF, ¶ 49. On or about May 10, 2017, Hayes directed Sgt. Det. Thomas Lembo, one of Gavin's subordinates in the CACU, to write a report critical of Gavin concerning an event that had allegedly occurred two months earlier in March. *See* SOF, ¶ 50. On May 16, 2017, Hayes filed a 45-page Internal Affairs ("IA") complaint against Gavin in which he levelled the most extreme and false allegations against her and demanded that she be transferred out of the FJC and stripped of her detective rating.[4] SOF, ¶¶ 51-52. This complaint consisted of the illegal log Hayes had been keeping on Gavin.[5] SOF, ¶ 51. On May 18, 2017, Hayes along with Lt. Det. Juliano, Supt. Francis Mancini ("Mancini") and others including Sgt. Det. Richard Dahill of IA, stormed the HTU while Gavin was not present and removed files, which alarmed HTU personnel who did not know some of the officers, and a false rumor spread of an FBI investigation. SOF, ¶ 53.

On May 23, 2017, Hayes violated BPD Rule 114 and informed Gavin's subordinates that she had filed a discrimination and harassment complaint against him and encouraged them to

---

[4]  A detective rating is obtained after a six-month probationary period at a new rank (e.g., Det., Sgt., Lt., Capt.) in the Bureau of Investigative Services. *See* SOF, pg. 14, n. 2.

[5]  It is illegal to keep a secret personnel record on an employee outside of their personnel file. *See* M.G.L. c. 149, § 52C.

circumvent her in the chain of command.[6] SOF, ¶ 54.  On May 23, 2017, Gavin filed a complaint of discrimination with the MCAD.  SOF, ¶ 10.  Hayes thereafter continued to subject Gavin to a hostile work environment including: (a) encouraging her subordinates to circumvent her; (b) freezing her out of BPD operations; (c) encouraging her subordinate Sgt. Det. Doris ("Doris") to write a complaint against her, and then personally causing it to be filed with Internal Affairs ("IA"); (d) making it known to others within the BPD that he "had her"; and (e) going out of his way to ruin her reputation within the BPD.  SOF, ¶¶ 55, 57, & 58.

As a result of Hayes' ongoing harassment, which was known to and endorsed by the BPD, Gavin began therapy in July 2017, to help her manage the stress and anxiety of the hostile work environment Hayes had created.  SOF, ¶¶ 61.  Gavin was prescribed medication in 2018 and continues to be treated by a psychiatrist and therapist to address the adverse effect on her mental health from Hayes's retaliation and harassment.  *Id.*

On or about March 23, 2019, Gavin was transferred out of the FJC to the Academy, which satisfied Hayes's demand.  SOF, ¶¶ 8, 16, 17, 21 & 62. The Academy is not part of the BIS and Gavin is no longer permitted to perform any investigative work, including in her area of expertise. SOF, ¶¶ 12, 16, & 17. Hayes's second demand – that Gavin be stripped of her detective rating – was thus effectively satisfied because Gavin no longer may participate in the work of the detectives in BIS. SOF, ¶ 21. Gavin now works alone in a "silo," and is primarily overseeing computerized exams.  SOF, ¶ 17.  Both Gavin and her current commander, Supt. Winifred Cotter ("Cotter") have testified that Hayes's retaliatory complaint "knocked her out of the box," and caused her to be transferred from the FJC to the Academy.  SOF, ¶ 18. She no longer is able to apply her expertise

---

[6] No one from the BPD ever countermanded Hayes' directive, thus it was clear to Gavin's subordinates that they could circumvent her in the chain of command without consequence, which they did.

in fighting crimes against women and children, including human trafficking, which she had hoped

and expected to continue with more effect as a Deputy or Superintendent on the Command Staff.

Two other members of BPD's command staff also testified that Gavin was transferred as a result

of the IA complaints.  SOF, ¶ 18.  Hayes, with the support of the BPD, killed her promising career

and professional aspirations.

## III.   <u>ARGUMENT</u>

### A.  Summary Judgment Standard

Summary judgment is a "disfavored remedy in civil rights cases" including cases involving

gender discrimination and retaliation.  *See Lavalley v. Quebecor World Book Services, LLC,* 315

F. Supp. 2d 136, 139 (D. Mass. 2004).  The Court must "view the record in the light most favorable

to the nonmoving party, and… draw all reasonable inferences in the nonmoving party's favor."

*LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993).

### B.  Gavin Has Presented More Than Enough Evidence That Hayes Retaliated To Defeat His Summary Judgment Motion

Hayes moves for summary judgment as to Gavin's retaliation claim against him (Count

Two) solely on the grounds that Gavin has not suffered an "adverse employment action."[7]  *See*

Docket No. 111 at pp. 2-8.  Hayes mischaracterizes the record and ignores the law, both of which

clearly demonstrate that Gavin's transfer to the Academy was an adverse employment action.  For

starters, it stripped her of all her investigative duties for which she had qualified; her totally altered

set of responsibilities required little to none of the training and qualifications she had obtained and

earned over a thirty year career; her duties are ill-defined and menial; and she has effectively no

---

[7]  Hayes concedes that there is a material dispute of fact regarding his motive of filing a complaint against Gavin following her protected activity, and as the non-moving party, the Court must conclude that he harbored the improper motive to retaliate against her.

managerial role any more.[8]   Even putting aside the transfer to the Academy, the hostile work environment that Hayes imposed on her after her complaints also constitutes an adverse employment action and is sufficient to prove retaliation.   Accordingly, Hayes's motion for summary judgment as to Gavin's claim of retaliation in violation of M.G.L. c. 151B, § 4(4) fails.

### 1.   Retaliation Standard

A *prima facie* case of retaliation is "a small showing that is not onerous and is easily made." *Che v. Massachusetts Bay Transp. Authority*, 342 F.3d 31, 38 (1st Cir. 2003) (quoting *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003)).   To prevail on a claim of retaliation, a plaintiff must establish that: (1) she "reasonably and in good faith believed that the [defendant] was engaged in wrongful discrimination"; (2) "acted reasonably in response to that belief… through reasonable acts meant to protest or oppose discrimination"; (3) the defendant "took adverse action against the employee"; and (4) the "adverse action was a response to the employee's protected activity." *Verdrager v. Mintz, Cohn, Ferris, Glovsky & Popeo, P.C.,* 474 Mass. 382, 406 (2016).   Hayes' Motion hinges nearly entirely on his argument that Gavin did not suffer an adverse employment action.

### 2.   Gavin's Transfer Was an Adverse Employment Action.

 "[R]etaliatory work assignments" are a classic and "widely recognized example of forbidden retaliation."   *See Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 71 (2006) (internal quotations omitted). The Supreme Judicial Court has held that "an action taken by

---

[8]  While Gavin was transferred to a position with predominantly clerical duties, Hayes was given a more prestigious position at BPD headquarters and retained, if not enhanced, his supervisory responsibilities within the Bureau of Investigative Services.  SOF, ¶ 63.  Furthermore, the BPD actively assisted other male supervisors who were transferred out of the FJC – Lt. Det. Mark Harrington and Sgt. Det. Miller – locate other positions. SOF, ¶ 64.   Except for Gavin, they all received favorable positions within Investigative Services.

an employer is an 'adverse employment action' where it is 'substantial enough to have materially disadvantaged an employee.'"  *See Yee v. Massachusetts State Police,* 481 Mass. 290, 296 (2019) (quoting *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 707-08 (2011).  A "material disadvantage" for purposes of an adverse employment action occurs "when objective aspects of the work environment are affected."  *See King v. City of Boston*, 71 Mass. App. Ct. 460, 469 (2008).  Courts "examine whether an employee has suffered an 'adverse employment action' on a case by case basis."  *Yee,* 481 Mass. at 297.  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[9]  *Billings v. Town of Grafton*, 515 F.3d 39, 52 (1st Cir. 2008).

The First Circuit has "squarely rejected the notion that a transfer cannot qualify as an adverse employment action unless it results in a diminution in salary or a loss of benefit" and instead holds that when "a transfer leaves an employee with significantly different responsibilities" such a transfer may qualify as an adverse employment action. *Caraballo-Caraballo v. Correctional Administration,* 892 F.3d 53, 61 (1st Cir. 2018); *see also, Morales-Vallellanes v. Potter,* 605 F. 3d 27, 35 (1st Cir. 2010) ("[R]eassignment with significantly different responsibilities" constitutes adverse employment action.).  Disadvantageous transfers or assignments may qualify as adverse employment actions.  *See Valentín–Almeyda v. Municipality of Aguadilla,* 447 F.3d 85, 95 (1st Cir. 2006).

---

[9]  *Billings* involved a claim of retaliation pursuant to Title VII.  However, M.G.L. c. 151B's "anti-discrimination and anti-retaliation provisions are very similar to the counterparts contained in Title VII, [and w]here such linguistic similarity exists, the SJC frequently looks to federal court interpretations of Title VII for guidance." *See Noviello v. City of Boston*, 398 F.3d 76, 91 (1st  Cir. 2005). *See also Yee,* 481 Mass. at 298.

In *Billings*, the First Circuit determined that the plaintiff had put forth sufficient evidence that would enable a jury to determine that his transfer was an adverse employment action, even though his transfer did not involve a loss in title, pay, or benefits.  515 F.3d at 54.  The First Circuit reasoned that the transfer caused the plaintiff to occupy an "objectively less prestigious job, report[ ] to a lower ranked supervisor, enjoy[ ] much less contact" with key supervisory personnel, and required "less experience and fewer qualifications" and that such "reduced prestige" materially impacted the plaintiff's employment.  *See id.*  A transfer which involves a "disparity in duties" when comparing the two posts may also be considered an adverse employment action.  *See Carlson v. University of New England,* 899 F.3d 36, 44 (1st Cir. 2018) (holding that a change in plaintiff's teaching assignments, her removal from the department website, and her removal as an advisor would permit a jury to find the transfer to be an adverse employment action).  Moreover, in the context of sex discrimination and harassment, a transfer of a highly skilled employee to a position involving menial work qualifies as an adverse employment action.  *See Burns v. Johnson*, 829 F.3d 1, 10-11 (1st Cir. 2016).  When a transfer renders an employee's expertise useless, such a transfer may also qualify as an adverse employment action.  *See Caraballo-Caraballo*, 892 F.3d 53 at 61.[10]

---

[10]   The cases cited by Hayes regarding an adverse employment action are easily distinguishable. In *Boutin v. Home Depot U.S.A., Inc.*, 490 F. Supp. 98, 106 (D. Mass. 2007), the plaintiff could not prove his underlying disability discrimination claim and could only point to personality conflicts and nitpicking. In *Wyse v. Summers*, 100 F. Supp. 2d 69, 77 (D. Mass. 2000), an employee claiming reverse discrimination had merely been counseled.  In *Bhatti v. Trustees of Boston University,* 659 F.3d 64, 70-73 (1st Cir. 2011), the court did not find a basis for the underlying race discrimination claim and held that the retaliation claim failed as there were no consequences to the criticism she received. In *Lavalley v. Quebecor World Book Services LLC*, 315 F. Supp. 2d 136, 139 & 148-49 (D. Mass. 2004), the plaintiff failed to submit a Rule 56.1 statement of disputed facts and the plaintiff failed to show discriminatory intent to satisfy her retaliation claim.  Here, Hayes has acknowledged discriminatory intent. Finally, in *O'Brien v. Robbins*, 679 F. Supp. 2d, 212, 271, n. 7 (D. Mass. 2010), the court held in a claim of First Amendment retaliation that the plaintiff failed to establish unconstitutional retaliation.  Gavin brings claims of statutory retaliation and discrimination, and Hayes concedes for purposes of summary judgment that he harbored discriminatory animus.

Gavin's transfer to the Academy materially disadvantaged her and thus qualifies as an adverse employment action.   As in *Carlson*, *Burns,* and *Caraballo*, Gavin's transfer to the Academy completely upended her responsibilities and rendered her detective and supervisory skills meaningless.  SOF, ¶¶ 16 & 18.  Gavin did not want to be transferred to the Academy.   An officer without a detective rating could hold Gavin's current position.  SOF, ¶¶ 12 & 16.  At the FJC, Gavin oversaw two units of detectives and three Sgt. Dets.  *Id.* In her current position, Gavin oversees one civilian, is sidelined to a desk job, and primarily oversees computerized exams.[11] SOF, ¶ 17.  Gavin does not train detectives, and any training she has performed has been minimal. *Id.* As a result of the transfer, Gavin is unable to be involved in CEASE.  SOF, ¶ 16.  Although a recognized expert in human trafficking investigations and a skilled detective, Gavin is not performing any detective work and is no longer investigating any human trafficking cases.  *Id.* Moreover, as a result of the transfer, Gavin was decommissioned as a Homeland Security Task Force officer, lost the ability to attend the FBI Academy, and is unable to attend the annual 3-week class  offered by the Police Executive Research Forum.  *Id.*  Gavin is the only Lt. Det. in the BPD without an assigned unmarked take home vehicle and had to purchase a car.  *Id.* Gavin's position at the Academy is the definition of a dead-end job:  it is without any purpose, a placeholder designed to sideline Gavin and induce her to leave the BPD. It offers none of the meaningfulness and prestige of commanding a specialized unit focused on protecting women and children.

Gavin has also been economically harmed by the transfer and her reputation is in tatters. SOF, ¶ 62.  Officers who are considered "problem" employees are put "out to pasture".  *Id.*

---

[11] In her position at the Academy, Gavin does **not** command two sergeants, eighteen sworn officers and multiple civilian employees (as inaccurately stated by Hayes, *see* Docket No. 111 at pg. 8); rather, as Gavin's current commander testified, these employees report to a different employee, not Gavin. SOF, ¶ 17.

Moreover, employees at BPD Headquarters scatter when they see her.  *See* **Exhibit D** to the SOF, at pp. 403-04 and **Exhibit EE** to the SOF.  Her career has been derailed and her opportunities for advancement within the BPD or with other agencies has been ruined.  SOF, ¶ 62.

Claims brought pursuant to M.G.L. c. 151B are to be allowed "liberally", *see Yee*, 481 Mass. at 299, Gavin has presented substantial facts showing how the transfer detrimentally impacted her position within the BPD.  What happened to Gavin certainly might dissuade another reasonable officer from making a complaint of discrimination at the BPD.  *See Billings v. Town of Grafton*, 515 F.3d at 52.  Thus, Hayes' contention that Gavin has not suffered an adverse employment action must fail.

### 3.  Gavin Has Presented Sufficient Evidence To Show That Hayes Was Responsible For Gavin's Transfer.

The passage of time between Gavin's initial complaints and her ultimate transfer does not defeat her claim that Hayes was responsible for her adverse employment action.  "[I]f the temporal proximity is elongated, the plaintiff may rely on additional evidence.  Evidence of discriminatory or disparate treatment between the protected activity and the adverse employment action can be sufficient to establish a causal connection."  *See Che,* 342 F.3d at 38 (holding that "[e]vidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action" can be sufficient to establish a causal connection and that the passage of eleven months between filing a claim and a demotion did not preclude jury from finding such causal connection).  Indeed, in a similar instance, the Supreme Judicial Court found that summary judgment was not appropriate where the plaintiff was demoted over two years after the protected activity.  *See Verdrager,* 474 Mass. at 407-08 (holding that a jury could infer that a "pattern of retaliatory conduct [began] soon after [the protected activity] and only culminate[d] later" in an adverse employment action); *see also Bakhtiar v. Infineon Technologies Americas Corp.*, 2019

WL 2479670 at *1, *7 (Mass. Super. May 29, 2019) (holding that the timespan between complaints and termination did not "break" plaintiff's case; it presents a question of fact as to whether retaliation occurred at the first available opportunity and was improperly influenced by his supervisor's allegedly biased reviews and input); *Travers v. Flight Services & Systems, Inc.* 737 F.3d 144, 147 (1st Cir. 2013) (vacating summary judgment, reasoning that there existed a genuine dispute as to whether the CEO's desire to retaliate played into the decision to fire the employee where "repeatedly voiced wishes of the king, so to speak, likely became well known to those courtiers who might rid him of a bothersome underling").

Gavin has presented ample evidence that her transfer out of the FJC and the removal of her detective duties was causally related to Hayes's conduct. In addition to the pattern of retaliation outlined in pp. 14-15, *infra*, Hayes lobbied multiple times to his superiors for Gavin to be transferred out of the FJC.  SOF, ¶¶ 13 & 52. He also recommended that Gavin be denied her detective rating.  *Id.* Three members of BPD's command staff indicated that Gavin was transferred entirely or at least in material part because of Hayes's retaliatory complaint.  Supt. Cotter attributes Hayes' retaliatory complaint for the reason why Gavin is no longer performing investigative work related to human trafficking. SOF, ¶ 18.   Supt. Long, the City's 30(b)(6) representative, admitted that Gavin was transferred out of the FJC because of the "toll" the environment was taking on her and the continuing issues with Hayes. *Id.*  Supt. Sharon Dottin also indicated that Hayes's complaint played a material role in Gavin's transfer out of the FJC.  *Id.* Hayes repeatedly demanded that Gavin be transferred, and told colleagues that he "had her," meaning he would ensure she was sidelined and defeated.  SOF, ¶¶ 52, & 55.  He succeeded.  This evidence is more than adequate to defeat Hayes' conclusory statement that he did not cause Gavin's transfer to the Academy.

### 4.  The Hostile Work Environment Perpetuated By Hayes Is Also An Adverse Employment Action.

The hostile work environment Hayes subjected Gavin to as a result of her complaints against him is itself actionable retaliation.  Under both Title VII and M.G.L. c. 151B, "subjecting an employee to a hostile work environment in retaliation for protected activity constitutes an adverse employment action."  *See Noviello,* 398 F.3d at 91; *see also Clifton v. Mass. Bay Transp. Authority*, 445 Mass. 611, 616-17 (2005) ("Although unlawful retaliation typically may involve a discrete and identifiable adverse employment decision (e.g., a discharge or demotion), it may also consist of a continuing pattern of behavior that is, by its insidious nature, linked to the very acts that make up a claim of hostile work environment.").  When considering whether a retaliation-based hostile work environment exists, the court considers "the relative ubiquity of the retaliatory conduct, its severity, its natural tendency to humiliate… a reasonable person, and its capacity to interfere with the plaintiff's work performance." *Noviello*, 398 F.3d at 93.  "[W]ork sabotage, exclusion, [and] denial of support" may contribute to the creation of a hostile work environment. *See O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001). Moreover, evidence that hostile activities created physical and psychological problems that require professional treatment highlights the negative effect on her work performance.  *See Noviello*, 398 F.3d at 94.  "A supervisor can be liable for a retaliatory hostile work environment if, among other things, the alleged harassment was severe or pervasive." *See Marrero v. Goya of P.R., Inc.,* 304 F.3d 7, 26 (1st Cir.2002).

Following Gavin's initial complaint of discrimination in March 2017, Hayes took multiple steps to ensure that her work environment was unbearable.  Hayes openly taunted Gavin and criticized her before her subordinates in email.   SOF, ¶ 44.  Hayes began secretly entering her office and removing files so that he could conduct a secret audit on the HTU, despite having previously informed her that the HTU was doing well.  SOF, ¶¶ 45 & 49.  Hayes undermined

13

Gavin by telling her subordinate, Sgt. Det. Doris, about the secret audit, sowing division and distrust. SOF, ¶ 45. When Gavin asked her if she knew about the missing files, she told Gavin she did not. Though she claimed to have forgotten, *see* **Exhibit Y** to the SOF, the reasonable inference is that she had to lie to Gavin to keep Hayes' secret. Hayes acted similarly in concealing a human trafficking sting operation from Gavin that involved her detectives, while informing Sgt. Det. Doris who testified that she felt uncomfortable and did not want to be put in that situation again. SOF, ¶ 48.

Hayes also directed Gavin's subordinate Sgt. Det. Lembo to write a report criticizing her two months after the alleged incident had occurred. SOF, ¶ 50. Hayes also handed Gavin a 17-page criticism of the HTU.[12] SOF, ¶ 49. In October 2017, Hayes prompted Sgt. Det. Doris to write a Form 26 report against Gavin, and then, unbeknownst to Sgt. Det. Doris, filed the complaint with the assistance of then Deputy Superintendent Marcus Eddings ("Eddings"). SOF, ¶ 55. Hayes encouraged and allowed Gavin's subordinates to avoid the chain of command, report directly to him, and froze Gavin out of BPD operations involving her subordinates. SOF, ¶¶ 54 & 55. Hayes also removed Gavin from emails in which her subordinates were copied. SOF, ¶ 55. Hayes continued his hostile posture toward Gavin in 2018, including in email to Supt. Paul Donovan (the Commander of BIS) ▉▉▉▉▉▉ and, in October 2018, Hayes and Deputy Supt. Eddings conspired to conceal a second human trafficking sting operation from Gavin that involved her subordinates. SOF, ¶ 55.

---

[12] Contrary to Hayes's argument, his 17-page criticism supports the retaliation claim. The secret audit on which it was based began in April *after* Gavin complained of discrimination to Hayes and the police. And, it was part of a campaign waged against Gavin to undermine her, unfairly criticize her and drive her out of the FJC. Following Hayes's IA complaint against Gavin, members of IA, including Supt. Mancini, stormed HTU and removed files.

As a result of the hostile environment, Gavin required professional therapy and ultimately medication.  Gavin also suffered from rashes, ground her teeth at night, refrained from her social activities, gained weight, had a panic attack, and had difficulty sleeping.  SOF, ¶ 61.  The hostile environment impeded Gavin's work performance and given her extreme distress, caused her to use more sick time. *Id.*  She also was unable to work overtime, something that she had regularly done before.  *Id.*

Gavin has more than sufficient evidence of the hostile environment Hayes created to defeat summary judgment.

### C.  Hayes Has Failed To Oppose Gavin's Claim That He Discriminated Against Her And Caused Her Material Harm In Violation Of M.G.L. c. 151B, §4(4A).

Hayes improperly characterizes Count Three of the Complaint – Interference with the Right to be Free from Discrimination in violation of M.G.L. c. 151B, § 4[4A] – as merely another recast retaliation claim.  Gavin's claim properly encompasses both claims that Hayes discriminated *and* retaliated against her.  As Hayes has not moved for summary judgment on the claim against him for discrimination, that claim survives.

In *Lopez v. Commonwealth*, the Supreme Judicial Court specifically rejected Hayes's contention that M.G.L. c. 151 B § 4(4A) is solely a retaliation claim.  *See Lopez v. Com.*, 463 Mass. 696, 707 (2012).  The Supreme Judicial Court stated that:

> The language of the statute does not support the division's claim that § 4(4A) provides protection only against retaliation. Section 4(4A) has two clauses, only one of which (the second) provides protection against retaliation. The second clause provides that it is an unlawful practice "[f]or any person ... to coerce, intimidate, threaten or interfere with [another] person for having aided or encouraged any other person in the exercise or enjoyment of any ... right granted or protected by [c. 151B]." G.L. c. 151B, § 4(4A). The first clause of § 4(4A) prohibits "interfere[nce] with ... the exercise or enjoyment of any right granted or protected by this chapter." Among the rights protected by G.L. c. 151B is the right to be free from discrimination in the terms, conditions, and privileges of employment, which

includes the right to equal opportunities for promotion without discrimination on the basis of race, color, or national origin.

*See id.*   Hayes misleadingly cites to *Pontremoli v. Spaulding Rehab. Hosp.,* 51 Mass. App. Ct. 622, 625 (2001), to imply that M.G.L. c. 151B, § 4(4A) is solely a "retaliation claim." But the Supreme Judicial Court, addressing *Pontremeli*, held that "notwithstanding the fact that retaliation may also constitute interference under the second clause of § 4(4A), retaliation is not required to establish a claim of interference under the first clause of § 4(4A)."  *See Lopez,* 463 Mass. at 708.

The evidence discussed in section B *supra* and recited more fully in the accompanying Response to Hayes's Statement of Facts demonstrates the validity of Gavin's discrimination claim against Hayes.[13]  Hayes treated her differently from the male Lt. Dets. under his supervision at the FJC, in a manner that was discriminatory and adverse.  There are so many examples, but in essence he undermined her authority at every turn and, without basis, lobbied to have her removed from the FJC and even the police force and to  strip her of her right to work as a detective.  By way of example only, he failed to provide her a comparable private office to the other male Lt. Dets. at the FJC, and falsely told her it was cost prohibitive.  SOF, ¶¶ 33 & 34.  Ultimately, after she complained of discrimination, the office was constructed in two weekends.  *See* SOF, ¶ 35.  The denial of a private office that was important to her performance and her leadership status was discriminatory.  SOF, ¶ 41.  He forced personnel changes on Gavin's unit that she did not want and were unnecessary; he deferred to his male Lt. Dets. on similar personnel matters.  *See* SOF, ¶¶ 36, 45.

He micromanaged the operations of the HTU, which included lengthy (and critical) emails to her on which he copied her entire unit and certain members of the Command Staff.   SOF, ¶¶

---

[13]   Gavin reserves the right to amend the complaint to conform to the evidence and to add an additional claim of discrimination against Hayes for violation of M.G.L. ch. 151B, § 4(1).

33 & 40.  In one such email, he copied Commissioner William Evans ██████████████

████████████████████████████████████████████████████████████████████████████

██████  SOF, ¶ 40.  He even ran the case reviews for Gavin's units.  SOF, ¶ 36.  He did not

micromanage the operations of SAU or DVU which were run by his male Lt. Dets.; he did not

even participate in their case reviews.  SOF, ¶¶ 36 & 57.  He secretly audited Gavin's files.  SOF,

¶ 45 He kept an unlawful, private personnel log on Gavin, which he even shared with her male

colleagues at the FJC, including her subordinate, Sgt. Det. Miller.  SOF, ¶¶ 8, 21, 37. He never

kept a log on his male Lt. Dets. (or anyone else at the FJC).  SOF, ¶ 41.

He conspired with her subordinates, including Sgt. Det. Miller and Sgt. Det. Doris, to

undermine her position and authority and to keep operations involving her units secret from her –

something that also jeopardized the safety of officers.  SOF, ¶¶ 36, 45, & 48.   He purposefully

violated BPD Rule 114 by broadcasting that Gavin had lodged a complaint against him and openly

informed her subordinates that they could report directly to him, which undermined her authority

and caused her harm throughout the BPD as word spread that she had complained against a

colleague – a violation of the BPD's code of silence.  SOF, ¶¶ 54 & 60.  Hayes also spread the

word that he was going to "get her" and that "he had her."  SOF, ¶ 55.  Hayes's actions were

calculated precisely to intimidate and undermine her, and with the support of the Command Staff

and others, he succeeded.  Summary judgment should not be granted to Hayes as to Count Three.

### D.  Hayes Cannot Prevail On The Aiding And Abetting Claim.

Given that Gavin's discrimination claims against the City are proceeding to trial, it is

premature for Hayes to argue that Gavin cannot sustain her aiding and abetting claim (Count Four)

---

[14]  This evidences the BPD's attempts to conceal the mistreatment of Gavin, which was enabled by the Command Staff and others.

against him.  "[A]n aiding and abetting claim under § 4(5) requires the defendant to act in concert with one or more specific employers to 'aid' or 'abet' a primary and independent act of discrimination by those employers."  *Lopez,* 463 Mass. at 714, n.23.  Gavin has more than sufficient evidence that Hayes acted in concert with the City to discriminate against Gavin.

The parties agree the standard set forth in *Lopez* is the correct one for a violation of G.L. c. 151, § 4(5).  Hayes makes two arguments to defeat this claim.  First, Hayes again incorrectly argues that Gavin's claim against him is solely for retaliation and that the aiding and abetting claim fails, because Gavin has not demonstrated an adverse employment action.  In fact, Gavin's aiding and abetting claim is derivative of her discrimination claim against the City, and Gavin has demonstrated adverse employment action against her, as discussed previously.

Second, Hayes puzzlingly appears to argue that Gavin has not shown that he possessed the required wrongful intent.  *See* Docket No. 111 at pp. 10-11.  But Hayes expressly concedes that he possessed the requisite wrongful intent for purposes of his summary judgment motion.  *See id.,* at pp. 3.   In any event, there is more than enough evidence to demonstrate Hayes acted in concert with the City to discriminate against Gavin, as discussed *supra* in Section C.

When Hayes failed to arrange for Gavin to have a private office, Supt. Long and the BPD failed to resolve the problem for nearly 1 ½ years after her promotion to Lieutenant.  SOF, ¶ 35.  When Hayes forced an unnecessary personnel change on Gavin, Supt. Long and the BPD supported him.  SOF, ¶ 45.  When Hayes continued to broadcast that Gavin caused a delay in the transfers and accused her of dishonesty in denying it, Supt. Long and the BPD did not intervene to stop him even though they knew his understanding of the delay was wrong.

As early as November 5, 2016, former Boston Police Commissioner William Evans ("Evans") and Supt. Long were aware that Hayes was inappropriately sending ██████emails to

Gavin and copying her subordinates ███████████████ evidencing discrimination against her. SOF, ¶ 40. Yet neither Commissioner Evans nor Supt. Long corrected his behavior. When Hayes violated Rule 114 in broadcasting Gavin's complaint against him to others in the FJC, Supt. Long, who was copied, and the BPD did nothing to discipline Hayes.

Despite her complaints about Hayes's hostility and discrimination, Hayes was permitted to continue to run case reviews for Gavin and she was required by Deputy Supt. Marcus Eddings to continue to attend them, which was very uncomfortable for her. SOF, ¶ 57. Hayes submitted an IA complaint against Gavin on behalf of her subordinate, Sgt. Det. Doris, even though she did not direct him to do so, and Deputy Eddings assisted in that filing.[15] SOF, ¶ 55.

Supt. Mancini participated with Hayes (and Lt. Det. Juliano) in storming the HTU and removing files, causing alarm to HTU personnel. SOF, ¶ 8 & 21. When Gavin attempted to approach Supt, Mancini to discuss Hayes's retaliatory conduct, he refused to speak with her, even though he had promised her there would be action against Hayes if he retaliated. SOF, ¶¶ 47 & 56. The City ultimately relegated her to the Academy while protecting Hayes with a more favorable Capt. Det. position at Headquarters. SOF, ¶ 63. Hayes acted in concert with the BPD by repeatedly demanding her punitive transfer.

Shortly after that transfer, Deputy Supt. Sharon Dottin found that Sgt. Dets. Miller and Lembo had treated her disrespectfully (something Gavin had experienced repeatedly herself) and Lt. Det. Harrington was also implicated; the three of them were transferred out of the FJC simultaneously. SOF, ¶ 64. Subsequently, Supt. Paul Donovan reached out to Lt. Det. Harrington

---

[15] Due to the hostile atmosphere that the BPD and Hayes cultivated and permitted, rank and file member of the BPD were emboldened to attack Gavin as well. Sgt. Det. Miller went so far as to threateningly tell another HTU detective that Gavin should "shut the f--- up." SOF, ¶ 59.

to offer him open Lt. Det. positions in the BIS, yet never reached out to Gavin to offer those or other similar positions. *Id.*

When a supervisor acts with wrongful discriminatory intent (which Hayes has conceded) and the employer fails to act and enables problematic behavior to continue (as the BPD allowed), a claim lies for aiding and abetting. *See Semmami v. UG2 LLC*, 2019 WL 2249705, *1 *8 (D. Mass. May 24, 2019). The main wrongful actor (Hayes) may also be liable for aiding and abetting where there is evidence of "distinct" acts supporting the discrimination claim against him and the employer. *See Ping Zhao v. Bay Path College,* 982 F. Supp. 2d 104, 115-16 (D. Mass. 2013). It is sufficient that Hayes made false and discriminatory complaints against Gavin to sustain her aiding and abetting claim. *See id.* (interference in investigation sufficient). Any evidence of joint discriminatory activity "that plausibly, if not necessarily, require multiple participants," including "rumor-spreading," is sufficient to state a claim for aiding and abetting in violation of M.G.L. c. 151B, § 4(5). *See Fisher v. Town of Orange,* 885 F. Supp. 2d 468, 477 (D. Mass. 2012).[16] The City and Hayes acted in concert to discriminate and retaliate against Gavin both in terms of their actions and the City's failure to stop those discriminatory and harassing actions against her. Accordingly, Hayes' motion to dismiss Gavin's aiding and abetting claim fails.

## CONCLUSION

For the reasons set forth herein, the Court should deny Hayes's Motion for Summary Judgment in its entirety.

---

[16] Hayes's reliance on *Furtado v. Standard Parking Corp.*, for the proposition that "plaintiff's aiding and abetting claims fails where underlying retaliation claim is unsubstantiated" is flawed. Docket No. 111, pg. 10. In *Furtado*, the disability discrimination claim failed and the aiding and abetting charge failed as the plaintiff did not produce evidence of intent or knowledge, *not,* as Hayes posits, because the retaliation claim failed. *See* 820 F. Supp.2d 261, 279 (D. Mass. 2011).

Respectfully submitted,

**DONNA GAVIN**


By her attorneys,


*/s/ Nicholas B. Carter*_____
Nicholas B. Carter (BBO#561147)
Lucia A. Passanisi (BBO#691189)
TODD & WELD, LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
ncarter@toddweld.com
lpassanisi@toddweld.com

Date: February 24, 2021


## CERTIFICATE OF SERVICE

I, Nicholas B. Carter, Esq., hereby certify that the foregoing document was filed through the ECF system and will therefore be sent electronically to all counsel of record as identified on the Notice of Electronic Filing (NEF).

*/s/ Nicholas B. Carter*_____

21