# EXHIBIT A

EXAMINING GENDERED EXPERIENCES IN POLICING:
FROM APPLICATION TO RETIREMENT

A dissertation presented

by

Lisa M. Barao

to
The School of Criminology & Criminal Justice

In partial fulfillment of the requirements for the degree of
Doctor of Philosophy

In the field of

Criminology and Justice Policy

Northeastern University
Boston, Massachusetts
August 2018

1

BARAO000001

EXAMINING GENDERED EXPERIENCES IN POLICING:
FROM APPLICATION TO RETIREMENT

by

Lisa M. Barao

ABSTRACT OF DISSERTATION

Submitted in partial fulfillment of the requirements for the degree of Doctor of Philosophy in
Criminology and Justice Policy in the College of Social Sciences and Humanities of
Northeastern University
August 2018

BARAO000002

## ABSTRACT

Despite continued efforts to increase recruitment and reduce gender-based employment discrimination, women continue to represent an extremely small proportion of police officers throughout the United States. Due to difficulties studying women in policing, previous studies examining female police officers have used limited research designs resulting in a very narrow understanding of the experiences of potential female law enforcement officers and the barriers to their entry and continued employment in police departments. Although research indicates that different processes and practices may make women feel unwelcome in policing, questions remain as to how and when these processes might affect female applicants and officers.

Across all occupations and social interactions, expectations exist regarding appropriate gendered conduct. Social structures and boundaries constrain social action, and resulting behaviors which adhere to these boundaries perpetuate stereotypes and inequalities. Barriers to departmental gender diversity are likely to be created by both the attitudes of potential and actual applicants as well as the attitudes of current officers as they interact with the gendered expectations and culture of police agencies. The goal of this study was to explore continued difficulties attracting and retaining female officers as a result of a complex set of gendered social norms that sustains police work as masculine work. It examines how women do gender in the police department over the course of their careers as a result of its organizational culture and the practices that take place within it.

Using a mixed methods research design involving surveys and interviews of applicants, recruits, and current female officers, this study examines the initial perceptions, changing attitudes, and ongoing experiences of women in policing throughout the progressive stages of their careers to determine how integration into the police culture and the ongoing expectations of

BARAO000003

doing gender appropriately and inappropriately affect female officers' attitudes and professional outcomes throughout their time in the police department. Specifically, these surveys and interviews were used to explore how women's experiences, from application until retirement, change how they behave and think about their career in the police department, and consequently, how those changes affect the recruitment and retention of women in policing. Integrated quantitative and qualitative finds, policy implications, and directions for future research are discussed.

BARAO000004

## ACKNOWLEDGEMENTS

The completion of this dissertation would not have been possible without the assistance and support of more organizations and individuals than I could ever name in only a couple of short pages, but these acknowledgements are my best effort to thank most. First and foremost, I would like to extend my deepest gratitude to the officers and administrators of the police department that participated in this research project. The administration was interested, engaged, and willing to offer any assistance possible throughout the duration of this project—from our first meeting to the final writing of this manuscript. Their valuing of this work demonstrated their continued commitment to ensuring that the organization is always improving, and I am extremely thankful to have worked with such a supportive agency. Additionally, I would like to thank all of the applicants and recruits who tolerated recurrent e-mails and participated in ongoing surveys during an extremely stressful period in officers' careers. I would also like to give endless thanks to each of the female officers who took time out of their busy lives to participate in interviews for this project. Sharing personal stories, achievements, and hardships with a stranger with a tape recorder is not easy, but these women were open, honest, and passionate about conveying their experiences. Their personal strength and commitment to their profession was an inspiration.

My dissertation chair, Amy Farrell, deserves more gratitude than I can put into words. She has offered me guidance to help me grasp new theoretical concepts and methodological approaches. She has offered me mentorship to navigate relationships with organizations and the complexities of academia. And she has offered me personal support through obstacles both related and unrelated to this work. She helped me make this dissertation and my academic journey something I can be proud of. I have also been lucky enough to have a committee that has

BARAO000005

been unrelentingly supportive. Kevin Drakulich, William McCarty, and Jack McDevitt have remained extremely passionate about this project, and the contributions of their individual expertise have helped tremendously in improving this manuscript and my own knowledge base. I would also like to thank Anthony Braga, who has served as a valuable mentor in these final years of my doctoral studies. His guidance and support has led me to many research opportunities which continue to help me grow and become a better scholar. Lastly, I would like to thank the entire faculty of the SCCJ, whose classroom lectures, words of encouragement, and simple smiles in the hallway made these years more enriching and more enjoyable.

Finally, my friends and family members deserve many thanks, and perhaps sainthood. Thank you to my mom, grandma, and brother for always being my biggest cheerleaders no matter what and, for some reason, never discouraging me from spending 12 years in college. Thank you to Katy and Katharina for the texts, calls, studying, and writing at all hours of the day. Their camaraderie as we pushed through this undertaking made me feel understood, slightly saner, and lucky to have such amazing friends. Thank you to my husband, Brian, for supporting me through everything and often not even realizing the difference he was making. We've encountered many highs and lows through these years, but his love and support has remained constant. He's made many sacrifices so that I could work, study, write, or wallow in procrastination guilt, but he's always done so with understanding and pride, each of which have meant the world to me. Thank you—I couldn't have done this without you.

BARAO000006

# TABLE OF CONTENTS

ABSTRACT ................................................................................................................. 3

ACKNOWLEDGEMENTS ........................................................................................ 5

TABLE OF CONTENTS ............................................................................................ 7

LIST OF FIGURES ................................................................................................... 10

LIST OF TABLES ..................................................................................................... 11

CHAPTER 1: INTRODUCTION ............................................................................... 12

CHAPTER 2: REVIEW OF THE LITERATURE .................................................... 21

    History of Women in Policing ............................................................................. 21

    The Police Culture ............................................................................................... 28

    Recruiting Female Officers .................................................................................. 29

    The Police Officer Career & Gender Disparities ................................................ 32

        Deciding to Become a Police Officer ............................................................ 32

        Testing and Selection ..................................................................................... 36

        The Police Training Academy ........................................................................ 40

        Officer Careers .............................................................................................. 41

CHAPTER 3: THEORETICAL FRAMEWORK ....................................................... 54

    Doing Gender ....................................................................................................... 55

    Doing Gender in Male-Dominated Cultures ........................................................ 59

        Women in Crime ............................................................................................ 60

        Women in Male-Dominated Professional Fields ........................................... 63

        Women in Other Criminal Justice Occupations ............................................ 67

    Doing Gender in Policing ..................................................................................... 69

CHAPTER 4: METHODOLOGY ............................................................................... 78

    Study Site ............................................................................................................. 79

    Mixed Methods Design ........................................................................................ 79

    Quantitative Methods ........................................................................................... 80

BARAO000007

Sampling for Applicant and Recruit Surveys ........................................................ 80

Sampling for Female Officer Surveys ................................................................. 85

Measures ............................................................................................................... 87

Sampling for Officer Interviews ......................................................................... 97

Data Collection ..................................................................................................... 99

Interview Questions ............................................................................................. 100

Coding and Analysis ........................................................................................... 101

Validity in Qualitative Research ......................................................................... 103

CHAPTER 5: WOMEN'S ENTRY INTO LAW ENFORCEMENT CAREERS ..................... 105

Police Officer Applicants ..................................................................................... 106

Motivations for Becoming a Police Officer ........................................................ 109

Women's Pathways to Policing ........................................................................... 112

Childhood Aspirations .................................................................................. 112

Similar Backgrounds ..................................................................................... 114

An Unexpected Profession ............................................................................ 116

Support for Women's Career Choice ................................................................... 117

Initial Perceptions of Applicants about the Profession ....................................... 120

Conclusion ............................................................................................................ 122

CHAPTER 6: FEMALE RECRUITS IN THE POLICE TRAINING ACADEMY .................. 126

Attitudes of Recruits Entering the Academy ...................................................... 128

Experiences in the Academy ............................................................................... 130

Paramilitary Training .................................................................................... 132

Focus on Physical Fitness ............................................................................. 135

Childcare Concerns ....................................................................................... 139

Changes in Recruit Perceptions Over Time ........................................................ 141

Conclusion ............................................................................................................ 145

CHAPTER 7: FITTING INTO THE MALE POLICE DEPARTMENT ................................. 148

Women Proving Themselves as Capable Officers ............................................... 150

Trying to be One of the Guys .............................................................................. 155

Dating and Sexual Relationships ......................................................................... 158

8

BARAO000008

Hindrances to Acceptance ........................................................................................... 161

Conclusion .................................................................................................................. 164

CHAPTER 8: THE STRUGGLE AND FAILURE TO SUCCEED .......................................... 167

Opportunities Based on Favoritism ............................................................................. 168

Undermining Successful Women ................................................................................. 174

Family Obligations ..................................................................................................... 175

Reluctance to Speak Up .............................................................................................. 179

Conclusion .................................................................................................................. 181

CHAPTER 9: ACCEPTANCE OF WOMEN'S STATUS IN POLICING ............................. 184

Women at the Bottom .................................................................................................. 185

Acceptance of Social Punishment ............................................................................... 189

Reluctance to Recommend the Job .............................................................................. 192

Warnings to Incoming Female Officers ....................................................................... 195

Conclusion .................................................................................................................. 198

CHAPTER 10: CONCLUSION ............................................................................................ 200

Discussion of Findings ............................................................................................... 201

Doing Gender throughout the Careers of Female Police Officers .............................. 208

Limitations .................................................................................................................. 213

Policy Implications ..................................................................................................... 215

Directions for Future Research ................................................................................... 220

REFERENCES ..................................................................................................................... 224

APPENDICES ..................................................................................................................... 235

APPENDIX A: Consent Forms ................................................................................... 236

Applicant Survey Consent: ..................................................................................... 236

Recruit Survey Consent: ......................................................................................... 238

Female Officer Interviews Consent: ....................................................................... 240

APPENDIX B: Applicant Survey ................................................................................ 242

APPENDIX C: Recruit Survey .................................................................................... 249

APPENDIX D: Female Officer Survey ....................................................................... 254

BARAO000009

## LIST OF FIGURES

1.1     Percent Women in Law Enforcement 1970-2013…………………………..…   13

4.1     Applicant and Recruit Survey Administration Timeline ………………….…   83

10

BARAO000010

## LIST OF TABLES

4.1   Demographics of Surveyed Applicants by Gender …………………………   81

4.2   Examination of Survey Nonresponse Bias ………………………………   84

4.3   Demographics of Surveyed Female Officers ……………………………   86

4.4   Survey Measures …………………………………………………………   93

4.5   Demographics of Interview Participants …………………………………   98

5.1   Risk-Taking Tendencies & Communication Styles of Applicants by Gender …..   109

5.2   Career Motivations of Applicants by Gender ……………………………...…   111

5.3   Level of Support Reported by Applicants by Gender ……………………   119

5.4   Initial Perceptions of Applicants by Gender ……………………………   120

5.5   New Recruits' Worries about Policing Career by Gender ………………   122

6.1   Training Academy Class Attrition by Gender ………………………………...   127

6.2   Satisfaction Among Incoming Recruits by Gender ……………………...…   129

6.3   Incoming Recruits' Worries about Policing Career by Gender ……………   129

6.4   Mean Differences in Perceptions of Applicants and Incoming Recruits ………   142

6.5   Mean Differences in Perceptions of Incoming Recruits and Graduating Recruits   143

6.6   Mean Differences in Perceptions of Applicants and Graduating Recruits ………   143

6.7   Mean Differences in Perceptions of Graduating Recruits and New Officers ……   144

8.1   Perceptions of Department Fairness …………………………………….   169

8.2   Female Officers' Worries about Career ………………………………   169

8.3   EPD Specialized Unit Gender Composition …………………………….   171

BARAO000011

## CHAPTER 1: INTRODUCTION

Despite continued efforts to increase recruitment and reduce gender-based employment discrimination, women continue to represent an extremely small proportion of police officers throughout the United States. After a rapid increase in law enforcement employment in the 1970s, the proportion of female officers has since plateaued at between 12-15% of police forces nationwide (Langton, 2010) (Figure 1.1). Since 1970, women's participation in the labor force has nearly doubled to about 57% in 2015 (Bureau of Labor Statistics, 2011, 2016). Although women consistently comprise a smaller proportion of the criminal justice workforce, the growth of female representation in police departments during this time has been much slower when compared to other criminal justice occupations.  Though women made up only about 12% of correctional officers in 1970, according to a 2016 report by the U.S. Department of Labor, approximately 27% of bailiffs, correctional officers, and jailers were women (Bureau of Labor Statistics, 2016). Similarly, only about 4% of the legal profession was female in 1970 (Bowman, 2009), and the American Bar Association reported that women comprised about 36% of the overall legal profession and approximately 30-38% of federal and state judges in 2016 (American Bar Association: Commission on Women in the Profession, 2017). Although women continue to enter occupations and increase their representation in other criminal justice spheres, the number of female law enforcement officers remains strikingly low.

The criminal justice field has historically been dominated by men. While other criminal justice occupations have gradually shed perceptions of being a "man's work," the prevalent and enduring masculine culture in law enforcement positions policing as work that can only be effectively controlled and accomplished by men. Prior research has identified two dominant

12

BARAO000012

**Figure 1.1** Percent Women in Law Enforcement 1970-2013



Data from the Office of Community Oriented Policing Services (COPS) (Crooke, 2013) and the Law
Enforcement Management and Administrative Statistics (Reaves 1987, 1993, 1997, 2003, 2007, 2013)

mechanisms by which women may be deterred from policing. First, women may be deterred

from professions in law enforcement due to negative perceptions of their acceptance or rejection

in the male-dominated culture of policing (Cordner & Cordner, 2011; Schulze, 2010). This is

first made apparent through the prevailing cultural norms which situate policing as a masculine

occupation (Martin, 1980; Schulze, 2010). To "do policing" is to reject traditional requisites for

feminine behavior. If women choose to break these conventional norms to pursue a career in

policing, they may not only be subjected to negative judgments by friends and family (Foley,

Guarneri, & Kelly, 2008), but they will also face difficulties integrating into the masculine police

culture (Martin, 1980). An understanding of these obstacles may be acquired through personal

experiences, the media, currently employed officers, or a combination of these. These forces are

also inherently difficult to examine because police departments must be able to identify

BARAO000013

individuals who choose not to apply to policing jobs in order to understand their reasons for not doing so.

To overcome such significant hurdles, agencies must be especially proactive in finding innovative ways to change their organizational image and culture, increase recruitment and retention of diverse officers, and examine their organizational policies and processes if they are to increase the number of female officers in their ranks. An effort led by the Office of Community Oriented Policing Services (COPS) and the Community Policing Consortium (CPC) acknowledged that effective and diverse recruitment relies on recognizing that many women may not be attracted the policing profession. Rather than utilize a screening out model of police testing and selection geared primarily toward the masculine, crime-fighting attributes of law enforcement, the Hiring in the Spirit of Service (HSS) project focused on screening in candidates with service-oriented values and skills necessary for safe, effective, and interactional policing methods (Scrivner, 2006). Though this approach is promising, few agencies have adopted these alternative screening in models. Instead, many departments have opted to implement a range of new recruitment strategies such as holding informational sessions, conducting presentations, visiting career fairs, placing radio and television advertisements, and diversifying recruitment teams in an attempt to recruit more female applicants (Milgram, 2005). However, despite steps taken to improve recruitment and selection strategies to increase diversity, increasing the representation of women in law enforcement continues to be a challenge. Likely due to prevailing perceptions of police work as "male work," law enforcement agencies receive only a very limited number of applications from female candidates (Cordner & Cordner, 2011; Jordan, Fridell, Faggiani, & Kubu, 2009).

BARAO000014

Second, when women do apply, the already limited number of female candidates may be diminished through obstacles in the police applicant screening process (Cordner & Cordner, 2011; Scrivner, 2006). Women may be barred from policing through testing and selection standards that cause disparate impact or through unconscious or conscious bias from law enforcement employers. Disparate impact has been argued to arise particularly in the physical fitness or agility test administered by police agencies, and critics challenge that these tests require unnecessary standards of physical fitness and work only to uphold masculine qualifications for police work (Carless, 2006; Cordner & Cordner, 2011). Fewer studies have been conducted on other phases of the police screening process primarily because of the confidential nature of information collected. Information gathered in background investigations, polygraph, and psychological examinations in particular is rarely accessible to anyone outside of police investigation units, and the presence of potential bias in decision-making remains unclear. Though empirical research is lacking, critics have noted that subjective decision-making used in background investigations, polygraphs, psychological examinations, and applicant interviews or oral boards may potentially be used to screen out candidates who do not embody the conventional ideals of a police officer (Martin, 1980). Problems in applicant screening are difficult for police departments to examine because the screening out model of police recruitment and selection prevents administrators from knowing how an applicant would have performed in all future testing phases, thus hindering them from achieving a comprehensive view of their applicant pool.

If women do apply, once female officers are hired, they are likely to face a series of challenges throughout their careers. They first face barriers to acceptance among fellow officers in the male-dominated environment and fight to prove themselves as capable equals (Martin,

BARAO000015

1980; Martin & Jurik, 2007; Rabe-Hemp, 2018). Additional difficulties may emerge if female officers decide to have children in an occupation historically oriented to meet the needs of male officers (Caroly, 2011; Schulze, 2010). These challenges range from determining the types of assignments allowed during pregnancy, the availability of maternal leave, and arranging childcare while adhering to a strict shift work schedule. Furthermore, women may face frustrations if there is limited access to promotional opportunities due to gender bias and the valuing of masculine traits (Archbold & Schulz, 2008; Schulz, 2004). These experiences compound to emphasize to many women that they are "guests in a man's world."

Understanding and addressing the experiences of current officers is a crucial and often overlooked step to increasing the recruitment of new female officers. Many police departments cite officer referrals as a predominant source of quality applicants (Casteneda & Ridgeway, 2010; Slater & Reiser, 1988). When current officers are unlikely to recommend policing as a positive and valuable job opportunity, then it is possible that department recruitment efforts will suffer. If negative perceptions of police agencies by currently employed female officers is a significant obstacle to the recruitment of female applicants, then improving the working environment and experiences of current female officers would be a vital step toward creating a more favorable, accepting, and integrated organizational image.

Due to difficulties studying women in policing, including both departmental and officer resistance, previous studies examining female police officers have used limited research designs resulting in a very narrow understanding of the experiences of potential female law enforcement officers and the barriers to their entry and continued employment in police departments. Instead of examining the selection process, training experiences, and careers of female officers as a continuum of experiences, many studies have instead focused on only one point in time in the

16

BARAO000016

progression from applicant to officer. For example, some researchers have surveyed potential police department applicants to determine how perceptions of policing may influence applicants' test performance (Carless, 2006). Others have examined the perceptions and attitudes of current officers to discover the motivations that lead individuals toward law enforcement careers (Cordner & Cordner, 2011; Ragnella & White, 2004; Ryan, Sacco, McFarland, & Kriska, 2000). Additional research has sought to discover whether adverse impact is present in particular testing phases and whether this eliminates women at a higher rate than men (Arvey, Landon, Nutting, & Maxwell, 1992; Detrick, Chibnall, & Rosso, 2001). However, it is unlikely that only one of these factors is responsible for the difficulties police departments face in diversifying their agencies.

Instead, barriers to departmental gender diversity are likely to be created by both the attitudes of potential and actual applicants as well as the attitudes of current officers as they interact with the gendered expectations and culture of police agencies. Because policing is so often portrayed as a masculine profession, understanding these barriers also requires an understanding of the way women's gender shapes their views and expectations of their roles as police officers. Additional research examining the gendered experiences of women in policing has discussed particular policies, practices, and interactions that continue to relegate female officers into positions as subordinate outsiders in police organizations (Martin, 1980; S. Miller, 1999; Rabe-Hemp, 2018; Wells & Alt, 2005). However, many gaps in the literature continue to limit an understanding of women's experiences. This research aims to expand the growing body of knowledge through a comprehensive examination of how police organizations gradually shape women's understanding of their roles and how they must do gender in the police department throughout their careers as well as the impact of these social constraints on the future recruitment and retention of female police officers. Using a mixed methods research design involving

17

BARAO000017

surveys and interviews of applicants, recruits, and current female officers, this study examines the initial perceptions, changing attitudes, and ongoing experiences of women in policing throughout the progressive stages of their careers to determine how integration into the police culture and the ongoing expectations of doing gender appropriately and inappropriately affect female officers' attitudes and professional outcomes throughout their time in the police department.

This examination is especially important because research suggests that female officers can bring many benefits to police departments nationwide. Resistance toward women in policing most often revolves around a belief that females are unfit for police work, and many male officers believe that women are not physically, mentally, or emotionally strong enough for law enforcement (Britton, 2003; Hunt, 1990; Martin, 1980). Despite these views, most research has demonstrated that male and female officers are more alike than different (Bazley, Lersch, & Miecakowski, 2007; Poteyeva & Sun, 2009; Rabe-Hemp, 2008a; Sun, 2007). Limited research regarding gender differences in officer injuries and the use of force against officers has produced mixed results. Schuck and Rabe-Hemp (2005) found that in some types of calls, citizens were more likely to use force against female officers, but female officers overall were not at an increased risk for injuries. Covington, Huff-Corzine, and Corzine (2014) found that officer demographics, including gender, had no effect on the likelihood that offenders would use force against the officer. When gender differences in officer behavior are apparent, findings tend to reveal that the employment of female officers offers benefits to police departments like reduced liability and excessive use of force (Harris, 2010; Rabe-Hemp, 2008a) as well as more caring and empathetic behaviors in cases like domestic violence (Poteyeva & Sun, 2009; Sun, 2007). Furthermore, increasing the presence of female officers in policing may improve community

BARAO000018

cooperation with the police and reduce negative perceptions of the police as unfair, overbearing, or corrupt (Barnes, Beaulieu, & Saxton, 2017; Dawson & Davies, 2017).

Though this body of research demonstrates numerous benefits to the employment of female police officers, police agencies continue to struggle to recruit, hire, and retain women. This struggle may persist because police agencies' efforts to recruit women address only one piece of a much larger problem. This research makes a significant contribution to the field for several reasons. First, it provides an understanding of how gendered expectations and perceptions of police organizations affect applicants' decision-making and performance in the testing process. Second, the study explores the experiences of current officers in different career lengths and ranks to track how progressive career experiences and performances of doing gender affect attitudes and levels of satisfaction in the police department. Third, this research uses a mixed-methods approach involving surveys and semi-structured interviews to develop a deeper understanding of the complex, varied, and evolving experiences among female recruits and officers. Lastly, this study utilizes a longitudinal approach to examine the changing attitudes of recruits throughout the selection and training process and retrospectively explores the experiences of current officers at different points throughout their careers. These approaches are especially important in developing an understanding of how the police department and its culture affect women and dictate how they must do gender at different points in recruitment, training, and throughout their careers, and in developing a more comprehensive and successful approach to increase female representation and improve the experiences of women within police departments.

The next chapter will describe the history of women in policing as well as the numerous obstacles they face in the selection process and upon entry into the police department. Chapter

BARAO000019

Three presents the theoretical framework revolving around how women do gender in policing. Chapter Four details the research design and methodology which includes quantitative and qualitative approaches and the integration of these results. Chapter Five describes the initial experience of deciding to apply for a police officer position and obstacles encountered during the application and testing process. Chapter Six presents the evolving perceptions and attitudes of recruits throughout the police training academy. Chapter Seven discusses the struggles of new female officers trying to fit into a male-dominated environment. Chapter Eight details the female officers' feelings of exclusion and segregation particularly through the limiting of career opportunities. Chapter Nine describes the tendency of female officers to accept the outcomes and consequences of doing gender and their unique adaptation to the complex gender expectations of the police department. Finally, Chapter 10 discusses these findings within the theoretical framework, the limitations of the study, and conclusions and policy implications from the results.

BARAO000020

## CHAPTER 2: REVIEW OF THE LITERATURE

**History of Women in Policing**

Women have faced a long history of both overt discrimination and subtle biases since they first began entering the field of law enforcement. Even in the wake of several anti-discrimination policies arising from the Civil Rights Era, female police applicants continue to struggle with discrimination and the negative perceptions of police administrators, fellow officers and recruits, peers, and family members. To improve the status of women in policing, it is crucial to understand how encounters with organizational policies and practices and the prevailing police culture affect women throughout the life course of their careers, including the initial selection and training processes. The reasons for women's exclusion from policing can be traced through a long history of resistance to women's presence in law enforcement.

A vast range of factors have historically barred women from policing, and the entry of female officers in law enforcement was consistently met with resistance. The first entry of women into policing originated in their hiring as prison matrons in the 1800s (Schulz, 1993). As was the practice in other criminal justice agencies at the time, prison guards were strictly male. Because men comprised the overwhelming majority of inmate populations, prisons were built to hold men and the accommodation of female prisoners was not a priority. As a result, female inmates were housed within prisons containing and built for male prisoners (Britton, 2003). They were held in separate quarters in locations and conditions that were often much more impoverished than those of male prisoners. They also received little attention to their needs and were subjected to poor treatment by the guards (Britton, 2003). Since female inmates were guarded by men, they were subjected to sexual abuse noted in accounts of sexual servitude and numerous pregnancies among the prisoners (Britton, 2003; Rabe-Hemp, 2018).

BARAO000021

Because this vulnerable population of female inmates was treated so poorly, groups of philanthropic women began volunteering to work with female prisoners, but they were still officially overseen by male prison guards. Quaker women, gradually joined by other middle-class women, volunteered to enter prisons and jails to provide training and religious guidance to female inmates (Britton, 2003; Schulz, 1995). The work of the women taking part in these activities evolved into the profession of prison matron. Volunteers felt that separate women's prisons with female prison guards were essential to ensuring humane treatment for these disadvantaged and underserved inmates. Female guards were also necessary to prevent sexual abuse of prisoners by male guards (Appier, 1992). Additionally, they were important to preserve the dignity of the inmates in an environment where women were likely to violate strict societal norms through behavioral and physical indecency (Rabe-Hemp, 2018).  Due to these concerns, the volunteers called for and achieved prison reform, including the establishment of separate facilities for women and the hiring of female prison matrons (Pollock, 2014). Although prison matrons ran the facilities and guarded the female inmates, the prisons and matrons were still supervised by men (Britton, 2003).

The establishment of prison matrons paved the way for women to begin slowly entering police departments. Reformers in the late 19th century also felt that women were necessary to guide and protect homeless women and children seeking shelter in police stations (Schulz, 1995). Those who focused their efforts on poor, vulnerable, homeless women finding refuge in police stations found that their duties evolved into the position known as the police matron. In the same way that women entered prisons as matrons, women gained roles as police matrons in response to increasing concerns about the vulnerability of women to male guards and officers (S. Miller, 1999; Schulz, 1995). Police matrons could protect the morality and sexual purity of women in

BARAO000022

police custody while also protecting them from physical and sexual abuse at the hands of men (Heidensohn, 1992; Schulz, 1995). Cases in which women were subjected to dire conditions and extreme instances of abuse helped bolster reformers' argument that women were the best caretakers of women. Throughout the late 1800s, many police departments primarily throughout the Northeastern United States hired several women to serve as police matrons. The limited custodial functions of these police matrons grew into the broader role of the policewoman which developed in the early 20th century.

Policewomen differed from police matrons in that they fulfilled an expanded role caring for women and juveniles outside of police custody and their status carried powers of arrest. The policewoman position was seen as a more professionalized role in which women were better educated and often had previous backgrounds in social work (Schulz, 1995). The first recorded female police officer, Marie Owens, was hired as a "policeman" in 1893 in Chicago (Schulz, 1993). With her extensive background working with children, she was hired as a detective sergeant who was charged with working as a juvenile reformer and enforcing child labor laws (Rabe-Hemp, 2018). However, this did not lead to a rapid adoption of women in police roles. Instead it took more than ten years for the next recorded woman to be granted any police powers. In 1905, social worker Lola Baldwin was granted police powers in Portland, Oregon to assist with protecting young women from the undesirable influences of unattached men (Schulz, 1993) and potential dangers of being lured into prostitution (Rabe-Hemp, 2018) during the Lewis and Clark Exposition. Due to her effectiveness, Baldwin's position was made a permanent position within the department in 1908 (Schulz, 1993).

While the first two recorded female officers were hired as "policemen" several years earlier (Schulz, 1993), Alice Stebbins Wells is popularly documented as the first female police

BARAO000023

officer. She was the first female to be officially hired as a "policewoman" in the Los Angeles

Police Department in 1910. Her hiring occurred after months of petitioning for the position

(Ramsland, 2011) and amidst several years of lobbying by activist women (Schulz, 1993). Wells'

background in social work made her especially passionate about addressing the vulnerabilities

and disadvantages of women and children. Taking note of Wells' position, many police

departments followed in hiring women over the next decade. By 1920, over 220 U.S. towns and

cities were recorded as utilizing women within their police departments (Martin, 1980).

The prevalence of policewomen in departments throughout the United States expanded

quickly from 1910-1920, but this was not without resistance from police departments and local

governments. Increases in the hiring of women was often due to pressure from lobbyists rather

than acceptance of the need for women's presence in policing. After Alice Stebbins Wells gained

notoriety as the first female police officer, she spent a significant amount of time travelling to

give speeches and lobby for policewomen in other departments (Ramsland, 2011; Schulz, 1995).

Despite being allowed to join the ranks alongside male officers, female officers were not

entrusted with the same duties as their male counterparts. Instead, policewomen were expected to

be responsible for assignments requiring nurturing and motherly duties like counseling

runaways, reforming juvenile delinquents, and saving women from alcoholism and drug

addiction (Martin, 1980).

Though female officers today often emphasize that they are able to police in the same

way or better than their male counterparts, the first policewomen did not argue that they could

perform the same functions as male officers (Schulz, 1995). Instead, they fought for their

positions in police departments by emphasizing that they could perform entirely different duties

that male officers were unable or uncomfortable performing: they could handle issues pertaining

BARAO000024

to women and children requiring emotion, empathy, and caretaking responsibilities (S. Miller, 1999; Schulz, 1995). In this way, women fought for integration in police agencies by setting themselves apart in gender-appropriate social worker roles.

In addition to their divergent duties, female officers were also offered significantly lower pay and severely limited opportunities for advancement (Martin, 1980; Martin & Jurik, 2007). Women were also set apart from male officers in appearance. Women's uniforms included skirts and heels. Women initially were rarely issued firearms because they were considered too emotional to wield weapons. If they were issued firearms, they were carried in their purses (Schulz, 1993). These stark differences persisted throughout the first half of the 20th century. Since they ensured that women would not truly be considered police officers in name, responsibility, or appearance, policewomen posed only a minimal threat to the masculinity of the law enforcement profession.

Women were furthermore differentiated from male officers by their separation into women's bureaus. In the police department, policewomen worked in different female divisions sometimes in entirely different buildings (Schulz, 1995). Female officers were limited to leadership positions only within women's bureaus and were prevented from taking the same promotional exams as male officers (Wells & Alt, 2005). The role of women in policing changed in 1968 when the first all-female unit was assigned to regular patrol in the Indianapolis Metropolitan Police Department (Schulz, 1995). This milestone marked a change that continued through the early 1970s as female officers were finally granted positions and responsibilities equal to those of male officers.

Sharp increases in the representation of women and minorities in law enforcement agencies were first seen throughout the 1960s and 1970s (Archbold & Schulz, 2012) due

25

BARAO000025

primarily to policy changes rather than police acceptance of female officers. Chiefly influenced by the Civil Rights Movement, perceptions of unfair policing, and a significant increase in crime rates at the time, there was a nationwide call for police reforms. In response, the President's Commission on Law Enforcement and the Administration of Justice was formed in 1965. The Commission thoroughly assessed many facets of the criminal justice system and two years later released a report including several recommendations for agencies moving forward. Among these, the report recommended that police departments should be more diverse, mirroring the proportions of race and gender in the communities they police. Commission members also encouraged the hiring of better educated officers and emphasized that hiring should consist of fair and unbiased processes. It was recommended that departments develop dedicated entities responsible for implementing fair, objective hiring practices and ensuring quality training for all officers (President's Commission on Law Enforcement and Administration of Justice, 1967).

The first national legislation to stop employment discrimination was implemented in the 1964 Civil Rights Act. In addition to creating the United States Equal Employment Opportunity Commission (EEOC), it granted women and minorities protections from overt discrimination in hiring, compensation and privileges, and firing practices. Nearly a decade later, the Equal Employment Opportunity Act of 1972 sought to make these protections enforceable by extending the jurisdiction of the EEOC and its litigation authority. Additionally, to clarify the definition of sex discrimination, the Pregnancy Discrimination Act of 1978 affirmed that discrimination based upon pregnancy was unlawful. However, Title VII of the 1964 Civil Rights Act allowed that employment decisions could be made based upon sex, religion, or national origin is any of those characteristics represented a bona fide occupational qualification (BFOQ). In 1970, *Griggs v. Duke Power Co.* established that if a company's employment requirements

BARAO000026

adversely impacted minority groups, the employer bears the responsibility to prove that the requirement reflects a BFOQ. According to *Robinson v. Lorillard Corporation* in 1971, organizations must also show that there are no other tests they could administer that would result in less adverse impact. Standards allowing adverse impact for BFOQs have continuously been used to both challenge and defend police departments' use of physical agility testing as well as age requirements (Gaines, Falkenberg, & Gambino, 1993).

In addition, affirmative action policies were adopted to help achieve a diverse workforce and eliminate discrimination from the hiring process. Affirmative action policies are intended to address and compensate for past gender or racial employment discrimination. In a study that examined police departments from 1983 to 1992, it was discovered that most departments made significant progress in increasing representation of officers from minority groups due to these policies (Sklansky, 2006). As an example of the vast demographic shifts in police departments at the times, Sklansky (2006) noted that the Pittsburgh Police Department's female officer representation increased from 1% in 1975 to over 27% in 1990.

Despite these changes to employment legislation, the sharp employment rate increases have since tapered off, and representation of women and minorities in police departments remains low. The proportion of female police officers nationwide has plateaued at between 12-15% of sworn officers (Langton, 2010) and their representation in managerial ranks remains even lower (Martin, 1989; Silvestri, 2018). Furthermore, police departments have difficulty attracting applications from women (Cordner & Cordner, 2011) and retaining female officers when they are hired (Cordner & Cordner, 2011; Martin, 1989). Although legal policies helped force the integration of minority groups in police departments, agencies' inability to continue to

BARAO000027

achieve and maintain increased gender equality suggests that changes to organizational attitudes and public perceptions are still needed.

**The Police Culture**

Perhaps the most unique, defining characteristic of police work has been described as the authorization of police officers to use force against citizens to overcome resistance to an imposed solution to a problem (Bittner, 1970). That the exercise of officers' capacity to use force is a rare occurrence has not diminished the centrality of this feature of police work to the development of a distinctive police culture. The police culture is often described as forming due, in part, to the danger and isolation officers encounter throughout their careers (Skolnick, 1966). Discussion of the existence of a police culture is sometimes criticized as being overly simplistic or ignoring the variations that may occur in different regions and agencies and over time (Bacon, 2014; Reiner, 1992; Silvestri, 2017). However, research commonly unveils core cultural elements emphasizing isolation, internal solidarity, and a valuing of the masculine features of police work.

Policing entails the risk that at any given time, an officer may be required to use physical force against another individual in self-defense or to coerce compliance. Additionally, police officers face the potential danger of being injured or killed by others in the course of their occupational duties. The danger inherent in policing and officers' authority to use force has resultingly gained symbolic value in the police culture (Martin, 1980). Facing danger and potentially using violence against offenders are tasks associated with bravery, toughness, and manliness. Thus, an emphasis on masculinity is central to police officers' occupational culture (Manning, 1978; Reiner, 1992).

28

BARAO000028

The danger of the policing profession and the capacity to use force, however, are complicated by legal, departmental, and community-defined constraints and criticisms pertaining to officers' behaviors (Bittner, 1970; Martin, 1980). Officers develop suspicion of outsiders who may criticize their actions or resist and physically harm them. They furthermore feel that only other police officers understand the nature of their profession and the difficulties and dangers they face in the line of duty (Bittner, 1970; Martin, 1980). Consequently, police officers isolate themselves and emphasize internal group solidarity.

In the masculine, exclusionary police culture, the entrance of women into policing poses a threat. Martin (1980) notes that women in policing both undermine the masculine identity of police work and disrupt male bonds of group solidarity. If women are accepted as capable equals, then men can no longer assert themselves as physically superior and can no longer use their occupation as confirmation of their masculinity. The values of the police culture have been said to become institutionalized in police organizations through the legitimation of hegemonic masculinity through the construction of images, symbols, and ideologies (Shelley, Morabito, & Tobin-Gurley, 2011); decision-making processes which control and segregate women; and processes of interaction and the construction of gendered personas (Acker, 1992). Processes that limit the ability of women to get hired or promoted serve to maintain policing's identity as a male-dominated profession. Furthermore, ongoing harassment and disrespect of fellow officers as well as departments' lack of policies to accommodate working mothers (Schulze, 2010) isolate women and sustain the commonly-held perception that women are not welcome in law enforcement.

**Recruiting Female Officers**

BARAO000029

Aware of the stagnant proportion of women in policing, as well as resulting public criticisms, some police departments have attempted to use proactive recruitment strategies to attract qualified female applicants to diversify and improve their agencies (Jordan et al., 2009). These efforts typically include special directed advertisements and concentrated attendance at high school and college career fairs. Recruiters at these events typically concentrate on the unique opportunity to help and protect those in need while also highlighting the employment benefits like salary, stability, and early retirement. They hand out brochures, applications, and showcase videos that detail the hiring process and what applicants can expect on the job once hired. Importantly, recruiters also aim to alleviate concerns, answer questions, and provide information on opportunities and advancement to any interested attendees.

To appeal to a wide range of potential applicants and to ensure a diverse pool of skillsets, recruiters often focus their messages on the helping nature of the profession. These messages resonate with both male and female applicants since research suggests that men and women are frequently attracted to law enforcement for the same reasons, although they may place their motivations in slightly different orders (Ragnella & White, 2004). Both genders rank the opportunity to help people as the most important reason for their career choice and other important motivations include job benefits, job security, the opportunity for advancement, and early retirement (Ragnella & White, 2004).

Although their career motivations are similar, women are likely to have special concerns about working in law enforcement which may include worries about coworker support, job security, stress, and the ability to take time off (Ryan et al., 2000). To address these concerns, some departments take their efforts a step further through activities like informational sessions geared exclusively toward female applicants (Jordan et al., 2009; Ward & Prenzler, 2016). In

BARAO000030

these recruitment events, departments organize panels of female officers to answer questions from interested women. These specialized efforts do not appear to be common since most female officers surveyed in three different U.S. counties stated that agencies do not recruit women very proactively (Cordner & Cordner, 2011) and only 18% of agencies surveyed in one study used targeted recruitment strategies for women and racial minorities (Jordan et al., 2009). Although less common, research suggests that these targeted strategies yield beneficial effects. Agencies dedicating more resources to recruitment tend to attract more female and minority applicants (Jordan et al., 2009). Once they apply, women are much less likely to withdraw from the hiring process when they perceive less work-family conflict and hold positive perceptions of the organization (Ryan et al., 2000).

Despite increased attention to proactive recruitment strategies, police agencies continue to struggle to attract and hire women. Once female officers are hired, police departments must also dedicate effort to ensuring that women remain satisfied within their positions, but strategies to create a positive work environment and retain officers are rarely planned priorities (Cordner & Cordner, 2011). Female officers in particular may face sexual harassment (Chaiyavej & Morash, 2009; Harrison, 2012), limited promotional opportunities (Archbold & Schulz, 2008; Schulz, 2004), and increased levels of stress due to competing home and work responsibilities (Duxbury & Halinski, 2017; Gershon, Barocas, Canton, Li, & Vlahov, 2009; Ni, Zhao, & Archbold, 2002). Additionally, hostility and social isolation from male coworkers and supervisors can significantly negatively impact the experiences of women (Franklin, 2007; Rabe-Hemp, 2018), and failure to improve women's integration and satisfaction within police departments may have harmful effects on future recruitment. Since difficulties arise from many intertwined factors arising both inside and outside of police departments, it is necessary to examine potential obstacles impeding

31

the successful recruitment and retention of female officers throughout several stages of the police officer career.

**The Police Officer Career & Gender Disparities**

*Deciding to Become a Police Officer*

Female representation may remain low because women are thwarted from entering the policing profession due to their negative perceptions of the organization or because of actual or perceived discrimination within the recruitment and selection processes (Cordner & Cordner, 2011). Before the application process begins, women may already feel that they do not belong in policing. Trouble attracting female and minority applicants appears to occur in agencies of all different sizes throughout the United States (Jordan et al., 2009) indicating problems with perceptions of the profession rather than individual agencies. Research suggests that there are multiple methods through which it is made known that females are not welcome in policing and therefore reduce women's likelihood of applying to police departments. Perhaps one of the first and most prevalent sources of police-oriented gender-role stereotypes is media portrayals of female law enforcement officers. Just as female officers are underrepresented in police departments, they have also been immensely underrepresented in television shows and movies. Women first emerged as police officer characters in the 1970s and 1980s (Schulz, 1995) and have gradually become more prevalent. However, even in modern roles, when women are portrayed as police officers, they are often sexualized and shows typically depict women predominantly fulfilling stereotypical social worker functions requiring empathy, sensitivity, and maternal caretaking (Merlo & Pollock, 2006; S. Miller, 1999). When women are cast in police officer roles, they are rarely taking part in scenes involving use of force or other conventionally

32

BARAO000032

masculine aspects of policing. Within police action movies, King (2008) found that women were featured as heroes in only 24 films as opposed to men being portrayed as heroes in 267 films. Females were more likely to be portrayed as rookie officers, and they were less likely to be portrayed in any combative scenarios.

These role confinements also exist in still media like advertisements featuring police officers. An examination of advertisements in Police Chief magazine from 1996 to 2006 found that women were often depicted in roles subordinate to men (Rabe-Hemp & Beichner, 2011). Furthermore, when female officers are present, they are rarely featured alone. These portrayals suggest that women are perceived as inadequate representations of police officers who can only fulfill secondary roles to male officers. In the same study, only two out of 680 advertisements reviewed depicted female officers without male accompaniments. Furthermore, women were more likely to be portrayed as caretakers and were more likely to be portrayed in less significant roles than male officers (Rabe-Hemp & Beichner, 2011).

The presence of these gender stereotypes is also suggested to extend to advertisements for police officers. Researchers attending a conference organized by a weapons manufacturer noted the ways by which this particular company appealed to masculinity in order to market their products to police officers. They noted that products were portrayed as the weapon of choice for real cops and real men. One presenter called those who couldn't do real police work and fight suspects "sissies." Throughout the conference, the effectiveness of the product for female officers was notably never mentioned (Wozniak & Uggen, 2009).

Social norms about appropriately feminine behavior have also helped shape persistent public perceptions of female officers. Due to public expectations, research suggests that even if male and female officers approach policing in the same manner, citizens will evaluate each

33

BARAO000033

differently based on gender-based stereotypes. Researchers in one study surveyed 379 students in an introductory psychology class at a Midwestern state university. Using scenarios in which the gender of the officers varied, they found that observers evaluate the actions of police officers in the context of gendered expectations about the fit between officer gender and the crime to which he/she responds (Grant, 2000). In particular, study participants were more likely to feel that women were unprofessional and guilty of misconduct when handling domestic violence cases inadequately because they were judged according to heightened expectations that they should "know better" than male officers.

For most, it is difficult and intimidating to violate widely-held gender norms. Since media portrayals and public reactions suggest that policing is still considered an improper profession for women (King, 2008; Rabe-Hemp & Beichner, 2011), potential female applicants may be deterred from law enforcement even when it is a significant area of interest (Foley et al., 2008). Because policing is a non-traditional occupation for women, they may be actively discouraged or worry about how they will be viewed by friends and family members if they become police officers. Policing is first inappropriate for women because it is seen as a masculine profession, but it is also unsuitable because its schedule and inherent danger conflict with traditional female roles in the home and concerning child-rearing (Martin, 1980; Messerschmidt, 1993). As a result of these norms defining appropriate feminine behavior, qualified women who are strongly attracted to jobs in policing must first overcome the powerful effects of these gendered expectations.

Women must not only worry about how friends, family, and other civilians will view their career choice. They are also plagued by concerns about their place in the police department. Some male coworkers may not accept or support them because they disrupt norms of the police

BARAO000034

as masculine crime fighters (Martin, 1980). Additionally, their opportunities for assignments and advancement may be severely limited as they are neither accepted in specialized units like SWAT teams nor appreciated for their special skills in units like community policing (Ahmad, 2001; Dodge, Valcore, & Gomez, 2011; McCarthy, 2013; S. Miller, 1999). When women are continuously absent from important and exciting roles in police departments or when current female officers share their own negative experiences and frustrations, potentially qualified female applicants may be deterred from entering law enforcement.

Female applicants may also feel that police agencies are not "female friendly" in that they will not work to accommodate their needs or ensure that the work environment is safe and welcoming (Cordner & Cordner, 2011; Ryan, Horvath, & Kriska, 2005). Cordner and Cordner (2011) found most female officers agreed that women are less likely to apply to law enforcement jobs because police departments do not recruit female applicants as proactively as they should, but importantly, they also argued that police departments are not seen as female-friendly agencies. Women likely expect that they may encounter hostility and negative attitudes from male officers and that they will have to fight for acceptance. In addition to a potential lack of coworker support, female applicants may also fear that police work cannot provide them with work-life balance or accommodate the unpredictable needs that may arise during pregnancy and child rearing (Schulze, 2010). When police departments fail to plan for common concerns like pregnancy or emerging childcare needs, they send a message that they are not welcoming to women even if this message is transmitted unintentionally.

The negative organizational image created by the media, the public, and police departments themselves can have significant effects on the decision-making of applicants. Research indicates that perceived organizational fit strongly affects whether an individual will

35

BARAO000035

apply for a position as well as whether they will withdraw, or self-select, out of a hiring process (Kuncel & Klieger, 2007; Ryan et al., 2005; Ryan et al., 2000). Negative organizational perceptions and concerns about factors like stress and time off significantly negatively impact women's decisions to pursue careers in law enforcement (Ryan et al., 2005; Ryan et al., 2000). However, if a woman does choose to apply to a job in policing, a new series of obstacles emerges once her application is submitted.

*Testing and Selection*

To ensure that women are equally likely to be hired as police officers, departments must ensure that the selection process is fair to all applicants regardless of ethnicity or gender. There is concern that organizational attitudes which consider masculinity as a valued trait will permeate the selection process through tests and procedures that unfairly eliminate female candidates. The most controversy has centered on the physical agility test, and many researchers attest that it unfairly eliminates female applicants from the process. Furthermore, it is argued that such tests do not reflect necessary law enforcement skills and the various physical tasks are not job-related (Arvey et al., 1992; Carless, 2006). Additionally, the length of police selection process and other subjective testing procedures may negatively impact female applicants.

The law enforcement hiring process is long and much more arduous than other traditional employment processes. Applicants must be prepared for employment screening that often lasts about six months to one year, with many taking much longer. The process requires dedication and patience, and those in more urgent need of reliable work and high-paying salaries may pursue careers elsewhere regardless of their interest in policing. Although selection and hiring procedures are determined by individual agencies and thus vary widely, several requirements and

BARAO000036

tests are common among most. Prior to participating in any employment-related testing, most departments require the submission of a relatively traditional employment application. The majority of departments require that applicants have reached the age of 21, have received a high school diploma or GED, and are free from felony convictions. Once eligible applicants submit their applications, they are next invited to participate in the testing process.

Most police selection processes consist of a "multiple hurdles" or "screening out" model in which applicants must pass each phase in order to move on to the next (Scrivner, 2006). Most commonly, a written test is first administered to all applicants who meet the basic age and education requirements. The written test assesses general competency skills like math, writing, and reading comprehension. Next, a physical fitness or agility test is administered. Many departments adhere to Cooper standards which may include sit-and-reach, sit-up, push-up, and 1.5 mile run tests. Other departments structure physical agility tests as obstacle courses which attempt to mirror encounters officers may have in the field and can include grip strength tests, wall jumps, and stair climbs (Barao, 2016). After passing the written and physical tests, applicants in some states may proceed to take a polygraph test. Where polygraph tests are not administered, a thorough background investigation is performed. Both the polygraph and background phase investigate topics pertaining to employment history, drug use, criminal involvement, sexual activity, and financial history. Finally, applicants are subjected to both psychological and medical examinations.

Initial entry requirements and written tests have not been found to have negative effects on female applicants (McKenna, 2014). Increasing education requirements is often supported because more highly educated officers are expected to perform better and more ethically than those without a college education (Decker & Huckabee, 2002; Harris, 2010). There is a fear,

BARAO000037

however, that increased education may make it even more difficult to diversify police departments. Increasing educational requirements has not been found to affect female applicants, however negative impacts may be felt among racial minority applicants (Decker & Huckabee, 2002). Similarly, written tests have also not been found to differentially impact female applicants and research supports that aptitude scores on these tests help predict successful academy performance (McKenna, 2014).

Most concerns about disparate impact in the selection process revolve around the physical agility test. Observers believe that requirements of upper body strength may unfairly eliminate women from law enforcement positions (Carless, 2006; Cordner & Cordner, 2011; Dick & Nadin, 2006; Lonsway, 2003) and the job-relatedness of these tests is often criticized. The development and implementation of these tests asserts the necessity for physical strength and toughness as a prerequisite for police work. Those who criticize the necessity of physical agility tests argue that if peak physical fitness was necessary, personnel would be required to maintain physical fitness throughout their careers (Cordner & Cordner, 2011). Scholars have argued that asserting that physical exertion is a necessary element of police work may be far-fetched. Pinpointing minimal standards of performance is also difficult because there is no agreement on the average amount of necessary force an officer might have to exert or the average size of a suspect an officer might encounter (Hoover, 1992). Although physical agility tests are administered in most police agencies across the United States, tests and standards differ widely between agencies with research finding no consistency among test types or benchmarks (Lonsway, 2003). Not only are these standards believed to be arbitrary, but it has been argued that there is no good evidence to support that physical agility tests are a valid measure of officer effectiveness. The arbitrariness of these tests and their standards is important because evidence

BARAO000038

suggests that women may fail these tests at a higher rate than men. When agencies employ physical agility testing in their selections process, they often also experience lower female representation (Arvey et al., 1992; Lonsway, 2003; Schuck, 2014).

Less research exists on the effects of other police testing processes, but there are often many opportunities for discriminatory practices to emerge. Police departments utilize either polygraph examinations, background investigations, or both to gather a detailed profile and history of each applicant. Investigators assigned to these tasks compile information which may include education, employment, and financial history; any minor or significant past criminal activity; relationships with any criminal or gang-affiliated individuals; prior and current drug use; prior and current alcohol use; disclosures of medical or psychological problems; and deviant or criminal sexual behavior. Though agencies often use predetermined standards for conduct that would disqualify applicants, opportunities for subjectivity remain if an investigator chooses to overlook certain indiscretions or judge some more harshly. Specifically, women may be judged more harshly than male applicants for any criminal or deviant conduct because they are expected to exhibit moral superiority (Heidensohn, 1992; Morash & Greene, 1986).

It is also possible for subjectivity to pervade oral boards and interview processes. In addition to judging applicants' answers to given questions, applicants are also judged on their presentation and demeanor. Because both police officers and the public hold powerful assumptions about law enforcement as a dangerous, masculine job, those perceptions may affect the assessments of those judging oral boards and interviews (Morash & Greene, 1986). Feminine attributes are judged negatively in policing (Martin, 1980; Schulz, 1995), and applicants who demonstrate these traits are seen as unfit for police work. As women are often assumed to be weak, submissive, and less authoritative, these gender-based assumptions may reduce their test

39

BARAO000039

scores in phases requiring applicants to demonstrate the mental toughness and assertiveness associated with policing and the police culture.

*The Police Training Academy*

After passing all tests in the selection process, officers attend a lengthy and vigorous training academy. Most departments send hired recruits to regional academies, but larger departments operate their own. Police training academies vary widely throughout the United States, but most in the Eastern U.S. typically consist of between 600-900 hours of curriculum and last 5-7 months. Some require residency at the academy for five days a week while others allow recruits to return home each night. Residential academies can be especially difficult for women with children who must seek around-the-clock child care for nearly six months and fear taking any time off during this intense period of training.

Police training academies typically focus on both academic standards and physical fitness. Academic topics include police procedure, law, and ethics. Recruits also attend specialized courses which detail response procedures for particular types of cases including domestic violence, cases involving juveniles as victims or offenders, and sexual assault. However, academies typically feature a strong emphasis on physical fitness, firearms training, and defensive tactics, and in some academies these skills can be the sole focus of nearly 40% of an academy's curriculum hours (CT Police Officer Standards and Training Council, 2018). This emphasis reiterates that policing is a masculine occupation requiring intense physical toughness and may isolate female recruits. Additionally, women may have more difficulty meeting performance standards which can lead to higher rates of academy failure and withdrawal (Carless, 2006; Cordner & Cordner, 2011).

BARAO000040

Outside of these performance standards, researchers have further argued that police academies often teach a "hidden curriculum" that makes clear that women do not belong in policing (Prokos & Padavic, 2002). If they choose to pursue a law enforcement profession, women are continuously reminded that they do not belong in policing through the behaviors and attitudes of male officers beginning in the police academy. Prokos and Padavic's (2002) examination of the police training academy found that male instructors and students regularly ignored, insulted, and criticized women and female officers. The researchers conducted participant observation in a police training academy and stated that the academy involved heavy use of profanity, anti-woman remarks, and a lack of consideration of female recruits. For example, when employment requirements were discussed, departments overlooked mentioning requirements for female recruits. In addition, they failed to discuss parental and maternity leave policies. The use of gendered language and the academy's focus on the masculine, crime-fighting aspects of policing through an emphasis on defensive tactics reinforced beliefs that women are different from the male recruits (Prokos & Padavic, 2002). Through these hidden, and sometimes more overt, messages, women learn that they are likely to be viewed as outsiders in the police department. Despite completing the same requirements and wearing the same uniform, they may struggle to be viewed as equals.

*Officer Careers*

Once recruits complete the training academy, they transition to working on the road in their own departments. This transition typically consists of a field training period of varying lengths in different agencies. During this period, new officers are paired with an experienced field training officer (FTO) who observes and guides them as they learn to apply their new skills

BARAO000041

and knowledge to real experiences. Both male and female officers face high levels of stress during this time period. They are allowed and expected to make mistakes, but continuous or repeated errors are heavily scrutinized by their FTO and other supervisors. Officers are on probation during field training and if too many faults exist, they may be terminated. Although it is possible that female officers feel a heightened need to prove themselves during this process, little research exists on officer experiences or gender differences during field training, but several hurdles and frustrations have been identified throughout the rest of officers' careers.

When women enter police departments, male officers may respond with criticism or social isolation because they do not adequately represent the tough, protective, masculine nature of policing. Although women achieved protection from employment discrimination in the 1970s, male officers still strongly resisted female officers in the police department in subsequent years. In fieldwork conducted throughout the 1970s, Hunt (1990) found that most male officers resisted females' entrance into the policing field because they feared that women were not physically strong or brave enough for the job and they would undermine the masculine identity of police work. Additionally, men believed female officers could not be trusted to keep sexual secrets of the department and that they would expose police involvement in corruption due to their more inherent morality. Although this fieldwork was conducted several decades ago, more recent research indicates that these ideas remain firmly entrenched in many departments, and new officers, male or female, who do not adhere to the masculine expectations of police work may further be subjected to isolation and bullying behaviors (H. Miller & Rayner, 2012).

Interviews conducted with 19 police officers revealed that gender-based categorization begins before individuals enter the workforce through media depictions of police and "real police work." For example, most women and any men who appear weak or submissive will fall short of

42

exemplifying the tough crime fighter image of "real police officers." Upon entry into the department, most individuals try to quickly accept and adjust to group norms, and those who don't may experience bullying behaviors like rejection, isolation, and threat to one's professional and personal standing (H. Miller & Rayner, 2012). For women, efforts to adjust to these group norms are much more difficult due to physical and behavioral reminders of their femininity.

Women's experiences within the workplace are first unique in that they are significantly more likely to be subjected to sexual misconduct and harassment (Chaiyavej & Morash, 2009; Harrison, 2012). In the male-dominated policing environment, these experiences are also common, but female officers face conflict in how they choose to address this behavior. The most common forms of sexual or gender-related harassment within police departments exist through sexual remarks and behaviors which are unlikely to be considered coercive or forceful (Chaiyavej & Morash, 2009). Instead, these behaviors are accepted as a common element in the masculine culture of law enforcement. Sexual harassment of varied forms is common, and the vast majority of female officers report having experienced some sort of harassment within their departments (Chaiyavej & Morash, 2009; Maher, 2010). When female officers are subjected to this conduct, they are extremely unlikely to officially report it (Chaiyavej & Morash, 2009; Maher, 2010) for two reasons. First, officers often accept such conduct as a normal part of the male-dominated culture, especially when it is not perceived to be severe or directed at one particular individual (Chaiyavej & Morash, 2009). Second, women fear further ostracizing if they speak out and report harassing behaviors (Maher, 2010).

Because police agencies were structured to accommodate male officers, many departments have furthermore failed to build policies regarding pregnant female officers. Upon disclosing pregnancy to supervisors, few departments have policies regarding assignments and

BARAO000043

most female officers are relegated to administrative responsibilities (Schulze, 2010). Being confined to such tasks can act to further reinforce organizational views of pregnancy and motherhood as an inconvenience (Schulze, 2010). Female officers furthermore face harsh criticism when they must take time off for maternity, and many departments still fail to use established maternity leave policies, instead dealing with officer pregnancy on an ad hoc basis. In 203 U.S. metropolitan police departments examined, 58% were found to rely on city policies that follow FMLA, and only 12.8% had any distinct policies detailing procedures for pregnant officers (Schulze, 2010).

Female officers are also likely to be stigmatized for needing time off for childcare. Generally, these needs are viewed negatively and women requesting time off for their children are perceived as less dedicated and less efficient (Schulze, 2010). Supervisors who allow shift swapping and schedule flexibility can greatly help accommodate childcare needs and reduce officer stress (Caroly, 2011), but these supervisors are not especially prevalent. Without the flexible work schedules, women are more likely to take lower, less value-enhancing positions that may be less exciting if they allow for more flexibility and work-life balance (Caroly, 2011).

Women in policing are furthermore judged according to stereotypical feminine qualities associated with domestic, family, and childcare responsibilities. The resulting belief that women were so well-suited to caretaker and social worker roles led to their initial entrance into the policing profession (S. Miller, 1999; Schulz, 1995). The primary role of women in police departments was that of a social worker until the 1960s and 1970s, but decades later, female officers are still viewed as most appropriate for police functions like community policing (S. Miller, 1999). Despite increased attention and support for these alternatives to traditional police patrol, the hyper-masculine stereotypes of police work also lead to a devaluing of "softer"

BARAO000044

approaches to policing which focus on areas like domestic violence, juvenile crime, and community policing (McCarthy, 2013). In interviews with 88 officers in community policing units, about 68% reported a lack of agency support for community policing programs (Garcia, 2005). These units and positions may be stigmatized as deviating from the traditional role of the police as crime fighters. Since these roles are also viewed as positions that are most appropriate for female officers, the stigmatization of soft approaches may further isolate female officers and prevent their acceptance in the police department.

Even when women attempt to take part in units or operations which fit the crime fighting view of policing, they often find that they are not accepted. Dodge, Valcore, and Gomez (2011) found that within police departments, women also continue to be viewed as unqualified for assignments in units like special weapons and tactical (SWAT) teams. Positions on SWAT teams are especially hyper-masculinized, and male officers are likely to argue that the physical requirements of the assignment are beyond the abilities of female officers (Dodge et al., 2011). The divide created by units like SWAT teams is likely to grow as militarization of police departments continues to increase. Government focus on drug crimes and drug arrests in the 1990s first ignited in the growth of militarized units, and concerns about homeland security in the wake of the September 11th attacks have further fueled the rise of special weapons and tactics teams (Balko, 2013).

Although many women feel barred from SWAT teams and other specialized units, they are likely to get opportunities to take part in undercover work through participation in decoy stings. Female officers are commonly used in decoy stings in the roles of prostitutes. Of 25 female officers interviewed, most were disgusted with the role-playing persona and the clientele, but they were excited about the opportunity to do undercover work (Dodge, Starr-Gimeno, &

BARAO000045

Williams, 2004). Women were also sometimes nervous that they would be placed for a sting and wouldn't be able to attract any johns. In addition, being chosen for a sting could produce mixed feelings as girls who are 'too pretty' are seen as being less likely to attract the usual prostitute clientele (Dodge et al., 2004).

Finally, female officers often feel isolated and frustrated with department promotional processes. Like department selection and training processes, promotional procedures also differ widely among agencies. Most commonly, promotions are granted through a testing process consisting of a written test and an oral board or interview. Written tests are often administered in multiple choice format and based on study materials covering police supervision and leadership as well as other topics like community policing or criminal investigation. Next, officers take part in oral boards which are typically observed and scored by a panel of individuals from different police or community organizations. Officers are asked situational, legal, and supervision questions and their responses are scored by the panel. Then both scores from the written and oral examinations are combined to produce rankings of each officer in the promotional process. Even with these procedures, many officers consider promotional processes to be unfair and subjective (Archbold & Schulz, 2008). These perceptions typically emerge because the command staff is often able to choose freely among any of the top scoring officers. Therefore, the officer with the highest score may be passed over for a lower ranking officer.

When promotional positions open, women first face difficulty deciding if they should apply. Although they may wish to take on supervisory roles and aspire to higher leadership positions, some women forego these opportunities in favor of the stable, reliable schedules that accompany current lower positions (Caroly, 2011). Once promoted, supervisors with low seniority can be moved to different shifts and units depending on departmental needs. An officer

BARAO000046

who previously worked day shift might be moved to midnights, disrupting childcare schedules and reducing officers' work-life balance (Caroly, 2011; Ni et al., 2002). If women do choose to apply for promotions, their status as visible tokens in the police department can reduce their chances of success. The behaviors and mistakes of female officers are more visible and they are thus subjected to more criticism than male officers (Gustafson, 2008). The resulting unfair perception of women as ineffective or incompetent can greatly reduce their promotional opportunities (Eagly, 2007; Silvestri, 2018). Conversely, some research suggests that female officers may actually be more likely than male officers to achieve these positions. However, they feel that they are only promoted because of their token status as women (Archbold & Schulz, 2008). Women are often reported to feel that they have to work harder than male officers to prove themselves (Schulz, 2004; Silvestri, 2018), and their achievements are undermined if coworkers perceive that successes are only due to their minority status.

Researchers have also suggested that women in supervisory roles may face an entirely new set of challenges when compared to rank-and-file officers (McCarty, 2013; Silvestri, 2018). Whereas female patrol officers may learn to cope with and navigate the masculine culture and expectations among line officers, female supervisors must struggle to attain credibility. Silvestri (2018) argues that police leaders are expected to embody gendered behaviors that differ from the predominantly physically-focused masculinity amongst patrol officers. Instead, they must demonstrate "competitive masculinity" which focuses on attributes of forcefulness, competitiveness, and demonstrations of commitment and commanding competence.

The differential treatment and lack of acceptance women face in police departments through sexual harassment and promotional processes can potentially lead to increased levels of stress among female officers due to the difficulties they face in their work environment. While

BARAO000047

some studies have found no or minimal differences in stress levels between male and female officers (Gershon et al., 2009; McCarty, Zhao, & Garland, 2007), other research indicates that female officers may experience more stress due to lack of coworker support and work-family conflicts (Chiaburu & Harrison, 2008; Duxbury & Halinski, 2017; Sloan, 2012). McCarty (2013) also acknowledged that challenges police supervisors face in gaining credibility and respect while leading and disciplining subordinates could lead to stress responses different from those of line officers. Since men and women face different leadership challenges in police departments, negative stress responses could also differ significantly depending on supervisor gender.

McCarty used surveys of 200 female sergeants and 700 male sergeants in one municipal department to assess levels of burnout among police supervisors. Results indicated that female supervisors reported significantly higher rates of emotional exhaustion while male supervisors indicated significantly higher levels of depersonalization, suggesting they were more likely to withdraw in response to stress. These findings suggest that while stress resulted in burnout among most supervisors, it was experienced differently among male and female officers. Importantly, findings also suggested that satisfaction with one's peers and supervisors could suppress levels of depersonalization, especially among female sergeants (McCarty, 2013).

Coworker support has also been found to be an important predictor of stress levels among rank-and-file officers since positive, supportive coworkers may help buffer the negative effects of stressful encounters and mistreatment or unfairness by supervisors (Sloan, 2012). When officers report low levels of coworker support, they are much more likely to also experience role conflict, role overload, reduced work effort, and increased absences. When coworker support increases, officers report more job satisfaction, involvement, and organizational commitment (Chiaburu &

BARAO000048

Harrison, 2008). Evidence suggests that female officers may be much more likely to feel that coworkers and the organizational culture are not supportive (Duxbury & Halinski, 2017).

**Benefits of Female Police Officers**

Increasing recruitment and retention of women in police departments is not only an important achievement in gender equality, but it is beneficial to agencies and communities in numerous ways. First, female officers can potentially reduce police departments' liability because they are less likely to use excessive measures of force. Rabe-Hemp (2008a) analyzed the behaviors of officers when they threatened, searched, interrogated, physically restrained, or arrested a citizen. Results indicated that female officers were over 27% less likely than men to use extremely controlling behaviors. Similarly, Bazley et al. (2007) examined use of force reports in one urban municipal department comprised of 476 male officers and 82 female officers. They found that both male and female officers had similar rates of exposure to suspect resistance, but female officers appeared to rely on lower levels of force than male officers. Finally, a study exploring problem behaviors by police officers through the examination of citizen complaints found that male officers were much more likely than female officers to receive higher rates of complaints (Harris, 2010). An analysis of these complaints indicated that female officers were much less likely to resort to extreme behaviors or force to assert their authority (Harris, 2010).

Research also indicates that female officers may be an especially beneficial asset when dealing with volatile domestic violence cases. Reporting domestic violence to the police may be an especially difficult task for victims, and the attitudes and approaches of officers may significantly impact victim willingness to report and the effectiveness of police response. Sun

BARAO000049

(2007) examined a survey of 623 citizens involved in 273 difference domestic violence incidents and found that female officers were more likely to employ supportive actions like referring victims to social service agencies. A survey of 398 male and female officers indicated that female officers were twice as likely as male officers to support mandatory arrest policies as the best approach to domestic violence cases (McPhedran, Gover, & Mazerolle, 2017). Finally, a review of published articles reviewing gender differences in police departments also found that several studies indicated that women offered more caring and productive behaviors in domestic violence cases when compared to male officers (Poteyeva & Sun, 2009).

Third, recent research finds that greater female representation may improve cooperation with and attitudes toward police departments as a whole. Dawson and Davies (2017) sought to examine police attitudes and responses to large-scale disturbances and crowd disorder in light of increased media attention. In a survey of 460 police officers, the researchers found that female officers were less likely to view crowd members as a homogenous threat and more likely to treat them as individuals. Female officers were also less likely to believe crowd control required strict intervention to conflict (Dawson & Davies, 2017). Such approaches to crowd control, especially in response to community outrage over perceived police brutality, are likely to garner more cooperation and create more positive views of the police. A second study found that the hiring of more female officers may be able to reduce perceptions of police departments as corrupt. The status of women as outsiders in the police department and the belief that women were more risk averse led respondents to believe that hiring more female police officers would reduce department corruption (Barnes et al., 2017).

Lastly, because the policing profession is inherently stressful, it is important that officers are able to cope with such stressors to avoid becoming a danger to themselves or others. Despite

BARAO000050

facing isolation and criticism, female officers also seem just as able or better able to cope with the stresses of police work. A survey of 87 male and female officers in one municipal department found that female officers did feel that their abilities were called into question more often, but that there were still no statistically significant differences in job stress, job satisfaction, or likelihood to make career changes among male and female officers (Hassell, Archbold, & Stichman, 2011). Another study of work-related stress found that male officers reported more work-related negative stress and higher levels of unfairness than females. In contrast, female officers tended to use more constructive stress coping mechanisms (Ni et al., 2002).

The benefits that female officers may offer to the law enforcement profession may be much more numerous than the current research reveals. For example, female officers state that they believe they possess a greater ability to empathize with victims and suspects and that they are better able to deescalate high-stress situations (Morash & Haarr, 2012). The special skills female officers might bring to departments are especially important assets amidst negative media portrayals and heightened levels of police-community tensions. Consequently, law enforcement agencies have become more concerned with developing strategies to both recruit and retain more women in policing.

**Conclusion**

Women face numerous obstacles to their inclusion and acceptance within police departments beginning before they even decide to apply. Perceptions of policing as a male appropriate occupation influenced by the media, current officers, and the organizational image of police agencies can diminish women's motivations to apply. For potential female applicants, it is often not enough to be qualified or interested and passionate about a career in law enforcement.

BARAO000051

They must further overcome fears of disapproval by friends and family, possible rejection by male coworkers, and concerns that the department will be unable to accommodate their needs for future work-life balance.

These concerns may be enough to prevent many women from applying, but those who decide to pursue careers in law enforcement typically continue to face difficulties throughout testing, training, and the rest of their careers. During the selection process, female applicants may fail physical agility tests at a higher rate or they may be eliminated tests due to subjective criteria and conscious or unconscious biases stemming from the belief that women are unfit for police work. Most police academies then send both implicit and explicit messages to both male and female recruits that women are less suited for police work. Finally, once on the job, female officers may be subjected to harassment, limited opportunities for advancement, and increased levels of stress and work-family conflict, all of which help to situate and perpetuate policing as a man's job.

In sum, prior research regarding women in policing has demonstrated that a variety of social norms, organizational policies and practices, and the occupational culture of policing culminate to create an environment in which women are often made to feel that they do not belong. Potential female candidates are resultantly thwarted from applying to police departments, and those who nevertheless choose to pursue policing careers can feel isolated from fully integrating, gaining acceptance, or achieving professional successes. The importance of addressing negative perceptions and experiences present during the application, testing, and training periods are obvious. There is no way to increase female representation within police departments if women are hindered from becoming officers. However, it is also essential to address the negative experiences of current female officers. Successful female officers sharing

BARAO000052

positive experiences are capable of referring more women to law enforcement careers and shaping a more positive organizational image of police departments.

BARAO000053

# CHAPTER 3: THEORETICAL FRAMEWORK

Although research indicates that different processes and practices make women feel unwelcome in policing, questions remain as to how and when these processes might affect female applicants and officers. Because research which examines the selection and training process longitudinally is lacking, how these initial stages affect women remains unclear. As woman proceed through these stages, the introduction of recruits to the police culture and its prescription of appropriate behavior may powerfully alter the initial attitudes of new recruits. Additionally, tracking how attitudes and experiences of current officers differ over the course of their careers can result in a much more thorough understanding of the processes and practices in policing that may contribute to dissatisfaction and low female representation in law enforcement.

Difficulties increasing female representation within law enforcement agencies likely exist as a result of the expectations associated with how male and female officers "do gender" in the police department. Across all occupations, and indeed in all social interactions, expectations exist regarding appropriate gendered conduct. Social structures and boundaries constrain social action, and resulting behaviors perpetuate these constraining expectations (Messerschmidt, 1993; West & Zimmerman, 1987). In doing gender, officers' behaviors are judged as either appropriately or inappropriately masculine or feminine, and they risk facing negative social consequences for behaviors that do not align with prevailing norms and expectations. Women who choose policing careers are entering a masculine, male-dominated profession which violates traditionally appropriate feminine behavior. Thus, choosing to pursue a law enforcement career alone can result in perceptions that a woman is less feminine. If women are sufficiently motivated to step outside of conventional constraints for female behavior and apply to a law

BARAO000054

enforcement position, they are likely to encounter negative judgment and treatment through different stages of their police careers as a consequence of doing gender inappropriately.

**Doing Gender**

The practice of doing gender is situated within the larger structure of constructed social boundaries. According to Lamont and Molnar (2002), social boundaries powerfully constrain behavior and social relations and can be understood as resulting from symbolic boundaries. The concept of symbolic boundaries refers to attempts made by individuals to categorize particular objects, people, and practices to separate them into groups based on feelings of similarity and difference. When these categorizations are widely agreed upon, they become social boundaries which take on the ability to pattern social interactions and produce inequality (Lamont & Molnar, 2002; Tilley, 2004). Working these boundaries, through sanctioning those who do not abide by them, sustains resulting inequalities and functions as a means of social control (Lamont & Molnar, 2002). Symbolic and social boundaries can be created in response to several distinctive individual characteristics like race, class, or gender. Social boundaries which categorize men and women according to widely-accepted stereotypes and behavioral expectations position men as the powerful in-group and women as the subordinate out-group (Collins-Dogrul & Ulrich, 2018; Lamont & Molnar, 2002). The resulting beliefs about masculine and feminine characteristics, and the production and reproduction of social constraints on men and women's behavior is often discussed as "doing gender" (Lamont & Molnar, 2002; West & Zimmerman, 1987).

While earlier research dichotomized males and females as belonging to different cultures and demonstrating inherent naturally masculine and feminine behavior (Martin & Jurik, 2007),

BARAO000055

the doing gender approach recognizes gender as an ongoing and changing performance embedded in nearly all social occasions (West & Zimmerman, 1987). Everyday social interactions are colored by expectations and biases that influence our perceptions of others' behaviors. Among those expectations and biases are those tied to gender and gendered expectations of behavior. Within every interaction, individuals are assigned to a sex category. One's sex is a binary categorization as male or female based on physiological genitalia. Individuals attempt to make accurate assumptions about the sex categories of others based on signals from dress, speech, and other physical features which then guide social reactions.

This sex categorization is important because it can then be used to interpret social conduct as appropriately or inappropriately male or female (Messerschmidt, 2007). Every behavior in any context may be judged and assessed according to the norms of masculinity or femininity (Messerschmidt, 1993; West & Zimmerman, 1987). If one's sex category membership does not align with the masculine or feminine nature of the behavior, individuals may be discredited or socially punished (Messerschmidt, 2007; West & Zimmerman, 1987).

Doing gender can be accomplished in a variety of contexts which fall along a spectrum of seemingly mundane to increasingly consequential, but each of these interactions has the power to cumulatively produce and reproduce gender biases and inequalities. Some sources of doing gender have likely ceased to be noticeable but are continually reproduced in physical settings like separate gendered restrooms or media depictions of women as weak or helpless (West & Zimmerman, 1987). In the arena of household labor, child rearing and other domestic activities are often designated as responsibilities of women. Such a designation embodies what is often seen as the essential nature of women as nurturing caregivers but also succeeds in reproducing females in a subordinate role to dominant males (Coltrane, 1989; West &

56

BARAO000056

Zimmerman, 1987). In expectations for behavior, women are generally expected to fulfill roles which require nurturing, empathy, and caregiving. Conversely, men are expected to fulfill roles requiring traditionally masculine traits like bravery, physical toughness, and authority. These expectations set women up as emotional, delicate, and submissive while men are physically and mentally strong and dominant. Thus, gendered role expectations not only shape occupational norms and responsibilities, but they also shape and reproduce larger social power inequalities. Male behaviors assert dominance while female behaviors perpetuate inferiority.

Scholars have emphasized that these expectations are produced and reproduced through a variety of interdependent social structures and social actions rather than through singular and independent mechanisms (Messerschmidt, 1993; West & Zimmerman, 1987). Rather than resulting from one social force or structure, doing gender is characterized as situated action. That is, gender is grounded in the context of structural inequalities which are reproduced through social action (J. Miller, 2002; West & Fernstermaker, 1995). Doing gender as a result of structured action emphasizes that social structures shape the norms and expectations according to which we participate in and judge particular behaviors (Martin & Jurik, 2007; Messerschmidt, 1993). Messerschmidt (1993) argued that gender-based social expectations result from gender divisions of labor, gender relations of power, and sexuality. Social rules and laws historically limited women's participation in the workforce and have led to a devaluing of work by women, a perception that women's work is secondary to that of men, and has positioned unpaid domestic labor as a female responsibility. Power relations resulting from such divisions of labor reflect gender inequalities with men controlling most workplaces and institutions in society. Finally, masculinity is characterized by a strong, "insatiable" sexual desire which "empowers men [and] shapes women as objects of heterosexual desire" (Messerschmidt, 1993, p. 75) while

57

BARAO000057

contributing to power relations between men and women. Similarly, Martin and Jurik (2007) described three forces that structure the experiences of women in the workplace: gendered division of labor, resulting power relations, and cultural views of gender which are perpetuated through symbols, images, and other habitual expressions characterize men as dominant.

The location of more debate centers on the motives and goals underlying doing gender as situated action. Messerschmidt (2002) and Miller (2002) argue two different viewpoints which focus on girls' involvement in crime specifically, but can be extended to other male-dominated cultures. Miller (2001, 2002) suggests that in her study of girls in gangs, girls constructed a masculine identity and crossed gender boundaries in order to build an identity which countered to normative femininity. This allowed girls to survive and thrive in masculine cultures through their ability to be accepted as "one of the guys" (J. Miller, 2001). However, Messerschmidt (2002) argues that in their participation in masculine cultures, girls do not aim to adopt a masculine identity, but rather, aim to create a different femininity-- what he refers to as "bad girl femininity." He emphasizes that girls are able to participate in more masculine and more feminine behaviors without changing their gender identity through identifying and adapting to the normative behaviors for one's sex category *in that particular context* (Messerschmidt, 2002).

Similarly, other scholars have continued to emphasize that gender is constantly "redone" and renegotiated in different situations wherein performances change as demanded by the current context (N. Jones, 2010). Therefore, gender according to this perspective is not constant or fixed, but rather requires ongoing management and interpretation by the individuals and his or her assessors (Messerschmidt, 1993, 2002; West & Zimmerman, 1987). For example, appropriate gendered behavior at work may differ substantially from appropriate masculine or feminine behavior in social settings. Culturally embedded gender norms as well as ongoing social

BARAO000058

assessments shape what is considered appropriately masculine or feminine behavior in different

settings. Even within the same social groups, different gender performances may be required

depending on present circumstances and changing expectations of behavior. The consistent

negotiation of gender is especially prevalent and noticeable when individuals perform in ways

that violate traditional gender-based roles, and these effects have been explored in women's

participation in male-dominated criminal and occupational cultures (N. Jones, 2010; Martin &

Jurik, 2007; J. Miller, 2001). Since men are consistently overrepresented in nearly all types of

violent crimes, the participation of young women in gangs and violent criminal acts has provided

an opportunity to examine how women negotiate displays of both masculinity and femininity

(Messerschmidt, 1993). Often, women in male-dominated spheres navigate quickly changing

demands for masculine behavior in certain contexts while heeding the need and expectation to

engage in feminine behaviors in other contexts.

## Doing Gender in Male-Dominated Cultures

Interactions in social groups and occupational settings in particular offer significant

opportunities for doing gender or more specifically, doing masculinity and doing femininity. In

the process of doing gender, others judge the performer as to whether or not behaviors are

appropriately masculine or appropriately feminine (West & Zimmerman, 1987). If a woman

engages in a behavior typically associated with the male sex category or if a man engages in a

behavior typically associated with the female sex category, they risk being assessed negatively or

socially punished. Though these gender-based social boundaries exist in nearly all facets of

social life, the consequences of these incongruent behaviors are especially visible in the context

of male-dominated cultures. Male-dominated cultures and occupations allow men to confirm and

BARAO000059

do masculinity (Britton, 2003; Collins-Dogrul & Ulrich, 2018; Messerschmidt, 1993) while also defining successful and proper behavior by masculine standards. Though acceptance and professional advancement often depends on adhering to these standards, women are evaluated negatively for masculine behaviors and feel pressure to fit in while also feeling compelled to prove their essential femininity.

*Women in Crime*

One male-dominated culture often studied in doing gender literature is that of illicit work in criminal networks like gangs and drug networks. Crime and violence in particular are often associated with men and act as a resource for demonstrating masculinity (Messerschmidt, 1993). Indeed, men are vastly overrepresented as perpetrators of crime, committing nearly approximately 80% of violent crime in the United States each year (Federal Bureau of Investigation, 2015) and criminologists often treated crime as a nearly exclusively male phenomenon until fairly recent decades (Messerschmidt, 1993). Men have been argued to participate in crime as a resource for doing masculinity and separating themselves from women (Messerschmidt, 1993). However, women are not absent as participants in criminal behavior. For example, while the population of drug users was previously dominated by men, women have become increasingly involved in drug use over the past three decades (Measham, 2002). In a qualitative examination of drug user cultures, Measham (2002) explored how the presence of women in drug spheres is negotiated and ultimately accepted by both males and females even though these behaviors violate traditional gender roles and social expectations for women. Female users of club drugs in particular were still able to accomplish femininity in this male-dominated culture through their use of illicit drugs to increase dancing, their social skills, and

BARAO000060

their desirability to male club-goers. Women were furthermore likely to express that the consumption of stimulant-type drugs allowed them to have nights out after long days, stay up late to accomplish more at home, or to have more energy to take care of family. While their behaviors could be judged as unfeminine, these justifications fell within the bounds of more appropriate feminine expectations pertaining to women's responsibility for domestic labor and caretaking behaviors. In their use of drugs, women engaged in behaviors more closely associated with femininity while also justifying behaviors that may otherwise have been viewed as inappropriate (Measham, 2002).

The world of drug sellers, however, remains heavily dominated by men due to beliefs about the toughness required and the physical danger involved, but female drug sellers have found unique ways to fit in and position themselves as assets. Ludwig, Murphy, and Sales (2015) note that women set themselves apart in this male network by using their gender as a cover, therefore situating themselves as beneficial to the drug dealing network. They were not only less likely to be suspected by the police for dealing drugs, but they also utilized feminine behaviors like flirting and dressing up to their advantage in interactions (Ludwick et al., 2015). Thus, they avoid harsh social punishment by retaining aspects of femininity and constructing a different "bad girl" femininity (Messerschmidt, 2002). Within their drug seller networks, women generally adopted one of two adaptations to achieve acceptance in the male criminal network. Some socially deviated only partially from traditional gender norms. They engaged in what is viewed as masculine work and adopted a forceful, authoritative personality when challenged, but they otherwise maintained relatively feminine behaviors and personalities. Others attempted to fit in by fully deviating from traditional gender norms and dealing and behaving in more

BARAO000061

masculine ways. These women adopted an intimidating persona both during and outside of drug dealing activities, and they always acted as one of the guys (Ludwick et al., 2015).

Research on female gang members has also explored how girls situate themselves in this predominantly male world. They state that their membership in a gang requires physical and mental toughness and aggressiveness (J. Miller, 2001). They engage in violence just as is expected from male gang members (Messerschmidt, 2002). They further work to assure themselves that male gang members see them as equals by mentally and verbally setting themselves apart from and casting negative judgments upon women who are sexed into gangs or are otherwise sexually promiscuous (J. Miller, 2001). They emphasize that they are respected by male gang members because they have had to prove themselves as equals rather than gaining acceptance only as sexual objects. Increased research on girls in male criminal networks engaging in traditionally masculine forms of crime have emphasized has debated how girls maintain or construct gender identities in these settings. Miller (2001) argues that survival and acceptance is gangs is the result of girls gender crossing and participating in conventionally masculine behaviors to build largely masculine identities. When girls join gangs, they do violate traditional expectations for feminine behavior, but other scholars have argued that female gang members practice gender fluidity and code switching which allow them to cater their behaviors to the demands of the situation (N. Jones, 2010) and perhaps construct a different feminine identity (Messerschmidt, 2002). Gender is "finely fitted to situations and modified or transformed as the occasion demands" (West & Zimmerman, 1987, p. 132), and as a result, girls in gangs cater either masculine or feminine behaviors to what is appropriate in a given circumstance (N. Jones, 2010; Messerschmidt, 2002).

BARAO000062

Jones' (2010) exploration of inner-city girls living in violent urban neighborhoods described how these young girls also engage in gender fluidity. Engaging in traditionally masculine behaviors like violence and displaying a willingness to fight results in social disapproval of girls' rejection of feminine norms. However, these behaviors can often be necessary for survival and protection in certain urban neighborhoods where violence is widespread. Therefore, many girls in these neighborhoods worked to ensure their own survival and protection through an identity that balanced the feminine attributes of a "good" girl and the more masculine behaviors of a "ghetto" girl.  In these conventionally masculine subcultures, many girls switch between conformity to expectations of male gender performances and demonstrations of socially approved feminine behaviors in response to the demands and pressures of particular contexts (N. Jones, 2010; J. Miller, 2001). These practices enable girls to find acceptance amongst their male peers while also minimizing the negative judgments that might result from their stepping beyond the boundaries of feminine social norms. Such research on women's interactions in stable overwhelmingly male criminal activity and criminal cultures helps to illuminate the similar processes which unfold in legitimate occupational cultures.

*Women in Male-Dominated Professional Fields*

Women doing gender in male-dominated spheres is perhaps even more widespread and evident in legitimate, predominantly male occupations. The growth of women in the paid labor force has resulted in the entry of female employees in occupations previously established as masculine work. One such area of both work and recreation is that of athletics and sports. The effects of gender in sports are not only felt by athletes but also by spectators at events and at home. Sports have been identified as an arena in which men are distinguished as superior

BARAO000063

through muscularity, physical toughness, aggression, and stamina (Messner, 1988). Their dominance over women in these traits is unmistakably and undeniably apparent. As in most male-dominated cultures, women's entry into sports was first resisted, but women now take part in nearly every sport previously allowed only for men. Despite their seeming acceptance as athletes, women are often both overtly and subconsciously judged as society grapples with the distinct and separate spheres of being an athlete or being a female (Messner, 1988), especially when competing in sports deemed more inappropriate for males like basketball or hockey (R. Jones, Murrell, & Jackson, 1999). Women are distinguished as secondary to male athletes due to assumptions about their inadequate strength and athleticism when compared to men, yet female athletes struggle to prove themselves as equals because of widespread attempts to remind viewers of their femininity and linked inferiority.

In examinations of print and televised media, researchers have found that coverage frequently casts women as separate and secondary to better and more powerful male athletes (Eastman & Billings, 1999; R. Jones et al., 1999; Messner, Duncan, & Jensen, 1993). Female athletes first receive substantially less coverage when compared to male athletes (Eastman & Billings, 1999), but when they do receive media coverage, they are often compared as subordinate to male athletes. These comparisons portray male athletes as the "real" athletes to whom women are inferior (R. Jones et al., 1999). Additionally, when women play traditionally male-appropriate sports like basketball, soccer, or hockey, televised media uses frequent gender marking, consistently designating games as "women's hockey" or "women's basketball." However, when men's games are televised, gender marking is absent (Messner et al., 1993). Commentators also frequently refer to female athletes as girls or young ladies whereas similar terms are not used to refer to male athletes (Messner et al., 1993). These actions create images

64

BARAO000064

and expressions which value male athletes more highly and designate women as outsiders in traditionally masculine arenas. Men are portrayed as embodying natural and dominant athleticism, but being female is represented as a quality which inherently prevents athletic excellence or superiority.

Inequities in the portrayal of female athletes in traditionally male-appropriate sports and women's seeming inability to gain acceptance in this masculine world continue due to beliefs in men's biological superiority in traits like power and strength, but disparities in representation and treatment also exist in sports like golf where the physical advantages of men should matter less (McGinnis, McQuillan, & Chapple, 2005). Female golf players interviewed remarked that male players were extremely likely to assume that women would be slower on the course and that they wouldn't be good golf players regardless of their actual ability. This was especially true when women's drives were shorter than men's even if they were more accurate (McGinnis et al., 2005). Women also complained that courses were organized to meet the needs of men. Not only are there inadequate restroom facilities located on the courses, but the shops feature only a very small amount of women's clothing and equipment, and it is rarely located in apparent, high-traffic areas (McGinnis et al., 2005). These expressions again emphasize that the sport is equated with masculinity, and the physical environment communicates that women are guests in a male world. Through these expressions and symbols, playing golf is maintained as a resource for doing masculinity, and negative judgments are cast upon women who attempt to participate in the sport.

Physical strength and prowess need not be at the forefront of an occupation in order for it to be viewed as a male-appropriate occupation. Men are also considered better suited for jobs requiring more cognitive skills and mental toughness. In the medical field, men are assumed to

65

be more fitting doctors which is believed to require more knowledge, skill, and mental toughness while women dominate nursing positions which is assumed to require a more caring, nurturing ethic. Adherence to these roles sustains the dominance and power of men as well as the submissive, caretaking role of women. When women enter positions as medical doctors, and especially if they enter positions as surgeons, they must struggle to fit into the male-dominated culture. Through the ongoing negotiation of both masculine and feminine behaviors. Despite increases in the number of female surgeons, researchers note that surgery remains a "boy's club" wherein men work in the trenches to make split-second decisions that save lives, and this is a world that tends to exclude women (Cassell, 1997). In observations of 18 female surgeons, Cassell (1997) notes many instances of women doing gender in the course of their everyday work. Male coworkers often confide in them about romantic or personal difficulties under the assumption that women will respond with empathy and sympathy, traits typically associated with femininity. Though success depends on traditionally masculine characteristics, women are also expected to display feminine attributes when male coworkers deem it appropriate. In the operating room, female surgeons must also carefully monitor their behavior. They must be tough, confident, and level-headed, but they must also ensure that they do not do or say anything that might cause them to be labeled demanding or temperamental even though male surgeons can exhibit the same types of behavior without consequence (Cassell, 1997). Thus, women are expected to act masculine, but not too masculine, in some contexts while behaving in a feminine manner in others.

Similar situations are experienced among women in science, technology, engineering, and mathematics (STEM) occupations. Men and women are taught that males possess more of the cognitive skills necessary for these positions at a young age (Correll, 2001, 2004), and these

BARAO000066

beliefs about differing skills and abilities persist throughout STEM occupations. After conducting fieldwork in three different engineering companies, Faulkner (2009) noted many different ways by which women remain marginalized. In conversation and interpersonal relationships, topics of conversation typically reflect stereotypical men's interests, humor can be offensive or vulgar, and many women feel that they are excluded from informal networks that carry workplace influence (Faulkner, 2009). As a result, female engineers not only tend to feel sidelined in daily interactions, but they also struggle to build relationships that are crucial for gaining power or climbing the career ladder (Faulkner, 2009). Such exclusions enable men to set themselves apart from female coworkers and continue to use their work as a way by which they accomplish masculinity in spite of women's achievements as capable equals.

In each of these occupations, women confront beliefs that men are best suited for each job. When women enter male-dominated professions, organizational practices diminish their status by casting them as outsiders and overlooking their presence through the absence of facilities or policies that accommodate female players or coworkers. Furthermore, women are socially isolated through their exclusion from social networks and opportunities for workplace bonding. Despite attempts by female coworkers to appropriately navigate requirements for both masculine and feminine behavior, these processes together help ensure that men remain dominant in each field. Since criminal justice occupations are even more strongly and consistently associated with masculinity, these gendered expectations and reactions appear amplified and even more difficult for women to navigate.

*Women in Other Criminal Justice Occupations*

BARAO000067

As in other similarly male-dominant cultures, the field of criminal justice has historically, persistently been viewed as one that is appropriately controlled by men due to the rationality, aggressiveness, and assertiveness believed to be required by officials in the criminal justice system. In legal occupations, women often find themselves pulled between masculine and feminine expectations and encounter barriers to their integration in what was traditionally defined as a masculine profession. Socially, women are often excluded from opportunities for bonding and networking among coworkers in addition to lacking access to quality mentoring experiences (Martin & Jurik, 2007; Reichman & Sterling, 2002). Furthermore, in the legal profession, those considered the top hardest-working litigators are those who spend countless hours at work. However, women are often unable to compete with the hours dedicated by men due to the obligations of outside familial responsibilities.  In the courtroom, women must navigate being tough and aggressive, and thus a good lawyer, at the risk of being viewed as unfeminine (Pierce, 1995). Additionally, female litigators are often subjected to challenges and comments in the courtroom which undermine their authority and status as legal professionals (Bogoch, 1999).

In corrections and policing in particular, employees are also believed to require physical strength and toughness in the face of potential violence and other dangers. In light of these requisites, women are often seen as being too weak, frightened, and emotional for these occupations (Martin & Jurik, 2007). In prisons, female corrections officers struggle to break free of assumptions that they are caring and motherly. They attempt to display masculine characteristics by demonstrating toughness and authoritativeness, but male officers emphasize women's difference and femininity by frequently calling upon women for any nurturing or counselor duties even if the female officer does not see that as her particular skillset.

68

BARAO000068

Alternatively, male officers are more often called upon for enforcement duties or to control inmates through the use of violence (Britton, 2003; Tracy & Scott, 2006). Within the occupational culture, male officers are much more likely to align with other men instead of women. Negative practices undertaken by these male groupings such as sexual harassment or poor quality on-the-job training for male officers helps perpetuate their dominance in the workplace. Male officers also seek to set themselves apart by asserting that certain aspects of the job are too dangerous for women and "re-segregate" themselves by maintaining responsibility for particular tasks such as those that require strength and violence (Britton, 2003). As in other male-dominated occupations, these practices maintain correctional work as a resource for doing masculinity.

**Doing Gender in Policing**

Practices which relegate women as subordinates are also prevalent in policing where traditionally masculine traits are valued more than stereotypically feminine traits and male officers are dominant. Policing has been identified as a gendered institution which strongly values masculinity over feminine characteristics (Shelley, Morabito, & Tobin-Gurley, 2011). The status of policing as a gendered institution is argued to persist because masculine values are perpetuated through the construction of images, symbols, and ideologies as well as decision-making processes, and processes of social interaction (Acker, 1992; Shelley et al., 2011). For example, emphasizing the potential risks and dangers of the profession results in a valuing of physical fitness and toughness. Even though many agencies continue to progress and work to achieve gender equality and acceptance, the perception of policing as a male-dominated gendered institution may still influence the views of potential female applicants as well as their

BARAO000069

friends and family members as they accept the belief that women are less suited for police work than men. These gendered beliefs have the power to hinder applicants from pursuing occupations which may violate social norms. As a result, females are less likely to apply to police departments because the profession lies outside the norms of conduct expected from women (Dick & Nadin, 2006). Women believe that they will face negative reactions from friends, family members, and coworkers if they enter a masculine profession like policing (Dick & Nadin, 2006; Flanagan, 2009).

Women who do apply are likely to be aware of and comfortable with the masculine behavioral requirements of policing. The majority of women entering policing do not do so in an effort to reconstruct femininity in policing. Rather, these women engage in gender crossing practices through their willingness to participate in both masculine and feminine performances in differing contexts of their policing career (Messerschmidt, 2002; J. Miller, 2002). Upon initially entering law enforcement, women are expected to embody the masculine ideals of police work by demonstrating authority, assertiveness, and confidence in interviews and proving their strength and stamina in the testing process and training academy environment. Once they are hired and as they proceed throughout their careers, women experience more complex standards for appropriate gendered behavior in different professional capacities and social interactions in the police department.

These gendered expectations of behavior and the valuing of masculine traits are strongly reinforced by the police culture. The police culture forms primarily because of the unifying nature of the danger of policing (Paoline, 2003; Skolnick, 1966) as well as negative public relations that lead to distrust (Martin, 1980). It places value on solidarity, the protection of fellow officers, physical strength, and other masculine qualities (Archbold & Schulz, 2012), and officers

BARAO000070

are trained to adapt the values of group solidarity and loyalty very early in their careers (Paoline, 2003).

As officers insulate themselves from the outside world, they must also ensure that the members of their isolated group are only individuals that they trust. These trusted individuals are those whom officers will rely on for protection and loyalty in the face of public criticism and potential physical danger. Since the police culture evolved alongside the policing profession when minority and female officers were a rarity, loyalty and solidarity developed primarily among white male officers. When women began entering the policing field, many male officers feared that women would attempt to invade the world of police work and strip it of its masculinity (Hunt, 1990; Martin, 1980). Many male officers also believed that women were unfit for police work and that they were not strong enough to handle the physical nature of the job (Archbold & Schulz, 2012). The persistence of this culture and its associated values have continued to influence male officers' views and treatment of their female counterparts. Certain personalities are attracted to the policing profession because of this inherently masculine culture and its emphasis on toughness, solidarity, and camaraderie, but it may act as a barrier to others considering work in law enforcement (Franklin, 2007). In particular, women may be less likely to pursue the law enforcement profession because police work is so strongly associated with doing masculinity.

Emphasizing and valuing the masculine features of police work ensures that women remain cast as outsiders and it reinforces the separation between male and female officers (Silvestri, 2018). Transmission of these values begins in the training academy and strengthens substantially once officers begin their careers in their police departments. The sustaining belief that policing is a masculine occupation significantly affects how male officers interpret female

BARAO000071

officers gender performances. Officers and civilians alike tend to view the crime fighting aspects of policing as "real police work" (Martin, 1980). When women first entered the policing profession, they achieved positions in police departments due to their abilities as social workers rather than their ability to fulfill the crime-fighter role (Schulz, 1995). Although women were believed to be unsuited for patrol positions which required masculine characteristics, they were believed to possess the natural nurturing and caretaking skills required for the more successful handling of cases involving homelessness, substance abuse, and other moral issues pertaining to women and juveniles (Schulz, 1995). These gender norms not only opened doors for women to initially enter law enforcement, but they also led to an increased appreciation for the qualities women brought to policing as departments began to focus strongly on community policing during the 1990s (S. Miller, 1999; Schulz, 1995). However, the masculine police culture and growing officer and department skepticism toward community policing approaches have nevertheless continued to result in a devaluing of the potentially beneficial skills women could bring to policing like empathy, de-escalation, and interpersonal skills (deGuzman & Frank, 2004; Dodge et al., 2011; Fejes & Haake, 2013).

At the same time, recognition of these "naturally" feminine skills does provide an opportunity to segregate women into social work and administrative functions in policing even if they do not see themselves as especially suited to such positions. Doing so neutralizes the threat women pose in undermining the masculinity of police work. Women are seen as more appropriate for inside positions or community-oriented work, yet these positions reproduce that women are weak and unfit for the exciting, dangerous aspects of policing (deGuzman & Frank, 2004; Fejes & Haake, 2013). These positions can also result in less respect and may be less likely to lead to promotion. While female officers are often relegated to inside work,

BARAO000072

administrative positions, or work that focuses on social relations like school or community policing units while men ensure that they maintain control and responsibility for the real police work required by SWAT teams, drug units, and serious criminal investigations (Fejes & Haake, 2013). In spite of increased attention to the importance of building relationships and trust within the communities that officers serve, the male-dominated culture of policing continues to elevate and value the exciting, dangerous, crime-fighting features of police work.

Similar to the experiences of women in other male-dominated occupations, female police officers are further marginalized through the frequent use of vulgar, sexualized humor and gender segregation in social interactions that reinforces women's status as outsiders (Martin, 1980; Rabe-Hemp, 2018). Excluding women from social networks serves to both maintain male-based group solidarity while also limited female officers' opportunities for upward mobility. Since many assignments or promotions rely either partially or fully on the recommendations of superiors, informally barring women from powerful networks keeps them at the bottom of the professional ladder. Even in routine social interactions, the use of offensive or sexual humor reminds women that they are in a man's world and rather than accommodate the presence of women, female officers must tolerate the sometimes-insensitive behaviors of men.

Finally, women who try too hard to fit in with male officers or who adopt too many masculine traits are judged negatively for not adhering to appropriately feminine behaviors and norms (Martin & Jurik, 2007). Women must display toughness and assertiveness in the field to be viewed as competent and capable officers, but in doing so, they risk being judged as unfeminine, especially if they do not balance these masculine traits with more appropriate feminine behaviors in other occupational contexts. Martin (1980, p.93) describes these difficulties when she remarks, "The more a female partner acts like a police officer, the less she

BARAO000073

behaves like a woman. On the other hand, the more she behaves like a woman, the less protection she provides, the less adequate she is as a partner—although such behavior preserves the man's sense of masculinity." Because of beliefs about inherently feminine characteristics, female officers are furthermore less likely to be considered for positions in more dangerous specialty units like SWAT (Dodge et al., 2011) and less likely to be seen as effective leaders (Archbold & Schulz, 2008; deGuzman & Frank, 2004; Franklin, 2007). In addition to their inability to infiltrate the male social networks which allow access to organizational power and influence (Rabe-Hemp, 2008b, 2018), these gender-based beliefs limit women's opportunities and successes in the police department. These experiences together with numerous other intricate interactional processes cumulatively disadvantage female officers and lead to negative attitudes and dissatisfaction among women in police departments.

**Conclusion**

As a result of the social norms, organizational policies, and the values of the police culture, women both inside and outside of the profession are often taught that they do not belong in policing. However, although female representation remains low, many women still choose to become police officers and questions remain as to how they learn appropriate gender roles and behavioral expectations over their time in the male-dominated law enforcement career. While specific organizational and social practices have been identified as ways by which women learn to do gender, less information exists about how these experiences unfold as a cumulative process over the course of women's careers and how this contributes to ongoing changes in women's behaviors and views of their role in the police department. Additionally, more information is

74

needed about how these ongoing gendered experiences ultimately impact the ability of agencies to increase female representation in law enforcement.

Previous research on how women do gender in policing suggests that multiple forces and processes within police departments guide appropriately gendered behavior, sometimes requiring more masculine actions and at other times requiring more feminine actions. Female representation in police departments likely remains low because of these complex and compounding gendered interactional processes and outcomes experienced during officers' journeys from application to the police department. Thus, what is needed is a comprehensive exploration of how the practices and culture of police organizations shape female officers' understanding of the social reactions and consequences for their behaviors in the police department. Examining how women adapt and react to these cumulative, varying contexts and expectations for behavior is crucial to gaining a greater understanding of how female officers do gender throughout their careers. In particular, examining how and when these impacts originate and progress over the course of the policing career is important for more fully understanding the attitudes and complex experiences of female police officers.

The body of existing research suggests that potential female applicants' perceptions of police agencies as male-dominated gendered institutions in which women are not welcome can minimize their interest in policing or lead them to seek a more gender-appropriate profession. These gender norms may powerfully affect women's decision-making throughout the early stages of their careers as they navigate maintaining their femininity while pursuing a masculine occupation. As recruits and new officers are introduced to the masculine police culture, they additionally begin to learn behavioral expectations that will guide how they understand their roles as women and officers in the police department. Women must then determine how to

75

construct appropriate reactions and adaptations to these complex gendered expectations dictated by a wide range of circumstances and settings encountered throughout their careers.

This research explores the experiences and effects of doing gender throughout the life course of women's careers through surveys of applicants, recruits, and officers in addition to interviews with current officers in one metropolitan police department. In this exploration, four key research questions will be addressed:

1) What are the characteristics and attitudes of women who choose to become police officers, and how do they affect the outcomes and future perceptions of female officers?

2) How do women learn to do gender in the police department, and how does this change throughout their careers?

3) How do the complexities of doing gender and resulting social assessments about female officers' gender roles affect women's attitudes and satisfaction in policing?

4) What are the implications of these experiences on future recruitment and retention of female officers?

The experiences and outcomes of doing gender among applicants will be assessed through surveys of police applicants who have not yet been hired into the police training academy. Since careers in policing emphasize masculinity and violate social norms for women, gendered occupational expectations are expected to affect the views of female applicants as well as their friends and family. Next, the impact of gendered experiences throughout the training academy will be investigated through surveys of police officer recruits. Finally, the experiences

BARAO000076

of current sworn female officers will be explored through interviews with officers of different ranks and career lengths.

BARAO000077

# CHAPTER 4: METHODOLOGY

This research seeks to understand the factors that predict women's experiences and perceptions over time using samples of applicants, recruits, and current officers in one metropolitan police department in the Eastern U.S. from 2017-2018, hereafter referred to as the Eastern Police Department (EPD). This study uses a concurrent nested mixed methods design (Creswell, 2013b; Creswell & Clark, 2007) to investigate the effects of gender on behaviors, perceptions of, and experiences with police organizations. In this approach, researchers collect both quantitative and qualitative data within the same time period and then merge the data to develop a comprehensive interpretation of the results (Creswell, 2013b). The research questions directing this study require a mixed methods approach in order to explore the varied experiences of police applicants, recruits, and officers at different points in the life course of their careers. Quantitative data provide a direct view of respondents' attitudes and opinions as well as how these change over time. However, this study aims to uncover how these changes emerge. An understanding of the meaningful experiences and social nuances that alter women's views of their roles in policing is therefore explored through in-depth qualitative interviews.

Data from survey responses from both EPD applicants and hired EPD recruits are used to investigate changing attitudes and experiences as a result of gendered practices and expectations throughout the testing and training processes. An additional survey of current female officers is used to discover how officers' attitudes and views of their role in the police department differ from those of new recruits. Concurrently, this study uses in-depth interview methods to examine the experiences of female sworn officers with varied longevity in the police department. Together, the results from both methods will help illuminate the effects of gendered values and behavioral expectations on the attitudes, performance, and job satisfaction of female applicants,

BARAO000078

recruits, and officers. The EPD traditionally hires about 100 recruits per training class and only 5-15% of each training class typically consists of female recruits. Furthermore, women make up only 13.4% of sworn officers in the EPD. Because small sample sizes reduce the impact of findings from quantitative analysis, the qualitative case study portion of this research is of considerable value.

**Study Site**

The Eastern Police Department (EPD) agreed to participate in this research and was used as the site for all study components. The EPD employs over 1,000 sworn personnel and uses a civil service examination process to hire new recruits. The state civil service unit is responsible for administering and scoring all written tests and subsequently ranking all applicants pursuing police officer positions in the EPD. The civil service process requires that all applicants are selected to advance to the next test phase based on their ranking on this list. All applicants and recruits participating in this study took the civil service test for police officer positions in 2015.

Female officers make up under 15% of the EPD's sworn officers. Within the EPD, officers achieve detective positions as well as the supervisory ranks of sergeant, lieutenant, and captain through traditional civil service promotional processes consisting of multiple-choice examinations. Recently, the department added interviews and written components to these promotional processes as well. Ranks above captain are appointed rather than achieved through civil service tests. While women appear to be equally represented as detectives, they are underrepresented in every supervisory civil service rank.

**Mixed Methods Design**

BARAO000079

This study utilizes a concurrent nested mixed methods design. In concurrent approaches, both quantitative and qualitative data are collected simultaneously during the same time period (Creswell, 2013b). Longitudinal surveys of applicants and recruits were ongoing as current female officers in the EPD were participating in retrospective interviews. This differs from other approaches in which one form of data may be used to inform the development and evolution of another method. Nested designs are used when one type of data is prioritized over another, and different questions are answered by the different forms of data (Creswell, 2013b). The findings from this research are driven by qualitative interviews conducted with sworn female officers, but a longitudinal survey of police recruits provides important information for understanding this initial stage of entry and integration in the law enforcement culture. Therefore, this study consists of quantitative data embedded in a qualitative approach.

**Quantitative Methods**

*Sampling for Applicant and Recruit Surveys*

Female applicants and recruits face the obstacle of overcoming initial, sometimes unexpected, difficulties of "doing gender" appropriately during the testing and training process which may then lead to negative organizational perceptions, impaired performance, and reduced rates of retention. Importantly, the initial prevalence of the need to do masculinity to establish credibility lays the groundwork for officers' understanding of policing as a masculine occupation. The quantitative element of this study explores perceptions of general injustice and discrimination in society as well as perceptions of agency-specific bias, and repeated questionnaires reveal how those perceptions change as recruits spend more time in the training academy and become more integrated into the police culture. Additionally, it investigates

80

BARAO000080

potential gender differences in areas like career motivations and personality characteristics that might influence individual attitudes.

The quantitative method first consists of surveys administered to both male and female Eastern Police Department applicants to assess their expectations and attitudes toward law enforcement occupations. Importantly, these surveys also assess applicants' perceptions of both general and agency-specific bias and unfair treatment. Surveys were administered electronically using SurveyGizmo. Survey responses were collected from a purposive sample of applicants and recruits from two different Eastern Police Department hiring and training academy processes. To

| Table 4.1. Demographics of Surveyed Applicants by Gender ($n=139$) | | | | |
|---|---|---|---|---|
| | **MALE ($n=109$)** | | **FEMALE ($n=30$)** | |
| | Frequency | Percent | Frequency | Percent |
| **AGE** | | | | |
| 20-24 | 7 | 7.4% | 6 | 20.7% |
| 25-29 | 34 | 36.2% | 16 | 55.2% |
| 30-34 | 37 | 39.4% | 5 | 17.2% |
| 35-39 | 14 | 14.9% | 1 | 3.4% |
| 40-44 | 2 | 2.1% | 1 | 3.4% |
| **EDUCATION** | | | | |
| HS Diploma/GED | 12 | 11.0% | 3 | 10.0% |
| Some College | 28 | 25.7% | 4 | 13.3% |
| Associate's Degree | 11 | 10.1% | 5 | 16.7% |
| Bachelor's Degree | 53 | 48.6% | 18 | 60.0% |
| Graduate Degree | 5 | 4.6% | 0 | 0.0% |
| **MARITAL STATUS** | | | | |
| Now Married | 32 | 29.4% | 8 | 26.7% |
| Widowed | 0 | 0.0% | 0 | 0.0% |
| Divorced | 3 | 2.8% | 0 | 0.0% |
| Separated | 0 | 0.0% | 0 | 0.0% |
| Never Married | 74 | 67.9% | 22 | 73.3% |
| **CHILDREN** | | | | |
| 0 | 77 | 70.6% | 24 | 80.0% |
| 1 | 18 | 16.5% | 1 | 3.3% |
| 2 | 8 | 7.3% | 4 | 13.3% |
| 3 | 5 | 4.6% | 1 | 3.3% |
| 4+ | 1 | 0.9% | 0 | 0.0% |

BARAO000081

receive a request to participate in this survey, selection criteria required that individuals be current applicants or incoming recruits for either the 2016 or 2017 police training academy classes at the time of initial surveying. Applicant e-mail addresses were collected by the Eastern Police Department. The researcher then used the collected e-mail addresses to invite all applicants to participate in these surveys online. In total, 200 police applicants and/or recruits were contacted via e-mail to participate in the survey. Upon clicking the included link, subjects were directed an initial SurveyGizmo page to provide informed consent. In this consent form, it was emphasized that surveys would be kept confidential and anonymous, and responses would have no bearing on their employment with the EPD (Appendix A).

Because this survey was longitudinal in nature, respondents remained eligible to participate in subsequent surveys even if they failed out or voluntarily withdrew from the training academy. Data were collected from April 2017 to April 2018. The initial applicant survey was administered approximately two months before the beginning of the police training academy. To increase participation, Eastern Police Department personnel encouraged applicant survey participation during the physical agility test. The first survey was completed by 139 male and female applicants involved in the police officer testing process, a response rate of 70%. These surveys were used to assess candidates' personal characteristics and perceptions during the application process and prior to any formal introduction to the police culture. All surveys collected data on career motivations, career concerns, support from friends and family, feelings of justice and empathy, perceptions of discrimination, risk-taking attitudes, and perceptions of organizational fit. Surveys administered to recruits included additional questions about the behaviors of fellow recruits and instructors and levels of job satisfaction.

BARAO000082

To track the changing attitudes and experiences of recruits over time, surveys were distributed online immediately after entering the training academy, about halfway through the six-month training period, immediately prior to graduation, and one month after graduation (Figure 4.1). For surveys 2, 4, and 5 (Incoming Recruit, Graduating Recruit, and New Officer surveys), recruits were offered remuneration of $5 Amazon gift cards if they completed the online survey and submitted their e-mail address for receipt of an electronic gift card. Incentive amounts were discussed and approved with the EPD to ensure that rewards given did not conflict with department ethics or gratuity policies. Distrust toward outsiders combined with the stress of training academy schedules and responsibilities were anticipated to strongly reduce response rates, so providing incentives was vital to maximizing research participation. Though the monetary incentive appeared to increase response rates slightly, many recruits may have remained reluctant to participate distrust or concern about how their responses would impact their employment status.

The Incoming Recruit Survey was administered to hired recruits entering the Eastern Police Academy in 2016 and 2017. Of incoming recruits, 52 participated in this second survey, a response rate of 25%. The third survey was administered halfway through the training academy,

**Figure 4.1 Applicant and Recruit Survey Administration Timeline**



BARAO000083

| Table 4.2. Examination of Survey Nonresponse Bias | | | | | | |
|---|---|---|---|---|---|---|
| | **FEMALE** | | | **NONWHITE** | | |
| | Percent | z | $p >|z|$ | Percent | z | $p >|z|$ |
| **TRAINING ACADEMY TOTALS** | | | | | | |
| Entering | 17.6% | | | 35.7% | | |
| Graduating | 15.7% | | | 34.6% | | |
| **SURVEYS†** | | | | | | |
| Applicant Survey | 21.6% | -1.52 | 0.129 | 45.3% | -1.80 | 0.073 * |
| Incoming Recruit Survey | 26.9% | -1.34 | 0.179 | 44.2% | -1.13 | 0.257 |
| Graduating Recruit Survey | 19.4% | -0.54 | 0.590 | 44.4% | -1.10 | 0.272 |
| New Officer Survey | 19.2% | -0.45 | 0.654 | 42.3% | -0.76 | 0.449 |

$*p < .10; **p < .05; ***p < .01$

† Applicant and incoming recruit surveys compared to entering training academy totals; Graduating recruit and new officer surveys compared to graduating training academy totals

and only 19 responded to a request for survey participation. Responses may have been low during this time period due to the increase in academic exams throughout the first three months of the training academy. Due to the low response rate of this time point, these responses were excluded from analysis. A fourth Graduating Recruit Survey was administered just prior to recruit graduation from the training academy, and 36 of the remaining recruits participated, a 24% response rate. Finally, the New Officer Survey administered one month after graduation resulted in 26 participants for a response rate of 17%. Although response rates declined over the course of data collection, no significant differences emerged in the gender or race of training academy recruit respondents. Later surveys were furthermore compared to responses received on the applicant survey when departmental encouragement led to a 70% response rate. Approximately 95% of those surveyed during the application period were later hired as police officer recruits. Comparisons of training academy recruit survey responses to applicant survey responses revealed no significant proportional differences in gender, race, education, relationship status, or number of children. Despite these examinations, low response rates to these surveys

84

may still conceal systematic differences in the attitudes and opinions of respondents versus non-respondents. Additionally, the low number of respondents reduces statistical power and threatens external validity. In this research, results from the applicant and recruit surveys are used to bolster findings from qualitative interviews, but the interpretation of survey results alone should be approached with caution due to these data limitations.

*Sampling for Female Officer Surveys*

The second quantitative element of this study consists of surveys administered to female police officers in the Eastern Police Department to assess their attitudes and perceptions of their career and police department. Surveys were administered electronically using SurveyGizmo. Survey responses were collected from a purposive sample of female officers in the EPD. To receive a request to participate in this survey, selection criteria required that individuals be currently employed female police officers in the EPD during the fall of 2017. E-mail addresses for current female officers were compiled and provided to the researcher by the EPD. The researcher then used the collected e-mail addresses to invite all applicants to participate in these surveys online. Upon clicking the included link in the e-mail, subjects were directed an initial SurveyGizmo page to provide informed consent. As in applicant and recruit surveys, the consent form stressed the confidentiality and anonymity of each survey and informed participants that their responses would have no bearing on the status of their employment with the EPD (Appendix A).

Data were collected from October 2017 to December 2017. In an effort to explore the attitudes prevalent among women in the EPD, this brief survey of officers included questions regarding feelings of justice and empathy, perceptions of discrimination, risk-taking attitudes,

BARAO000085

and career concerns. This survey was completed by 108 female officers, a response rate of 39%

(Table 4.3). In the police department, 50% of women are white, 39% are black, 9% are Hispanic,

| Table 4.3. Demographics of Surveyed Female Officers (*n*=108) | | |
|---|---|---|
| | Frequency | Percent |
| **RACE** | | |
| White | 58 | 54.7% |
| Black or African American | 34 | 32.1% |
| Hispanic | 7 | 6.6% |
| Asian/Pacific Islander | 2 | 1.9% |
| Other | 5 | 4.7% |
| **AGE** | | |
| 20-24 | 1 | 1.1% |
| 25-29 | 2 | 2.2% |
| 30-34 | 10 | 11.0% |
| 35-39 | 15 | 16.5% |
| 40-44 | 13 | 14.3% |
| 45-49 | 17 | 18.7% |
| 50-54 | 13 | 14.3% |
| 55-59 | 17 | 18.7% |
| 60-64 | 3 | 3.3% |
| **EDUCATION** | | |
| HS Diploma/GED | 1 | 0.9% |
| Some College | 9 | 8.3% |
| Associate's Degree | 6 | 5.6% |
| Bachelor's Degree | 42 | 38.9% |
| Graduate Degree | 50 | 46.3% |
| **MARITAL STATUS** | | |
| Now Married | 44 | 41.1% |
| Widowed | 1 | 0.9% |
| Divorced | 16 | 15.0% |
| Separated | 1 | 0.9% |
| Never Married | 45 | 42.1% |
| **CHILDREN** | | |
| 0 | 70 | 65.4% |
| 1 | 23 | 21.5% |
| 2 | 8 | 7.5% |
| 3 | 6 | 5.6% |
| 4+ | 0 | 0.0% |

BARAO000086

and 2% are Asian. The racial composition of survey respondents largely mirrored these proportions. Most were between the ages of 35-59. Over 65% had no children, and 41% were currently married while 42% had never been married. The women surveyed were highly educated and 39% achieved a Bachelors degree while another 46% had a graduate degree.

*Measures*

Law enforcement has historically been viewed as a masculine occupation. Through various organizational and social practices, women often feel as if they do not belong in the policing profession. As they are outliers in a male-dominated profession, women's behaviors are scrutinized and judged as either appropriately or inappropriately masculine or feminine. It is therefore anticipated that gender will strongly affect the attitudes and experiences of applicants, recruits, and officers. Because one's sex category determines the gendered standards by which they are assessed, sex was measured as a binary variable (0=Male; 1=Female).

Applicants and recruits with military or policing background may be more likely to persist and succeed in law enforcement careers due to their paramilitary structure. Prior experience in these fields may affect women's perceptions of organizational fairness, especially within male-dominated occupations, since they may be more accustomed to agencies' masculine values and culture. Military experience and prior law enforcement experience were each measured as binary variables (0=No; 1=Yes).

Applicants who report numerous strong law enforcement career motivations may be more dedicated to their pursuit of the occupation and less likely to voluntarily withdraw from the selection process despite challenges they may encounter. Women are also often assumed to be attracted to "softer," more service-oriented features of the job, so this measure is also used to

BARAO000087

investigate gender differences in initial motivations to become a police officer. Career

Motivation was measured using 18 different reasons for the recruit's decision to pursue a career

in law enforcement. These include reasons like the excitement of the work, good salary, the

prestige of the profession, and to help people in the community. This list of motivations was first

developed by Lester (1983) to explore state police recruits' reasons for becoming police officers.

Fifteen different career motivations were included and in analyzing his results, three subscales of

reasons were formed: pay security, service, and power and status. Findings from 128 surveyed

state police recruits indicated that most rated pay security and service reasons most highly.

Subsequent research included a modified version of Lester's list in which the wording of some

statements were altered and updated, and three new motivations were added. In these studies,

service reasons like helping people and pay security motivations were consistently ranked

highest among recruits while power and status related motivations were lease influential

(California Commission on Peace Officer Standards and Training, 2006; Castenada & Ridgeway,

2010; Ragnella & White, 2004; Ridgeway et al., 2008). This study uses the updated version of

Lester's original list and includes 18 total items (Appendix B). Each career motivation included

in this measure was rated by the respondent on a 5-Point Likert scale from 1=Unimportant to 5=

Very Important (Castenada & Ridgeway, 2010; Ragnella & White, 2004).

Women in policing are immersed in a masculine culture structured in a way that sustains

their subordinate status through various organizational and cultural practices. Therefore, women

may be more likely to perceive and experience gender-based discrimination within law

enforcement agencies as their training and careers progress. Perceived unfairness and

discrimination may further affect perceptions of organizational fit and job satisfaction. Measures

assessing perceptions of agency fairness and discrimination used seven statements developed to

BARAO000088

assess police officer perceptions of their workplace (Alderden, Farrell, Skogan, & Rosenbaum, 2011). The goal in first developing these measures was to test Ely and Thomas' (2001) cultural diversity perspectives pertaining to workplace environments. In this work, Ely and Thomas interviewed a sample of workers from three different organizational sites to examine how workplace diversity resulted in either positive or negative outcomes relating to employee satisfaction and work group functioning. According to the researchers, organizations with an integration and learning perspective, which incorporate different ideas and ensure that diverse contributions are valued, experience the greatest amount of employee satisfaction and effectiveness.

In a later study to examine these effects in police agencies, Alderden et al. (2011) developed 14 survey questions intended to explore aspects of each workplace diversity perspective. The current study is particularly concerned with experiences that result in the perception that gender-based bias and discrimination may be embedded in the police organization. Seven of the 14 questions previously developed by Alderden and colleagues (2011) were included in the current questionnaires administered to recruits throughout the training academy (Table 4.4). Although this research did not seek to explicitly test workplace diversity perspectives, the selected questions were chosen because of their ability to illuminate sources of perceptions of unfairness which may shape women's attitudes and behaviors. Responses to each question were rated on a 5-Point Likert scale from 1=Strongly Disagree to 5=Strongly Agree. To assess perceptions of fairness, recruits were asked whether they believed their agency treated its employees fairly a) based on gender and b) based on race. Due to the paramilitary training environment, police recruits do not experience whether their ideas and skills are respected and valued, but they are able to observe recruit and instructor socialization and behavior. Two

BARAO000089

questions were asked to evaluate recruits' perceptions of social integration and whether this differs by gender. Recruits were asked whether they agreed or disagreed that recruits tended to socialize with other recruits a) of the same gender and b) of the same race. Finally, to assess the workplace environment of the training academy and its treatment of those who appear to differ from characterizations of the ideal police officer (i.e. heterosexual white male), recruits were asked to agree or disagree that other recruits or instructors made jokes or negative comments about a) female officers, b) minority officers, and c) the sexual orientation of others.

Because police officers are affected by their pre-existing value systems and beliefs and because the culture of policing may powerfully shift these values, it is important to examine officers' original beliefs as well as how they vary over time. Rosenbaum, Schuck, and Cordner (2011) evaluated how the career experiences of new officers are affected by their personal backgrounds, characteristics, values, and the social context. Acknowledging that these factors can significantly affect how officers interpret their experiences and work environment, the researchers conducted surveys with 227 police officer recruits before and after their training, but they did not examine these results in light of officer gender. The survey administered included questions pertaining to recruits' general attitudes toward fairness and justice in society, personality characteristics, ethics, stressors, and coping strategies.

Rosenbaum, Schuck, and Cordner's (2011) questions examining recruits' personality characteristics and value systems are important to this research because they may influence recruits' sensitivity to bias and unfairness. Women who initially believe that injustice and discrimination are widespread may be more likely to perceive unfair gender bias within police agencies. As a result, they may be more sensitive to and negatively impacted by requirements for complex gender performances. In the current research, feelings of justice and empathy for others

BARAO000090

were investigated using four different questions rated on a 5-Point Likert scale from 1= Strongly disagree to 5= Strongly agree (Table 4.4). These questions asked respondents whether they agreed or disagreed that life is generally fair and people get what they deserve and whether they agreed or disagreed that minorities and women have been mistreated by society (Rosenbaum et al., 2011).

Recruits who have a stronger predisposition to risk-taking are generally believed to be better suited for police work even though thorough attention and cautiousness are also valued by administrators. Additionally, recruits with a more authoritative communication style are believed to be better able to maintain control of their interactions with the public. Though research remains unclear as to which traits produce the most effective policing, the police culture highly values traits of authoritativeness and risk-taking. Importantly, these traits are believed to align with one's sex category in that men are expected to possess these characteristics. Recruits who possess these traits when they enter the police training academy are likely to feel that they are well-suited for police work and will be accepted by their fellow officers. Moreover, these recruits are likely to have an easier time gaining respect and integrating into the police culture, especially since risk-taking tendencies and communication styles are predicted to strengthen as recruits spend more time in the police academy. Research has indicated that women applying to and selected for policing positions are more likely to score lower on scales of femininity and have attributes more commonly associated with men, like stronger communication styles and the tendency to seek adventure and risk. However, what remains unclear is whether possessing these characteristics leads to acceptance and respect for women. General personality traits pertaining to risk-taking and styles of interaction were assessed using seven different questions (Rosenbaum

91

et al., 2011) rated on a 5-Point Likert scale from 1=Strongly disagree to 5=Strongly Agree (Table 4.5).

Prior research has indicated that both racial minorities and females are less likely to perceive that they are a fit for public safety positions because organizations are not believed to welcome or respect their presence (Ryan et al., 2005; Ryan et al., 2000). This perception may be associated with higher withdrawal rates and increased levels of dissatisfaction among respondents of a certain race or gender. Several studies have investigated applicant self-selection which refers to the choice between continuing an application process or accepting an offer versus withdrawing from the process or declining an offer. Applicant self-selection may be influenced by how a job and organization fit individual desires (Beach, 1993), expectations about the likelihood of obtaining a certain job and the level of commitment needed (Barber & Roehling, 1993), and inferences about organizational attributes when some information is unknown (Rynes, 1991). Those who identify more with an organization and a greater commitment to the job and organization are less likely to self-select out of the process (Ryan et al., 2000). Therefore, applicants and recruits who feel that their skills and values align with the organization and hold positive perceptions of the agency may be less likely to voluntarily withdraw from either the testing process or training academy. These applicants and recruits are also expected to believe that they will integrate well into the police culture. Perceived fit was measured by investigating respondents' level of agreement with the statements, "I believe that I am likely to be selected for this position" (Ryan et al., 2005; Ryan et al., 2000).

Final measures included in this survey were previously used in a RAND research project initiated by the Office of Community Oriented Policing Services (COPS) surveyed recent sheriff and officer recruits to discover information that might help improve nationwide police

BARAO000092

**Table 4.4 Survey Measures**

| MEASURE | RESPONSE SCALE |
|---|---|
| **Perceptions of Fairness** | 1 (Strongly disagree) to 5 (Strongly agree) |
| I believe this agency treats its employees the same regardless of race. | |
| I believe this agency treats its employees the same regardless of gender. | |
| **Integration** | 1 (Strongly disagree) to 5 (Strongly agree) |
| Recruits will tend to socialize with other recruits who are of the same gender as themselves. | |
| Recruits will tend to socialize with other recruits who are of the same race/ethnicity as themselves. | |
| **Workplace Environment** | 1 (Strongly disagree) to 5 (Strongly agree) |
| Recruits and instructors will frequently make jokes or sexual comments about female officers/recruits | |
| Recruits and instructors will frequently make jokes or negative comments about minority officers/recruits | |
| Recruits and instructors will frequently make jokes about the sexual orientation of officers/recruits | |
| **Feelings of Justice and Empathy** | 1 (Strongly disagree) to 5 (Strongly agree) |
| In life, people usually get what they deserve and deserve what they get. | |
| Life is simply not fair for many people. | |
| Overall, minorities have been mistreated by society. | |
| Overall, women have been mistreated by society. | |
| **Risk-Taking Tendencies** | 1 (Strongly disagree) to 5 (Strongly agree) |
| A sensible person avoids activities that are dangerous. | |
| I would like to try parachute jumping. | |
| When I go on a trip, I like to plan my route and timetable fairly carefully. | |
| **Communication Style** | 1 (Strongly disagree) to 5 (Strongly agree) |
| When I am with my friends, I do most of the talking. | |
| I like to take charge in social situations. | |
| I like action, not talking. | |
| **Perceived Fit** | 1 (Strongly disagree) to 5 (Strongly agree) |
| I believe that I am likely to be selected for this position. | |
| **Level of Satisfaction** | 1 (Very unsatisfied) to 5 (Very satisfied) |
| My decision to accept a position with the EPD | |
| My level of job-related knowledge | |
| Amount of Support from the EPD | |
| Amount of support from friends/family members | |

BARAO000093

recruitment strategies (Casteneda & Ridgeway, 2010). The survey was administered to 1,619 recruits from 44 different agencies in the U.S. and included questions pertaining to their motivations, support from friends and family, and opinions about the law enforcement profession.

One measure included in the RAND project asked respondents to indicate the source that referred them to apply to their police agency. This measure was developed based upon a previous question asked of police recruits in California as part of the California Commission on Peace Officer Standards and Training (2006) report of best practices in recruitment. Given that women may face social disapproval for choosing a traditionally masculine occupation, it is important to understand how their sources and influences may differ from others who apply to police officer positions. This research examined sources referring and motivating applicants to apply to the EPD using a measure from the RAND Law Enforcement Recruit Survey which asked respondents to select all applicable motivators from a list of 22 potential referral sources like career fairs, mass mailings, and referrals from friends or family members in law enforcement (Appendix B).

Social support can play an important role in motivating individuals to apply to a police department, remain in the testing process, and accept an employment offer. It is likely that female applicants may be strongly influenced by the gendered expectations of friends, family members, and/or mentors which may lead them to believe that they are not fit for a career in policing. Applicants of both genders may encounter both support and opposition, but it is likely that women experience more opposition from friends and family than men. The RAND Law Enforcement Recruit Survey included a measure to examine potential applicant influencers. As previous researchers noted, it is important to note that this measure cannot provide information

BARAO000094

on friends or family members whose opinions dissuaded individuals from applying for a police officer position. However, this measure is informative for assessing whether female applicants report less support from friends and family and how those influencers affect future perceptions and job satisfaction. This survey question listed 14 different potential influencers. If any of the family members, friends, and professionals listed provided the applicant with an opinion about his or her decision to enter a career in law enforcement, respondents were asked to indicate how much they supported that decision on a 5-point Likert scale from 1=Strongly opposed to 5=Strongly favored (Appendix B).

Women who are worried about multiple facets of the training academy and law enforcement career may be more likely to voluntarily withdraw or report dissatisfaction, especially if they face challenges to their presence in the law enforcement profession. Furthermore, some concerns may be more prevalent among females when compared to male respondents, especially if conventionally feminine responsibilities like childcare are ignored in male-dominated occupations. Concerns about policing were examined through a question developed in the RAND study which asks respondents to select applicable concerns from a list providing 16 potential disadvantages of a policing career (e.g. long hours, difficulty meeting family obligations, threat of injury) (Appendix B).

The values and experiences of recruits can powerfully impact how they assess their work environment and job satisfaction. As recruits spend more time in the police training academy and integrate into the police culture, their values, as well as their perceptions of fairness, may change and consequently alter levels of satisfaction. To assess changes in satisfaction over time, respondents were asked to rate their level of job satisfaction with a) their decision to accept a position with the EPD, b) their level of job-related knowledge, c) the amount of support from the

BARAO000095

EPD, and d) the amount of support from friends/family. Responses were rated on a 5-point Likert sale from 1=Very unsatisfied to 5=Very satisfied.

Finally, additional control variables in the survey included demographic information like age, race, education, children, and marital status (Appendix B).

*Analytic Strategy*

Applicant and recruit surveys were examined to explore the impact of the experience of doing gender in the early stages of a law enforcement career. Specifically, a Wilcoxon-Mann-Whitney test was used to assess gender differences in career motivations, support from friends and family, perceptions of organizational fit, and perceptions of agency discrimination. This test is appropriate when assumptions of normality required for *t*-tests are violated. These questions were answered using Likert scales and the Wilcoxon-Mann-Whitney test is appropriate for use with such ordinal data (DePuy, Berger, & Zhou, 2014).

Wilcoxon-Mann-Whitney tests were also used to analyze the longitudinal recruit survey data. Random-effects generalized least squares (GLS) would have been ideal to analyze this longitudinal data while allowing for differences across individuals to affect the dependent variable. However, academy and survey attrition resulted in small sample sizes that prevented this analytic strategy from accurately detecting effects. Additionally, respondent errors in creating survey identification numbers limited the ability to confidently link subsequent survey responses. Wilcoxon-Mann-Whitney tests were instead used to examine changes in the means of responses regarding career motivations and perceptions of agency discrimination, recruit socialization, and offensive comments over time. Surveys of current female officers were

BARAO000096

examined using univariate analyses. Response means and percentages were used to bolster confidence in findings from female officer interviews.

Of note, several survey measures include multiple questions to assess a central core concept (e.g. feelings of justice and empathy, risk-taking tendencies). The internal consistency of these items was initially examined using Cronbach's alpha, and only one scale produced an alpha value greater than .70, which indicates a good level of scale reliability (Nunnally, 1978). Furthermore, the ability to perform factor analysis on multidimensional items (e.g. worries about a career in law enforcement) was limited by small sample sizes (MacCallum, Widaman, Zhang, & Hong, 1999; Mundfrom, Shaw, & Ke, 2005), particularly due to continued attrition throughout the survey administration period. Therefore, all questions in each response category were analyzed and are presented in the results.

*Sampling for Officer Interviews*

Despite the array of questions included on surveys of applicants, recruits, and officers, findings from this quantitative approach only provide an initial frame for understanding women's experiences in policing. Interviews with sworn female officers offer the insight and detailed accounts necessary to more fully understand the organizational processes and social mechanisms which shape behavioral expectations, gendered roles, and, consequently, the behaviors and attitudes of women in law enforcement. Semi-structured interviews were concurrently conducted with a snowball sample of 28 sworn female officers at different stages of their careers to gain an understanding of how experiences in the police department affect women's attitudes and adaptations over time. The online survey administered to current female officers in the EPD asked respondents whether they would be willing to participate in an interview. Those who

BARAO000097

indicated a willingness to be interviewed were then contacted by the researcher to schedule an interview. Officers were able to select an interview location with which they were comfortable. In total, 15 interviews were conducted in-person and 13 were conducted via phone. Of the face-to-face interviews, 11 took place in the researcher's private office and 4 took place in the officer's district or unit.

Upon the completion of the interview, participants were asked to encourage voluntary participation from other female officers in the EPD. While 16 officers responded directly to survey and subsequent e-mail requests for participation, an additional 12 female officers volunteered for interviews due to the encouragement of fellow officers. Recruiting interview participants was made difficult not only because of the tendency of police officers to distrust outsiders, but also because the women interviewed expressed a prevalent fear among female officers they would be retaliated against or ostracized if others discovered they took part.

| Table 4.5. Demographics of Interview Participants ($n=28$) | | |
|---|---|---|
| | Frequency | Percent |
| **RACE** | | |
| White | 16 | 57.1% |
| Black or African American | 9 | 32.1% |
| Hispanic | 3 | 10.7% |
| Asian/Pacific Islander | 0 | 0.0% |
| Other | 0 | 0.0% |
| **CAREER LENGTH** | | |
| 0-10 Years | 4 | 14.3% |
| 11-20 Years | 10 | 35.7% |
| 21+ Years | 14 | 50.0% |
| **RANK** | | |
| Officer | 12 | 42.9% |
| Detective | 6 | 21.4% |
| Supervisor | 10 | 35.7% |

BARAO000098

Therefore, although snowball sampling may have increased potential participant biases, the benefit of a larger sample of women who felt comfortable providing candid information far outweighed these costs. Twenty-eight female officers volunteered for interviews, and these participants ranged in experience from recruits in the training academy to officers and supervisors with over 30 years in the police department (Table 4.5). Most participants had worked in the department for more than 10 years, and only 4 participants had worked less than 10 years. Twelve (43%) interview participants were officers, 6 (21%) were detectives, and 10 (36%) held supervisory ranks of sergeant or above. Sixteen (57%) of interview participants were white, 9 (32%) were black or African-American, and 3 (11%) were Hispanic.

*Data Collection*

Data collection began in October 2017 and continued through March 2018. For telephone interviews, informed consent was obtained verbally from the interviewee. For face-to-face interviews, receipt of informed consent was confirmed via a signed consent form (Appendix). Following consent procedures, female officers participated in a semi-structured interview using 12 pre-determined guiding questions. During the course of the interviews, follow-up questions were asked to clarify or expand on the unique experiences shared by each participant. Of the 28 interview participants, 24 consented to their interviews being recorded and 4 did not consent to recording. Once interviews were completed, all recordings were transcribed and all identifying information was removed. For those women who were not comfortable with recording, detailed notes were taken during the interview and summaries of all responses were compiled

BARAO000099

immediately following completion. Interviews varied in length from 23 minutes to 1 hour and 47 minutes. The average interview lasted 59 minutes.

*Interview Questions*

Each semi-structured interview aimed to gain a more complete understanding of women's experiences, gendered behavioral expectations, and perceptions of discrimination and fairness in the academy and police department through the use of 11 guiding questions. In these semi-structured interviews, participants were also allowed to bring up any topics they find important even if such topics are not included in the guiding questions. Six of the included guiding questions were influenced by previous qualitative research undertaken to understand women's perspectives of law enforcement and their perceived barriers in policing careers (Kringen, 2014). An additional 5 questions were included to better understand the experiences of women in policing and potential sources of their perceptions of gender-based differential treatment. The following questions were used to guide all interviews:

1. Why were you interested in a career in policing? What made you want to become a police officer?
2. Have you worked in any other law enforcement or military-related fields?
3. What are the most positive aspects of a career in policing?
4. What are some of the most positive experiences you've had while in the training academy/police department?
5. What are the most negative aspects of a career in policing?

BARAO000100

6.  What are some of the most negative experiences you've had while in the training academy/police department?

7.  Can you tell me about any fears or worries you have about a career in policing?

8.  On a scale of 1 to 10, how dangerous do you believe a career in policing to be?

9.  Do you think policing is more difficult for females? Why or why not?

10. Do you believe that women are treated fairly or unfairly in your department compared to male officers? Can you provide examples of such fair/unfair treatment?

11. Do you feel that you've been accepted by your peers in the training academy/police department?

While each question was used to lead into a new topic of discussion, each response was followed by probing questions intended to gain more in-depth information. The women interviewed generally provided detailed responses to each question. When answers were vague, appropriate follow-up questions were asked to elicit more information. If responses were succinct, the women were asked to provide examples that led them to express particular feelings or conclusions. Additionally, ongoing reassurances of confidentiality assisted in helping the officers share their experiences openly.

*Coding and Analysis*

The qualitative method in this research utilized a phenomenological approach. Phenomenology focuses on lived experiences and aims to synthesize individual experiences into a common essence (Creswell, 2013a). The narratives of several individuals are examined to discover common meanings and experiences.

101

Each interview was conducted and personally transcribed by the researcher, allowing a closer familiarity and deeper processing of each participant's responses and experiences. Following the prescribed coding, or reduction, process of phenomenology, significant statements which provided information about how a phenomenon was experienced by female officers in the EPD were first highlighted in the transcripts using NVivo software (Creswell, 2013a; Moustakas, 1994). Next, clusters of meaning were developed from the significant statements and led to the development of several core themes. As recommended by Moustakas (1994), individual textural descriptions were compiled for each participant. For example:

> **Officer 05** has been on the job for 15 years and wanted to be a police officer since she was a young child. As she got older, she was especially attracted to the notion of a stable job with such good benefits. When she first entered the department, she had very good experiences, but when she transferred, she had supervisors who were not supportive. Despite how hard she worked, she never got ahead because she was a female. She says she finds that positions in specialty units are especially unfair and that they know who's going to get a position before they post it. People rarely get positions because they do a good job; they get them because they know people. The specialized divisions have a disproportionate number of males, and when women do enter the highly masculinized units like the gang unit and drug unit, they are largely ignored or given menial tasks. She remarks that some women are fine with their positions and the consistency of their schedules but that others want more of a career and want to advance.

While portions of this description were changed to maintain confidentiality, this example demonstrates the content of each individual textural description. These summaries highlight the common themes and opinions from each officer interview, and provide an overview of each participant's individual experiences in the police department.

BARAO000102

Next, composite textural descriptions were compiled for each of five different career phases: Applying to become a police officer, the police training academy, early career (0-10 years), middle career (11-20 years), and the end of officers' careers (20 years - retirement). First, individual textural descriptions were organized in to groupings by career length. Then, composite textural descriptions were developed by identifying the common threads in each career stage. This process allows common experiences in each career stage to be conveyed as a whole. Once common themes and experiences were identified, both qualitative and quantitative results were integrated to inform otherwise poorly identified and poorly understood processes which contribute to persistently low female representation in policing.

*Validity in Qualitative Research*

Though many objective criteria exist for establishing validity and reliability in quantitative research, less consensus exists as to how validity and reliability should be defined and assessed in qualitative research. Despite this confusion, scholars agree that establishing the credibility of qualitative research is necessary, and Creswell and Miller (2000) have provided a basic framework of approaches to do so. It is recommended that in undertaking and analyzing qualitative studies, researchers engage in at least two different validity procedures. This study utilized three different procedures: triangulation, disconfirming evidence, and peer debriefing.

Triangulation seeks to establish common themes among multiple sources of data in a study and may be completed by sourcing information from different stakeholders, researchers, and/or data. This research used methodological triangulation in which survey responses and administrative data provided by the EPD were used to confirm conclusions established in officer interviews. For example, to enhance female officer claims that assignments in specialized units

103

were disproportionately awarded to male officers, gender-specific data was requested from the EPD regarding personnel in all specialized divisions. Next, a search for disconfirming evidence was conducted in the interview data. Once core themes were developed, the researcher searched for evidence that contradicted them to ensure that disconfirming evidence did not outweigh the established themes. Finally, peer debriefing was used throughout the interview and analysis processes. This procedure consists of reviewing data and findings with individuals familiar with the study and concepts being investigated. Ongoing peer debriefing occurred with individuals from Northeastern University, the EPD, and other outside police agencies.

BARAO000104

## CHAPTER 5: WOMEN'S ENTRY INTO LAW ENFORCEMENT CAREERS

A career in law enforcement is unique and unlike any other occupation. It first entails acceptance of an irregular and often unpredictable schedule. Officers engage in shift work, work holidays, and are regularly called in to fill shifts or assist with large cases or events. Most distinctively, police officers take a job in which there is an ever-present risk of danger. Though the majority of calls and interactions are mundane (Casteneda & Ridgeway, 2010), officers also sometimes encounter dangerous offenders and find themselves in high-risk situations involving potential disease, physical injury, or death. Due to these features of policing, it is unlikely to be a career option situated among other more common choices in retail or corporate settings. To enter a career in policing, candidates must possess an acceptance of these unique characteristics and a dedication to the overarching mission and values of law enforcement.

Once an individual decides to become a police officer, the journey to get on the job is not an easy one. It begins with the decision to apply for an entry-level police officer posting at the law enforcement agency of their choice. Though the process to acquire other jobs is fairly short, deciding to apply to a police department requires commitment to a lengthy process. Most selection processes for police agencies take about one year, but many take even longer. The testing and selection process for the Eastern Police Department begins with a written test administered by a civil service commission. Next, the highest ranked eligible applicants are chosen to proceed to the background investigation phase wherein detectives verify applicant information and investigate personal history details like detected and undetected criminal activity, drug history, and financial history. Applicants must then pass rigorous psychological and medical exams before finally proceeding to a physical agility test which assesses cardiovascular endurance and strength.

BARAO000105

Since the police officer selection process is thorough, intrusive, and requires enduring dedication, most likely believe that those who apply to policing jobs have given the career path extensive thought and consideration. A common perception is that becoming a police officer is a lifelong aspiration applicants are finally able to fulfill. Though some certainly consider the career a lifelong dream, others only choose a policing career shortly before applying. In either case, the kinds of personal motivations that drive this career choice are important to sustaining commitment throughout the intensive testing process. Similarly, applicants' impressions of the organization and level of social support can significantly impact their willingness to continue pursuing the occupation (Casteneda & Ridgeway, 2010; Ryan et al., 2000).

For women, this career decision is complicated by gender norms which situate policing as a masculine profession. The decision to apply can be strongly influenced by discouragement by friends and family members, fears of violating social norms, and concerns about fitting into the male culture. This goal of this chapter is to investigate whether and how they characteristics and attitudes of female applicants differ from male applicants. These questions are important in exploring whether such initial differences might impact future recruit and officer perceptions and career outcomes. This chapter examines the characteristics, attitudes, and social support of police applicants using surveys of male and female EPD applicants ($n = 139$) as well as retrospective narratives from interviews with 28 current female EPD officers. Analysis of this survey and interview data seeks to determine how women might differ from men in terms of their demographics, personality characteristics, motivations, worries, and social support when entering a career in policing.

**Police Officer Applicants**

BARAO000106

Individuals must be at least 19 years of age to take the police civil service exam and 21 years of age to become a police officer. Because many individuals at this age may be completing educational pursuits, awaiting the next civil service exam, or may be required to test multiple times to achieve better scores and, thus, increase their likelihood of selection, most new police officers are slightly older than the minimum age of hire. The majority of Eastern Police Department applicants are between the ages of 25-34. Notably, for applicants of this age, the police department may be their first experience in a serious, long-term career environment.

Individuals between the ages of 25-34 fall within a life stage in which many will get married and begin having children. Likely because many are relatively young, 69% of applicants have never been married and 73% do not have any children. Female applicants tend to be slightly younger than male applicants when they enter the academy. Perhaps as a result, they are also slightly less likely to have children. While this study is not able to investigate those who chose not to apply, it is possible that women with children are less likely to apply to police departments since they are more likely to be the primary caregiver for children. Prior research has indicated that women with children may be less likely to select law enforcement occupations because they do not perceive it to be welcoming or accommodating to women with familial responsibilities (Ryan et al., 2000). Therefore, that women in this sample are less likely to have children may indicate that women with children are less likely to apply due to concerns about work-life conflicts. Men and women are otherwise largely similar in terms of life circumstances and educational attainment.

Most police departments, including the EPD, only require a high school diploma or GED for hire. However, whether to make themselves more competitive or to position themselves for future career pursuits, most applicants achieve higher levels of education. Amongst both male

BARAO000107

and female applicants, most have earned a Bachelor's degree. For those who have not, applicants have typically taken some college classes or have earned an Associate's degree

Male and female applicants are not only similar in their life circumstances and educational attainment before they enter the police academy, but responses to surveys administered indicate that they also demonstrate similar personality characteristics. An examination of personality characteristics is important because a large point of opposition to women's integration in policing has been that they are inherently too weak, submissive, and emotional for police work (Martin, 1980; Schulz, 1995). Contrary to these stereotypical beliefs, female applicants in this sample report behavior and communication tendencies that are largely similar to their male counterparts (Table 5.1). Previous research examining gender differences in communication styles find that men demonstrate more dominant orientations (Radecki & Walstedt, 1980; Terrell, 2008). Additionally, studies regarding risk-taking often find that men report higher levels of risk-taking tendencies when compared to women (Byrnes, Miller, & Schafer, 1999; Meertens & Lion, 2008). Among EPD applicants, there are no significant differences between male and female applicants' level of risk taking behavior. Interestingly, female applicants reported slightly stronger, more authoritative communication styles than male recruits on all measures. Women reported significantly higher levels of agreement with the statement, "I like to do most of the talking," and their greater level of agreement with the statement, "I like action, not talking" approached significance.

Although men are often believed to be better suited for police work because of their more dominant, authoritative personalities, female police applicants appear to be just as likely to hold similar characteristics. If these gender differences tend to hold in the general population, they do not appear to persist in this sample of police applicants. This may indicate that women who

BARAO000108

| Table 5.1. Risk-Taking Tendencies & Communication Styles of Applicants by Gender ($n$=139) | | | | |
|---|---|---|---|---|
| | | | Mann-Whitney | |
| | MALE ($n$=109) | FEMALE ($n$=30) | $z$ | $p$ |
| **Risk Taking** | | | | |
| A sensible person avoids activities that are dangerous | 3.42 | 3.29 | 0.483 | 0.629 |
| I would like to try parachute jumping | 2.85 | 3.17 | -0.951 | 0.342 |
| When I go on a trip, I like to plan my route and timetable fairly carefully | 4.12 | 4.22 | -0.536 | 0.592 |
| **Communication Style** | | | | |
| I like to be in control of the conversation | 3.03 | 3.30 | -0.892 | 0.372 |
| When I am with friends, I do most of the talking | 2.68 | 3.26 | -2.140 | 0.032 ** |
| I like to take charge in social situations | 3.44 | 3.74 | -1.098 | 0.272 |
| I like action, not talking | 3.45 | 3.91 | -1.817 | 0.069 * |

*$p$<.10; **$p$<.05; ***$p$<.01

apply to police positions possess more stereotypically masculine attributes and reject some traditionally feminine attributes. Despite preconceived expectations about women, female police applicants are actually much more similar to their male counterparts. This is meaningful because such non-traditional personality characteristics should position these women to succeed in the enduring masculine culture of policing. It furthermore may provide evidence that women who choose policing professions seem to engage in gender crossing wherein they do not seek to construct purely feminine identities but also participate and identify with conventionally masculine behaviors.

**Motivations for Becoming a Police Officer**

Because male and female applicants seem more alike than different in basic demographics and personality style, it is important to explore possible differences in their motivations for becoming police officers. Differences in motivations may result in varying levels of commitment to the job and divergent career trajectory aspirations. Differences in motivations may also be especially helpful in explaining gendered variations in retention and assignments in the department. Though no research has been conducted on how these motivations affect the

109

BARAO000109

future retention of officers, it is possible that individuals who rate economic factors most highly may experience burn-out sooner than their coworkers due to the extreme mental and emotional demands of police work. Conversely, those who report that features like helping people and enforcing the laws of society have greater importance may be better able to cope with ongoing stressors since they are driven by the ideological tenets of the law enforcement profession. For males, childhood dreams of working in law enforcement are considered normal and these desires often receive approval from friends and family. Males are taught that this is a gender-appropriate career path because of the ability to take risks, face danger, protect others, and fight crime. Each of these career goals exemplifies male characteristics of strength, power, and authority. However, since career aspirations in policing violate gender norms for women, they likely receive less social approval if they report the desire to become a police officer when they are young. Influenced by these social norms, women's motivations may differ greatly and may revolve around socially approved gender appropriate community-oriented and caretaking functions of the job.

Though such differences in gender norms and social approval could lead to strong variation in reported career motivations among male and female applicants, surveys of applicants indicate comparable motivations among both men and women (Table 5.2). Applicants were motivated both by the personal and financial benefits of the career as well as the fundamental nature of law enforcement work. They ranked salary, career opportunities, benefits like medical insurance and a pension, and job security high in importance. Applicants also ranked several value-laden features of the policing profession as important, and they rated these types of motivations slightly higher. They reported that the opportunity to help people, fight crime, and enforce the law were all strong motivations for pursuing a law enforcement career. Applicants

BARAO000110

| Table 5.2. Career Motivations of Applicants by Gender ($n$=139) | | | Mann-Whitney | |
|---|---|---|---|---|
| | MALE ($n$=109) | FEMALE ($n$=30) | $z$ | $p$ |
| Opportunities for advancement | 4.36 | 4.23 | 0.283 | 0.777 |
| Structured like the military | 3.85 | 3.40 | 1.742 | 0.082 * |
| Good salary | 4.23 | 4.10 | -0.044 | 0.965 |
| Job benefits | 4.47 | 4.20 | 0.966 | 0.334 |
| Early retirement | 3.72 | 3.40 | 1.163 | 0.245 |
| Excitement of the work | 4.37 | 4.00 | 0.604 | 0.546 |
| Opportunity to help people | 4.55 | 4.30 | 0.992 | 0.321 |
| Job security | 4.50 | 4.27 | 0.986 | 0.324 |
| Fight crime | 4.48 | 2.17 | 1.157 | 0.247 |
| Prestige of the profession | 4.25 | 4.07 | 0.680 | 0.497 |
| Great deal of autonomy | 3.81 | 3.57 | 0.680 | 0.497 |
| Variety and non-routine nature of work | 4.12 | 3.97 | 0.268 | 0.789 |
| Enforce the laws of society | 4.44 | 4.20 | 0.676 | 0.499 |
| Camaraderie with co-workers | 4.49 | 4.27 | 0.589 | 0.556 |
| Lifelong dream or aspiration | 4.39 | 4.31 | -0.576 | 0.565 |
| Friends/relatives who are police officers | 4.02 | 3.30 | 2.359 | 0.018 ** |
| Power and authority of job | 3.31 | 3.21 | 0.282 | 0.778 |
| Use as stepping stone to better career | 3.17 | 3.20 | -0.157 | 0.875 |
| Lack of other job alternatives | 1.90 | 2.21 | -0.733 | 0.463 |

*$p$< .10; **$p$< .05; ***$p$ <.01

also considered the camaraderie of the profession as an important feature, and many indicated that becoming a police officer was a lifelong dream. These findings mirror results in previous research which indicate that police recruits and new officers often rate economic and public service-oriented traits of policing highly while features related to power and authority are generally ranked as slightly less important (Lester, 1983; Ragnella & White, 2004).

Few differences emerged between the motivations of male and female applicants but men were slightly more likely to report that the military-like structure of policing was important. Male applicants in this sample were also more likely to report prior military or law enforcement experience, so familiarity with this structure along with the masculine nature of both fields may make this attribute more appealing for men. A second more powerful difference emerged when applicants were asked to indicate the importance of family members and friends who are police officers. Women were significantly less likely to rank this as an important motivation in their

BARAO000111

decision to become a police officer, and this finding has emerged in previous studies as well (Foley et al., 2008; Lester, 1983). Prior scholars have noted that one obstacle to attracting women to law enforcement is their lack of policing role models (Schulz, 1995). Men are more likely to have male family members or other mentors who work as police officers, but women's low representation means that young women are far less likely to grow up with these sources of inspiration. Women may therefore learn that policing is an uncommon and inappropriate occupation for females. It may further communicate that women are unwelcome in policing, and female police officers risk being perceived as unfeminine. Lacking female police role models may not only affect women's initial decision to apply but could strongly impact their motivation to remain in the profession long term.

**Women's Pathways to Policing**

Although both male and female applicants' rate particular career features as more important than others, detailed narratives about the paths by which they are led to policing provide more information about how gender norms and expectations influence women's career choices. In interviews with 28 current female officers, three common pathways to policing emerged among participants: policing was either a childhood aspiration, an occupation related to a previous field of work or study, or an unexpected and unplanned line of work.

*Childhood Aspirations*

Of the 28 women interviewed, childhood dreams to become a police officer were rare. That so few women thought about becoming police officers as children or teenagers suggests that they are rarely socialized to consider policing as a serious or appropriate career option. Only 5

BARAO000112

female officers in this sample reported having aspirations to become police officers during their childhood and teenage years. For these women, some were inspired by family members in law enforcement who supported them entering the "family business." A supervisor in the department noted that since she had multiple family members in law enforcement, it was expected that some of the children would follow that path as well.

> Well, it was just a family business. My older sister was a cop before me, she's still a cop. And then I had an older cousin, a female, who was also on, and two guy cousins ahead of me. But my father had been a cop also… so it wasn't unexpected. (Supervisor 09)

She further explained that since the occupation was common in the family, she received a lot of support for her decision. This support did not waiver or differ based on her sex, especially since other women in the family had paved the way before her.

Others without police officer family members were often motivated by police-related programming they watched on television. Female police officers on television served as role models for women when they lacked those female figures amongst their friends and family members. For women growing up during the 1970s in particular, the emergence of female law enforcement figures in shows was new, powerful, and inspired them to pursue a career path they might not have otherwise considered possible. A second supervisor who grew up during this time period explained her inspiration:

> I always as a kid growing up, that was like really at the beginning of police shows on TV. So The Mod Squad and the very early shows. But I was so psyched and I thought that Angie Dickinson was the bomb and I just thought that was so cool and then the idea of helping people. (Supervisor 02)

BARAO000113

For young women during this time period, characters like Angie Dickinson had previously been absent from mainstream media. At the same time that these shows gained popularity, women were entering police departments in greater numbers due to legal and legislative changes that mandated their inclusion and equal treatment in law enforcement agencies. Therefore, these female characters represented an exciting new reality for women attracted to the features of police work. Their existence suggested that policing was no longer off-limits to women.

*Similar Backgrounds*

Other women had been travelling down career paths in criminal justice, social work, and other related fields, but they leaned toward more gender-appropriate options. They worked or planned to work in areas like probation, court, forensics, emergency medical response, or in positions as social workers. Although these women didn't expect to end up working as police officers, the transition felt more natural to them and it was simply an avenue in their field of work that they hadn't previously considered. A patrol officer noted that she had studied in similar fields and the opportunity to become a police officer presented itself suddenly:

> I kind of just came home from college on a break and my sister and I decided that I should take the exam. I was majoring in sociology with a criminal justice concentration in an undergrad, so I knew I wanted to do something in criminal justice or go to law school to be an attorney. But I chose this route instead. (Officer 10)

Although she had an education in sociology and criminal justice, she hadn't seriously considered becoming a police officer. However, when the exam opportunity arose, it seemed like a good career path for which she felt prepared. These expressions were common and suggest that

114

BARAO000114

women interested in criminal justice do not immediately consider policing to be a realistic career path. Instead, they often first considered more gender-appropriate options before varying circumstances eventually led them to policing.

A detective echoed another experience common among the women. She had pursued a career in a related first responder profession but found herself suddenly steered into policing instead:

> I really had no wish to want to do it. I was looking more in the medical field. I was going to work instead in paramedicine in the ambulance world. I was going to still go down that road but issues about needles and sticking people, I couldn't. My husband at the time, we had just been dating, and he was like why don't you just take the test? And I was like okay, I'll take the test. (Detective 16)

For her, policing was a profession in which she could continue to experience what attracted her to paramedicine. She could be a front line first responder tasked with helping those in need. Again, when the exam opportunity presented itself, she took the chance even though it wasn't the exact path she previously expected.

Other women with similar experiences spent several years working in related fields. Though policing had not been a career aspiration, none expressed regret about their chosen new direction. For these women, it seems that although their personalities and career interests aligned with law enforcement, they were driven toward more acceptable occupations for women. This may have been the result of a lack of female police role models, the pressure of cultural norms regarding the masculine nature of policing, or both. To many women, it appears that becoming a police officer was at odds with traditional social expectations regarding performances of femininity. It was only when obstacles in their current career occurred alongside an application opportunity that these women considered policing a feasible career choice.

115

*An Unexpected Profession*

The largest proportion of women interviewed described policing as a career they simply fell into unexpectedly. They were in need of a well-paying job with a stable salary and job security. When they heard about an upcoming opportunity to take the civil service test to become a police officer, they chose to do so because it felt like a reliable career option that would provide them with financial security and independence. Many had never considered becoming police officers, and several expressed that they took the police exam just to see what would come of it. One supervisor explained that she simply came upon a posting and decided to take a shot:

> I was a student here and there was a posting, I think it was in Curry, and I took the civil service test just because why not? At that point I was in my third or fourth year. I just took it to take it, but I got a call right away which I was super surprised by. I had heard it was a slow process. I got called literally within the same year. (Supervisor 01)

The speed of a typically slow process took her by surprise and since she was hired so quickly, she had to decide to forego completing her degree. That it was necessary to leave school in her final year highlights the unexpected and unplanned nature of her future career. A detective reported a similar sudden decision after receiving an advertisement in the mail:

> I saw something in the mail just saying hey, if you're interested in this job... And I just took the police cadet test and they were like we like you, come in to do the interview. I went through the procedure and I fell into law enforcement. It's not like a lot of people who are like, "I wanted to be a police officer forever." I tried it out and here I am 20-something years later. (Detective 06)

BARAO000116

At the time, she had moved out on her own and was in need of a stable job. Pursuing a police cadet opportunity appeared to be a reliable path toward a future sworn law enforcement positions that would offer long-term employment and benefits.

To this last group of women, the primary attraction of policing was the stability and financial security it offered. These motivations were especially prevalent among senior female officers hired during the 1980s and early 1990s. They voiced that a lack of other well-paying job opportunities made policing a very attractive option. Female officers hired in this era were often aware that they would face difficulties being accepted in the male-dominated environment but felt that the benefits were worth the struggles they would face.

**Support for Women's Career Choice**

After choosing to pursue a career in law enforcement, most women reported that they received the support of their friends and family despite entering a profession considered to be more appropriate for men. Officers interviewed noted that some family members expressed worry about their safety but never attempted to dissuade them from policing. However, discouragement from friends and family more often appeared to occur at the intersection of gender and race or sexual orientation. If officers did have friends who disagreed with their decision to enter law enforcement, their lack of support was often based on beliefs about police treatment of minorities rather than the officers' gender. Officers who were members of racial minority groups or identified as lesbian sometimes reported that their friends were wary of their choice because police officers had engaged in misconduct or maltreatment of their minority group in the past. One African-American patrol officer explained:

> It was like going against the grain because I'm the first in the family to become a police officer... and in those days of growing up, I mean it was in the 70s and 80s,

BARAO000117

and there was still a big issue of racial divide. So for the family, it was moreso that I was going towards ... crossing the other line. But I explained to them that it wasn't about crossing the other line, it was about being able to give back to the community, to the city. (Officer 04)

Because her friends and family members had such negative perceptions of the police, their overarching concern was with the reputation of law enforcement agencies rather than her gender. A supervisor who identified as lesbian detailed similar concerns among her friends:

I had many friends who were gay or gay-friendly, and they thought I was crazy because I was going to become one of "them." Especially if you think back, my high school years were in the 70s, so it was very fresh after the Stonewall Riots and there was no such thing as gay groups and gay movements or anything like that. So the police would always beat people up if they were perceived as being gay. Or arrest you, you could be arrested for being gay … so for me to all of a sudden want to be one of them. (Supervisor 02)

Both women reported difficulties integrating into the police department due to their gender, and opposition from friends and family due to their status as gay or racial minorities made their decision to enter the profession even more difficult. Although poor relations between the police and the gay community have largely dissipated, tensions in minority communities remain strong. Interestingly, this additional discouragement and these added hardships do not appear to compound and thwart these women from entering law enforcement. In the EPD, only 31% of male sworn officers are minorities while 50% of sworn women are minorities.

Surveys of 139 applicants supported findings from officer interviews indicating that women's friends and families were largely supportive. Applicants were asked whether different friends, family members, and other influential figures had voiced opinions about their choice to

118

BARAO000118

pursue a policing career. Of those who provided opinions, applicants were asked about their level of agreement or support on a Likert scale from 1 to 5. Both male and female applicants reported that the important figures in their lives were largely supportive of their decision (Table 5.3). Women furthermore reported slightly higher levels of support from coworkers and individuals with experience in the Eastern Police Department when compared to men.

Interestingly, though women report that friends and family members did not strongly affect their motivation to become police officers, personal referrals do appear to act as a significant source of female applications as well as their positive perceptions of the organization. For both male and female applicants, the overwhelming majority were led to apply through personal referrals. Among female applicants, 33% were referred by someone working in law enforcement and another 30% were referred by someone not working in law enforcement. Among male applicants, 30% were referred by someone working in law enforcement while 19% were referred by someone not working in law enforcement. Additionally, 67% of women and

| Table 5.3. Level of Support Reported by Applicants by Gender ($n$=139) | | | | |
|---|---|---|---|---|
| | | | Mann-Whitney | |
| | MALE ($n$=109) | FEMALE ($n$=30) | $z$ | $p$ |
| Biological Father | 4.43 | 4.38 | 0.155 | 0.877 |
| Step-Father | 4.42 | 4.29 | 0.238 | 0.812 |
| Biological Mother | 4.39 | 4.27 | 0.720 | 0.472 |
| Step-Mother | 4.50 | 4.33 | 0.282 | 0.778 |
| Sibling | 4.62 | 4.70 | -0.367 | 0.714 |
| Another Relative | 4.62 | 4.68 | -0.619 | 0.536 |
| Spouse or Partner | 4.75 | 4.71 | -0.226 | 0.821 |
| Girlfriend or Boyfriend | 4.58 | 5.00 | -1.694 | 0.090 * |
| Friend | 4.68 | 4.78 | -1.167 | 0.243 |
| Coworker | 4.67 | 4.95 | -2.355 | 0.019 ** |
| Professor, Teacher, or Counselor | 4.59 | 4.83 | -1.521 | 0.128 |
| Someone with Experience in this Department | 4.74 | 5.00 | -2.243 | 0.025 ** |
| Someone with Experience in Another Department | 4.78 | 4.95 | -1.417 | 0.156 |

*$p$<.10; **$p$<.05; ***$p$<.01

119

BARAO000119

78% of men reported discussing their career choice with someone who had experience in the EPD specifically. Among them, women were more likely to report that these individuals were supportive of their choice. Given that officer role models among family and friends are less common for female applicants, these findings indicate that current law enforcement officers are an important source of referrals, and officer outreach and interactions are crucially important for departments seeking to recruit more women.

**Initial Perceptions of Applicants about the Profession**

Prior to entering the police training academy, most male and female applicants hold relatively neutral views toward the occurrence of discrimination and unfairness (Table 5.4). They neither strongly agree nor disagree with statements related to feelings of injustice in society. Moreover, neither male nor female applicants hold strong views about societal mistreatment of

| Table 5.4. Initial Perceptions of Applicants by Gender ($n$=139) | | | | |
|---|---|---|---|---|
| | | | Mann-Whitney | |
| | MALE ($n$=109) | FEMALE ($n$=30) | $z$ | $p$ |
| **Perceptions of Discrimination** | | | | |
| In life, people usually get what they deserve | 3.31 | 3.39 | -0.348 | 0.728 |
| Life is simply not fair for many people | 2.62 | 2.73 | -0.323 | 0.747 |
| Overall, minorities have been mistreated by society | 3.16 | 3.39 | -0.879 | 0.379 |
| Overall, women have been mistreated by society | 3.11 | 3.33 | -0.835 | 0.404 |
| **Perceptions of Agency Fairness** | | | | |
| I believe that this agency treats its employees the same regardless of race | 4.30 | 4.32 | -0.168 | 0.867 |
| I believe that this agency treats its employees the same regardless of gender | 4.34 | 4.17 | 0.588 | 0.557 |
| **Organizational Fit** | | | | |
| I am likely to be selected for this position | 4.56 | 4.70 | -0.605 | 0.545 |
| **Academy Environment Expectations** | | | | |
| Recruits will socialize with others of same gender | 3.07 | 2.50 | 0.391 | 0.696 |
| Recruits will socialize with others of same race | 2.73 | 1.50 | 1.226 | 0.220 |
| Recruits/instructors will frequently make jokes or sexual comments about female officers/recruits | 1.60 | 1.00 | 1.054 | 0.292 |
| Recruits/instructors will frequently make jokes or negative comments about minority officers/recruits | 1.60 | 1.00 | 1.054 | 0.292 |
| Recruits/instructors will frequently make jokes about the sexual orientation of officers/recruits | 1.60 | 1.00 | 1.054 | 0.292 |

*$p$<.10; **$p$<.05; ***$p$<.01

120

BARAO000120

women and minorities. Both groups expressed neutral views rather than strongly agreeing or disagreeing that women or minorities are generally mistreated. These rather indifferent perspectives appear to lead to applicants' positive perceptions of fairness within the Eastern Police Department. Male and female applicants strongly agreed that the agency would treat its employees fairly based on both gender and race. The majority of applicants, regardless of gender, also indicated that they believed they were a good organizational fit and were very likely to be selected to become police officers in the EPD, indicating that female applicants are unlikely to see the police department as an isolated, exclusive, male-dominated environment in which they will be cast out.

Applicants' expectations about the training academy environment mirrored their reported neutral feelings about recruits' potential tendency to socialize mainly with others of the same gender or race. In fact, many even disagreed that such segregated socialization would occur, suggesting that they believed gender and racial divides would be absent from the police academy environment. When asked whether they thought recruits or instructors would make jokes or negative comments pertaining to gender, race, or sexual orientation, most applicants strongly disagreed that this might be prevalent.

Although all applicants hold similar views about bias, discrimination, and their expectations of fair and respectful treatment, males and females may still have very different concerns about entering a policing career. For women, who are often expected to bear the brunt of childcare and homecare responsibilities, it might be expected that long hours and unpredictable schedules of law enforcement careers might be of special concern. Furthermore, conventional gender norms prescribe that men should be tougher and take more risks while women should fear the potential danger of working as a police officer. In spite of these expected

BARAO000121

| Table 5.5. New Recruits' Worries about Policing Career by Gender ($n=52$) | | | | |
|---|---|---|---|---|
| | | | Mann-Whitney | |
| | MALE ($n=38$) | FEMALE ($n=14$) | $z$ | $p$ |
| **Worries About Policing Career** | | | | |
| Insufficient salary | 0.00 | 0.07 | -1.648 | 0.100 * |
| Insufficient health insurance benefits | 0.03 | 0.07 | -0.743 | 0.457 |
| Long hours | 0.18 | 0.00 | 1.710 | 0.087 * |
| Shift work | 0.13 | 0.00 | 1.414 | 0.157 |
| Personal health or medical limitations | 0.05 | 0.07 | -0.255 | 0.798 |
| Difficulty meeting family obligations | 0.37 | 0.21 | 1.041 | 0.298 |
| Threat of injury | 0.24 | 0.21 | 0.170 | 0.865 |
| Threat of death | 0.34 | 0.50 | -1.028 | 0.304 |
| Family members' negative views regarding law enforcement | 0.05 | 0.00 | 0.867 | 0.386 |
| Friends' negative views regarding law enforcement | 0.05 | 0.00 | 0.867 | 0.386 |
| Negative portrayal of law enforcement in the media | 0.32 | 0.07 | -1.546 | 0.122 |
| Military-like qualities such as use of rank and command structure | 0.03 | 0.00 | 0.607 | 0.544 |
| Paramiliary environment of the training academy | 0.13 | 0.00 | 1.414 | 0.157 |
| Length of the training academy | 0.13 | 0.07 | 0.596 | 0.551 |
| Possible corruption within law enforcement agencies | 0.16 | 0.14 | 0.132 | 0.895 |
| Possible favoritism within law enforcement agencies | 0.08 | 0.29 | -1.919 | 0.055 * |

*$p<.10$; **$p<.05$; ***$p<.01$

gender variations, there were no significant differences in reported career concerns among male and female applicants (Table 5.5). Applicants were asked to indicate whether or not they worried about each of the listed potential concerns. They reported that negative media portrayal of policing, the threat of injury, and the threat of death worried them most about the job. Though the differences did not reach significance, male applicants were slightly more likely to indicate concerns about long hours and potential difficulty meeting family obligations.

**Conclusion**

Consistent with prior research, the overall demographic profile, attitudes, and motivations of male and female recruits are much more alike than different. Similarities in risk-taking tendencies and stronger communication styles indicate that women applying to policing positions may exhibit personality characteristics that are more masculine than women who do not apply.

122

BARAO000122

These results mirror findings from previous studies indicating that female police officers tend to score lower on scales of femininity. These characteristics likely reduce concerns about entering a dangerous career in a male-dominated environment and increase one's personal identification with the values of the police culture. Such findings also suggest that women in policing may be similar to girls who enter masculine gangs and commit masculine forms of crime in that they do not attempt to maintain a strictly feminine identity. Instead, their entry into the male-dominated police culture in which they must often participate in conventionally masculine behaviors entails the practice of gender crossing. These women exhibit more gender fluidity in their switching from feminine to masculine performances depending on what particular situations require.

Both male and female applicants also report similar motivations for pursuing a career in law enforcement. While it is often assumed that women are more naturally attracted to the "softer" aspects of policing, few significant differences exist between how men and women rate their motivations for entering police work. Findings that women are motivated by the same features as men reduces the ability of these stereotypical gendered beliefs to explain why women are so vastly overrepresented in social work and administrative functions in the police department.

One notable difference, however, is that women are significantly less likely to say that they were strongly influenced by friends or family in law enforcement. This is not surprising given that women are underrepresented as police officers and, thus, are less likely to serve as police role models. When girls do not see women working as police officers on patrol, policing is understood to be a job for men. Despite this difference in the importance of close, influential role models, the overwhelming majority of both men and women are led to apply to police officer jobs through referrals, and women are much more likely to report that officers in the EPD

123

expressed support for their decision. Since few women report that policing was a lifelong dream, the presence and influence of law enforcement role models found among friends and family may be minimal. However, others in policing do still appear to play an important role in pushing women to apply and providing support that may help retain them throughout the application process. Police officers who encourage and support their decision to pursue law enforcement appear to make a substantial impact on applicants' decision making.

Applicants pursuing a policing career also report strong, widespread perceptions of fairness. These positive beliefs about equality are important to ensure that applicants will continue the testing process and succeed in the training academy. Upon taking this survey, applicants had completed both a written exam and thorough background investigation. Though minimal, they had some contact with officers and detectives in the EPD. Their responses suggest that their interactions did not give them reason to be concerned about any gender-based bias or unfair treatment. It appears that at this initial stage of their careers, applicants hold favorable beliefs about equality in the police department. As they are still civilians and remain isolated from the police culture of their future department, they may not have encountered any indications that they will be treated differently.

The decision to apply to become a police officer is a key life decision, especially for women who are choosing to violate gendered expectations in favor of the positive career benefits policing can provide. Unlike other occupations, entry into law enforcement professions not only hinges on this initial decision, but it also requires that applicants continuously choose to reaffirm their career choice by continuing to take tests and wait long periods of time for the outcomes. The personalities, social support, motivations, and initial perceptions of the organization can thus be extremely important in sustaining positive applicant attitudes and dedication throughout an

BARAO000124

intensive employment testing process. That women report so many similarities to men suggests that female applicants are capable of adapting to the masculine behavioral requirements in policing and do not yet feel significant concern about how they will be treated in the police department. They instead feel well-suited for the job and expect fair treatment in the training academy and police department.

BARAO000125

### CHAPTER 6: FEMALE RECRUITS IN THE POLICE TRAINING ACADEMY

Upon notification that they have been hired, new incoming police officers in the EPD must attend a rigorous, seven-month training academy. The curriculum of the training academy involves physical, technical, and academic classroom portions. Throughout the course of the academy, a series of written and physical examinations are administered. Recruits who fail to meet training standards in any of these areas may be terminated from their position as a police officer recruit. Recruits may also leave the academy through voluntary withdrawal as a result of personal concerns or limitations.

The EPD training academy consists of approximately 925 curriculum hours including classroom instruction, physical training, and academic and fitness examinations. In this curriculum, approximately 160 hours (17%) are dedicated to legal instruction including constitutional law, criminal law, and court procedures. About another 210 hours (23%) consist of patrol procedure instruction encompassing investigation techniques, interview approaches, motor vehicle stops, and patrol response approaches. Police training academies are often criticized for focusing on the more masculine aspects of policing, and though other departments dedicate an even greater proportion of their curriculum to these aspects, the EPD training academy does allocate a sizeable proportion of its curriculum to these areas as well. Recruits spend about 191 hours (21%) with instruction on defensive tactics, physical fitness, and firearms training. Though women are said to bring special communication, empathy, and de-escalation skills to law enforcement, only 67 hours (7%) of the curriculum are dedicated to areas like community policing, domestic violence intervention, and conflict resolution.

BARAO000126

| Table 6.1 Training Academy Class Attrition by Gender | | | | |
|---|---|---|---|---|
| | Start | End | % Attrition | $p > |z|$ |
| **ACADEMY CLASS 1** | | | | |
| Male | 70 | 51 | 27.1% | 0.139 |
| Female | 10 | 5 | 50.0% | |
| **ACADEMY CLASS 2** | | | | |
| Male | 103 | 78 | 24.3% | 0.573 |
| Female | 27 | 19 | 29.6% | |

*$p < .05$

Two recruit classes entered the Eastern Police Training Academy in 2016 and 2017. The first class consisted of 80 recruits with 70 men (88%) and 10 women (12%). At the time of graduation, a total of 24 recruits had either voluntarily withdrawn or failed out of the training academy (Table 6.1). Reasons for termination may include failure of academic requirements, failure to meet physical standards, or, more rarely, disciplinary measures. Nineteen of these recruits were male and 5 were female. The second class entering the academy consisted of 130 recruits. Of those, 103 were male and 27 were female. Throughout the course of the training academy, 33 recruits either voluntarily withdrew or were terminated. Of the 33 recruits who did not complete the training academy, 25 were male and 8 were female. Though attrition rates appear higher for female recruits, a two-sample test of proportions indicated that gender differences in attrition were not significant both in separate and aggregated academy class totals.

The police training academy provides new recruits with their first experiences in the police culture, and the training academy delivers the first messages regarding how women must do gender to achieve success. Though operated in a facility separate from the police departments and districts in which they will eventually work, instructors from the EPD help transfer the values and expectations that will shape recruits' perceptions and guide their conduct as new police officers. Civilians are treated as outsiders to the policing profession and are thus prevented

127

from gaining a thorough understanding of the job and its values and culture until they are on the inside. It is in the training academy then that new female recruits not only learn the legal and procedural guidelines for behavior, but they also begin to gain a more intimate understanding the gender norms which guide how they are expected to act and how they can expect to be treated for the duration of their careers.

This chapter discusses the experiences of police recruits throughout the training academy phase of the law enforcement career in an effort to explore the mechanisms through which recruits begin to learn the gender norms of the police department. First, the attitudes of new police officer recruits are examined using surveys of EPD recruits administered just prior to their entry into the police training academy. Results from two subsequent surveys of recruits near the end of their training as well as shortly after graduation provide more information about how their perceptions changed throughout this training and socialization process. Finally, since the training academy may provide new officers with their first encounter with the masculine police culture, the experiences and perceptions of women in the training academy are also examined using the retrospective narratives from interviews with 28 current female officers.

**Attitudes of Recruits Entering the Academy**

Attitudes of recruits entering the police training academy remained largely similar to attitudes held during the application phase. Incoming recruits overwhelmingly agreed that they believed the agency treated its employees the same based on gender and race, and most did not believe that either instructors or fellow recruits would make jokes or negative comments based on gender, race, or sexual orientation. Both male and female recruits were also extremely likely to agree that they were a good fit for the position of police officer.

BARAO000128

| Table 6.2. Satisfaction Among Incoming Recruits by Gender ($n=51$) | | | Mann-Whitney | |
|---|---|---|---|---|
| | MALE ($n=37$) | FEMALE ($n=14$) | $z$ | $p$ |
| Decision to accept this position | 4.65 | 4.93 | -1.561 | 0.119 |
| Level of job-related knowledge | 3.89 | 4.00 | -0.333 | 0.739 |
| Level of support from department | 4.22 | 4.21 | -0.079 | 0.937 |
| Level of support from family and friends | 4.73 | 4.86 | -0.642 | 0.521 |

*$p<.10$; **$p<.05$; ***$p<.01$

| Table 6.3. Incoming Recruits' Worries about Policing Career by Gender ($n=139$) | | | Mann-Whitney | |
|---|---|---|---|---|
| | MALE ($n=109$) | FEMALE ($n=30$) | $z$ | $p$ |
| **Worries About Policing Career** | | | | |
| Insufficient salary | 0.01 | 0.05 | -1.124 | 0.261 |
| Insufficient health insurance benefits | 0.00 | 0.00 | – | – |
| Long hours | 0.18 | 0.05 | 1.572 | 0.116 |
| Shift work | 0.06 | 0.00 | 1.212 | 0.226 |
| Personal health or medical limitations | 0.03 | 0.09 | -1.234 | 0.217 |
| Difficulty meeting family obligations | 0.33 | 0.18 | 1.355 | 0.175 |
| Threat of injury | 0.19 | 0.27 | -0.843 | 0.399 |
| Threat of death | 0.31 | 0.41 | -0.901 | 0.368 |
| Family members' negative views regarding law enforcement | 0.04 | 0.00 | 0.980 | 0.327 |
| Friends' negative views regarding law enforcement | 0.05 | 0.05 | 0.147 | 0.883 |
| Negative portrayal of law enforcement in the media | 0.24 | 0.41 | -1.546 | 0.122 |
| Military-like qualities such as use of rank and command structure | 0.00 | 0.00 | – | – |
| Paramiliary environment of the training academy | 0.01 | 0.05 | -1.124 | 0.261 |
| Length of the training academy | 0.03 | 0.00 | 0.845 | 0.398 |
| Possible corruption within law enforcement agencies | 0.09 | 0.18 | -1.335 | 0.182 |
| Possible favoritism within law enforcement agencies | 0.11 | 0.14 | -0.400 | 0.690 |

*$p<.10$; **$p<.05$; ***$p<.01$

At the time that recruits are entering the police training academy, they report being very satisfied with the department and their decision to accept the job (Table 6.2). Male and female recruits both additionally report high levels of support from their family and friends. Thus, the encouragement that women receive during the application phase does not appear to dissipate as the desire to work in policing becomes a reality.

Despite reporting high levels of satisfaction, concerns among recruits do appear to shift as they are about to enter the police academy (Table 6.3). The primary worries reported amongst

BARAO000129

applicants centered on difficulty meeting family obligations, threat of injury, threat of death, and the negative media portrayal of law enforcement. While these remain chief concerns among incoming recruits, several other worries emerge especially among male recruits. Male recruits indicate concerns with the long hours of police work as well as the paramilitary environment and length of the training academy, but these worries are nearly nonexistent among female recruits.

In addition to the primary worries expressed during the application phase, women report heightened concerns about possible favoritism in law enforcement, and this gender difference nearly reaches significance. Although women indicate strong agreement with the statement that the agency will treat employees fairly based on gender and race, this intensified worry about favoritism suggests that this may be the first time that they may have received indications, or they are simply more acutely aware, that they are entering a male-dominated profession in which they may not fit.


**Experiences in the Academy**

As recruits enter the police training academy, their first task is to adapt to the strict schedule and paramilitary environment. The Eastern Police Training Academy is a non-residential training academy for which recruits must arrive each day for roll call at 7:30 AM and their day continues until 4:00 PM. Through the course of this seven-month academy, there are no personal days, no vacations, and recruits are expected to consistently arrive on time. The EPD training academy, like most throughout the United States, also adheres to a paramilitary training model. Though critics argue that this type of training focuses on the wrong values and communicates the wrong message to recruits who should instead be learning how to connect, empathize, and communicate with their communities, supporters counter that paramilitary

BARAO000130

approaches are extremely effective in producing disciplined and well-prepared police officers (Gundy, 2007). These training approaches are often referred to as stress training or character-based training, and the goal is to cultivate changes in thinking, behavior, and self-discipline in new recruits (Gundy, 2007). Paramilitary stress training in police academies typically progress through several stages in which recruits are first subjected to intense physical stress and public discipline after which there is a focus on compliance, respect, and teamwork with gradually increasing privileges. Next, stress is reduced with an emphasis instead on time management and academic discipline. During these final build-up phases, the goal of training is to increase motivation, self-esteem, and foster adherence to the core values of the organization (Gundy, 2007).

Throughout the course of this training, new recruits are also engaged in a unique socialization process. Paramilitary approaches aim to build loyalty, respect, and a team mentality among recruits. Several scholars argue that these socialization processes communicate a hidden curriculum to police recruits (Prokos & Padavic, 2002). Though the training academy formally emphasizes equality and fairness, the hidden curriculum subtly, and at times not so subtly, teaches recruits the values and characteristics associated with the ideal police officer (i.e. White male) (Conti & Doreian, 2014). As a result, women and racial minorities may begin to see themselves as outcasts in the police culture (Conti & Doreian, 2014; Prokos & Padavic, 2002).

The majority of women interviewed, however, felt that their experiences in the EPD police training academy were relatively fair.  They conceded that particular aspects may have been more difficult for women, but ultimately defended the training environment as crucial for building effective police officers and weeding out individuals who may not have what it takes to work in law enforcement. Nevertheless, several women identified features of the training

131

BARAO000131

academy that they felt made success more difficult for women to achieve. More importantly, even when women achieve success, the training academy environment may still communicate to new recruits that masculine traits like strength, power, authority, and dominance are most highly valued by the police organization and culture. The primary training academy features that created obstacles for women while also beginning to shape gendered behavioral expectations were the paramilitary training environment, a strong focus on physical fitness, and instructors' inability to accommodate recruit childcare conflicts.

*Paramilitary Training*

For both male and female recruits, the most immediately jarring aspect of the police training academy is the paramilitary environment. Recruits must participate in frequent rigorous physical training and are expected to endure the militaristic drill-style tactics used by instructors. Instructors yell and try to break the will of new recruits. Enduring these tactics is considered to be a rite of passage for anyone entering policing. In an already stressful, foreign environment, this may quickly result in demoralization and resignation among some recruits, but those withdrawing due to the environment are believed to be an inappropriate fit for the similarly stressful potential encounters of police officers. Since women are often considered weaker and more emotional, many women felt that instructors sometimes directed their militaristic tactics on the goal of making female recruits cry. Such practices can demonstrate to both male and female officers that women were unfit for police work. A female patrol officer described her experiences in avoiding attention from instructors but witnessing how the environment affected other women in her academy class:

> When I went through I really didn't get yelled at too much. Maybe like the first
> four days because I fell out of the runs. After that, I was like I'm tired of people

> yelling in my face so after that I didn't get yelled at. … But some people have
> never been yelled at like that. So now you're crying and you're like I don't want to
> do this anymore, I give up. (Officer 20)

Though women entered the training academy believing they could perform just as well as men, Officer 20 felt that women were quickly discouraged by facing a high-stress environment they had never experienced. She explained that women were much more likely to cry in response to the paramilitary tactics which then led to embarrassment and a general feeling that they were not cut out for the police environment.

A second newer female patrol officer also felt that instructors were harder on female recruits:

> Academically and physically, I think it's pretty equal. … But for example, when
> you start your practicals with your class partners, I feel like they were harder on
> the females just because they were trying to weed out the females as much as they
> could. I don't know, I just felt like just the screaming and the threatening … they
> were harsher trying to see if they could break a female. Obviously females are
> different to men, so you would you see a lot of the instructors making the females
> cry.  (Officer 26)

Since official academic and physical standards are relatively equal for both male and female recruits, paramilitary training tactics can function as a way for instructors to weed out those they believe are unfit for police work. Officer 28 explained that instructors seemed to work harder to "break" women and see if they could make them cry. As another officer explained, women couldn't tell if these approaches were in an effort to make female recruits stronger, cause female recruits to resign, or some combination of the two.

BARAO000133

> I think they may have been a little harder on us physically. I don't know if it was to ultimately make us better in the end, I don't know if it was some master plan they had. But I think overall they pushed us more because we were girls. (Officer 27)

She continued to explain that women who resigned as a result of this environment may not have been a good fit for policing anyway:

> I don't know if it was actually because they were females because I feel like there were a lot of guys in my class that left, but they just didn't come prepared to do what we were doing … the physical and the mental. People are yelling at you but you have to just block it out … I could tell that some of the girls there were just very emotional, and I feel like if you're super emotional, it just might not be the best place for you. In my opinion, I think it's kind of good that you do get weeded out in the beginning because you're going to deal with so much on the street. (Officer 27)

This sentiment was echoed by several other female officers. While they felt that this pressure and the seeming attempts to break female recruits were unfairly harsh, they also felt that it may have been necessary to eliminate women who were unfit for police work. In this way, women tended to accept masculine values of the police culture as valid. Although they began to argue that these tactics were unfair and unnecessary, they ultimately relented that showing emotion or weakness had no place in law enforcement.

Some women who were also racial minorities felt that they received poor treatment compounded by their status as non-white women in a predominantly white male culture. Whereas women felt that they were treated differently than male recruits, many minority women

BARAO000134

also felt that they were treated and punished more severely than white women. A young African-American officer described her perception of treatment in the training academy:

> In the academy, being an African-American female, I feel like in the academy, they gave me hell. The treatment I felt was different for me than it was for the white females. I would hear one thing, and I would hear the white females, the instructors would tell them they just had a bad day or they'll be able to do something over. Me on the other hand, I would be told to come back for remedial. (Officer 10)

She acknowledged that women were treated differently than men, but amongst female recruits, racial minorities were treated differently. Divisions existed first based on sex and then based on race. She believed that white women were treated with more understanding and received more flexibility in retaking both academic and physical exams, but felt that she was treated more harshly.

*Focus on Physical Fitness*

Like the application process, the intense physical fitness standards of the police academy are scrutinized for unfairly disadvantaging and eliminating female recruits. The Eastern Police Training Academy adheres to the testing standards of a regional Police Training Committee (PTC). Physical fitness tests based on PTC standards are administered at the start, middle, and end of the seven-month training period. These tests include a sit-and-reach test, sit-ups, push-ups, a 300-meter run, and a 1.5-meter run. For each, benchmarks depend on both recruits' gender and age. However, expectations for daily physical training are universal. All recruits are expected to finish a run together or execute the same number of pushups or complete the same number of exercise repetitions. The fact that these expectations are constant for both men and

BARAO000135

women communicates to some that they are all assessed based on equal standards. A patrol officer recalled these training academy standards:

> When they're actually tested in the academy, standards differ based on gender and age, but everyone's expected to do everything the same for normal workouts. Only the weights might differ. But the most fair you're ever going to be treated is in the academy. (Officer 12)

In these statements, Officer 12 recognizes that the official standards in the police training academy are fair. They attempt to account for gender-based physiological differences that may affect exam outcomes while holding both men and women to the same standards during all other fitness sessions. However, she hints that this level of equality discontinues after recruits have graduated when she comments that the fairest women are treated is in the academy. While level performance standards may make police organizations appear gender-neutral, these characterizations suggest that other gender-based divisions and limitations emerge after officers' initial training.

To other women, regardless of the equality of fitness benchmarks, the high physical standards to which recruits are held cannot help level the playing field for women since they feel that they are still likely to result in greater rates of withdrawal or failure. One supervisor explains a viewpoint held by many of the women interviewed:

> Yeah but the physical fitness standards, like yeah you should be in shape but there's no reason why you should have to do these ridiculous physical feats. You're losing candidates that maybe are really good talkers and problem solvers. Maybe they're not the biggest and brawniest ... but they have a really good skillset that they can bring to this department. (Supervisor 01)

136

Even though expectations are held relatively equal across male and female recruits, some women interviewed believe that the extreme stress of physical fitness in and of itself leads to greater rates of resignations among female recruits. While EPD administrative data does not show significantly greater rates of female attrition in either the applicant physical fitness test or the police training academy, the intense physical fitness standards did appear to intimidate and frustrate many of the women interviewed.  Police agencies' strong emphasis on physical training then can hinder efforts to develop a more diverse and professional workforce through its potentially negative impact on women's willingness to apply for policing jobs. It may thwart those who have strong interpersonal skills but feel they lack the necessary levels of strength and endurance emphasized in both the application and police training academy processes. For female recruits in the training academy, this emphasis communicates police organizations' prioritization of skills. A senior patrol officer explained how masculine qualities like physical strength are valued more than skills like effective communication and empathy.

> When you chase a suspect, you've seen the chases on TV, what do they last? 20 seconds? 30 seconds? None of these foot chases are lasting for miles at a time but women are dropping out of the academy because they're falling behind in the runs. … But because a man is more physically fit and they can run for an hour a day and do a stellar job at that, they're more fit for the job. For women, I think this job is more of a thinking person's job. … We're going to try to talk to you first and then if that doesn't work, you're going to do what you have to do from there. … So I don't consider that physical fitness part of the job the most important part of the job at all. … But I think with the academy, all of the male attributes, the physical prowess and all that, that's considered to be the telltale sign that you deserve to be on the job or not. What's in your head and how smart you are, it doesn't matter. (Officer 08)

BARAO000137

She argues that the importance placed on physical strength and endurance can't be defended as a necessary job qualification because the realities of policing don't require such feats. She further states that on the job, communication and problem solving are most important, but these qualities take a back seat in the academy. The valuing of physical traits and accomplishments in police training academies transmits to recruits that strength and toughness are prioritized as characteristics of a good police officer.

Though reports of difficulties regarding the paramilitary environment and rigorous physical standards were common, most officers reflected on the training academy as a fair environment in which male and female recruits are largely treated equally. As one officer explained, most women rationalized that despite training academy obstacles that more acutely affected female recruits, they would be successful so long as they took the time to prepare physically and mentally for the journey.

> Obviously, the academy sucked for everyone, but looking back, it wasn't terrible. I went in there in shape because I mean, I still don't understand why people would go in out of shape, because you know what you're going to be doing everyday. So I made sure I was in shape. I went to school my whole life, so I got good grades and stuff, so the studying aspect wasn't hard for me. I  mean, I was never in the military, I was never in ... I played sports my whole life, so I guess that helped with the discipline sense of it. I don't know, they didn't really bother me. I feel like the people that they did bother, it was kind of their own fault. I mean it sucked but it wasn't the worst. (Officer 17)

This rationale used by some respondents tend to blame women for the consequences they face when they lack proper preparation. If they train physically and steel themselves against the harsh treatment they are sure to receive, they should have no issues completing the police training academy. If they are to succeed, women must adapt to the masculine expectations of

138

unwavering demonstrations of physical strength and mental toughness. In the academy then, it seems that women must often conceal most evidence of their femininity, and female officers appear to accept that this is the most effective way to succeed in this phase of their careers.

*Childcare Concerns*

The inflexible and unforgiving schedule that they must keep for more than half a year can be especially challenging for recruits with children. As women are far more likely to bear the brunt of familial and childcare responsibilities, maintaining work-life balance and preventing conflict may be especially stressful for female recruits. If women are juggling childcare issues in the training academy, women interviewed reported that they are expected to find ways to handle it that will not affect their dedication to the police training academy. A patrol officer explained that she felt that women were given little sympathy for any childcare issues they may have to juggle while in the training academy:

> In the women's case, I would say that for one thing, when you take this job, they tell you in the academy look, you got personal affairs, issues with kids and family and this and that, you gotta square that away because there's no room for that. You know what I mean? If you have child care issues, this and that, you have to deal with it. (Officer 08)

Though accommodations must be limited due to the time and curriculum constraints of the training academy, these challenges can make many female recruits feel that the police environment is unsympathetic to women's outside familial responsibilities. Since men are less likely to function as the primary caregivers for their children, they are able to ensure that their work lives remain unaffected by any arising complications. If children interfere with the ability of women to attend to work responsibilities, it can confirm the belief held by many male officers

139

BARAO000139

that women are unsuited for police work. Their conflicts make them appear undedicated and unprepared for the demands of the job.

If a woman with children voices a particular childcare concern while in the academy, they appear to receive mixed reactions. The women interviewed felt that some instructors were supportive while others were critical. For at least the beginning of the EPD training academy, recruits are expected to carpool with their classmates. Groups of recruits both arrive together and leave together at the end of the day, and driving assignments rotate throughout the academy. One new female officer who was the sole caretaker of her child needed to make sure that she was consistently a carpool driver so that she could quickly pick up her child at the end of the day. The officer detailed the mixed reactions she received when an instructor asked if there were any problems with the latest carpool assignments:

> He said, "Does anyone have an issue?" I said okay, they're asking, so I raised my hand and I was like, "I'm going to have to drive at the end of the day." And he was like okay, we'll talk later. He was fine. Then this other instructor lost her mind. She was like, "You shouldn't say that to the officer." She was like, "You always have to have a plan B." (Officer 28)

Of the two instructors present, one was understanding of her request and indicated a willingness to accommodate her needs. However, the second instructor was appalled that she would request a change to her assignment. In telling her that a plan B was always required, she highlighted the need for women to keep their childcare responsibilities quiet and find a way to handle their obligations behind the scenes. That the critical instructor was female further underscores how these rules are accepted and transmitted by senior female officers as well.   A lack of flexibility regarding familial responsibilities is often defended as a necessity for instilling discipline and ensuring that outside obligations don't interfere with the staffing of patrol shifts.

BARAO000140

Though critical to ensuring adequate resources and district coverage, these organizational practices and policies are likely to have a greater negative impact on female officers and again serve as a way by which women come to be seen as incompatible with the demands of policing.

**Changes in Recruit Perceptions Over Time**

Over the course of their training, recruits entering the Eastern Police Training Academy in 2016 and 2017 were surveyed at three different time points: immediately upon entering the academy, immediately prior to graduating, and one month after graduation. At the time of the final survey, new officers were completing field training in the police department with a field training officer (FTO). During each of these surveys, respondents were asked questions regarding their perceptions of agency bias/discrimination and the conduct of fellow recruits and their instructors.

Prior research has found that significant changes in personality and personal values occur throughout the police training academy as a result of its paramilitary training and gradual socialization into the police culture (Conti & Doreian, 2014; Gundy, 2007). The police training academy is structured to break down the previous values and behaviors of recruits and rebuild them to align with the values and discipline encompassed in the culture of the police department (Gundy, 2007). Since the police culture is said to value masculinity in the ideal police officer (Martin, 1980), this rebuilding process may result in increased perceptions of bias or unfairness among recruits who previously expected to be viewed equally.

Respondents were asked two questions regarding their perceptions of agency fairness. In both the Applicant and Incoming Recruit surveys, most participants agreed or strongly agreed that they believed the agency treated its employees fairly based on gender and race (Table 6.4).

BARAO000141

Although results should be interpreted with caution due to survey attrition and decreasing sample sizes, among participants in the Graduating Recruit survey, the mean of responses regarding agency fairness decreased. Respondents were less likely to agree or strongly agree, and this was significantly different from the beliefs of applicants (Table 6.5) and neared significance when compared to the sample of incoming recruits (Table 6.6).

Respondents were also asked questions regarding socialization and negative comments in the training academy. Across all surveys with applicants and recruits, respondents were largely neutral in their beliefs that recruits socialized more with others of the same race or gender. Recruits were also asked about the prevalence of frequent jokes or negative comments based on gender, race, or sexual orientation. Throughout recruits' duration in the academy, most disagreed or strongly disagreed that recruits or instructors made jokes or negative comments about the

| Table 6.4. Mean Differences in Perceptions of Applicants and Incoming Recruits | | | | | | |
|---|---|---|---|---|---|---|
| | Applicants ($n=139$) | | Incoming Recruits ($n=52$) | | Mann-Whitney | |
| | Mean | sd | Mean | sd | z | p |
| Perceptions of Agency Fairness | | | | | | |
| I believe that this agency treats its employees the same regardless of race | 4.30 | 0.94 | 4.18 | 0.84 | 1.215 | 0.225 |
| I believe that this agency treats its employees the same regardless of gender | 4.31 | 0.92 | 4.24 | 0.76 | 0.998 | 0.318 |
| Academy Environment | | | | | | |
| Recruits (will) socialize with others of same gender | 3.00 | 1.32 | 3.10 | 1.08 | -0.029 | 0.977 |
| Recruits (will) socialize with others of same race | 2.59 | 1.33 | 2.94 | 0.94 | -1.002 | 0.317 |
| Recruits/instructors (will) frequently make jokes or sexual comments about female officers/recruits | 1.53 | 0.80 | 1.54 | 0.97 | 0.243 | 0.808 |
| Recruits/instructors (will) frequently make jokes or negative comments about minority officers/recruits | 1.53 | 0.80 | 1.37 | 0.66 | 0.707 | 0.479 |
| Recruits/instructors (will) frequently make jokes about the sexual orientation of officers/recruits | 1.53 | 0.80 | 1.41 | 0.75 | 0.627 | 0.531 |

$*p<.10; **p<.05; ***p<.01$

BARAO000142

| Table 6.5. Mean Differences in Perceptions of Incoming Recruits and Graduating Recruits | | | | | | |
|---|---|---|---|---|---|---|
| | Incoming Recruits ($n$ =52) | | Graduating Recruits ($n$ =36) | | Mann-Whitney | |
| | Mean | sd | Mean | sd | z | p |
| Perceptions of Agency Fairness | | | | | | |
| I believe that this agency treats its employees the same regardless of race | 4.18 | 0.84 | 3.78 | 1.17 | 1.447 | 0.148 |
| I believe that this agency treats its employees the same regardless of gender | 4.24 | 0.76 | 3.81 | 1.14 | 1.620 | 0.105 |
| Academy Environment | | | | | | |
| Recruits (will) socialize with others of same gender | 3.10 | 1.08 | 3.17 | 1.26 | -0.467 | 0.641 |
| Recruits (will) socialize with others of same race | 2.94 | 0.94 | 3.23 | 1.19 | -1.444 | 0.149 |
| Recruits/instructors (will) frequently make jokes or sexual comments about female officers/recruits | 1.54 | 0.97 | 1.47 | 0.73 | -0.036 | 0.971 |
| Recruits/instructors (will) frequently make jokes or negative comments about minority officers/recruits | 1.37 | 0.66 | 1.50 | 0.94 | -0.340 | 0.734 |
| Recruits/instructors (will) frequently make jokes about the sexual orientation of officers/recruits | 1.41 | 0.75 | 1.50 | 0.66 | 0.420 | 0.674 |

*$p$ < .10; **$p$ < .05; ***$p$ < .01

| Table 6.6. Mean Differences in Perceptions of Applicants and Graduating Recruits | | | | | | |
|---|---|---|---|---|---|---|
| | Applicants ($n$ =139) | | Graduating Recruits ($n$ =36) | | Mann-Whitney | |
| | Mean | sd | Mean | sd | z | p |
| Perceptions of Agency Fairness | | | | | | |
| I believe that this agency treats its employees the same regardless of race | 4.30 | 0.94 | 3.78 | 1.17 | 2.570 | 0.010 *** |
| I believe that this agency treats its employees the same regardless of gender | 4.31 | 0.92 | 3.81 | 1.14 | 2.466 | 0.014 ** |
| Academy Environment | | | | | | |
| Recruits (will) socialize with others of same gender | 3.00 | 1.32 | 3.17 | 1.26 | -0.464 | 0.642 |
| Recruits (will) socialize with others of same race | 2.59 | 1.33 | 3.23 | 1.19 | -1.673 | 0.094 * |
| Recruits/instructors (will) frequently make jokes or sexual comments about female officers/recruits | 1.53 | 0.80 | 1.47 | 0.73 | 0.211 | 0.833 |
| Recruits/instructors (will) frequently make jokes or negative comments about minority officers/recruits | 1.53 | 0.80 | 1.50 | 0.94 | 0.363 | 0.717 |
| Recruits/instructors (will) frequently make jokes about the sexual orientation of officers/recruits | 1.53 | 0.80 | 1.50 | 0.66 | 0.902 | 0.367 |

*$p$ < .10; **$p$ < .05; ***$p$ < .01

BARAO000143

women, racial minorities, or sexual orientation, but responses to the survey conducted amongst the same group when they were new officers on FTO revealed a significant increase in the mean of these responses, suggesting that the occurrence of these behaviors may increase once new officers enter the police department (Table 6.7). An examination of the frequencies in Likert response categories indicated that this change may was largely driven by an increase in neutral responses. Therefore, it is possible that these changes reflect an increase in ambivalence rather than an increase in negative behaviors amongst officers. However, given that survey respondents consistently chose more extreme options (i.e. strongly disagree) in all previous questionnaires, the emergent central tendency of responses to this question may be meaningful. While many recruits could strongly assert that these behaviors were not occurring in the training academy, they are less willing or able to do so once they transition into the police department.

| Table 6.7. Mean Differences in Perceptions of Graduating Recruits and New Officers | | | | | | |
|---|---|---|---|---|---|---|
| | Graduating Recruits (*n* =36) | | New Officers (*n* =26) | | Mann-Whitney | |
| | Mean | *sd* | Mean | *sd* | *z* | *p* |
| Perceptions of Agency Fairness | | | | | | |
| I believe that this agency treats its employees the same regardless of race | 3.78 | 1.17 | 3.70 | 1.15 | 0.340 | 0.734 |
| I believe that this agency treats its employees the same regardless of gender | 3.81 | 1.14 | 3.65 | 1.15 | 0.516 | 0.606 |
| Academy Environment | | | | | | |
| Recruits (will) socialize with others of same gender | 3.17 | 1.26 | 3.14 | 1.25 | 0.652 | 0.515 |
| Recruits (will) socialize with others of same race | 3.23 | 1.19 | 3.05 | 1.05 | 0.355 | 0.723 |
| Recruits/instructors (will) frequently make jokes or sexual comments about female officers/recruits | 1.47 | 0.73 | 2.36 | 1.14 | -3.087 | 0.002 *** |
| Recruits/instructors (will) frequently make jokes or negative comments about minority officers/recruits | 1.50 | 0.94 | 2.14 | 1.04 | -2.507 | 0.012 ** |
| Recruits/instructors (will) frequently make jokes about the sexual orientation of officers/recruits | 1.50 | 0.66 | 2.36 | 1.18 | -3.500 | 0.001 *** |

*$p$< .10; **$p$<.05; ***$p$<.01

BARAO000144

**Conclusion**

For most recruits, both male and female, the training academy is an extremely exciting but trying experience. It is the first time they wear a uniform and begin to feel the camaraderie of policing. However, it is also the first time many have encountered a strict paramilitary environment alongside various rigorous academic and physical expectations.

At the beginning of the police training academy, most incoming recruits report similar attitudes and experiences. They retain favorable expectations of equality within the police organization and indicate similar concerns. As recruits near graduation and complete field training, their perceptions of unfairness and biased treatment do appear to shift. Graduating recruits and those completing field training are less likely to believe the agency treats its employees the same regardless of race or gender. New officers in field training are also less likely to deny that recruits, instructors, or officers make jokes or negative comments based on the gender, race, or sexual orientation of other officers. Though these shifts are small and should be interpreted with caution due to small survey sample sizes, they do seem to indicate a gradual altering of recruit perceptions as they are introduced to the police culture.

Interviews with sworn female officers support the notion that the culture of the police training academy begins to more subtly teach new recruits about the values and gender norms by which they are expected to abide. To female officers, the structure of the training academy often emphasizes the masculine qualities of policing like strength and toughness. Though academic and practical police skills comprise the majority of curriculum hours, many of the women interviewed indicate that the physical aspects are valued and emphasized much more. Women felt that instructors focused on them and pushed them harder, though disagreement existed regarding whether the intention was to benefit women or break them. Furthermore, the long,

BARAO000145

rigid academy schedule created stress for recruits with children. This was amplified for women who often bear the majority of childcare responsibilities and especially for single mothers. Though many instructors were supportive in extenuating and emergency circumstances, some scolded or embarrassed recruits who requested accommodations.

Male and female recruits appear to be treated fairly in the police training academy based on academic and physical standards. Indeed, most recruits and officers feel that the academy creates a very level playing field. Most officers interviewed suggested that the time they spent in the police training academy was relatively fair and benign. This perception may prevail because the gendered behavioral expectations were relatively direct. Female recruits are expected to abide by predominantly masculine norms and suppress evidence of their femininity. They are taught that if they do so, they will pass the same tests and be awarded the same respect given to male officers. Female recruits therefore appear to enter the police department expecting that success and acceptance can be achieved through the straightforward adoption of largely masculine gender performances. Women in the training academy feel that they are treated as equals, even if equality is based on masculine standards.

Many of the women interviewed dismissed their training experience as inconsequential even if they had faced some obstacles, saying that gendered inequality and unfairness are really faced when women get into their districts, but it felt largely absent from the academy environment. Overall, their time in the academy reinforced the belief that they would be treated equally and fairly so long as they committed the same amount of effort as male officers and adhered to predominantly masculine behavioral norms. Since most female applicants and recruits surveyed appeared to possess qualities traditionally considered to be more masculine and since

146

these women are likely to be more comfortable in switching between appropriate gender performances, such masculine requirements may pose only minimal difficulties.

Still, even though many women felt they were treated fairly, this period is when recruits are first introduced to the police culture, and women appear to begin to notice indications of differential treatment and observe how their experiences diverge from those of men. Importantly, the police training academy begins to transmit messages that police organizations tend to devalue feminine characteristics and experiences while emphasizing masculinity. Though women are held to unbiased official standards, the training academy's social and cultural environment tends to emphasize that feminine qualities are contrary to the requisites of the ideal police officer. Despite an overall sense of equality, the training academy serves as police recruits' initial introduction to the police culture and they begin to observe fragments of this male-dominated environment which begin to shape their understanding of appropriately gendered behaviors in policing.

BARAO000147

## CHAPTER 7: FITTING INTO THE MALE POLICE DEPARTMENT

While the police training academy is perceived as a relatively fair and equal environment for most, officers interviewed reported that perhaps some of the greatest difficulties emerged when they first entered the police department. For the first few years of their careers, female officers are forced to adjust their perceptions of anticipated equality to the realities they face working in a male-dominated occupation. Largely due to lessons learned in the police training academy, women initially believe they will be treated fairly if they are intentional about working hard and remaining diligent in answering their calls and handling other work-related responsibilities. They believe that if they assimilate to the masculine culture of policing, merit will be the primary determinant of their status and success. To succeed, they must act more masculine and less feminine. However, female officers interviewed expressed that once they entered their districts, they quickly learned that vastly different and complex rules and expectations apply to women's gender performances. While masculine behaviors are expected in some contexts, demonstrations of femininity are expected in others, resulting in a complex set of hidden rules by which women must practice code switching and gender fluidity.

Upon completion of the police training academy, officers in the EPD are assigned to work in one of several districts in the city. Throughout the course of a year, they will be rotated through three different districts in order to provide them with experience in different communities and levels of activity. During the year in which officers rotate through different districts, they are designated as probationary officers. This means that new officers do not receive union protection, and mistakes or misconduct can easily lead to termination. Once officers are beyond this probationary period, police union membership makes dismissal much more difficult.

148

When they initially enter their first district, new officers spend 30 working days under the guidance of a Field Training Officer (FTO). Whereas the training academy provides recruits with the skills and knowledge they will need to perform their duties effectively, the FTO period is intended to be when they first put these skills into practice in the field. Like the training academy, this also serves as an opportunity for training officers to communicate and demonstrate the gender norms and expectations of the police culture. Field training is inherently stressful for most officers, and many report feeling extremely insecure and inadequate. Officers face many varied and dynamic encounters during their shifts, and they are tasked with a great deal of autonomy and discretion in how they handle such cases. Because only more experience can make officers feel more confident about their decision-making, these feelings of uncertainty often last months or years beyond their field training instruction.

In the early years of their careers, new officers attempt to develop their identity within their police department. Their behaviors and attitudes assist fellow officers in forming impressions of their new coworkers. Built on elements of solidarity and distrust toward outsiders, acceptance into the police culture is a gradual process. That new officers have completed the police training academy is only a small step toward full acceptance. They must further demonstrate that they embody valued traits like power, confidence, and physical toughness. Since women are expected to be less capable of police work and often face resistance to their presence in policing. Their behaviors are scrutinized more closely and acceptance is much more difficult to achieve.

Data used to detail female police officer career experiences was collected through an online survey and semi-structured interviews with current female officers. All sworn female officers in the EPD invited to participate in an online survey and 108 (39%) responded to the

BARAO000149

survey. Included in the female officer survey was a request for respondents to participate in an interview. Sixteen women agreed to be interviewed by responding to the survey, and an additional 12 volunteered as a result of referrals from other participants. This chapter details common experiences among women in the first stage of their police officer career. Five core themes emerged from interviews with female officers: the continuous need to prove their abilities, attempts to fit in as one of the guys, challenges of dating and sexual relationships, and initial observations and resentment of hindrances to women's acceptance in the police department.

## Women Proving Themselves as Capable Officers

Primed by the impression of a level playing field presented in the training academy, female officers likely believe that they will be judged by their abilities in the same way that male officers will when they enter the police department. They are taught that so long as they hold themselves to the same behavioral and professional standards, male and female officers will be treated as equals. However, in the police department, many women reported that it is quickly made apparent that the rules are very different from the training academy. Instead of entering with a clean slate and at the same level as men, women felt that they began their work as officers at a disadvantage due to their status as females.

Nearly every female officer interviewed felt that they first had to battle against the notion that women are inherently ill-fitted for work in law enforcement. Most police officers and departments value masculine traits like strength, toughness, risk-taking, and authoritativeness. The notion that women can't embody these traits leads men in this male-dominated occupation to believe that women should not work in law enforcement. Women are furthermore believed to

BARAO000150

diminish the masculinity of the profession. These deep-seated beliefs lead female officers to have to prove themselves and their abilities on the job even if they've demonstrated that they perform just as well as male recruits in the academy. A detective explained that the necessity to prove themselves is always present throughout female officers' careers, and this sentiment was expressed by many women:

> I'd say that on this job if you're respected and you show that yes you can do the job, there's less of the questioning of you but there still is that. But it's less. It's less. But it's still always there. As a female, you're always having to prove that you can do the job. (Detective 06)

Even as they gain experience and knowledge, women's abilities are continuously questioned. This questioning and skepticism demonstrates that being female contradicts the ability to be a good police officer. Female officers learn that they will often be doubted and they become aware of the need to prove themselves in nearly every call for service or professional interaction. One newer officer described how she felt that it was very quickly made apparent that female officers are not viewed as capable officers:

> Most females on this job get paired with somebody else because sometimes they don't think they're capable or I don't know. At first I was always paired with someone. A bigger guy. Probably because they thought that because of my height and size I wasn't capable of doing certain things. You have to constantly be proving yourself, and I would keep asking if I could drive by myself and be alone and it was denied. They were like no, no, no. Eventually after being able to prove myself and how I could handle myself, I was given permission to drive alone. (Officer 27)

BARAO000151

She further noted that the process of achieving permission to drive alone was not one faced by male officers. This practice, if perceived to be focused primarily on female officers, can undercut attempts to portray women as equals in the police department. The need to be accompanied by a larger male officer was felt to undermine female officers' credibility and ability to be accepted as capable coworkers. Some women felt that assigning larger men to ride with female officers invalidated women's efforts to be viewed as equals. It furthermore provides an opportunity for male officers to accomplish masculinity in their role as a physically superior protector.

Because seemingly minor actions can result in enormous, long-lasting impacts on a female officer's career, they must consistently engage in careful self-regulation of their behavior. In addition to proving their competence and physical strength on the job, women in policing must also work diligently to distinguish and become the kind of female officer that men in the department will find non-intimidating and acceptable. An informal process of labeling women in the police department suggests a belief that women cannot simply be good police officers. A patrol officer described how male coworkers view and label female officers:

> I feel like you have to prove yourself socially as a female. Because they're going to either label you as okay, you're actually a good worker, which is a very small percentage. Then oh okay, you're only here because you want to sleep with all the other cops. I feel like there's categories and there's you really have to go out of your way to make sure that people don't see you as just another female cop. Like oh she's just trying to date everyone on the job. Or she just wants to be a clerk. Like every day you have to actively avoid those categories. (Officer 17)

She remarks that male officers are eager to label women who engage in particular inappropriate actions. Women who sleep with other officers will gain a reputation for only being

BARAO000152

interested in dating. Women who work desk jobs without adequate experience and dedication to patrol are designated as lazy and incapable of being effective police officers. In efforts to prove themselves, women must also be aware of any behaviors that might result in negative labeling by male officers.

Officers described several ways by which women could take steps to prove their abilities in police organizations. They first emphasized that female officers should respond to all of their calls without hesitation or fear. If a physical confrontation ensues, female officers must jump into the fight. Any evidence of fear or weakness is subject to heightened visibility for women. Whereas male officers may periodically deviate from these expectations of conduct without consequence, the women interviewed argued that they were unforgiving of any deviation by female officers. A brief moment of hesitation when a fight emerges or a break in authoritative demeanor can be used to confirm that women are not a fit for policing. Thus, in the field, women are expected to leave feminine attributes behind in order to increase their chances of acceptance as capable police officers.

In their efforts to assert their ability, some officers caution against becoming too ambitious, confident, or bull-headed in patrol noting that this may instead get women into troubling situations with both suspects and coworkers. While attempting to prove that they have the drive, strength, and mental toughness considered necessary to succeed in the masculine policing profession, female officers may ignore and overstep personal and departmental limitations. They might confront or search a suspect without waiting for a backup officer because they want to prove they can handle it themselves. They might rile up a suspect instead of attempting to deescalate a situation because they want to prove to other officers that they are aggressive and unafraid of physical confrontation. A detective explained that overstepping these

BARAO000153

bounds not only puts the female officer in danger, but it creates safety risks for officers who respond to assist as well.

> Because you have to kind of prove that you can be dominant and you can be aggressive, some women can take that over the top. So it's one of those very fine lines where if you're aggressive and you're out there and you're doing the right thing and you're helping people out, it's like you're one of the dudes, you're one of the boys. But then it's a fine line where it becomes too aggressive and you're overcompensating for your lack of stature or your lack of respect that you're receiving. … what makes it difficult is finding that happy medium where I can be aggressive, I can be out there, I can be one of you, without being overly aggressive and putting people at risk and putting myself at risk and being ousted. Because once you're ousted, it makes your working environment very difficult. (Detective 11)

Despite efforts to prove themselves, female officers felt that eyes were keenly attuned to women and their mistakes. Mistakes made by male officers are often overlooked. Male officers might endure friendly, fraternal, and often temporary taunting, but missteps are quickly forgotten as just part of the learning process of the job. New officers inevitably make plenty of mistakes over the course of their first few years, but any wrongdoing by women is not so easily overlooked. When female officers make errors, they are often considered a confirmation that women shouldn't be police officers. The same detective further noted that because male officers expect that they won't succeed, female officers feel that their mistakes are placed under a microscope and magnified while men don't face the same scrutiny.

> It's definitely harder for a woman to prove that they belong, but for women it quickly hits that tipping point where they're just reckless. Whereas if a male does it, he gets a much broader brush to work with. You see it all the time where they're like well she did this and she did this and I'm not going to any more of her

BARAO000154

calls. … Well this guy did it last week six times. You're going to his calls still. (Detective 11)

Several officers affirmed that when male officers made mistakes during calls or investigations, they were largely ignored, but women were not afforded the same luxury. Female officers must be even more conscientious and ensure that they don't call attention to errors that could be characterized as evidence of their incompetence. When attempting to prove themselves, adherence to masculine behavioral norms was often not enough to motivate confidence in their abilities. Most women felt that they also had to be unrelentingly perfect in the execution of their police responsibilities.

**Trying to be One of the Guys**

As a minority in a male-dominated profession like policing, the intuition of many women tells them that they should try to integrate and fit in with male officers as best as possible to minimize differences and the likelihood of being cast as outsiders. Indeed, this assumption logically evolves from expectations that women should display masculine behaviors in their professional duties in order to prove themselves as capable officers. As a result, many female officers made special efforts to socialize with male officers both inside and outside of the police department. In doing so, they hoped that they would be accepted as just another one of the guys. They believed they could be accepted as police officers first and women second rather than the reverse. However, female officers learn that they must abide by different rules in their social interactions and personal relationships than they do in their professional roles.

The women interviewed noted that as new female officers, they primarily attempted to build or maintain friendships with male coworkers by going out to bars and drinking with their

BARAO000155

coworkers. Women often join male officers because they formed friendships in the training academy or while working in their new district, and they saw socializing over drinks as a way to continue bonding. Additionally, female officers believed that if they socialized with male coworkers, they could begin to erase the invisible line created by their gender. Instead of being viewed as a female officer, they expected that increased socialization would allow them to be seen as one of the guys. More seasoned female officers warn that this hope is futile in policing. Despite their attempts to hang out, drink, and joke around with the guys, many said that female officers will never be accepted. A detective attempting to offer guidance to new female officers asked her male coworkers what advice they could provide:

> I had asked the guys what I could impart [to new female officers]. And they were like, "Let them know that they'll never be one of the guys." And it's true, it's very true, we'll never be one of the guys. They can be nice, they can help you, but we will never be one of the guys. Never. So don't think that by going to the bar with them and them having a beer that you're cool with them. You're just cool with them at that moment. (Detective 06)

These assertions by male officers tended to emphasize that women are permanently situated outside of the male-dominated police culture regardless of their attempts to fit in. This advice explicitly discourages attempts to construct a masculine identity through attempted to become "one of the guys." At work, women may further attempt to connect with male officers through contributing to or condoning vulgar or sexual humor. Several senior female officers also cautioned that this may give them the wrong idea. Even though joining in the crass humor might make women feel like they're fitting in, it may actually give male officers the wrong impression of a woman's personality, preferences, and tolerance for gender-based harassment. Contributing to vulgar humor too often can also unfairly and inaccurately lead to rumors that women are

BARAO000156

sexually promiscuous, seemingly because they are not behaving according to the gendered expectation that women be polite, respectable, and submissive. In this way, the behavior can actually lead to more isolation rather than integrating them into the male police culture.

Women often find that they can gain a base level of acceptance if they adhere to masculine behavioral norms in their daily work as police officers. They do so by responding to all of their calls without hesitation, presenting themselves as authoritative and in control, and proving they can handle themselves in physical confrontations. Regardless of these accomplishments in masculinity, most women felt that they were never fully regarded as equals. A supervisor outlined how male officers socially punish those who think they are one of the guys and how she gradually came to accept the social divide between male and female officers:

> It used to bother me because I wanted to fit in and I tried to fit in and that actually caused problems for me. Because I didn't realize that I was never going to be one of the boys. … I was going out drinking with them, I was trying to do all the things like, "They'll accept me, they'll accept me." They never accepted me. To my face they were nice, but they were talking shit and telling stories. (Supervisor 01)

Though women come to accept these social constraints, it is a difficult realization for most. Women are initially taught that if they suppress feminine behaviors and act according to masculine standards, they might achieve complete acceptance, but over time many learn that this isn't true. A senior officer explained that this rejection appears to be the result of socialization and indoctrination into a system of beliefs unique to policing:

> I say to females all the time, you're not one of the boys. You may think you are because all you know is equality as you know it until you get on the police department. It's a different kind of equality. It's like you're never going to be one of the boys. You may be able to drink them under the table, you may be able to hang with the best of them, and it might appear that they're looking at you like you're cool but they're not. And it's funny

157

because some of these young men have only known the same thing these young women have known, which is women in whatever job. It's like is it that easy that when you get on this job, somebody says something to you and you fall that easily? But I think it is a systemic thing in the culture of the department. It's not so much this department, it's just in this profession. (Officer 23)

The police culture tends to characterize using force and controlling citizens is a man's job. Conceding that women can perform the functions of police work as well as men undermines the masculine identity of the profession and its cultural beliefs. Rejecting women from male social circles is one way by which men can retain their dominant status. In response, many female officers gradually learn that they must monitor and alter their behaviors to be appropriately masculine or feminine depending on what male officers deem acceptable in varying contexts.

**Dating and Sexual Relationships**

Working in a predominantly male environment, especially one in which closeness and camaraderie is held in high regard, means that women are often pulled into romantic and/or sexual relationships with coworkers. For both men and women, this is often a consequence of working closely in a unique occupation which emphasizes trust, loyalty, and isolation among police officers. Although the development of romantic and sexual relationships is expected, women face a double standard in which workplace relationships are largely inconsequential for male officers but potentially significantly damaging for female officers. In their interviews, all but three women (89%) brought up dating and sexual relationships within the police department as harmful to women's careers, and many recommended that new female officers "find your

BARAO000158

boyfriends elsewhere." One patrol officer described why most police officers recommend women avoid any close relationships with male officers:

> Don't fraternize with the male officers. And I say that because you start doing this fraternizing and hanging out and then you're dating and then it doesn't work out with this one and then you're with this one and that one and you're with all of them. And people are comparing notes and talking and whatever else. I think it's important to be a professional and to be viewed as a professional and to be respected just as that. Because I notice that when women have all these other stories about who they dated and who they slept with and what their history is with their personal life and all that, it gets in the way of them getting credit for the actual work that they do. (Officer 08)

She noted that it is important to avoid these relationships and maintain a wide separation between work and personal life. This officer, along with many other women, recognized that socializing with or dating male officers may be tempting. They work in an occupation that fosters close relationships due to the nature of their work and the negative public and media attention they receive. Moreover, dating coworkers provides an avenue through which women can connect with male officers while also behaving in a feminine, albeit sexualized, manner. These performances provide balance for women who must otherwise adapt to masculine expectations of behavior.

Many women asserted that if a new female officer has any type of romantic or sexual relationship with one or more male officers, they quickly gain a negative reputation that remains with them throughout their careers. If she begins dating a fellow officer and the relationship ends, some rumors will begin to circle. If she then dates another officer, she's seen as a woman whose primary focus and concern is dating and sex, not policing. Additionally, having casual sex with even just one male officer immediately indicates to fellow officers that she is a slut even

159

BARAO000159

though a man would face no social punishment. Moreover, if a female officer sleeps with a married officer, she is blamed and faces significant harm to her reputation while the married male officer's reputation often remains unscathed amongst his peers. These negative perceptions, however unwarranted, damage women's ability to be taken seriously and prevents them from being considered good police officers.

Even if a woman is not acting in a way that would be considered sexually promiscuous by most, female officers have to pay special attention to any behavior that might be misconstrued. They may be pursuing a serious romantic relationship with a coworker, or they may simply be carrying on a friendship, but in spite of such traditionally accepted intentions, women warn that female officers should avoid those circumstances as well. Although they may not be engaged in a sexual relationship with a male officer, others may not believe that to be true. Again, female officers often hold other women accountable for recognizing the risks of carrying on friendships with men. A newer patrol officer explained that she had to take extra steps to avoid rumors regarding her personal relationships:

> Like my first year on the job, all I wanted to do was hang out with my friends who were cops and go out and just talk about work and whatever. Now it's like I barely want to go out with cops because … god forbid someone sees me out with two of my male classmates because then it means I'm hooking up with them. It's just a lot of avoiding things. Even if you're not doing anything wrong. (Officer 17)

Among the women interviewed, this was a common viewpoint. The social and sexual behaviors of female officers are informally regulated by both men and women in the police department. It seems that according to both, women who engage in romantic or sexual relationships with male officers are not acting like proper, conservative women deserving of

BARAO000160

respect. Although some women may assume that romantic or sexual relationships with male officers may be another avenue of acceptance in police organizations, women whose reputations remain relatively unscathed are those who behave appropriately by avoiding relationships and off-duty interactions with male officers.

**Hindrances to Acceptance**

As women navigate their many different attempts to fit in, new female officers begin to notice various dynamics within the department that they feel may hinder their efforts to fit in or succeed. Frustrations emerge toward the ways in which other female officers behave if they see those behaviors as contributing to negative beliefs about women. Young female officers also begin to observe some instances of favoritism in which connected male officers receive benefits rarely awarded to deserving women.

Because these new officers are trying their best to fit in and be viewed as equals, they express frustrations with women who appear to perpetuate the stereotype of women as incapable of police work. In particular, young officers voiced disapproval toward females who tried to work inside jobs rather than patrolling and taking calls. Some who didn't take inside jobs could also perpetuate negative views if they avoided confrontational or dangerous situations while on patrol. They believed that in doing so, those female officers help uphold beliefs that women lack the mental and physical toughness necessary for police work and that they're all better suited for administrative or care-taking positions. An officer expressed frustrations held by many women regarding how the performances of other female officers affect men's impressions of all women in the police department.

161

BARAO000161

> I feel like for the girls who are kind of, 'Oh she's just a girl so she'll be a clerk' or 'Oh she's whatever,' it's how they portray themselves. If they come out and they're already asking to be on the front desk or be the booking officer or be a clerk in a very short amount of time, it's just kind of like they're playing up the stereotype, so that's what affects it for the rest of us. … But I feel like there's girls and they come on and they act like they're not a cop. They act more like, I can't think of a word for it, but they don't act like every other cop if that makes sense. Like they're playing the female card, basically. They think, 'I'm a girl so I don't have to do that.' Well, you took a predominantly male job and we're all held to the same standards. (Officer 17)

To women who work diligently to prove themselves and follow masculine standards of behavior in their work, female officers who ignore these expectations of male gender performances and instead do femininity discredit the efforts of other women. Their actions substantiate stereotypical beliefs about women's role in policing. They serve as evidence that women do not possess the power, authority, or toughness necessary for success in police work.

New female officers furthermore begin to notice favoritism toward male officers and the advantages of male social networks in police organizations, though it doesn't yet strongly impact their success at work. Testing for a supervisor positions requires three years as a patrol officer and testing for a detective position requires five years as a patrol officer. Thus, although many women have not yet experienced favoritism in promotions, they generally report observing a preference for certain male officers to receive the better district assignments and shift assignments. Some women felt that male officers tended to have an easier time being transferred to the districts they preferred. They also felt that men got better jobs during their shifts, and they were more likely to be awarded the exciting, proactive assignments while women were rarely considered.

BARAO000162

Several women also agreed with a new officer who explained that hurdles are not only created by men. Women also hinder their advancement and acceptance in policing amongst themselves:

> I've noticed female officers toward other female officers being very brutal to each other instead of, I don't know … when you're in the field as a female, you have to prove yourself a lot. You have to prove yourself wherever you go. But females on this job can be very hard and brutal to each other, especially when you're new. Instead of showing that new female the way, it's kind of like she's being criticized because she's not tough enough or not good enough. That's the one thing that I see the most and that has shocked me the most since I've gotten on. .. I think it comes mostly from older female officers, and some younger officers, but mostly older females that have been on the job a little bit longer. (Officer 27)

Rather than support new female officers, she describes being faced with hostile treatment from more senior women in the department. A second officer explained that she felt the same rejection from older female officers, and she felt that this was the result of jealousy:

> For example, in my station, there used to be a group of female officers that were older than us. They had a few more years than we did, but they were very cliquey. Then here you have a new set of females coming, so I think that they thought that we would take that attention away from them because now we're like fresh meat in a male dominant environment. But I wasn't thinking like that. I'm thinking as females to females, we help each other out. We stay together. I did not feel that. (Officer 20)

In this description, women who come to accept men's perception of them as feminine and sexualized feel threatened as new female officers enter the department. If they have not gained acceptance as capable police officers, this status may become their primary means of receiving acknowledgement at work. When women criticize and fight amongst themselves, they perpetuate

163

the male-dominated culture of policing in two ways. First, fighting among women confirms to male officers that women are unable to control their emotions-- a stereotypical trait historically used to defend the exclusion of women from law enforcement. Second, criticizing female officers' calls attention to minor or nonexistent flaws, a practice commonly undertaken by male officers in order to undermine the status and abilities of women. As a result, female officers then affirm the rhetoric and invalidating practice of men. Both of these effects help maintain women's positions as outcasts in police work.

**Conclusion**

For new female officers, their most immediate struggle is to fight to prove themselves as capable police officers. Women in the academy appear to learn that they will be equals if they hold themselves to the same standards as men, but in the police department they must actually strive to be even better than their male coworkers. Their efforts may still fall short since their conduct in the field is placed under a microscope, and women must demonstrate unrelenting competence, authority, strength, and fearlessness. In searching for flaws amongst female officers, men may seek to devalue women's abilities, demonstrate that they are incapable, and reassert the dominance and superiority of male officers. Though women seem to expect that they will have to prove their abilities, for most the effort is much greater and longer than anticipated. It appears that their efforts are never truly complete, and even one mistake could negate their past positive performance.

In the training academy, women also expect that they will be accepted so long as they mask their femininity and engage in masculine behaviors. However, in the police department women begin to discover that masculine gender performances are expected in some situations and appropriately feminine behaviors are expected in others. New female officers often first

164

BARAO000164

recognize these nuanced expectations as they navigate the social sphere of their new work environment. They instinctively believe that socializing with male officers outside of work will lead to closer friendships and greater acceptance. Instead, women often report that their efforts are futile. Rather than leading to increased loyalty and respect between male and female officers, when women attempt to bond, men are still quick to spread rumors and insults about those female officers. Excluding women in this way is necessary in police organizations because allowing female officers into men's social networks strongly disrupts and threatens male group solidarity, a core feature of the police culture.

Similar disregard is shown in response to dating or sexual relationships among officers. While the sexual behavior of male officers is largely inconsequential for their reputations, it can be extremely damaging for women. Women who date or sleep with other officers are often quickly labeled as "sluts" while the same consequence does not affect men. Though sexualized, women who have sex with male officers may see this behavior as an outlet for asserting their femininity, but this is not viewed as traditionally proper or moral feminine behavior. Again, evidence of inappropriate gendered behavior is used to discredit female officers even if they demonstrate toughness and competence and have proven their abilities as police officers.

Despite hoping that they may be accepted and respected, the early years of a female officer's career are a period in which women in policing first begin to understand their confinement to a very narrow lane of conduct. If women fulfill the gendered expectations of feminine behavior held by male officers—that they are weak, submissive, and sexual objects— they are ostracized. However, if they conform too closely to masculine expectations of behavior too often by acting too assertive or too tough on calls or by trying to socialize and become "one of the boys," they are also rejected. Martin (1980) remarks that women face a choice of being

BARAO000165

deprofessionalized or defeminized in the police department. Women who are defeminized participate in predominantly masculine behaviors and may be viewed as good police officers, but they are negatively judged for not adhering to norms of what is appropriate for a woman. Women who are deprofessionalized engage in predominantly feminine behaviors and though they are viewed as appropriate women, they are not considered capable police officers. In this early stage of their careers, female officers engage in frequent code switching. They begin to discover that they must monitor and regulate their conduct to ensure that they are neither too feminine nor too masculine for a chance of acceptance and success in the police department. How they navigate the imposed rules of conduct will determine how they are judged throughout their careers.

BARAO000166

## CHAPTER 8: THE STRUGGLE AND FAILURE TO SUCCEED

For their first several years on the job, women report struggling to prove themselves as capable officers and fit in with their peers. They attempt to balance demonstrations of masculinity with a maintenance of their appropriate femininity. Limited by informal and unspoken rules controlling how women must act in police organizations, they walk a precarious invisible line in their relationships with male officers, monitoring their behaviors and constantly trying to avoid being branded with a damaging label. However, the effort they dedicate to acting appropriately as both women and police officers still fails to guarantee success. Although balancing masculinity and femininity to do gender appropriately decreases the likelihood that women will face harsh social consequences from male officers, it also ultimately undermines their ability to achieve professional success as their careers progress.

Beyond their first few years, newer officers become eligible for different levels of promotion as well as specialized assignments in various divisions. Promotion to the rank of supervisor entails a civil service test similar to police officer entry exams. Eligible officers take a written exam, and final scores are calculated based on one's test score and education and experience. Moving into assignments in specialized divisions uses a less structured process. When a position opens, interested and eligible candidates respond by submitting a letter of interest and their qualifications for review. Division supervisors then use this information to select the candidate they believe to be the best fit. In the middle of their careers, when they have been working in the department for about 11-20 years, most women have attempted to move into different assignments or roles as supervisors at least once and typically more often. In doing so, most women have also been denied such opportunities. They furthermore deal with the stresses

BARAO000167

of juggling increasing family responsibilities. Thus, women must confront an additional set of significant frustrations in this stage of their careers.

This chapter describes the middle stage of female officers' careers and the prevalent frustrations they face as they continue to navigate gendered expectations of their behavior while also attempting to advance professionally. This section focuses on interviews with 24 current female officers who worked in the EPD for 10 or more years. In interviews with these officers, several experiential themes were present. First, women overwhelmingly felt that opportunities in the police department were based on favoritism, and this unfairly disadvantaged women. Women further noticed that the achievements of women who did succeed were often discredited. Female officers also discussed struggles to balance family obligations and resistance to confronting unfair treatment.

**Opportunities Based on Favoritism**

At this phase of their careers, many women begin to express dissatisfaction regarding the opportunities that are available and achievable in their police department. This demoralization may also be present among male officers, but the women interviewed expressed feeling dissatisfaction due to what they perceived to be gender-based favoritism. Of the 108 current female officers surveyed, women were most likely to disagree or strongly disagree with the statement that their department treated employees the same based on gender or race (Table 8.1). When asked to respond to the statement that employees were treated the same based on gender, 35% disagreed and another 27% strongly disagreed. When asked the same based on race, 40% disagreed while another 28% strongly disagreed. These views differ significantly from those of recruits where those surveyed overwhelmingly agreed that the department treated its employees

BARAO000168

the same based on gender and race. Along the journey from recruit to seasoned officer, women's

perceptions change substantially.

| Table 8.1. Perceptions of Department Fairness ($n$=108) | | |
|---|---|---|
| | Frequency | Percent |
| **Department treats employees the same regardless of gender** | | |
| Strongly agree | 4 | 3.8% |
| Agree | 20 | 18.9% |
| Neutral | 16 | 15.1% |
| Disagree | 37 | 34.9% |
| Strongly disagree | 29 | 27.4% |
| **Department treats employees the same regardless of race** | | |
| Strongly agree | 4 | 3.8% |
| Agree | 13 | 12.3% |
| Neutral | 17 | 16.0% |
| Disagree | 42 | 39.6% |
| Strongly disagree | 30 | 28.3% |

| Table 8.2. Female Officers' Worries about Career ($n$=108) | |
|---|---|
| | Percent |
| **Worries About Policing Career** | |
| Insufficient salary | 8.1% |
| Insufficient health insurance benefits | 4.5% |
| Long hours | 55.0% |
| Shift work | 29.7% |
| Personal health or medical limitations | 18.9% |
| Difficulty meeting family obligations | 54.1% |
| Threat of injury | 33.3% |
| Threat of death | 32.4% |
| Family members' negative views regarding law enforcement | 5.4% |
| Friends' negative views regarding law enforcement | 9.0% |
| Negative portrayal of law enforcement in the media | 54.1% |
| Military-like qualities such as use of rank and command structure | 2.7% |
| Paramiliary environment | 0.0% |
| Possible corruption within law enforcement agencies | 13.5% |
| Possible favoritism within law enforcement agencies | 45.9% |

BARAO000169

The primary grievance among women interviewed in the middle phase of their careers is that favoritism affects assignments, promotions, and opportunities in specialized divisions. They felt that this favoritism primarily benefits male officers due to the powerful male social networks in policing. Surveys of current female officers confirmed that this is a prevalent concern. Among female officers, 46% indicated that favoritism worries them about their career in law enforcement (Table 8.2), more than the threat of injury or death. Women further remarked that it is rare that female officers are awarded positions in specialized units, especially those traditionally considered more masculine and dangerous like the gang unit and drug unit.

Most women interviewed stated that the promotional testing process (i.e. tests for promotion to the rank of sergeant, lieutenant, or captain) was generally fair. This is likely because the EPD's promotional process follows a civil service test model in which each test taker is ranked by their score. Except in special circumstances, individuals with a lower score cannot be promoted unless those scoring higher have been promoted first. Despite the fact that women expressed less concern about the promotional testing process, some argued that administrators can choose who they would like to promote among all candidates with the same score ranking. When there are multiple candidates eligible for promotion, women feel that men are more likely to get promoted.

There are several reasons why men may be more likely to get promoted over a female candidate. First, the majority of supervisory positions in policing are held by men. Social and cultural structures which make it easier for male officers to build connections with other male officers increases their likelihood of being selected for a promotion and perpetuates the reproduction of primarily male supervision and police administration. In addition to increasing the likelihood that male officers will ultimately be selected for promotional opportunities, male

BARAO000170

social networks also increase the chance for men to gain experience through different career opportunities beforehand. Lastly, in police organizations especially, men are stereotypically expected to possess the qualities necessary in a good leader (Schein, 2001; Silvestri, 2005). They are decisive, dominant, authoritative, and communicate directly and confidently. However, women are believed to be too submissive and emotional for such positions (Martin, 1980; Schulz, 1995). Even if they were believed to be capable, a female leader is quickly perceived as acting contrary to the rules of femininity which require her to be quiet, polite, and obedient.

Regardless of perceiving some unfairness in department promotions, most female officers were much more concerned with what they considered an unfair and biased process for entering specialized units, as opposed to promotion in rank more generally. In the EPD, the composition of specialized units is indeed heavily skewed (Table 8.3). Men comprise a disproportionate majority of every specialized unit except the school police unit and police training academy. The care-taking, administrative, and teaching roles encompassed in these units are often viewed as being more appropriate for women. These functions are seen as fundamentally different than the crime-fighting role male officers embrace as being essentially masculine.  Allowing women to

| Table 8.3. EPD Specialized Unit Gender Composition | | |
|---|---|---|
| UNIT | FEMALE | MALE |
| | Percent | Percent |
| Drug Unit | 6.1% | 93.9% |
| Police Training Academy | 16.0% | 84.0% |
| Bicycle Unit | 8.3% | 91.7% |
| Canine Unit | 7.7% | 92.3% |
| Firearms Training | 9.1% | 90.9% |
| Homicide | 11.6% | 88.4% |
| Mobile Operations | 2.0% | 98.0% |
| School Police | 38.9% | 61.1% |
| Gang Unit | 4.0% | 96.0% |

171

BARAO000171

serve in positions requiring nurturing and administrative skills serves to provide female officers with special positions that do not threaten the status or masculinity of men in police organizations.

Unlike the promotional process, there is no civil service test administered for entry into a specialized unit. Instead, an opening is posted internally to which officers respond with a letter of interest and resume. However, once these are turned in, the women reported that no objective criteria exist for how an individual should be selected. This lack of structure in selection creates an environment in which favoritism toward male officers is perceived to be unchecked, and a supervisor noted how this leads to obvious disparities in these units:

> If you look at the makeup of the specialized units, it's not usually, except for the school police unit which has a whole bunch of women in it because real cops don't want to just police the kids, you know ... The gang unit: overwhelmingly male. The drug unit: overwhelmingly male. Fugitive unit: Overwhelmingly male. (Supervisor 01)

In describing several units as overwhelmingly male, she makes a distinction between traditionally masculine units and those in which women are allowed to work. Several women remarked that in order to pacify complaints about a lack of opportunity for female officers, women are given positions in units like school police, community policing units, and some investigative divisions. The danger and crime-fighting characteristics of policing are nearly absent in these roles, and so they may be viewed as more appropriate positions for women.

Although some female officers felt that the disproportionately male composition of most units reflected blatant gender discrimination, most suggested that this was due to the importance of personal connections rather than explicit gender bias. They explained that supervisors are choosing officers they know and like for positions rather than selecting officers based purely on

172

BARAO000172

qualifications. If officers hold connections to powerful families or political figures, they are much more likely get desirable positions. Importantly, in the male-dominated police culture, social networks which hold power and influence are also likely to be male-dominated. A patrol officer explained the prevalence of these practices and how they are perceived by most women:

> And it seems like a disproportionate number of people are white males … so I'm like well why is that happening? It's kind of like the old boys network like 'why don't you come to work here, okay I'll put in a good word for you because I know you' ... so I think sometimes where people wind up working has to do with favoritism. And so if your son plays baseball with the lieutenant's son over in this district and you want to go work there then you might talk to him about transferring. And so if you don't know anybody and you don't have anybody that you're connected with, then you can put in for transfers but you might not get it. Then it's like well okay, that's not fair, I'm just as qualified. (Officer 08)

Earlier in their careers, women typically learn that socializing with male officers can lead to negative consequences. To evade negative labelling and hostility from male officers, women learn that socially, they are expected to act according to stereotypically appropriate feminine norms. This means not drinking, crassly joking, or sleeping with the male officers. Because female officers are excluded from dominant male social networks, they more often lack the connections necessary to succeed when opportunities are governed by subjective standards.

Most officers agree that whether male or female, anyone with an influential personal connection is awarded opportunities, especially within specialized units. Several women interviewed explained that it is rare that female officers are welcomed into male social networks, but when they are, it is usually based on familial, romantic, or sexual relationships. An officer noted that when women have such connections, they too reap benefits similar to connected males:

BARAO000173

They do what they want and it's all about who you know. They hook up family members, they hook up friends, and it's male dominated, so a lot of them are going to be friends with males. Some females get stuff because they're either sleeping with someone or they know somebody or they have a good connection or they're friends with somebody, but a lot of those females get what they want. (Officer 10)

However, she continued to express that though they gain coveted positions, they don't generally gain respect. If female officers don't have existing personal connections, most are aware that they can develop connections through romantic or sexual relationships. However, engaging in these relationships also reduces the respect they receive from male officers. As a result, women often felt that they were forced to choose between professional respect and professional success.

**Undermining Successful Women**

Despite the obstacles they must overcome, some women do still manage to achieve coveted positions in specialized units and high-ranking supervisory positions. Women interviewed who held these positions reported that they achieved those opportunities through hard work and working tirelessly to prove themselves. They successfully acted as both capable police officers and acceptable women. According to the women interviewed, they patrolled and handled their calls, ensured they kept to themselves, and maintained a level-headed, confident, and authoritative demeanor without overstepping and threatening the masculinity of male coworkers. Though difficult at times, they believed they proved that they could perform the job just as well, if not better, than their fellow male officers.

BARAO000174

Although most women report achieving their positions due to merit, they perceived that other officers frequently attempted to discredit their achievements. Female officers recounted that once a woman is promoted or moved into a coveted specialized division, rumors begin to circle. For some women, other officers commented that the only reason they were put into their new position was because they are female and make the department appear diverse. For others, rumors could become much harsher. They stated that officers began to dig for negative information about women to further prove that their success was not meritorious. This negative information sometimes involved behavior prior to becoming a police officer, past off-duty conduct, or rumors about sexual encounters. Therefore, even when success is achieved, many feel that those accomplishments are undermined through emphasizing female officers' token minority status or attempting to prove that they are of questionable character and otherwise undeserving. A senior female supervisor remarked, "I know all the dirt about each sergeant female because once they're promoted, that's all you hear from all the guys" (Supervisor 18).

Women who earn supervisory positions can threaten the dominance and masculinity of men in policing. They furthermore tend to violate expectations that women should behave quietly and passively both in society and in police departments. When compared to men, female supervisors in many professions, including policing, are characterized as bossy, overbearing, and often incompetent rather than assertive and confident. Female officers promoted to supervisory ranks thus overstep their bounds as women and threaten the superiority of men. Criticizing the accomplishments of women provides some male officers with a means of invalidating the merit behind their achievements.

**Family Obligations**

175

BARAO000175

During their early years in the police department, many female officers struggle with difficulties and uncertainties involved in planning for pregnancy and parenting. As women proceed through their careers, deciding to start families and difficulties in meeting evolving family obligations becomes a much more prevalent concern. The shift work, long hours, and sometimes unpredictable schedules of police work mean that officers, both male and female, must juggle responsibilities with spouses and children in addition to dealing with the significant everyday stressors of police work. For women, this often results in a heavier burden. Because women are frequently tasked with working as the primary caretaker of the home and their children, sustaining work-life balance and reducing stress may be much more difficult.

Of current female officers surveyed, only 41% were married and 35% had children. However, 54% of respondents felt worried about having difficulty meeting family obligations due to their law enforcement profession. Female officers reported trying to avoid the need for accommodations because they felt that such requests discredited their dedication to policing. This need to prove that family obligations do not interfere with their law enforcement duties appears to increase stress among female officers. Because more women surveyed reported concerns about family obligations than had children, it's possible that this worry may prevent female officers from starting families. As one officer mentioned, this concern may intensify for female officers who are dating or married to other police officers as the stress and schedule difficulties are compounded.

> I think in law enforcement, it kind of discourages people. Especially if you have both parents as police officers. I think it discourages them from having big families because it's too much to juggle. Who's going to care for these kids, who's going to do this, and you can't work this day and I can't work this day. It's hard. (Officer 20)

BARAO000176

She went on to describe the overwhelming stress she feels trying to balance work and the schedules and activities of her two children. She struggled to keep work at the forefront and diminish obligations to her family but was dissatisfied. Though she knew she would lose respect for putting her children first, she decided that creating work-life balance, despite the consequences, was important to her.  She described being especially inspired by a senior female officer who told her that at the end of her career, she didn't know her child's favorite color or favorite TV show, and she advised her not to make the same mistake. She was happy with the route she took but felt she was taken less seriously as an officer for adjusting her schedule and taking time off for her kids.

Among women interviewed who had children, problems often arose finding childcare in special circumstances. If called in for a special event or holiday, they had to work to find childcare on a day when most businesses might be closed. If they were held late at work, they'd also have to scramble to find a caretaker if their spouse was unavailable as well or if they were a single parent. Because men are less often the primary caretakers of their children, the police environment has not been structured with childcare issues as a primary concern. Women are instead left to figure out their family responsibilities on their own, and they felt that they had to keep quiet about these issues to avoid intensifying negative attitudes toward women's integration in policing. Such familial difficulties can lead many women to seek positions within the police department that feature a more regular, Monday through Friday, 9 to 5 schedule, even it costs them a more successful career. A female supervisor described why some women sacrifice professional success for less exciting and less demanding inside positions. Inside jobs like clerk positions offer women a greater balance between their work and family responsibilities.

> Sometimes on this job, you find a lot of females who end up going inside and not coming out. They get a comfort zone and they're like oh it's easier. Because

177

BARAO000177

> unfortunately the other aspect is that we're the ones who are also running families. We run our families. So that's hard to do. So if you can't balance that, you can run into problems. (Supervisor 13)

She explains that many women take inside desk jobs while pregnant or while their children are young. Although they are no longer engaged in the more exciting aspects of policing and although they receive fewer opportunities for advancement, women become comfortable with the ease of balancing work and family in these inside positions. When female officers choose to continue working in patrol or other positions with more irregular schedules, they do so with the weight of knowing that they must sometimes sacrifice time with their children. They're often unable to attend school events, parties, and family get-togethers. If they take days off too frequently in order to attend these events, they risk male officers believing that they aren't as loyal or dedicated to the job. Women's family obligations further prevent male officers from accepting that they are appropriate for positions in law enforcement.

> And it can be stressful at times because you want to do certain things with your family and you can't. You may have friends that work Monday through Friday and they can go here on the weekends and ... sorry I can't go. Or my kid has to go over there or go with someone else, like I want to experience that with them. Or I have to take a day off and it's like oh I took another day off or another sick day. So it's a lot. It's a lot to deal with. (Detective 21)

Although their schedule creates difficulties meeting family obligations and spending time with their kids, another officer explains why it is necessary to make those sacrifices if women want to maintain respect and advance in law enforcement:

> When you actually get out of the academy and you start doing this job, you notice how women who have these child care issues and whatever else are perceived as they don't belong on the job. They shouldn't be here. They should have figured it

178

> out. But then when you have the guys who they want to make it to their kids'
> game or they have to take their kids to school or whatever it is they have to do, it's
> always ... no big deal, he's being a good father. He's number one dad. (Officer 08)

Women in policing appear to face a significant gender role conflict in which they must continuously meet masculine expectations of dedication to the policing profession while also balancing feminine roles as primary caregivers to their children. While women struggle to balance these roles, several female officers observed a double standard regarding parenting. While women are professionally and socially penalized for tending to their childcare obligations, men receive praise for being good fathers.

However, a supervisor pointed out that women who choose not to have children due to these anticipated conflicts tend to fare no better in the policing workplace.

> I don't have children and you're just viewed differently. It's like you're not
> woman enough if you don't have kids. But then they all say things if you do have
> kids and responsibilities, so it's like you can't win anyway. (Supervisor 22)

It would be expected that since they do not have children to act as distractions from their responsibilities as police officers, women without children might be viewed more positively in the police department. However, instead of this leading to greater acceptance among their male peers, it serves as another reason for rejection. Women who choose not to have children, while perhaps behaving as better police officers, are not behaving as women should. Having and caring for children is a central gender role for women, and those who do not fulfill it are violating traditional norms first by working as police officers and second by failing to create families.

**Reluctance to Speak Up**

BARAO000179

In this phase of their careers, most senior female officers begin learning that if they have issues within the department or their particular district, it is better to keep quiet rather than speak up. Although this tendency to avoid "rocking the boat" is likely to occur among male officers as well, reactions toward women who complain may be more severe because they may already be treated as outsiders. Women in policing learn early on that they should keep their head down and avoid complaining about minor problems. Women are expected to be properly feminine in that they remain unassuming and submissive. Female officers who challenge the authority of the male-dominated supervision and administration can face social reprimand for their inappropriate behavior. However, even when significant issues arise that should be addressed by superiors or administrators, such as gender-based harassment or explicit gender bias in patrol assignments, female officers felt that attempting to address a troublesome situation could result in much more harm. They feared being ousted from their, albeit tenuous, membership in the police culture. One supervisor noted, "Once I was branded with the 'oh she's not cool,' then I went to the next station and I had people harassing me there. It follows you from station to station" (Supervisor 09).

Even if they find themselves in a situation that clearly requires intervention, many women don't expect understanding from their peers. The administration may be receptive and respond to ameliorate the circumstances, but female officers report a powerful fear of retaliation and ostracizing from fellow officers. The negative repercussions have long-lasting effects on officers' reputations. Women interviewed felt that just one instance of complaining could result in a female officer being labeled as a complainer or troublemaker. Their accounts suggest that speaking out against other officers or department practices violate expectations that police officers demonstrate loyalty and solidarity within their profession, and this can be especially

BARAO000180

detrimental to the careers of women who are already so closely scrutinized. The negative reputation they gain as a consequence follows them through years, positions, and transfers in the department. Women moving to different districts often still found that the treatment they received from officers and supervisors continued to reflect that they are perpetually viewed as troublemakers.

**Conclusion**

Because the obstacles female officers face become more significant and affect large facets of their work and home lives, women who have worked in the police department for 11-20 years start to express feelings of frustration and demoralization specific to the unique challenges of being female in a male-dominated culture. Whereas they previously learned the rules for engaging in gender crossing practices in order to succeed in men's world of policing, they now begin to feel that they cannot succeed at all. Even if they act appropriately masculine or feminine as particular situations warrant, they are only accepted as good *female* officers. In performing gender appropriately, women might avoid some negative social judgments, but they also set themselves apart from male officers. They exclude themselves from male social networks and emphasize their perceived differences from men. Because the police culture creates a belief that maleness is an essential requisite for the ideal police officer, being different through being female is incompatible with achieving success and respect in policing. Many begin to express feeling defeated as a result of the circumstances in which they find themselves. For many of the women, their vision of their law enforcement career is not the reality and they find themselves faced with accepting their subordinate status in the police department or working to confront and correct the conditions of the department at the risk of being further cast as outsiders.

BARAO000181

In addition to the general benefits of membership in the majority group, male police officers have a special advantage that allows them to succeed. In this male-dominated profession, the social networks which hold the most power and influence over the operations and opportunities of the department are networks to which men have access because of their gender. The women interviewed regularly felt that specialized assignments were awarded based predominantly on personal connections. Some described these relationships as being forged when male officers bond inside the police department, drink after work, or even coach or attend their children's sporting events together. These social connections allow them to achieve upward mobility much more easily while women in policing are excluded from these networks and, consequently, the opportunities that come along with them.

That assignments in specialized units are disproportionately male not only reflects access to powerful male social networks but also echoes findings from prior research which suggest that when women are integrated into male-dominated occupations, men often find ways to re-segregate themselves (Britton, 2003). In police departments, maintaining an overwhelmingly male composition of units that emphasize more masculine qualities, like the gang unit and drug control unit, allows male officers to ensure that pieces of policing remain just for men (Britton, 2003; Martin, 1980; S. Miller, 1999).

Women in this stage of their careers also experience growing frustrations as they have children and as those children grow. They face a gender role conflict in which domestic and family responsibilities generally attributed to women clash with the commitment and dedication they are expected to show to the police department. Women report facing a double standard in how their familial commitments and responsibilities are viewed by male officers. Male officers needing time off for their children are good fathers while women needing time off for their

BARAO000182

children are uncommitted to the job. Consequently, female officers become more willing to take inside jobs to gain schedule flexibility even though it will likely suppress their opportunities for advancement.

Despite growing frustrations, efforts to speak up about unfair treatment in any aspect of the police department is quickly met with widespread ostracizing. This, in effect, can help to maintain the inferior status of women in police organizations. During the first ten years of their careers, the majority of women interviewed say that they would recommend a policing career to a young female. However, when officers have been working for between 11-20 years, only 50% of women interviewed would recommend it as a good career choice for women. Many women begin to feel that even with great effort to carefully navigate appropriate gender performances, female officers are still unable to achieve the professional opportunities and respect they desire in law enforcement.

BARAO000183

## CHAPTER 9: ACCEPTANCE OF WOMEN'S STATUS IN POLICING

Female officers who have worked in the police department for over 20 years have experienced unique working conditions that differ substantially from those hired after them. Many of these women began their careers in the 1980s and 1990s as a result of legislative pushes and grants focused on increasing both racial and gender diversity in police departments across the country. Nationally, from 1970 to 1991, the proportion of women in police agencies increased from 2% to 9% (Price, 1996). Female officers during these decades faced even more difficulty assimilating into the police culture because of their glaring minority status and a stubborn unwillingness to accept that women could be successful police officers.

When the women interviewed for this research told stories of their experiences as officers during this time period, many reported instances of explicit sexual harassment both in the training academy and within the police department. These situations often included occurrences of insults or sexual comments in front of coworkers as well as the incidence of unwanted sexual advances and groping. Many women did not report these instances because they believed that their complaints would not be taken seriously by male superiors. They accepted it as part of the culture and a necessary consequence of working in a predominantly male profession. When problematic behavior became serious enough to address, the perpetrating officer was usually transferred to a different position or district but was subjected to little other intervention or discipline.

These experiences are immensely different from the treatment of female officers entering policing in the late 1990s or after. Despite the fact that such appalling, overt harassment and discriminatory treatment is no longer reported to be prevalent in the EPD, the conditions women faced during this time period are important for understanding how they characterize the life-

184

BARAO000184

course of their career. Women in police departments during the 1980s and 1990s were more focused on survival than success and social acceptance. Whereas women previously faced powerful forms of rejection and hostility simply for their presence regardless of their behavior, female officers can now typically avoid such harsh treatment by navigating established contextual gender norms in the law enforcement. Women who entered the agency during this earlier time period are likely much more keenly attuned to potential unfair treatment and may be less likely to expect equality in the police department.

This chapter describes themes that emerged from interviews with women who have worked in the EPD for over 20 years ($n = 14$). In this stage of their careers, most women appear resigned to the roles and expectations of female officers in policing. They accept their persistently inferior position in the department and describe how women should behave in order to limit rejection and increase their chances of success. Discussions primarily revolved around five core themes: the rejection of female officers from promotions and specialty assignments, social punishment for women who do not abide by informal rules of conduct, accentuating differences between male and female officers, teaching new female officers how to act appropriately, and general reluctance or hesitation to recommend the job to young women.

**Women at the Bottom**

Similar to women in the middle of their career, female officers later in their careers also acknowledge the powerful influence of favoritism but they accept rather than fight against these forces. They believe that women will remain secondary and subordinate to men in the police department, and one officer described why many believe that the culture is unlikely to change:

> I guess that's the culture and hopefully it changes. I just don't know when though. The younger officers will just go into that mindset of, "I must comply, I must

BARAO000185

> follow, I must be as they are in order to fit in, to exist." Instead of saying, "No,
> that's not how I'm going to be." And the majority of them will begin to see that
> their morality and their character will have to change to meet a standard of the
> department. (Officer 04)

She noted that in more than 20 years in the department, she hasn't seen any change to the exclusionary culture and doesn't believe that women will ever be seen as equals in policing. Most senior officers interviewed were less likely to emphasize proper code switching practices as a path to success. Instead, they discussed that rather than trying to fight against the established norms, all women can do is study harder and work harder to prove themselves as the best candidates for specialized assignments and promotions. Their goal should be to position themselves as the undeniable top pick rather than fight the how the system works or dedicate excessive energy to unravelling the intricate complexities of gender-based social expectations. Many senior female officers were doubtful that these more straightforward efforts would truly lead to success but felt that it was the only option because they believed trying to change the culture was futile. Complaining and sticking up for themselves will only lead to further rejection for women. When senior officers have been kept out of the positions they want for many years, some women say that they stop committing effort to achieve them and resign to just collecting their paychecks. They do little throughout the course of their shifts because they no longer believe that hard work will be rewarded. A senior supervisor described this prevalent feeling of resignation among women in response to what they perceive as gender-based professional limitations:

> So what winds up happening with women is you find a pretty decent job, it's not
> your dream job and it's not really what you expected, but you get used to it and
> now you know it's good because I can just go read the paper for a few hours and

186

BARAO000186

nobody bothers me. Then the women don't make any noise because they don't want to rock the boat. So then we become our own worst enemies. (Supervisor 02)

She felt that by giving up on their goals, women limit their own opportunities for success. However, she expressed feeling like this often seemed like the only option. Another supervisor was similarly frustrated with women's lack of opportunities in law enforcement. She described feeling discouraged when she tried to guide younger women:

The younger generation, they don't know the whole thing. They're just thinking hard work, they're going to do it. They haven't seen it yet. They don't even see that yeah, you can work hard but you're still not going to get anything. And you want to tell them somthing. So it's like what's the deal guys? What do they have to do to get these assignments? They have to get their PhD in what? (Supervisor 18)

Young women often enter the department excited at the potential opportunities for advancement, and although senior female officers want to encourage them, many reported feeling conflicted. At the same time that they wanted to support their endeavors and enthusiasm, they felt that all would eventually feel the same disappointment most women felt when their efforts were never enough.

In addition to feeling like women are largely unable to achieve their desired professional opportunities despite their best efforts, many senior officers also start to accept that their male coworkers and superiors will always see them as women first and police officers second. Rather than realizing that women are largely equal to men in their ability to perform policing functions, female officers feel they are perpetually viewed through the lens of traditional gendered expectations. They are only expected to excel in administrative positions, caretaking roles, and

BARAO000187

positions requiring more emotional labor since these skills associated with typical, appropriate demonstrations of femininity. Even if women do not identify with these roles, it is often assumed that these positions are best suited for female officers. One female officer explained that she entered policing expecting that her prior military experience would set her up for numerous opportunities for advancement. Instead, she felt that it ultimately provided her with no advantages and gave up trying to gain recognition:

> And then after a while it's like, you know, the hell with this. You set your path and just do other things because the acknowledgement isn't there. Another thing that you can see with females is how many females are doing inside jobs, like they're clerking or they're in whatever position like community service ... and again, not to say those positions aren't important, but again it's that stereotypical type of position where women get the job because they're good in clerical type areas and so forth. (Officer 04)

Though she was interested in proactive policing assignments and specialized divisions like the gang unit, she was never given the chance to participate in these roles. Instead, she felt that they were reserved for men because the qualities of female officers did not align with the masculine values of these positions. However, she noted that women are prevalent in desk assignments and community service roles because they are assumed to be better for these types of assignments. A detective further noted that the department provides positions to women in divisions that are less dangerous:

> What they'll do is they'll give women another cushiony job that's just a good gig like oh, you can be crime scene response. Look at crime scene response, there's a ton of females. But they're not good enough for the gang unit or the drug unit. (Detective 21)

BARAO000188

She expressed feeling like there were many women with interest in joining the gang unit or drug unit, and in order to pacify female officers' complaints about opportunities in specialized divisions, the department filtered them into divisions more appropriate for women. This not only limits female officers' opportunities for success, but a second officer described how placement in these stereotypical roles allows men to further criticize women in the police department:

> They choose to have women working inside… And you have a lot of men who prefer to work inside as the booking officer or in the clerk's office or whatnot but they're not perceived as being lazy or being afraid of working the street. So you see there's a huge difference in how men and women are viewed when they have inside positions or inside assignments. (Officer 08)

She conveyed that department supervisors often prefer to have women working inside because they perceive female officers as organized and better at clerical duties. However, women in desk positions are seen as lazy and fearful of patrol, designations not applied to men who work inside. Female officers' overrepresentation in inside jobs appears to reproduce the belief that women cannot work effectively in police patrol.  Whether women are facing exclusion from social networks, getting passed over for promotional positions, or being confined to administrative or social work roles, the senior female officers interviewed felt that that although adhering to gendered expectations for women in police organizations can make their lives easier, there is a ceiling which will always limit their acceptance and ability to succeed in law enforcement.

**Acceptance of Social Punishment**

Senior female officers also appear to recognize that nearly every behavior comes with its own set of consequences. To these women, there are strict rules of conduct for how women

189

BARAO000189

should act in policing, and consequences should be expected if they are violated. Female officers who have worked in the department longer are more likely to suggest that when women are ostracized or otherwise socially punished, it was probably their own doing. They either should have known better or they behaved a certain way knowing the consequences for their actions.

Female officers often note that although the double standard pertaining to dating and sexual relationships is unfair and biased against women, it is just the nature of the job they are in. In this way, women bolster the validity of these gendered social constraints and perpetuate the idea that responsibility for keeping themselves out of these situations rests solely with women while men are continuously excused from their behavior. Many female officers argue that women with tarnished reputations should have known better. They also voice acceptance that females simply cannot hang out with, date, or have sex with any male officers, and they hold women responsible for abiding by those rules and dealing with the consequences if they choose to ignore them. A detective provided a warning to new female officers and felt that they should be aware of the double standard:

> Don't sleep around. I need to say it. The guys can sleep around with so many women and they're a stud. But a female does that? Oh it's straight up she's dirty, she's a pig. (Detective 06)

In voicing this sentiment, the detective expressed acceptance of this unfair perception. Rather than challenge this double standard, women must understand that they cannot "sleep around." The senior female officers interviewed seemed to internalize that the social interactions of women are judged by standards of feminine behavior, and proper women are not sexually promiscuous. Another officer elaborated on the consequences of sleeping with male officers:

> I don't care who you sleep with or how many people, don't start sleeping with cops, especially if you're new. If you get out and start messing around with these

BARAO000190

> guys, then that's all you are. That's all they care about. And just because you're
> from the same class and you're friendly doesn't mean they're not talking about
> you. …You have to be cognizant of what you say, where you go, and who you
> hang out with. If you go out drinking with the guys, the guys might start drinking
> and say things that are inappropriate. You have to understand that's going to
> happen and you have to remove yourself from that situation. (Officer 12)

She notes that women must be understanding of male officers' tendency to make inappropriate jokes or advances. In deciding to hang out and drink with the guys, they have chosen to put themselves in a potentially troubling position and it is their responsibility to be morally responsible and remove themselves if necessary.

Additionally, women reported feeling that administrative and social retaliation was likely if women complained, especially if complaints were filed through supervisors or more formal legal channels, perhaps due to the enhanced and widespread attention these received. However, senior female officers emphasized that being ostracized by officers and supervisors should be expected, and they felt that filing any type of complaint is a choice for which officers know and should be ready to accept the consequences. One supervisor remarked that if a female officer wants to complain, "You'll just kiss your career goodbye. You can definitely stir up things but you'll be handing in that badge. One hundred percent" (Supervisor 18).

In nearly every discussion of these behaviors, senior officers described frustration with the female officers who did not adhere to the rules of conduct rather than frustration with the existence of these standards. The women interviewed suggested that female officers should be aware of these expectations and it is their responsibility to avoid certain reprehensible behaviors and remove themselves from situations that could result in social punishment. These sentiments convey that after all, women must understand that they are invading a man's world and accept

BARAO000191

the consequences. Rather than characterize this gendered differential treatment as unfair, the consequences are characterized as the fault of the officer. It seems that senior female officers have accepted that they are outsiders in a male occupation and must follow the informal rules established by men. Women must accept the consequences of intruding in a masculine occupation. Though acquiescing to the limitations and unfair expectations placed on women may provide senior officers with a sense of peace, women's acceptance of these norms continuously reaffirms the dominant status of male officers.

**Reluctance to Recommend the Job**

Most senior female officers interviewed were much more reluctant than their junior coworkers to say they would recommend policing as a good career option for young females. Only 30% said they would recommend a police officer career to women. For many, they felt that a law enforcement career was simply one in which women could not get ahead. They knew what obstacles women would face in police work, and they expressed little hope that the culture would change. In their eyes, female officers would always be prevented from achieving the opportunities that would allow them to be promoted or have more fulfilling careers. Instead, officers recommend that if women are attracted to the criminal justice field or the idea of helping people, they find other avenues to do so. Like one officer remarked, many recommended taking jobs in probation, the courts, or taking the firefighter civil service exam instead.

> Probably not. No. Because I feel that as females we have more to offer. Unless things change where you can just move through the rankings on merit and your performance and your knowledge of law enforcement. But get involved in law enforcement in different aspects. Because there's so much more to do. (Officer 20)

BARAO000192

She recommended that women pursue other options because their talents and abilities are squandered in police work. She felt that women couldn't succeed in gaining the promotions or assignments they deserved as a result of their hard work, and they should dedicate themselves to other fields in which they are actually able to make a difference.

Others were reluctant to make an unwavering commitment to their recommendation or lack thereof. Like junior officers, these women said they would still recommend the job to the "right kind" of female:

> I think it depends on the female because I can't say no because if I did say no, it means that I don't want to see any more women in this profession, and I think this profession does need women who are going to be strong enough to work within this and make the statement that needs to be made. So that's the only reason why I just can't say no that I wouldn't recommend it at all. But I think it's a profession for a certain kind of female because it's definitely not for the weak. It's for a female who really wants to do this job ... like literally solve crime and do everything this job requires. But she's got to be tough and she's got to be able to put up with the rest of what's going to happen. She has to know the proper channels to deal with it and be willing to deal with it. (Officer 08)

This officer was cautious in saying she would recommend police work to other women but relented that hiring more women in law enforcement would be necessary if there was any hope for the culture to change. In her characterization of the women she, and many other women interviewed, would recommend for police work, she upholds masculine beliefs that female officers must be tough and "strong enough" and that the job is "definitely not for the weak." That so many women interviewed would only recommend policing to these particular kinds of females reflects their internalization of the values of the male-dominated occupational culture.

BARAO000193

Still others, though a minority within the group, were more certain they would recommend policing for young women. This motivation was sometimes explained as being due to the positive financial benefits and independence that can be derived from a policing career. It is because of these benefits that some women feel that they must endorse the choice to become a police officer in spite of the difficulties they may face. Other female officers say that they continue to recommend the career because increasing the proportion of women in police departments is the only way that change will be made. One supervisor explained that if there are more female officers and they continue to prove themselves, tolerance for their presence and respect for their abilities might continue to increase:

> I still do in spite of everything. I always think about it. And would I say ... the job's not for everybody and that's true for men and women. But I still have hope and so the only way we can really get there is by continuing to have women on the job. (Supervisor 02)

However, despite these hopes, she continued on to explain that increasing female representation would remain difficult due to the features of police work and the police culture:

> There's no welcome mat for women. And there has to be because the numbers are too small. That's huge. And then you're looking at shift work. You're gonna have to work weekends, holidays, midnights, whatever. It used to be that other jobs didn't pay as well as policing but now we're doing okay. So a woman now is going to be like, "Okay, so I can go over here in an office and maybe I'll only make 60 grand, but I'm not working midnights and I'll have three day weekends, holidays, I still get insurance, and it's this nice, clean environment and whatever." But policing … to say, "Ok midnights, I'm not going to see my family because they're going to be awake and I'm going to be sleeping" and then what that does to your body ... and for that little bit more money at the entry-level, it's not worth it to them. So we have to figure out how to entice them to come and then once

BARAO000194

they're there, it's the environment itself. Nobody is saying "Oh hey it's great to see you, happy to work with you." It's, "Oh no don't put me in that car, not with her" you know? Why would we want to stay? (Supervisor 02)

She poignantly acknowledges that women are more attracted to occupations offering greater flexibility, especially in light of family obligations, and that when they do choose police work, women are rejected from the male-dominated culture rather than accepted into a welcoming environment. Thus, although she is enthusiastic about recruiting more women into policing, she is doubtful about the prospect of success if department cultures remain the same.

**Warnings to Incoming Female Officers**

When women are asked what advice they would give to new female officers, their messages detail how women should act so as to avoid extra scrutiny and negative rumors. The guidelines they discuss emphasize that women must accept that they are held to a different set of rules than men. They furthermore demonstrate that women must act differently in the police department than they act outside of it.

First, female officers highlight the importance of accepting the nature of the male-dominated workplace. They admit that there are times during which you must stand up for yourself, but caution women against being too sensitive. They should expect to encounter and tolerate a frequent amount of vulgar and sometimes offensive humor. Some jokes and comments may be of a sexual nature, but women should take this in stride. These attitudes seem to reflect an understanding that it is not their world, it is a man's world and women must remain in the background. Although it may not be acceptable in other work environments, it is normal within police organizations and women who take offense and consider this behavior harassment will

195

BARAO000195

quickly be ostracized. One supervisor was flippant about the sexually charged or inappropriate comments of male officers:

> It's just kind of normal talk. So it's not like the guys are trying to ask you out and be inappropriately touching you. It's just like gross comments or something like that. (Supervisor 18)

She suggests that the comments and jokes of male officers are harmless and trivial. She characterizes them as an inevitable occurrence in police departments so heavily dominated by men. A detective further explained that women should understand that "locker room talk" is a regular occurrence and she felt that feeling offended or filing complaints was an excessive response:

> Be respectful to people, don't be a pushover. Take things a little ... you know, it's still a predominantly men's job so I wouldn't get too bent out of shape about everything. I wouldn't be running to affirmative action and discrimination every chance you get. There's people that really are discriminated against and are treated badly and harassed sexually but I mean locker room kind of little jokes and stuff, I wouldn't sweat the little stuff like that. I think because the end result is you want to work and you want to fit in. Unless something's grossly offensive. (Detective 03)

She explicitly acknowledges that policing is a predominantly male job and that women should expect these behaviors. These comments seem to reveal an acceptance of the expectation that women are unable to do the job as well as the rules set by men since they are ultimately in control. These feelings suggest that over time, female officers decide that the best adaptation to the male-dominated police culture is to remain relatively invisible, keep their head down, and not be gendered.

BARAO000196

Women furthermore rarely took ownership as equals in the police department, and instead paint themselves as intruders when they warn that women should not attempt to change the behaviors of men. A supervisor generalized these feelings to women's everyday work in the department as well:

> Women that don't cause any ... women that just go along to get along, they do okay. If they just stay under the radar. Don't be innovative or forward. That's why I say don't make problems because if you're trying to do something but it's not what the department likes or wants to do ... you get ... you're unable to do it. Whereas for men, it always goes, it's always allowed. And there's not that many females in that type of position. (Supervisor 24)

She emphasized that women should keep to themselves and avoid trying to make changes in the department. Her comments suggest that although male officers may be able to initiate proactive and innovative new strategies, female officers should understand that this profession does not belong to them and it is not theirs to change. However, some women also remarked that women must be able to identify when it is worthwhile to stand up for themselves because without setting boundaries, they'll be taken advantage of and cast aside. As one detective advised:

> I'd say know your limitations. Be safe. Know what you can and can't do. Stand up for yourself. Don't just take the inside job every day because that's what they say is available. I transferred over that shit. Like oh, you're going to put me inside again? Here's my blue slip, I'm leaving. I don't want to be here anymore because you're not treating me well. And that's what I did. …But stand up for yourself, don't get walked over. Don't let them look at you like just a civilian. Because that's what they'll do. Prove that you can do it but also be safe when you do it. And learn from your mistakes. Because everyone makes them. (Detective 25)

BARAO000197

In nearly every piece of advice given by senior female officers in interviews, they characterized their recommendations in the context of women disrupting a man's world. They described how women should act so as not to challenge the status quo of the male-dominated police culture. Rather than provide wisdom regarding how women can be good police officers, they communicate advice for how women can be good *female* police officers in a profession belonging to men.

**Conclusion**

Women who have worked in policing for more than 20 years often voiced acceptance of the dynamics of the male-dominated police culture. Instead of expressing anger or a strong desire to change the environment, they have resigned to submit to the informal requirements of women in police departments. Although these women discuss many of the same issues brought up by junior female officers, the nature of their statements focus on how to successfully navigate these experiences in a way that reduces stress, conflict, and frustration. In this way, female officers with more experience accept that the way they do gender, rather than the way they do the job, powerfully affects their success and happiness in law enforcement, but more importantly, they also recognize that their status as women significantly limits their opportunities for success regardless of their actions.

Interviews with senior female officers suggest that over time, constraint to particular gendered behaviors and roles limit women's opportunities for success and lead to frustrations which diminish women's expectations of equality in the police department. Strict expectations of appropriate conduct for female officers are not only enforced by male officers and male social networks, but they are also reinforced by female officers who come to accept women's

BARAO000198

subordinate position in policing. This occurs through the informal guidance and mentoring senior female officers provide to newer women.

Notably, the EPD organizes panels of female officers to speak to female recruits before they graduate the police training academy. Women report that these officers advise that women shouldn't socialize with, date, or sleep with any male officers. They tell recruits that they should expect that they'll have to be tougher and better than male officers, but not so tough that they're reckless. They warn that mistakes they make will be criticized more strongly. Their commitment to their families will be seen as a lack of commitment to the job. Their emotional and empathetic nature can be an asset on the job, but they must be careful to self-regulate so that it is not seen as a weakness. Finally, they should know and be prepared to use the proper channels for seeking help if they find themselves being harassed or treated poorly, but they should also be prepared to tolerate certain kinds of behavior. Though the intent of these panels may seem altruistic in their goal of helping women integrate into an occupation dominated by men, these panels provide a more formal channel to communicate how women must submit and do gender appropriately in the police department. The senior female officers in these panels also help transmit the ideals and expectations of the male-dominated police culture through their warnings and thus sustain their power and influence over women in policing.

BARAO000199

# CHAPTER 10: CONCLUSION

Although women's representation in other criminal justice occupations has continued to grow, the number of women in policing has plateaued and remained stagnant (Langton, 2010). When women first entered police departments in the late 19th century, they fulfilled the roles of social workers. Their duties consisted of those typically associated with traditionally feminine gender expectations like caring for homeless women and children, counseling runaway youth, and protecting the sexual morality of young women (Schulz, 1995). As an increasing number of police departments across the United States began hiring policewomen, these functions remained the same. Women did not take part in patrol, and if they were given powers of arrest, they only did so in the course of executing their feminine duties of caretaking and moral protection (Heidensohn, 1992; Schulz, 1995).

Even as women were granted patrol duties in the 1960s and 1970s and began entering policing at a greater rate, they continued to struggle for acceptance. Though they were granted legal protections against discrimination, a hostile masculine culture and gender-biased practices remained (Martin, 1980; Martin & Jurik, 2007; Schulz, 1995). Female officers faced a tremendous amount of difficulty being accepted by their male coworkers and struggled to achieve supervisory ranks (Archbold & Schulz, 2008; Schulz, 2004). Today, stronger legal protections exist and police agencies are often gender-neutral in their official organizational policies. Despite this progress, female representation in policing remains low and women continue to struggle to find their place in the police department.

The goal of this study was to explore continued difficulties attracting and retaining female officers as a result of a complex set of gendered social norms that sustains police work as masculine work. It examines how women do gender in the police department over the course of

BARAO000200

their careers as a result of its organizational culture and the practices that take place within it. This investigation was accomplished using four driving research questions which were explored using longitudinal surveys administered to police officer applicants and recruits as well as interviews conducted with current female officers in one metropolitan police department. Though this study only examined the experiences of women in one law enforcement agency and only a small group of women agreed to be interviewed, this research makes important contributions to our understanding of doing gender in policing. The findings of this study build upon the existing body of research investigating the unique experiences of women in policing and the forces that prevent increases in female representation. Specifically, this project sought to examine how women's experiences, from application until retirement, change how they behave and think about their career in the police department, and consequently, how those changes affect the recruitment and retention of women in policing.

## Discussion of Findings

Integration into policing agencies is made difficult for women as a result of the ways by which men and women are expected to do gender in policing. The unique police culture which values masculinity, toughness, group solidarity, and loyalty has been said to evolve as a result of the danger and public criticism directed toward the policing profession (Martin, 1980; Skolnick, 1966). This culture historically developed among a primarily white male police force, and as the occupation remains male-dominated, the conventionally masculine ideals of physical strength, toughness, confidence, and authoritativeness are held in high esteem and are believed to be necessary qualities of a good police officer (Manning, 1978; Martin, 1980; Sklansky, 2007; Skolnick, 1966). When women enter the law enforcement profession, they not only threaten the

201

male group solidarity, but they invalidate claims that masculinity is a requisite for capable and effective police officers (Martin, 1980; Martin & Jurik, 2007). Thus, they also invalidate men's use of policing to affirm their own masculine identity.

This research first explored the characteristics and attitudes of women who choose to become police officers and sought to examine how these characteristics might affect future perceptions and career outcomes. In the application phase, women appear to be extremely similar to male applicants, and perhaps as a result, they feel that they will be accepted in their new profession. They do not seem to have had any negative experiences that would tell them otherwise, and they expect to be treated as equals. During the application process, female and male survey respondents appear to be very similar. Though many prior studies have found that men have more authoritative communication styles  (Luxen, 2005; Radecki & Walstedt, 1980; Terrell, 2008) and exhibit stronger risk-taking tendencies (Byrnes et al., 1999; Meertens & Lion, 2008), women generally do not significantly differ from men and appear to exhibit stronger communication styles. This may indicate that women who choose to become police officers are already engaging in gender crossing, in which they exhibit both masculine and feminine behaviors (Messerschmidt, 2002; J. Miller, 2002). Women who pursue policing careers may be much more comfortable engaging in masculine behaviors when compared to women to do not have an interest in traditionally male-dominated occupations.

Women's career motivations also mirror those of male applicants. Despite assumptions about inherent gender differences in policing styles and values, both male and female applicants were equally likely to rate the public service aspects of policing most highly and the power, control, and authority aspects least highly. Importantly, applicant responses about their sources of referrals indicate that women are significantly less likely to say that they applied because of

BARAO000202

friends or family members in policing. These responses indicate that although male and female applicants have similar personalities and career motivations, recruiting women likely requires more outreach due to their lack of policing role models.

As recruits begin training, their survey responses again indicate that men and women are quite alike in their personality characteristics and attitudes. At this stage in their careers, women feel positively about the organization and the likelihood that they will be treated equally. Feelings of fairness and equality were also expressed in interviews with current female officers. Overall, they felt that the training academy was a place in which both male and female recruits were held to the same standards. Evidence of similarities in personal characteristics as well as perceptions of organizational fairness during the application and training phase suggest that future obstacles faced by women are unlikely to be due to significant inherent differences between male and female officers.

Second, interviews with current female officers were conducted to learn how women do gender in the police department and how these lessons and resulting performances changed throughout their careers. The careers of police officers can often be broken down into several different formative phases. Just as each period provides officers with different career opportunities and experiences, each also seems to result in distinct experiences among female officers. First, applicants pursuing a career in law enforcement begin the long application process which involves several hurdles such as a written examination, physical agility test, and background investigation. Next, hired recruits must attend the police training academy which not only teaches them police policies and procedures but also serves as a rite of passage and period of indoctrination into the unique police culture.

BARAO000203

Though formal official academy standards emphasize equality and fairness, the informal standards which guide the training academy are often explicitly masculine. The paramilitary training academy environment teaches recruits that they must be physically and mentally tough and they must control their emotions. A curriculum focus on physical fitness, firearms training, and defensive tactics demonstrates a valuing of masculine traits while minimizing the "softer" sides of law enforcement like community policing and conflict resolution tactics. Thus, while all recruits are held to the same standards, they are importantly all held to *masculine* standards. The training academy, then, is an environment in which women are taught that the police organization values masculine qualities and devalues qualities and behaviors typically associated with women. However, these norms appear to be accepted by the women. So long as they abide by masculine behavioral expectations, they will succeed and be accepted.

Despite appearing quite similar to male applicants and recruits in the beginning of their careers, the findings from this study suggest that women experience unique circumstances and behavioral expectations that guide how they must behave differently than male officers, and interviews with current female officers suggest that the majority of these changes occur in the police department. Once officers graduate from the training academy and enter the police department, the early years are a period of learning and adjustment to the requirements of the job as well as internal social expectations. The female officers interviewed reported feeling like the training academy taught them that they would succeed if they held themselves to the same standards as male officers, but in the field, they learn that they must be even better. The women interviewed reported that they had to prove that they were tougher, more confident, and more competent than men in the field in order to be accepted as a good police officer. While they must exhibit masculine characteristics of toughness and authoritativeness through the course of their

BARAO000204

work, they also learn that they must often act appropriately feminine in other contexts. Women are taught that they should not attempt to gain acceptance throughout socializing with their male coworkers. They furthermore should avoid dating or sex with male officers. It appears that women might gain negative reputations for these behaviors because they are acting immorally and improperly by traditionally feminine standards.

This research also explored how the complexities of doing gender and resulting social assessments of female officers affected women's attitudes about the policing profession and organizational culture. When they first begin working in the police department, female officers start to learn that the rules that shape appropriate conduct from women in the department are much more complex than previously thought. They begin their careers expecting that they should do masculinity both in the field and with their coworkers to be accepted as a good officer and "one of the guys" but then see differently. Slowly, women are confronted with the fact that they should display more masculine qualities in the field while generally adopting more feminine behaviors in social situations. The informal requirements to which women must adhere require that female officers behave in a gender fluid manner, engaging in more masculine behaviors in some spheres while engaging in appropriately feminine behaviors in others. Still, these younger officers are generally energetic and enthusiastic about their ability to work hard, succeed, and gain acceptance as women in the department.

In the next middle phase of their careers, female officers face ongoing struggles and rejection that lead them to feel a great deal of frustration with their role in the police department. They feel that despite their efforts to behave appropriately in varying contexts, perceptions of female officers as well as the way these perceptions limit women's opportunities are unfair and based upon gendered beliefs and masculine values entrenched in the police culture. The middle

BARAO000205

years of a police officer's career typically involve new positions through transfers into specialty divisions or promotions to supervisory ranks, but for women, many experience disappointment instead of these new career opportunities. The women interviewed expressed that at this point in their careers, they feel that their efforts to prove themselves and act appropriately are fruitless. Instead, they feel that it becomes obvious to them that opportunities are awarded based upon personal connections developed in male social networks. Additionally, they express feeling as though there is an increase in clear efforts to challenge women in the department through criticisms of childcare obligations or complaints by female officers. This is not to say that no women succeed in the EPD. Several women interviewed had gained powerful positions in the department, but many still felt that any achievements by female officers were undermined by rumors highlighting why they were not actually qualified and negating the possibility that she achieved her position based on merit alone.

The final stage of a police officer's career appears to involve reflection, an internalization of police department norms, and acceptance of women's secondary status. Younger officers seemed to continuously grapple with how to abide by shifting social norms in order to gain acceptance and respect, but the senior female officers interviewed seemed to reduce these efforts and accept their subordinate position in the police department. They often expressed that policing was and would always be a male-dominated culture. They detailed how new female officers had to behave in the department in order to avoid negative rumors and hostility from fellow officers. These women seemed to internalize the values of the masculine police culture in noting that women who don't follow the informal rules only have themselves to blame for the consequences they face. In an effort to help new women navigate the intricacies of the culture, several reported trying to share what they'd learned with new female officers, and these practices ultimately help

BARAO000206

perpetuate women's acquiescence to the dominant male culture, its values and gendered expectations, and its dismissal of women as equals.

The final research question guiding this research focused on exploring the implications of such gendered experiences on the future recruitment and retention of female police officers. The findings of this study indicate that even when female officers begin their careers with positive perceptions and belief that they will be treated equally, their experiences in the police department gradually alter those perceptions. Gendered behavioral expectations shape the narrow constraints on how women must act in both professional and social situations. Although adhering to these standards can help women avoid hostility and damage to their reputations, it does not necessarily help them succeed. Over the course of their careers, many women grow increasingly frustrated and finally resign to the realization that their efforts are futile and the belief that women will always be viewed as inferior to men in the police department.

Of course, the negative experiences of female police officers can consequently negatively influence the perceptions of new female officers while also reducing senior officers' willingness to recommend law enforcement as a career for young women. Research has repeatedly demonstrated that women perform policing functions just as well as men, and in some cases, they even bring special benefits to police departments through more empathetic handling of cases and reductions in department liabilities due to excessive use of force. Therefore, approaches aimed at increasing outreach toward potential female applicants and improving the work environment for current female officers are worthwhile endeavors for increasing the recruitment, retention, and satisfaction of women in police agencies. Though a more extensive overhaul to the masculine police culture is certainly necessary, these steps can go a long way in shifting the organizational environment in the right direction.

BARAO000207

**Doing Gender throughout the Careers of Female Police Officers**

In summary, the findings of this study suggest that female officers confront a progressive range of experiences throughout their careers that alter their expectations and teach them how they must do gender in the police department. As influences and experiences change throughout the course of women's careers, so too does their understanding of how they are viewed and how they must behave. As a result of this progression of experiences, female officers often begin their careers with excitement and enthusiasm and tend to end with a negative and somewhat hopeless attitude toward their subordinate status in the male-dominated police department.

Previous works examining how women do gender in masculine cultures have revealed that most women engage in a complex process of gender crossing or code switching which allows them to display appropriately masculine or feminine behaviors as differing circumstances require (N. Jones, 2010; Martin, 1980; Messerschmidt, 1993; J. Miller, 2001), though the degree to which they construct a different gender identity has been subject to debate. Jody Miller's (2001) study of girls in gangs found that girls participated in masculine behaviors like violence and displaying toughness and a willingness to be aggressive, largely constructing a masculine identity. However, she acknowledged that subtle acceptance of feminine gender expectations by both boys and girls maintained their identity as *female* gang members, though they often attempted to downplay their gender differences. Most girls were willing and able to participate in violent acts and expressed a preoccupation with developing a "hardcore" reputation that would garner respect, characteristics typically associated with male gang members. Miller (2001) noted that the motivations for male and female gang membership and violence were similar, yet girls were less likely to participate in serious ongoing delinquency, more severe forms of violence, or violent acts involving firearms—a difference she explains through the reciprocal nature of the

BARAO000208

ability to do crime through gender by capitalizing on the advantages offered by femininity (J. Miller, 2002). Additionally, although girls tended to accept the need for male gang members to provide protection and sustain a gang's reputation for toughness, they also attempted to bolster their own sense of equality and masculine identity by setting themselves apart from non-gang girls (J. Miller, 2001).

Messerschmidt's (2002) conclusions differed in that he found that girls were not crossing to a masculine identity but were instead constructing a different femininity. Girls built their own "bad girl femininity" by engaging in masculine and feminine behaviors which, as a whole, were accepted as appropriately feminine for the criminal culture. Nikki Jones' (2010) examination of girls in violent, inner-city neighborhoods found more frequent instances of code switching in an effort to maintain both masculine and feminine identities. To construct identities as "good," girls must not act crassly, be aggressive, or engage in physical confrontations. Those girls who fight and participate in other criminal activities are cast as being "ghetto." Since fighting is sometimes required for survival and protection in these neighborhoods, Jones found that many girls constructed an acceptable identity between the two poles. They attempted to avoid violence and aggression whenever possible, but they fought if it necessary for physical protection and to prevent future victimization. This balancing act allowed girls to reap the benefits and protections associated with building a tougher, more masculine reputation while also reducing negative social judgments by otherwise abiding by feminine norms (N. Jones, 2010).

Research on women in criminal justice occupations like policing and corrections have also suggested that women engage in these code switching practices in order to find acceptance in a male-dominated culture. The police culture in particular has been characterized as one which strongly rejects women's entry into policing due to the threat they pose to male group solidarity

BARAO000209

and the masculine qualities required of the ideal police officer. However, it appears that more overt forms of rejection from the police culture have softened. Female officers are accepted into some facets of the police culture while they are simultaneously rejected from others. The women interviewed in this research very much develop a police identity and become immersed in some aspects of the police culture. If in trouble, they'll receive backup quickly. They internalize and emphasize the dangerous nature of the job. They experience much of the professional camaraderie that accompanies becoming a part of the "law enforcement family"− police officers quite consistently recognize and express a loyalty toward their brothers and sisters in law enforcement. But they largely operate on the periphery of the police culture, and they are never fully accepted into the folds. Thus, their attempts at code switching do not appear to result in acceptance or integration.

Gender norms embedded in the police culture guide how female officers must behave in various professional and social contexts, and these are learned throughout the course of women's careers. Just as young girls in gangs have been found to engage in gender crossing and fluid gender performances (N. Jones, 2010; Messerschmidt, 2002; J. Miller, 2001), so do women in policing. The findings of this research indicate that through their first ten years or longer in the police department, women attempt to learn and engage in conduct that is either conventionally masculine or feminine depending on what the situation requires. More often, women feel that they are expected to demonstrate more masculinity in the field to be considered a good officer, but they are expected to demonstrate more femininity in social interactions to be considered an appropriate woman. Most women during this stage of their careers believe that appropriately crossing back and forth between masculine and feminine behavioral norms will result in professional success. However, more senior officers eventually learn that being female is

BARAO000210

inherently contradictory to being a police officer, and despite abiding by appropriate and contextually fluid gender performances, female officers can only hope to be successful *for a woman*. As a result, they learn that rather than balancing displays of masculinity and femininity, their ability to survive depends on not being gendered at all.

The women interviewed reported that their initial enthusiasm continued as the training academy teaches them that the police culture values masculine qualities, and they accept that they must display more masculine behaviors to fit in. Once in the department, female officers begin to undergo a relearning of how they must act to be accepted—display conventionally masculine qualities in some situations while displaying conventionally feminine qualities in others. Still, they are generally optimistic that if they play by these rules, they can succeed in policing. Women then appear to experience increasing amounts of frustration. Most have attempted to play by the rules but still find that their professional opportunities are limited and they are often confined to positions considered more appropriate for women. Finally, women in the last years of their police careers voice an acceptance of their subordinate status in the male-dominated culture of policing. They hesitate to believe that the culture will change, and instead offer women advice for surviving through invisibility rather than thriving through code switching. Furthermore, they transmit the lessons they've learned, including how women must act in the police department, to new female officers and appear to help sustain the values and norms which keep women at the bottom in the law enforcement profession.

Research concerning women's experiences in policing has pointed out many mechanisms and social processes which direct women to either do masculinity or do femininity and confine them to particular gender roles in the police department. This study expands our understanding of women doing gender in policing by exploring how female officers' gender performances

BARAO000211

change and are structured by the norms prescribed by the masculine police culture. Rather than experiencing immediate and overt rejection soon after being hired as police officers, women instead learn the prevalent gender-based expectations and roles more gradually. Many women in fact believe for several years that they will be accepted as equals among male officers and attain the same level of success and respect achieved by male peers. The exclusion of women and the professional limitations placed on female officers are often not so immediately obvious, but instead appear to grow from a culmination of sometimes subtle and mostly informal social interactions and organizational processes that accumulate in ways that reproduce gender inequalities and reassert that women are unsuited for policing.

Although previous examinations about how women do gender in masculine cultures have emphasized code switching as a way by which women can find satisfaction and eventually thrive in these spheres, this life-course view of female officers' careers reveal a different dynamic process. Prior research suggests that women often engage in code switching practices in order to gain acceptance and a feeling of equality amongst their male peers. However, the findings of this study indicate that over time, women's engagement in these processes diminishes and they instead often realize that the path of least resistance involves a willingness to remain subordinate to and in the background of male officers. Indeed, Kanter (1977) suggested that one method through which women may assimilate in male-dominated occupations is to become socially invisible to minimize gender differences and sexual attributes. Kandiyoti (1988) and Miller (2002) see these as "gender strategies" to navigate masculine cultures in response to their particular gendered constraints. The senior female officers interviewed in this study tend to learn and accept over time that women are guests in the male world of policing and indicate that frustration, confrontation, and retaliation can be avoided if they simply remain invisible. In sum,

BARAO000212

female officers tend to progress through first attempting to adhere more closely to masculine standards of conduct, then engaging in more frequent code switching behaviors, and then finally try to reduce their visibility and accept the subordinate status of women as an adaptation to the complex and often frustrating gendered behavioral expectations embedded in the police culture.

**Limitations**

As in most studies, this exploratory research does include several limitations to the data and related findings. First, this study only collects data from one agency in the Eastern United States. Policing approaches and organizational policies vary widely among regions, states, and individual organizations. Thus, the experiences of women in this department may not be generalizable to other police agencies.

Next, longitudinal recruit survey findings must be interpreted with caution as a result of small samples which continuously diminished over the course of recruits' training phase. Responses were expected to decrease as a result of reductions in training academy class size as recruits fail or voluntarily withdraw, but others simply stopped participating in follow-up surveys. While the number of female respondents remained proportional to their representation in the training academy class, the training academy classes included only 37 women at the beginning, and only 24 remained at the end. It is therefore possible that that these small sample sizes may diminish the reliability of results.

Findings from applicant surveys are also limited by an inability to compare characteristics and perceptions of those who do apply to those who do not apply. Results are unable to conclude whether the personality characteristics of women who apply to police departments differ from those who do not. Similarly, this data cannot be used to determine

BARAO000213

whether women who apply to law enforcement positions have more positive perceptions of organizational fairness and equality.

It is furthermore possible that applicants and recruits who did respond to surveys were fearful of responding honestly if they had negative experiences or opinions. Recruits may have been fearful of negative reactions from administrators, supervisors, and fellow officers if their responses were to be disclosed. Additionally, police recruits and new police officers do not yet have union protection, and may be terminated for a variety of reasons. These concerns may have been similarly present among female officers who may have feared retaliation if their responses were not truly anonymous. In an attempt to alleviate concerns, anonymity and confidentiality were emphasized in all e-mail solicitations and consent forms. Still, fear of potential social and professional consequences may have prevented complete honesty from respondents.

In officer interviews as well as surveys of recruits, applicants, and officers, the data may suffer from a nonresponse bias. Response rates to applicant and recruit surveys in particular were relatively low. Those who were motivated to participate may have had particularly positive or negative experiences with the police department, and the responses from those who did not participate may have told a different story. In particular, those woman that agreed to be interviewed may have been more likely to be disgruntled or angry with their individual experiences. However, that interviews appeared to confirm findings from applicants, recruit, and officer surveys increases confidence in this study's findings.

Though male applicants and recruits participated in surveys, no male officers were interviewed for this project. Therefore, it is not possible to compare how strongly the experiences of current female officers diverge from those of male officers. Additionally, it is not possible to confirm whether male officers actually view women as outsiders or consciously subscribe to the

BARAO000214

belief that policing is a man's job. Although this limits the ability to make assertions about how men think about women and their place in the police department, how female officers perceive they are seen and treated by men, separate from actual intent, powerfully affects their own attitudes and reactions.

Interviews with female officers provided a great deal of insight into the experiences of women in the police department, but these interviews were only conducted with 28 female volunteers from in the EPD. Because there are 279 sworn female officers in the department, it is possible that the women interviewed, and the opinions they expressed, are not representative of the entire population of EPD women. Still, confidence in these limited accounts was bolstered by the high degree of consistency and the speed with which a saturation of themes occurred.

As in the surveys of applicants, recruits, and officers, it is also possible that the women interviewed were not comfortable expressing their honest opinions or disclosing particular experiences. Indeed, many of the women interviewed expressed fear of retaliation if their identities were discovered. To alleviate these fears, anonymity and confidentiality were again emphasized in the process of gaining consent. Additionally, the women were provided with transparent answers to questions about how interview data would be stored, transcribed, and reported to maintain confidentiality.

**Policy Implications**

The findings of this study suggest several policy implications that may help increase the recruitment, retention, and satisfaction of women in policing. First, departments should focus on ensuring that they engage in recruitment efforts directed toward women. Women appeared to have fewer influential police role models among their family and friends, and this may contribute

BARAO000215

to a lower application rate among women in general. The female applicants in this sample were heavily influenced to apply to policing positions by personal referrals. Many of these referrals seem to have come from individuals with experience in policing and they voiced support for the women's decision to enter law enforcement. These findings indicate that police agencies may be able to increase applications from women if they engage in strategic outreach geared toward interacting with potential female candidates. In particular, using current female officers for these outreach efforts can help women see policing as an acceptable career option rather than a field that is conventionally inappropriate women. Additionally, organizing special panels or presentations focused on issues that may be prevalent among women as a result of gendered socialization can alleviate concerns and reduce pre-existing beliefs that police organizations are unwelcoming to women.

Agencies may find that changing their organizational image may be a slow process, but more immediate results might be achieved by adjusting websites, recruitment materials, and presentations to specifically address potential job-related concerns that may prevent individuals from applying. Both male and female applicants reported that the threat of death and the threat of injury were significant worries held about a future career in law enforcement. Although these risks are always present, research demonstrates that injuries and fatalities are relatively rare occurrences. Police organizations can address the exaggerated view of the frequent dangers of police work by emphasizing the rarity of these occurrences and instead focusing on the more significant job features and responsibilities centering on the service and investigatory roles of police officers.

Because referrals and support from police officers are important in applicants' decision to apply, current officers play a vital role in the ability of departments to recruit quality applicants,

BARAO000216

especially within underrepresented groups like women and racial minorities. These groups may be discouraged from applying due to a negative impression of how they will be treated in the police department. For recruitment efforts to succeed, current female officers must be satisfied with and optimistic about experiences in the police department and therefore enthusiastic about recommending a law enforcement career. Throughout their careers, female officers reported facing a progressive number of obstacles which gradually increase frustration and decrease women's perceptions of equality and acceptance. Thus, improvements to the work environment can have significant returns for departments like increased job satisfaction and more positive referrals of potential female candidates.

First, agencies should ensure that access to opportunities in positions like specialized units involves objective criteria and a transparent selection process. Among the women interviewed, the most significant complaint was that favoritism in promotions and special assignments limited their opportunities for advancements. They felt that positions were awarded based on "who you know" rather than determining the most qualified candidates for the job. Because women are often kept out of influential male social networks, their success is severely limited when promotions and special assignments are based on personal connections. Though this study cannot conclude that this subjective process is actually occurring, what is important is that there is a widespread perception that these determinations are unfair. To minimize these negative perceptions, departments can ensure that transfers to specialized units in particular are made according to objective criteria and specific qualifications. When decisions are made, increasing transparency in decision-making could help reduce assumptions that positions were awarded based on personal connections instead of merit.

BARAO000217

Departments should also work to develop formal mentoring programs for women and other minority groups. Several women mentioned that mentoring programs among female officers would be especially valuable, and previous research has also suggested that these are effective strategies for increasing retention and helping women gain upward mobility (Hassell et al., 2011; Ward & Prenzler, 2016). Effective initiatives used by other departments include formal programs structured to provide mentoring and networking opportunities for female officers. Additionally, some departments have also made an effort to include leadership from these programs in agency committees to ensure that they have a voice regarding any frustrations or perceived barriers to success. To further help women achieve success, one department even reserved 40% of its training for women so that women would not only have mentor support but also the skills and training needed to succeed (Ward & Prenzler, 2016).

Because many women had trouble achieving work-life balance and felt they were devalued if family responsibilities interfered with work, agencies should also aim to develop ways by which they can increase work-life balance and better accommodate the needs of both male and female officers when they experience conflicts with outside responsibilities. One way through which women are made to feel that they do not belong in policing is through a devaluing of the needs that are more likely to affect female officers. Beginning in the training academy, the traditional role of women as primary caretakers of their children and family is overlooked. Women are taught that they must ensure that their childcare obligations are taken care of and that they must deal with problems quietly. These outside familial obligations should not interfere with their dedication to policing. A review of police organizations with 30% or more female officers found that these successful agencies often implemented flexible scheduling options (Ward & Prenzler, 2016). Some agencies offered options for officers to adjust their working

218

BARAO000218

hours when necessary, others offered vouchers for childcare, and still others voiced a strong organizational commitment to accommodating any familial needs to help officers achieve positive work-life balance. These options not only allowed women to balance their roles at work and at home without sacrificing professional success, but they also powerfully communicate that the organizations welcome and accepts female officers in their ranks. Rather than expecting women to conform to the masculine values of the police agency, these agencies have reshaped their values and policies to create a more positive working environment for all women.

Perhaps most importantly, this research highlights the need for widespread change to the police culture. Though a difficult undertaking, small steps like demonstrating that the recruitment of women is valuable, creating mentoring programs to offer support, and altering the work environment to be more welcoming toward both men and women with competing familial responsibilities can make significant strides in shifting the organizational culture in a more positive direction. Agencies should also take steps to demonstrate that the ideal police officer does not just embody strength and authority. For example, direct entry programs in some England and Wales agencies allow the hiring of outsiders into police supervisory positions rather than requiring them to begin at the bottom of the hierarchy (Silvestri, 2018). It is argued that the hiring of legitimate outsiders might be able to transform core organizational values because they are removed from the agency's cultural norms, receive training that is more focused on problem-solving and communication rather than crime-fighting, and are more likely to question existing policies and practices (Silvestri, 2018). Though such programs might be a considerable change to existing and enduring practices, police departments can start to transform their culture by devoting attention toward hiring recruits who exhibit a dedication toward the service aspects of policing (Scrivner, 2006) and bolstering the amount of training centering on the community

BARAO000219

service, de-escalation, and conflict resolution aspects of law enforcement in the police training

academy. Through these efforts, they can begin to reshape what it means to be a good police

officer.

## Directions for Future Research

This study importantly contributes to our understanding of women's changing

experiences in policing careers and how they do gender differently in the masculine law

enforcement culture. However, many areas in need of future research remain. First, subsequent

studies should address limitations imposed by small sample sizes throughout both the survey and

interview approaches to this research. A small sample affected by increasing attrition over time

limited the ability to draw conclusions from survey results alone. Since this is a crucial period

during which individuals are much more likely to self-select out of their pursuit of a law

enforcement career, confirming these findings is important in aiding departments' recruitment

efforts. Additionally, the mixed methods approach of this study should be replicated in different

agencies of varying sizes. Replication can inform whether these experiences and attitudes remain

constant in other regions wherein the police culture might differ. Experiences and attitudes might

also differ in larger or smaller agencies where women work alongside more or fewer female

officers. In departments with more women, conditions might improve because their token

minority status decreases (Kanter, 1977), or conditions might worsen because women

increasingly threaten the dominant status of men.

Researchers should also seek to interview both male and female officers in different

stages of their careers to determine how strongly the experiences of men and women differ or

coincide. In particular, feelings of demoralization reported by the women in this study might be

BARAO000220

widely reported by male officers as well. Importantly, the sources of these feelings of discouragement are likely to differ, and exploring these differences can help illuminate the unique experiences of female officers while also providing insight that can assist agencies in improving the work environment for both men and women.

Although this study finds significant shifts in how women do gender in the police department over time, additional inquiries should attempt to explore these experiences and perceptions more in subsequent years as current veteran officers retire. Women who entered policing professions during the 1970s and 1980s faced harsh forms of harassment and discrimination, and these circumstances may continue to affect their outlook on the policing profession. As a younger generation of female officers progresses through their careers, further examination of their experiences can add substantial value to the existing body of knowledge. It is possible that findings from this and previous research may differ considerably amongst this newer cohort of female police officers since they are less likely to have encountered the harsh resistance and more severe treatment of earlier generations. Alternatively, their views might remain quite similar to those of current senior officers in response to the powerful transmission of values through the police culture.

Importantly, the salience and power of social boundaries and gender norms are likely to discourage many women from applying to police departments. As previously noted, this study was unable to explore the perceptions of women who do not consider applying or who are discouraged from applying. Despite efforts to direct recruiting efforts appropriately, many departments still suffer from extremely low rates of applications from women. Researchers should further explore the attitudes of women who do not consider or apply for policing jobs as well as the social mechanisms that prevent them from doing so.

BARAO000221

Future research should also explore how intersecting minority statuses affect officers' experiences in the police department. Many of the African-American women interviewed for this study expressed feeling as though they were viewed and treated worse than white women. If the status hierarchy placed white men at the top, black women often felt that they were at the bottom. Similarly, openly-gay women felt that they were marginalized more than straight women. Women who were racial minorities or identified as gay often felt that they had "two ticks" against them. This study was not structured to examine the interplay of these characteristics, but a deeper exploration of the effects of intersectionality is necessary. Researchers have found that the intersection of gender and race in particular can have powerful effects on other social processes and interactions in the criminal justice system (McCall, 2005). This intersection may offer benefits in some contexts (Baca Zinn & Thornton Dill, 1996), but in male dominated cultures, being female and a racial minority appears to lead to greater oppression and disadvantage. Jones (2010) described how characteristics like race affect how girls do gender in violent inner-city neighborhoods. She noted that black women were often taught values and behaviors that already conflicted with traditional, white feminine ideals resulting in even greater challenges managing gender performances and social judgments.

Lastly, this research highlights the need for additional research pertaining to how women do gender as a more dynamic process over time. Especially in masculine occupational cultures, how women do gender in the beginning of their careers may gradually, but significantly, change over the course of their careers as they are subjected to different experiences, social interactions, and social punishments. As more seasoned employees, they may increasingly seek alternative gender strategies like social invisibility to adapt to the powerful masculine culture. Conducting further research which views and explores doing gender as a more extensive changing process

222

BARAO000222

may help expand our understanding of how women learn to adapt to these power structures and masculine cultures and illuminate additional opportunities for change.

This exploratory study suggests that although there has been great attention to various testing phases and the potential presence of gender bias, the larger problem resulting in low female representation is the overarching environment and the internal, as well as the larger social, culture in which the policing profession is situated. Women attempted to adapt to the shifting social norms requiring them to be masculine in some contexts but feminine in others. However, they eventually felt that their efforts would not lead to success and they believed that accepting their secondary status was the only way they could avoid ongoing confrontation and frustration. While organizations have been pressured to be at least officially gender neutral, the masculine police culture appears to most powerfully control the dynamics and experiences of officers. Despite genuine progressive efforts by the police department in this study to increase fairness and quality in recruitment, hiring, and promotion, women still felt like outsiders and believed that they were treated as subordinate to male officers. Thus, changes to official hiring criteria, promotional processes, or departmental policies, though laudable, might do little to change the conditions women face in policing if the larger organizational culture does not change alongside them.

BARAO000223

# REFERENCES

Acker, J. (1992). From sex roles to gendered institutions. *Contemporary Sociology, 21*(5), 565-569.

Ahmad, J. (2001). *Congruence between police officers' acceptance of community policing concepts and their attitudes toward women police officers and women in the workplace.* (Doctoral Dissertation), Sam Houston State University,

Alderden, M., Farrell, A., Skogan, W., & Rosenbaum, D. (2011). *The diversification of police departments.* Washington, DC: National Institute of Justice.

American Bar Association: Commission on Women in the Profession. (2017). *A current glance at women in the law.* Chicago, IL: Author.

Appier, J. (1992). Preventative justice: The campaign for women police, 1910-1940. *Women & Criminal Justice, 4,* 3-36.

Archbold, C., & Schulz, D. (2008). Making rank: The lingering effects of tokenism on female police officers' promotion aspirations. *Police Quarterly, 11*(1), 50-73.

Archbold, C., & Schulz, D. (2012). Research on women in policing: A look at the past, present, and future. *Sociology Compass, 6,* 694-706.

Arvey, R., Landon, T., Nutting, S., & Maxwell, S. (1992). Development of physical ability tests for police officers: Aconstruct validation approach. *Journal of Applied Psychology, 77*(6), 996-1009.

Baca Zinn, M., & Thornton Dill, B. (1996). Theorizing difference from multiracial feminism. *Feminist Studies, 22,* 321-331.

Bacon, M. (2014). Police culture and the new policing context. In J. Brown (Ed.), *The future of policing.* London: Routledge.

Balko, R. (2013). 'Rise of the warrior cop': How did America's police become a military force on the streets? *ABA Journal, 99*(7), 44.

Barao, B. (2016). *A healthier police force: Examining the benefits and support for law enforcement fitness programs.* Central CT State University, New Britain, CT.

Barnes, T., Beaulieu, E., & Saxton, G. (2017). Restoring trust in the police: Why female officers reduce suspicions of corruption. *Governance, 31,* 143-161.

Bazley, T., Lersch, K., & Miecakowski, T. (2007). Officer force versus suspect resistance: A gendered analysis of patrol officers in an urban police department. *Journal of Criminal Justice, 35*(183-192).

BARAO000224

Bittner, E. (1970). *The functions of the police in modern society: A review of background factors, current practices, and possible role models*. Rockville, MD: National Institute of Mental Health.

Bogoch, B. (1999). Courtroom discourse and the gendered construction of professional identity. *Law and Social Inquiry, 24*(2), 329-376.

Bowman, C. (2009). Women in the legal profession from the 1920s to the 1970s: What can we learn from their experience about law and social change? *Maine Law Review, 61*(1), 2-25.

Britton, D. (2003). *At work in the iron cage: The prison as a gendered organization*. New York: New York University Press.

Bureau of Labor Statistics. (2011). Women in the labor force, 1970-2009. Retrieved from https://www.bls.gov/opub/ted/2011/ted_20110105.htm?view_full

Bureau of Labor Statistics. (2016). *Women in the labor force: A databook*. Washington, DC: Author.

Byrnes, J., Miller, D., & Schafer, W. (1999). Gender differences in risk taking: A meta-analysis. *Psychological Bulletin, 125*(3), 367-383.

California Commission on Peace Officer Standards and Training. (2006). *Recruitment and retention best practices update, 2006*. California: Author.

Carless, S. (2006). Applicant reactions to multiple selection procedures for the police force. *Applied Psychology: An International Review, 55*(2), 145-167.

Caroly, S. (2011). How police officers and nurses regulate combined domestic and paid workloads to manage schedules: A gender analysis. *Work: A Journal of Prevention, Assessment, and Rehabilitation, 40*, 71-82.

Cassell, J. (1997). Doing gender, doing surgery: Women surgeons in a man's profession. *Human Organization, 56*(1), 47-52.

Casteneda, L., & Ridgeway, G. (2010). *Today's police and sheriff recruits: Insights from the newest members of America's law enforcement community*. Arlington, VA: RAND Corporation.

Chaiyavej, S., & Morash, M. (2009). Reasons for policewomen's assertive and passive reactions to sexual harassment. *Police Quarterly, 12*(1), 63-85.

Chiaburu, D., & Harrison, D. (2008). Do peers make the place? Conceptual synthesis and meta-analysis of coworker effects on perceptions, attitudes, OCBs, and performance. *Journal of Applied Psychology, 93*(5), 1082-1103.

Collins-Dogrul, J., & Ulrich, J. (2018). Fighting stereotypes: Public discourse about women in combat. *Armed Forces & Society, 44*(3), 436-459.

BARAO000225

Coltrane, S. (1989). Household labor and the routine production of gender. *Social Problems, 36*(5), 473-490.

Conti, N., & Doreian, P. (2014). From here on out, we're all blue: Interaction order, social infrastructure, and race in police socialization. *Police Quarterly, 17*(4), 414-447.

Cordner, G., & Cordner, A. (2011). Stuck on a plateau? Obstacles to recruitment, selection, and retention of women police. *Police Quarterly, 14*(3), 207-226.

Correll, S. (2001). Gender and the career choice process: The role of biased self-assessments. *American Journal of Sociology, 106*(6), 1691-1730.

Correll, S. (2004). Constraints into preferences: Gender, status, and emerging career aspirations. *American Sociological Review, 69*, 93-113.

Covington, M., Huff-Corzine, L., & Corzine, J. (2014). Battered police: Risk factors for violence against law enforcement. *Violence and Victims, 29*(1), 34-52.

Creswell, J. W. (2013a). *Qualitative inquiry and research design: Choosing among 5 traditions*. San Francisco, CA: Sage Publications.

Creswell, J. W. (2013b). *Research design: Qualitative, quantitative, and mixed methods approaches*. Thousand Oaks, CA: Sage Publications.

Creswell, J. W., & Clark, V. L. P. (2007). *Designing and conducting mixed methods research*. Thousand Oaks, CA: Sage Publications.

Creswell, J. W., & Miller, D. (2000). Determining validity in qualitative inquiry. *Theory into Practice, 39*(3), 124-130.

CT Police Officer Standards and Training Council. (2018). Basic Training Curriculum. Retrieved from http://www.ct.gov/post/lib/post/basic_training/871_curriculum_hours.pdf

Dawson, S., & Davies, G. (2017). Gender differences in understanding police perspectives on crowd disorder. *An International Journal of Police Strategies & Management, 40*(2), 228-243.

Decker, L., & Huckabee, R. (2002). Raising the age and education requirements for police officers: Will too many women and minority candidates be excluded? *Policing: An International Journal of Police Strategies and Management, 25*(4), 789-802.

deGuzman, M., & Frank, J. (2004). Policewomen and their problems: The Phillippine context. *Policing: An International Journal of Police Strategies and Management, 27*(3), 396-412.

DePuy, V., Berger, V., & Zhou, Y. (2014). Wilcoxon-Mann-Whitney Test: Overview. *Wiley Stats Reference Online*.

226

Detrick, P., Chibnall, J., & Rosso, M. (2001). Minnesota Multiphasic Personality Inventory—2 in police officer selection: Normative data and relation to the Inwald Personality Inventory. *Professional Psychology: Research and Practice, 32*(5), 484-490.

Dick, P., & Nadin, S. (2006). Reproducing gender inequalities? A critique of realist assumptions underpinning personnel selection research and practice. *Journal of Occupational Psychology, 79*(481-498).

Dodge, M., Starr-Gimeno, D., & Williams, T. (2004). Puttin' on the sting: Women police officers' perspectives on reverse prostitution assignments. *International Journal of Police Science & Management, 7*(2), 71-85.

Dodge, M., Valcore, L., & Gomez, F. (2011). Women on SWAT teams: Separate but equal? *Policing: An International Journal of Police Strategies and Management, 34*(4), 699-712.

Duxbury, L., & Halinski, M. (2017). It's not all about guns and gangs: Role overload as a source of stress for male and female police officers. *Policing and Society*, 1-17.

Eagly, A. (2007). Female leadership advantage and disadvantage: Resolving the contradictions. *Psychology of Women Quarterly, 31*(1), 1-12.

Eastman, S., & Billings, A. (1999). Gender parity in the Olympics. *Journal of Sport & Social Issues, 23*(2), 140-170.

Ely, R., & Thomas, D. (2001). Cultural diversity at work: The effects of diversity perspectives on work group processes and outcomes. *Administrative Science Quarterly, 46*(2), 229-273.

Faulkner, W. (2009). Doing gender in engineering workplace cultures: Observations from the field. *Engineering Studies, 1*(1), 3-18.

Federal Bureau of Investigation. (2015). Crime in the United States. Retrieved from https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the.u.s.-2015/tables/table-42

Fejes, A., & Haake, U. (2013). Caring and daring discourses at work: Doing gender through occupational choices in elderly care and police work. *Vocations and Learning, 6*, 281-295.

Flanagan, D. (2009). Women in policing. *Politics, Bureaucracy, & Justice, 1*(1), 7-16.

Foley, P., Guarneri, C., & Kelly, M. (2008). Reasons for choosing a police career: Changes over two decades. *Journal of Police Science and Management, 10*, 2-8.

Franklin, C. (2007). Male peer support and the police culture: Understanding the resistance and opposition of women in policing. *Women & Criminal Justice, 16*(3), 1-25.

BARAO000227

Gaines, L., Falkenberg, S., & Gambino, J. (1993). Police physical agility testing: An historical and legal analysis. *American Journal of Police, 12*(4), 47-66.

Garcia, V. (2005). Constructing the 'other' within police culture: An analysis of a deviant unit within the police organization. *Police Practice and Research: An International Journal, 6*(1), 65-80.

Gershon, R., Barocas, B., Canton, A., Li, X., & Vlahov, D. (2009). Mental, physical, and behavioral outcomes associated with perceived work stress in police officers. *Criminal Justice and Behavior, 36*(3), 275-289.

Grant, D. (2000). Perceived gender differences in policing: The impact of gendered perceptions of officer-situation "fit". *Women & Criminal Justice, 12*(1), 53-74.

Gundy, J. (2007). Paramilitary training in police academies. *Law & Order, 55*(6), 22-30.

Gustafson, J. (2008). Tokenism in policing: An empirical test of Kanter's hypothesis. *Journal of Criminal Justice, 36*, 1-10.

Harris, C. (2010). Problem officers? Analyzing problem behavior patterns from a large cohort. *Journal of Criminal Justice, 38*(216-225).

Harrison, J. (2012). Women in law enforcement: Subverting sexual harassment with social bonds. *Women & Criminal Justice, 22*(3), 226-238.

Hassell, K., Archbold, C., & Stichman, A. (2011). Comparing the workplace experiences of male and female police officers: Examining workplace problems, stress, job satisfaction and consideration of career change. *International Journal of Police Science & Management, 13*(1), 37-53.

Heidensohn, F. (1992). *Women in control? The role of women in law enforcement*. New York: Oxford University Press.

Hoover, L. (1992). Trends in police physical ability selection testing. *Public Personnel Management, 21*(1), 29-40.

Hunt, J. (1990). The logic of sexism among police. *Women & Criminal Justice, 1*(2), 3-30.

Jones, N. (2010). *Between good and ghetto: African-American girls and inner-city violence*. New Jersey: Rutgers University Press.

Jones, R., Murrell, A., & Jackson, J. (1999). Pretty versus powerful in the sports pages: Print media coverage of U.S. Women's Olympic Gold Medal winning teams. *Journal of Sport & Social Issues, 23*(2), 183-192.

Jordan, W., Fridell, L., Faggiani, D., & Kubu, B. (2009). Attracting females and racial/ethnic minorities to law enforcement. *Journal of Criminal Justice, 37*(333-341).

228

Kandiyoti, D. (1988). 'Bargaining with patriarchy'. *Gender & Society, 2*, 274-290.

Kanter, R. (1977). *Men and women of the corporation*. New York, NY: Harper Collins.

King, N. (2008). Generic womanhood: Gendered depictions in cop action cinema. *Gender and Society, 22*(2), 238-260.

Kringen, A. (2014). *Understanding barriers that affect recruiting and retaining female police officers: A mixed method approach*.

Kuncel, N., & Klieger, D. (2007). Application patterns when applicants know the odds: Implicaitons for selection research and practice. *Journal of Applied Psychology, 92*(2), 586-593.

Lamont, M., & Molnar, V. (2002). The study of boundaries in the social sciences. *Annual Review of Sociology, 26*, 167-195.

Langton, L. (2010). *Women in law enforcement: 1987-2008*. Washington, D.C.: Bureau of Justice Statistics Retrieved from http://www.bjs.gov/content/pub/pdf/wle8708.pdf.

Lester, D. (1983). Why do people become police officers: A study of reasons and their predictions of success. *Journal of Police Science and Adminstration, 2*(2), 170-174.

Lonsway, K. (2003). Tearing down the wall: Problems with consistency, validity, and adverse impact of physical agility testing in police selection. *Police Quarterly, 6*(3), 237-277.

Ludwick, M., Murphy, S., & Sales, P. (2015). Savvy sellers: Dealing drugs, doing gender and doing difference. *Substance Use & Misuse, 50*(6), 708-720.

Luxen, M. (2005). Gender differences in dominance and affiliation during a demanding interaction. *The Journal of Psychology, 139*(4), 331-347.

MacCallum, R., Widaman, K., Zhang, S., & Hong, S. (1999). Sample size in factor analysis. *Psychological Methods, 4*(1), 84-99.

Maher, T. (2010). Policing sexual misconduct: Female police officers' views regarding its nature and extent. *Women & Criminal Justice, 20*(3), 263-282.

Manning, P. (1978). The police: Mandate, strategies and appearances. In P. Manning & J. Van Maanen (Eds.), *Policing: A view from the street*. Santa Monica, CA: Goodyear.

Martin, S. (1980). *Breaking and entering: Policewomen on patrol*. Berkeley, CA: University of California Press.

Martin, S. (1989). Women on the move? A report on the status of women in policing. *Police Foundation Reports*, 1-10.

Martin, S., & Jurik, N. (2007). *Doing justice, doing gender: Women in legal and criminal justice occupations*. Thousand Oaks, CA: Sage.

BARAO000229

McCall, L. (2005). The complexity of intersectionality. *Signs: Journal of Women in Culture and Society, 30*(3), 1771-1800.

McCarthy, D. (2013). Gendering 'soft' policing: Multi-agency working female cops, and the fluidities of police culture/s. *Policing and Society, 23*(2), 267-278.

McCarty, W. (2013). Gender differences in burnout among municipal police sergeants. *Policing: An International Journal of Police Strategies and Management, 36*(4), 803-818.

McCarty, W., Zhao, J., & Garland, B. (2007). Occupational stress and burnout between male and female police officers: Are there any gender differences? *Policing: An International Journal of Police Strategies and Management, 30*(4), 672-691.

McGinnis, L., McQuillan, J., & Chapple, C. (2005). I just want to play: Women, sexism, and persistence in golf. *Journal of Sport & Social Issues, 29*(3), 313-337.

McKenna, G. (2014). Empirical evaluation of aptitude testing and transcript review for police cadet applications. *International Journal of Police Science & Management, 16*(3), 184-195.

McPhedran, S., Gover, A., & Mazerolle, P. (2017). A cross-national comparison of police attitudes about domestic violence. *Policing: An International Journal of Police Strategies and Management, 40*(2), 214-227.

Measham, F. (2002). "Doing gender" - "doing drugs": Conceptualizing the gendering of drugs cultures. *Contemporary Drug Problems, 29*, 335-373.

Meertens, R., & Lion, R. (2008). Measuring an individual's tendency to take risks: The Risk Propensity Scale *Journal of Applied Social Psychology, 38*(6), 1506-1520.

Merlo, A., & Pollock, J. (2006). *Women, law, and social control* (2nd ed.). Boston, MA: Pearson.

Messerschmidt, J. (1993). *Masculinities and crime: Critique and reconceptualization of theory*. Lanham, MD: Rowman & Littlefield Publishers.

Messerschmidt, J. (2002). On gang girls, gender and a structured action theory: A reply to Miller. *Theoretical Criminology, 6*(4), 461-475.

Messerschmidt, J. (2007). Doing gender: The impact and future of a salient sociological concept. *Gender & Society, 23*(1), 85-88.

Messner, M. (1988). Sports and male domination: The female athlete as contested ideological terrain. *Sociology of Sport Journal, 5*, 197-211.

Messner, M., Duncan, M., & Jensen, K. (1993). Separating the men from the girls: The gendered language of televised sports. *Gender & Society, 7*(1), 121-137.

BARAO000230

Milgram, D. (2005). Get the facts: Recruiting women officers. *Policeone.com*. Retrieved from

Miller, H., & Rayner, C. (2012). The form and function of "bullying" behaviors in a strong occupational culture: Bullying in a U.K. police service. *Group & Organizational Management, 37*(3), 347-375.

Miller, J. (2001). *One of the guys: Girls, gangs, and gender*. New York, NY: Oxford University Press.

Miller, J. (2002). The strengths and limits of 'doing gender' for understanding street crime. *Theoretical Criminology, 6*(4), 433-460.

Miller, S. (1999). *Gender and community policing: Walking the talk*. Boston, MA: Northeastern University Press.

Morash, M., & Greene, J. (1986). Evaluating women on patrol: A critique of contemporary wisdom. *Evaluation Review, 10*(2), 230-255.

Morash, M., & Haarr, R. (2012). Doing, redoing, and undoing gender: Variation in gender identities of women working as police officers. *Feminist Criminology, 7*(1), 3-23.

Moustakas, C. (1994). *Phenomenological research methods*. London: Sage Publications.

Mundfrom, D., Shaw, D., & Ke, T. L. (2005). Minimum sample size recommendationa for conducting factor analyses. *International Journal of Testing, 5*(2), 159-168.

Ni, H., Zhao, J., & Archbold, C. (2002). Gender and police stress: The convergent and divergent impact of work environment, work-family conflict, and stress coping mechanisms of female and male police officers. *Policing: An International Journal of Police Strategies and Management, 25*(4), 687-708.

Nunnally, J. (1978). *Psychometric theory*. New York: McGraw-Hill.

Paoline, E. (2003). Taking stock: Toward a richer understanding of police culture. *Journal of Criminal Justice, 31*, 199-214.

Pierce, J. (1995). *Gender trials: Emotional lives in contemporary law firms*. Berkeley: University of California Press.

Pollock, J. (2014). *Women's crimes, criminology and corrections*. Long Grove, IL: Waveland.

Poteyeva, M., & Sun, I. (2009). Gender differences in police officer attitudes: Assessing current empirical evidence. *Journal of Criminal Justice, 37*, 512-522

President's Commission on Law Enforcement and Administration of Justice. (1967). *The Challenge of Crime in a Free Society*. Washington, DC: Author.

BARAO000231

Prokos, A., & Padavic, I. (2002). 'There oughtta be a law against bitches': Masculinity lessons in police academy training. *Gender, Work and Organization, 9*(4), 439-459.

Rabe-Hemp, C. (2008a). Female officers and the ethic of care: Does officer gender impact police behaviors? . *Journal of Criminal Justice, 36*, 426-434.

Rabe-Hemp, C. (2008b). Survival in an "all boys club": Policewomen and their fight for acceptance. *Policing: An International Journal of Police Strategies and Management, 31*(2), 251-270.

Rabe-Hemp, C. (2018). *Thriving in an all-boys club: Female police and their fight for equality*. Lanham, MD: Rowman & Littlefield.

Rabe-Hemp, C., & Beichner, D. (2011). An analysis of advertisements: A lens for viewing the social exclusion of women in police imagery. *Women & Criminal Justice, 21*(1), 63-81.

Radecki, C., & Walstedt, J. (1980). Sex as a status variable in work settings: Female and male reports of dominance behavior. *Journal of Applied Social Psychology, 10*(1), 71-85.

Ragnella, A., & White, M. (2004). Race, gender, and motivation for becoming a police officer: Implications for building a representative police department. *Journal of Criminal Justice, 32*, 501-513.

Ramsland, K. (2011). The thin blue thread: Alice Stebbins Wells. *The Forensic Examiner, 20*(1), 138-140.

Reichman, N., & Sterling, J. (2002). Recasting the brass ring: Deconstructing and reconstructing workplace opportunities for women lawyers. *Capital University Law Review, 2*(923-977).

Reiner, R. (1992). *The politics of the police*. London: Harvester Wheatsheaf.

Ridgeway, G., Lim, N., Gifford, B., Koper, C., Matthies, C., Hajiamiri, S., & Huynh, A. (2008). *Strategies for improving officer recruitment in the San Diego Police Department*. Santa Monica, CA: RAND Corporation.

Rosenbaum, D., Schuck, A., & Cordner, G. (2011). *The National Police Research Platform: The life course of new officers*. Washington, DC: National Institute of Justice.

Ryan, A., Horvath, M., & Kriska, S. (2005). The role of recruiting source informativeness and organizational perceptions in decisions to apply. *International Journal of Selection and Assessment, 13*(4), 235-249.

Ryan, A., Sacco, J., McFarland, L., & Kriska, S. (2000). Applicant self-selection: Correlates of withdrawal from a multiple hurdles process. *Journal of Applied Psychology, 85*(2), 163-179.

Rynes, S. (1991). Recruitment, job choice, and post-hire consequences: A call for new research direction. In M. D. Dunnette & L. M. Hough (Eds.), *Handbook or industrial and*

BARAO000232

*organizational psychology* (2nd ed., Vol. 2, pp. 399-444). Palo Alto, CA: Consulting Psychologists Press.

Schein, V. (2001). A global look at psychological barriers to women's progress in management. *Journal of Social Issues, 57*, 675-688.

Schuck, A. (2014). Female representation in law enforcement: The influence of screening, unions, incentives, community policing, CALEA, and size. *Police Quarterly, 17*(1), 54-78.

Schuck, A., & Rabe-Hemp, C. (2005). Women police: The use of force by and against female officers. *Women & Criminal Justice, 16*(4), 91-117.

Schulz, D. (1993). From policewoman to police officer: An unfinished revolution. *Police Studies, 16*, 90-98.

Schulz, D. (1995). *From social worker to crimefighter: Women in United States municipal policing*. Westport, CT: Praeger Publishers.

Schulz, D. (2004). *Breaking the brass ceiling: Women police chiefs and their paths to the top*. Westport, CT: Praeger Publications.

Schulze, C. (2010). Institutionalized masculinity in US police departments: How maternity leave policies (or lack thereof) affect women in policing. *Criminal Justice Studies: A Critical Journal of Crime, Law and Society, 23*(2), 177-193.

Scrivner, E. (2006). *Innovations in police recruitment and hiring: Hiring in the spirit of service*. Washington, DC: U.S. Department of Justice, Office of Community Oriented Policing Services.

Shelley, T., Morabito, M., & Tobin-Gurley, J. (2011). Gendered institutions and gender roles: Understanding the experiences of women in policing. *Criminal Justice Studies, 24*(4), 351-367.

Silvestri, M. (2005). 'Doing time': Becoming a police leader. *International Journal of Police Science & Management, 8*(4), 226-281.

Silvestri, M. (2017). Police culture and gender: Revisiting the 'cult of masculinity'. *Policing: A Journal of Policy and Practice, 11*(3), 289-300.

Silvestri, M. (2018). Disrupting the "heroic" male within policing: A case of direct entry. *Feminist Criminology, 13*(3), 309-328.

Sklansky, D. (2006). Not your father's police department: Making sense of the new demographics of law enforcement. *Journal of Criminal Law and Criminology, 96*(3), 1209-1244.

BARAO000233

Sklansky, D. (2007). Seeing blue: Police reform, occupational culture, and cognitive burn-in. In M. O'Neill & A. Singh (Eds.), *Police occupational culture: New debates and directions*. New York: Elsevier.

Skolnick, J. (1966). *Justice without trial: Law enforcement in a democratic society*. New York, NY: Macmillan.

Slater, H., & Reiser, M. (1988). A comparative study of factors influencing police recruitment. *Journal of Police Science and Administration, 16*, 168-176.

Sloan, M. (2012). Unfair treatment in the workplace and worker well-being: The role of coworker support in a service work environment. *Work and Occupations, 39*(1), 3-34.

Sun, I. (2007). Policing domestic violence: Does officer gender matter? . *Journal of Criminal Justice, 35*, 581-595.

Terrell, H. (2008). Gender differences in aggression: The role of status and personality in competitive interactions. *Sex Roles, 59*(11), 1-13.

Tilley, C. (2004). Social boundary mechanisms. *Philosophy of the Social Sciences, 34*(2), 211-236.

Tracy, S., & Scott, C. (2006). Sexuality, masculinity and taint management among firefighters and correctional officers. *Management Communication Quarterly, 20*(1), 6-38.

Ward, A., & Prenzler, T. (2016). Good practice case studies in the advancement of women in policing. *International Journal of Police Science & Management, 18*(4), 242-250.

Wells, S., & Alt, B. (2005). *Police women: Life with the badge*. Westport, CT: Praeger Publishers.

West, C., & Fernstermaker, S. (1995). 'Doing difference'. *Gender & Society, 9*, 8-37.

West, C., & Zimmerman, D. (1987). Doing gender. *Gender & Society, 1*(2), 125-151.

Wozniak, J., & Uggen, C. (2009). Real men use nonlethals: Appeals to masculinity in marketing police weaponry. *Feminist Criminology, 4*(3), 275-293.

BARAO000234

**APPENDICES**

BARAO000235

**APPENDIX A: Consent Forms**

*Applicant Survey Consent:*

**Northeastern University**
**College of Social Sciences and Humanities**
**School of Criminology and Criminal Justice**
**Names of Investigators:** Amy Farrell, Ph.D., Lisa Barao
**Title of Project:** Examining Gendered Experiences in Policing: From Application to Academy

**Request to Participate in Research**

We would like to invite you to take part in a research study we are conducting to examine the changing perceptions and attitudes of police applicants and recruits over time. This information will be used to develop recommendations to improve the recruitment and selection of qualified and diverse police officer candidates.

You will be asked to complete a survey two different times throughout the _____ Police application and selection process: immediately after initial contact from the _____ Police Department and again approximately six months later. Each survey will be brief and will take approximately 15 minutes to complete.

The decision to participate in this research project is voluntary. You do not have to participate and you can refuse to answer any question. Even if you begin the web-based online survey, you can stop at any time.

The possible risks or discomforts of the study are minimal. You may feel slightly distressed answering any sensitive survey questions.

There are no direct benefits to you from participating in this study. However, the information learned from this study may help police agencies improve the recruitment, testing, and training process for future police applicants.

Your part in this study will be handled in a confidential manner. Any reports or publications based on this research will use only group data and will not identify you or any individual as being affiliated with this project. Only the people doing the research will see any information that identifies you personally and your decision to participate in this study or the answers you provide will have no bearing on your employment or standing within your agency.

**If you have any questions regarding electronic privacy,** please feel free to contact Mark Nardone, NU's Director of Information Security via phone at 617-373-7901, or via email at privacy@neu.edu.

**If you have any questions about this study**, please feel free to contact the Principal Investigator, Amy Farrell, Ph.D., School of Criminology and Criminal Justice, Northeastern University, Tel: 617-373-7439, Email: am.farrell@neu.edu.

236

BARAO000236

**If you have any questions about your rights in this research**, you may contact Nan C. Regina, Director, Human Subject Research Protection, 360 Huntington Avenue, Mail Stop 560-177, Northeastern University, Boston, MA 02115. Tel: 617-373-7570, Email: irb@neu.edu. You may call anonymously if you wish.

By clicking on the survey link below, you are indicating that you consent to participate in this study. Please print out a copy of this consent form for your records.

Thank you.

237

BARAO000237

*Recruit Survey Consent:*

**Northeastern University**
**College of Social Sciences and Humanities**
**School of Criminology and Criminal Justice**
**Names of Investigators:** Amy Farrell, Ph.D., Lisa Barao
**Title of Project:** Examining Gendered Experiences in Policing: From Application to Academy

**Request to Participate in Research**

We would like to invite you to take part in a research study we are conducting to examine the changing perceptions and attitudes of police applicants and recruits over time. This information will be used to develop recommendations to improve the recruitment and selection of qualified and diverse police officer candidates.

You will be asked to complete a survey four different times throughout the _____ Police Academy training process: immediately prior to entering the academy, halfway through the training academy, immediately prior to graduating from the academy, and immediately after completing field training. Each survey will be brief and will take approximately 15 minutes to complete.

If you complete the first survey (immediately prior to entering the academy), the third survey (immediately prior to graduation), or the fourth survey (immediately after completing field training), you will receive a $5 Amazon gift card for your participation. You will receive a $5 gift card for each of these surveys that you complete, and participation in all three surveys is not required to receive compensation. Gift cards will be delivered electronically, and participants must submit an e-mail address to receive their gift card code.

The decision to participate in this research project is voluntary. You do not have to participate and you can refuse to answer any question. Even if you begin the web-based online survey, you can stop at any time.

The possible risks or discomforts of the study are minimal. You may feel slightly distressed answering any sensitive survey questions.

There are no direct benefits to you from participating in this study. However, the information learned from this study may help police agencies improve the recruitment, testing, and training process for future police applicants.

Your part in this study will be handled in a confidential manner. Any reports or publications based on this research will use only group data and will not identify you or any individual as being affiliated with this project. Only the people doing the research will see any information that identifies you personally and your decision to participate in this study or the answers you provide will have no bearing on your employment or standing within your agency.

238

BARAO000238

**If you have any questions regarding electronic privacy,** please feel free to contact Mark Nardone, NU's Director of Information Security via phone at 617-373-7901, or via email at privacy@neu.edu.

**If you have any questions about this study**, please feel free to contact the Principal Investigator, Amy Farrell, Ph.D., School of Criminology and Criminal Justice, Northeastern University, Tel: 617-373-7439, Email: am.farrell@neu.edu.

**If you have any questions about your rights in this research**, you may contact Nan C. Regina, Director, Human Subject Research Protection, 360 Huntington Avenue, Mail Stop 560-177, Northeastern University, Boston, MA 02115. Tel: 617-373-7570, Email: irb@neu.edu. You may call anonymously if you wish.

By clicking on the survey link below, you are indicating that you consent to participate in this study. Please print out a copy of this consent form for your records.

Thank you.

BARAO000239

*Female Officer Interviews Consent:*

**Northeastern University**
**College of Social Sciences and Humanities**
**School of Criminology and Criminal Justice**
**Names of Investigators:** Amy Farrell, Ph.D., Lisa Barao
**Title of Project:** Examining Gendered Experiences in Policing: From Application to Academy

**Request to Participate in Research**

We would like to invite you to take part in a research study we are conducting to examine the changing perceptions and attitudes of police applicants and recruits over time. This information will be used to develop recommendations to improve the recruitment and selection of qualified and diverse police officer candidates.

This interview will last approximately one hour and will take place in a private location convenient and comfortable for you. You will be asked to respond to a brief list of interview questions. You will be asked to answer honestly, and you may discuss any other topics you feel may be important. Your answers will be recorded, and all audio recordings will be destroyed once the interview is transcribed. Everything you report to us will be kept in confidence. Only the people doing the research will see any information that identifies you personally and your decision to participate in this study or the answers you provide will have no bearing on your employment or standing within your agency. Your name will never be used in any report. The answers you provide during an interview will be combined with answers from many individuals and will be reported in the aggregate without a link to your name.

There are no foreseeable risks or discomforts to you for taking part in this study. There are no direct benefits to you for participating in the study. However, the information learned from this study may help police agencies improve the recruitment, testing, and training process for future police applicants.

The decision to participate in this research project is up to you. You do not have to participate and you can refuse to answer any question. Even if you begin the study, you may withdraw at any time.

**If you have any questions about this study**, please feel free to contact the Principal Investigator, Amy Farrell, Ph.D., School of Criminology and Criminal Justice, Northeastern University, Tel: 617-373-7439, Email: am.farrell@neu.edu.

**If you have any questions about your rights in this research**, you may contact Nan C. Regina, Director, Human Subject Research Protection, 360 Huntington Avenue, Mail Stop 560-177, Northeastern University, Boston, MA 02115. Tel: 617-373-7570, Email: irb@neu.edu. You may call anonymously if you wish.

BARAO000240

I am signing this form to show that I have read you this information and have promised confidentiality. If you agree to participate, please sign this form to show that I have explained this information to you and you agree to be interviewed.

_____

Interviewer's Signature and Date


*I consent to participate in this study. I understand that my participation is voluntary and information on my participation will not be known to anyone. I understand that I can stop participating at any time or refuse to answer questions in any interview.*

Please check **one**:
___ I agree to the interview being audio-taped
___ I do **not** agree to the interview being audio-taped

Name_____
(PLEASE PRINT)


Signature_____ Date _____

241

BARAO000241

**APPENDIX B: Applicant Survey**

1. To create a unique identifier for your survey responses, please enter the DAY of your birth followed by your ZIP CODE without spaces. For example, if you were born on February 16, 1980, and you live in the zip code 06101, you would enter 1606101.

2. Are you male or female?
   o Male
   o Female

3. In what year were you born?

4. What is the highest level of school you have completed or the highest degree you have received?
   o Less than high school degree
   o High school degree or equivalent (e.g. GED)
   o Some college but no degree
   o Associate degree
   o Bachelor degree
   o Graduate degree

5. Which of the following best describes your current relationship status?
   o Now married
   o Widowed
   o Divorced
   o Separated
   o Never married

6. How many children under the age of 18 do you have?

7. Which race/ethnicity best describes you? (Please choose only one.)
   o American Indian or Alaskan Native
   o Asian/Pacific Islander
   o Black or African American
   o Hispanic
   o White/Caucasian
   o Other

8. Have you ever served in a branch of the United States military, or not?
   o Yes, I have
   o No, I have not

9. Have you ever worked as a sworn law enforcement officer, or not?

242

    o  Yes, I have
    o  No, I have not

10. How many law enforcement agencies have you applied to in the past 12 months?

11. On a scale of 1 (very important) to 5 (very important), please rate the importance of each of the following factors in your decision to pursue a career in law enforcement.

| | 1- Very Unimportant | 2- Somewhat unimportant | 3- Neutral | 4- Somewhat Important | 5- Very Important |
|---|---|---|---|---|---|
| Opportunities for advancement | | | | | |
| Structured like the military | | | | | |
| Good salary | | | | | |
| Job benefits (e.g. medical insurance, pension) | | | | | |
| Early retirement | | | | | |
| The excitement of the work | | | | | |
| It provides an opportunity to help people in the community | | | | | |
| Job security | | | | | |
| To fight crime | | | | | |
| The prestige of the profession | | | | | |
| You work on your own a lot and have a great deal of autonomy | | | | | |
| The variety and non-routine nature of the work | | | | | |
| To enforce the laws of society | | | | | |
| Good camaraderie with your co-workers | | | | | |
| It has been a lifelong dream or aspiration | | | | | |
| Have friends/relatives who are/were police officers | | | | | |
| The job carries power and authority | | | | | |
| To use this job as a stepping stone to a better career | | | | | |
| There was a lack of other job alternatives | | | | | |

12. Which of the following prompted you to consider working as an officer in this agency? (Check all that apply)
    o  Newspaper ad
    o  Magazine/journal ad
    o  Radio ad
    o  Television ad
    o  Internet ad
    o  Billboard
    o  Posters

BARAO000243

- o   Mass mailing
- o   Career fair
- o   Community organization
- o   High school outreach
- o   Explorer and/or Cadets program
- o   College outreach
- o   Experience working with the organization in another capacity
- o   Referral from a friend or family member not in law enforcement
- o   Referral from a friend or family member who works or once worked in a different law enforcement agency
- o   Referral from a friend or family member who works or once worked in this law enforcement agency
- o   Don't know
- o   Other (please specify)

13. In the first column of the table below, you will find a list of family members, friends, and professionals who may have offered their opinions about your decision to enter a career in law enforcement. If any of the following people offered you an opinion, first indicate whether that individual works or once worked in law enforcement. Then, on a scale of 1 (strongly opposed) to 5 (strongly favored), rate how much each individual supported your decision to work in law enforcement.

|  | N/A | Check if works/once worked in law enforcement | 1- Strongly opposed | 2- Opposed | 3- Neutral | 4- Favored | 5- Strongly favored |
|---|---|---|---|---|---|---|---|
| Your biological father |  |  |  |  |  |  |  |
| Your step or adoptive father |  |  |  |  |  |  |  |
| Your biological mother |  |  |  |  |  |  |  |
| Your step or adoptive mother |  |  |  |  |  |  |  |
| Your brother or sister |  |  |  |  |  |  |  |
| Another relative |  |  |  |  |  |  |  |

BARAO000244

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Your spouse or partner | | | | | | | |
| Your girlfriend or boyfriend | | | | | | | |
| Your friend | | | | | | | |
| Your co-worker | | | | | | | |
| Your professor, teacher, or counselor | | | | | | | |
| Someone with professional experience with the _____ Police Department | | | | | | | |
| Someone with professional experience with another law enforcement agency | | | | | | | |
| Other: Please specify | | | | | | | |

14. On a scale of 1 (strongly disagree) to 5 (strongly agree), please rate how much you agree or disagree with the following statements.

| | 1- Strongly disagree | 2- Disagree | 3- Neither agree nor disagree | 4- Agree | 5- Strongly agree |
|---|---|---|---|---|---|
| In life, people usually get what they deserve and deserve what they get | | | | | |
| Life is simply not fair for many people | | | | | |

BARAO000245

| | | | | | |
|---|---|---|---|---|---|
| Overall, minorities have been mistreated by society | | | | | |
| Overall, women have been mistreated by society | | | | | |
| A sensible person avoids activities that are dangerous | | | | | |
| I would like to try parachute jumping | | | | | |
| When I go on a trip, I like to plan my route and timetable fairly carefully | | | | | |
| I like to be in control of the conversation | | | | | |
| When I am with my friends, I do most of the talking | | | | | |
| I like to take charge in social situations | | | | | |
| I like action, not talking | | | | | |
| I believe that this agency treats its employees the same regardless of race | | | | | |
| I believe that this agency treats its employees the same regardless of gender | | | | | |
| I believe that I am likely to be selected for this position | | | | | |

15. Which of the following best describes your current status in the _____ Police application process?
    o  I have passed all tests and I am still a candidate in this application process
    o  I have voluntarily withdrawn from the application process
    o  I failed a test and I am no longer a candidate in this application process

IF STILL A CANDIDATE:
16. Which of the following factors worries you about a career in law enforcement? (Check all that apply)
    o  Insufficient salary
    o  Insufficient health insurance benefits
    o  Long hours
    o  Shift work
    o  Personal health or medical limitations
    o  Difficulty meeting fitness requirements
    o  Difficulty meeting family obligations (e.g. child care, elder care)
    o  Threat of injury
    o  Threat of death
    o  Family members' negative views regarding law enforcement
    o  Friends' negative views regarding law enforcement
    o  Negative portrayal of law enforcement in the media
    o  Military-like qualities such as use of rank and command structure
    o  Paramilitary environment of the training academy
    o  Length of the training academy

BARAO000246

- o   Possible corruption within law enforcement agencies
- o   Possible favoritism within law enforcement agencies

**IF VOLUNTARILY WITHDREW:**

17. Which of the following reasons help explain why you have decided NOT to pursue a career with this agency?
- o   Insufficient salary
- o   Insufficient health insurance benefits
- o   Long hours
- o   Shift work
- o   Personal health or medical limitations
- o   Difficulty meeting fitness requirements
- o   Difficulty meeting family obligations (e.g. child care, elder care)
- o   Personal criminal record
- o   Other career interests/already have satisfying career
- o   Threat of injury
- o   Threat of death
- o   Personal negative views regarding law enforcement
- o   Family members' negative views regarding law enforcement
- o   Friends' negative views regarding law enforcement
- o   Negative portrayal of law enforcement in the media
- o   Abuse of power or excessive force used by law enforcement officer(s)
- o   Military-like qualities such as use of rank and command structure
- o   Paramilitary environment of the training academy
- o   Length of the training academy
- o   Perceived corruption within law enforcement agencies
- o   Perceived favoritism within law enforcement agencies
- o   Length of hiring/application process
- o   Accepted employment offer from another law enforcement agency
- o   Accepted employment offer from another career industry

**IF FAILED A TEST:**

17. Why were you eliminated from this application process?

18. Would you apply to this agency again?
- o   Yes
- o   No

**IF NO:**

19. Which of the following reasons help explain why you would NOT pursue a career with this agency?
- o   Insufficient salary
- o   Insufficient health insurance benefits
- o   Long hours
- o   Shift work

BARAO000247

- o Personal health or medical limitations
- o Difficulty meeting fitness requirements
- o Difficulty meeting family obligations (e.g. child care, elder care)
- o Personal criminal record
- o Other career interests/already have satisfying career
- o Threat of injury
- o Threat of death
- o Personal negative views regarding law enforcement
- o Family members' negative views regarding law enforcement
- o Friends' negative views regarding law enforcement
- o Negative portrayal of law enforcement in the media
- o Abuse of power or excessive force used by law enforcement officer(s)
- o Military-like qualities such as use of rank and command structure
- o Paramilitary environment of the training academy
- o Length of the training academy
- o Perceived corruption within law enforcement agencies
- o Perceived favoritism within law enforcement agencies
- o Length of hiring/application process
- o Accepted employment offer from another law enforcement agency
- o Accepted employment offer from another career industry

248

**APPENDIX C: Recruit Survey**

1. To create a unique identifier for your survey responses, please enter the DAY of your birth followed by your ZIP CODE without spaces. For example, if you were born on February 16, 1980, and you live in the zip code 06101, you would enter 1606101.

2. Are you male or female?
    o Male
    o Female

3. In what year were you born?

4. What is the highest level of school you have completed or the highest degree you have received?
    o Less than high school degree
    o High school degree or equivalent (e.g. GED)
    o Some college but no degree
    o Associate degree
    o Bachelor degree
    o Graduate degree

5. Which of the following best describes your current relationship status?
    o Now married
    o Widowed
    o Divorced
    o Separated
    o Never married

6. How many children under the age of 18 do you have?

7. Which race/ethnicity best describes you? (Please choose only one.)
    o American Indian or Alaskan Native
    o Asian/Pacific Islander
    o Black or African American
    o Hispanic
    o White/Caucasian
    o Other

8. Have you ever served in a branch of the United States military, or not?
    o Yes, I have
    o No, I have not

9. Have you ever worked as a sworn law enforcement officer, or not?
    o Yes, I have
    o No, I have not

10. On a scale of 1 (very important) to 5 (very important), please rate the importance of each of the following factors in your decision to pursue a career in law enforcement.

BARAO000249

| | 1- Very Unimportant | 2- Somewhat unimportant | 3- Neutral | 4- Somewhat Important | 5- Very Important |
|---|---|---|---|---|---|
| Opportunities for advancement | | | | | |
| Structured like the military | | | | | |
| Good salary | | | | | |
| Job benefits (e.g. medical insurance, pension) | | | | | |
| Early retirement | | | | | |
| The excitement of the work | | | | | |
| It provides an opportunity to help people in the community | | | | | |
| Job security | | | | | |
| To fight crime | | | | | |
| The prestige of the profession | | | | | |
| You work on your own a lot and have a great deal of autonomy | | | | | |
| The variety and non-routine nature of the work | | | | | |
| To enforce the laws of society | | | | | |
| Good camaraderie with your co-workers | | | | | |
| It has been a lifelong dream or aspiration | | | | | |
| Have friends/relatives who are/were police officers | | | | | |
| The job carries power and authority | | | | | |
| To use this job as a stepping stone to a better career | | | | | |
| There was a lack of other job alternatives | | | | | |

11. On a scale of 1 (strongly disagree) to 5 (strongly agree), please rate how much you agree or disagree with the following statements.

| | 1- Strongly disagree | 2- Disagree | 3- Neither agree nor disagree | 4- Agree | 5- Strongly agree |
|---|---|---|---|---|---|
| In life, people usually get what they deserve and deserve what they get | | | | | |
| Life is simply not fair for many people | | | | | |
| Overall, minorities have been mistreated by society | | | | | |
| Overall, women have been mistreated by society | | | | | |
| A sensible person avoids activities that are dangerous | | | | | |
| I would like to try parachute jumping | | | | | |
| When I go on a trip, I like to plan my route and timetable fairly carefully | | | | | |
| I like to be in control of the conversation | | | | | |
| When I am with my friends, I do most of the talking | | | | | |

250

BARAO000250

| | | | | | |
|---|---|---|---|---|---|
| I like to take charge in social situations | | | | | |
| I like action, not talking | | | | | |
| I believe that this agency treats its employees the same regardless of race | | | | | |
| I believe that this agency treats its employees the same regardless of gender | | | | | |
| I believe that I am a good fit for this position | | | | | |

12. Which of the following best describes your current status in the _____ Police Academy training process?
- o   I am currently a police officer recruit
- o   I have voluntarily withdrawn from the training academy and I am no longer a police officer recruit
- o   I have been terminated from my position as a police officer recruit

IF STILL A RECRUIT:

13. Which of the following factors worries you about a career in law enforcement? (Check all that apply)
- o   Insufficient salary
- o   Insufficient health insurance benefits
- o   Long hours
- o   Shift work
- o   Personal health or medical limitations
- o   Difficulty meeting fitness requirements
- o   Difficulty meeting family obligations (e.g. child care, elder care)
- o   Threat of injury
- o   Threat of death
- o   Family members' negative views regarding law enforcement
- o   Friends' negative views regarding law enforcement
- o   Negative portrayal of law enforcement in the media
- o   Military-like qualities such as use of rank and command structure
- o   Paramilitary environment of the training academy
- o   Length of the training academy
- o   Corruption within law enforcement agencies
- o   Favoritism within law enforcement agencies

14. On a scale of 1 (Strongly disagree) to 5(Strongly agree), please rate each of the following statements about your training academy experiences.

| | 1 - Strongly disagree | 2 - Disagree | 3 - Neither agree nor disagree | 4 - Agree | 5 - Strongly agree |
|---|---|---|---|---|---|
| Recruits tend to socialize with other recruits who are of the same gender as themselves | | | | | |

BARAO000251

| | 1 - Very unsatisfied | 2 - Unsatisfied | 3 - Neutral | 4 - Satisfied | 5 - Very satisfied |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| Recruits tend to socialize with other recruits who are of the same race/ethnicity as themselves | | | | | |
| Recruits and instructors frequently make jokes or sexual comments about female officers/recruits | | | | | |
| Recruits and instructors frequently make jokes or negative comments about minority officers/recruits | | | | | |
| Recruits and instructors frequently make jokes about the sexual orientation of officers/recruits | | | | | |

15. On a scale of 1 (Very unsatisfied) to 5 (Very satisfied), please rate your level of satisfaction with each of the following factors at this point in time as a police officer recruit.

| | 1 - Very unsatisfied | 2 - Unsatisfied | 3 - Neutral | 4 - Satisfied | 5 - Very satisfied |
|---|---|---|---|---|---|
| My decision to accept a position with my law enforcement agency | | | | | |
| My level of job-related knowledge | | | | | |
| Amount of support from my law enforcement agency | | | | | |
| Amount of support from friends/family members | | | | | |

IF WITHDREW:

13. Which of the following reasons help explain why you have decided not to pursue a career with this agency?
- o Insufficient salary
- o Insufficient health insurance benefits
- o Long hours
- o Shift work
- o Personal health or medical limitations
- o Difficulty meeting fitness requirements
- o Difficulty meeting family obligations (e.g. child care, elder care)
- o Personal criminal record
- o Other career interests/already have satisfying career
- o Threat of injury
- o Threat of death
- o Personal negative views regarding law enforcement
- o Family members' negative views regarding law enforcement
- o Friends' negative views regarding law enforcement
- o Negative portrayal of law enforcement in the media
- o Abuse of power or excessive force used by law enforcement officer(s)
- o Military-like qualities such as use of rank and command structure
- o Paramilitary environment of the training academy
- o Length of the training academy
- o Perceived corruption within law enforcement agencies
- o Perceived favoritism within law enforcement agencies
- o Length of hiring/application process

252

BARAO000252

- o   Accepted employment offer from another law enforcement agency
- o   Accepted employment offer from another career industry

IF TERMINATED:
13. To the best of your knowledge, why were you terminated from the _____ Police Academy?
- o   Failed to meet academic expectations
- o   Failed to meet physical fitness expectations
- o   Failed to meet firearms training requirements
- o   Failed to abide by academy rules
- o   Other (Please explain)

253

**APPENDIX D: Female Officer Survey**

1. In what year were you born?

2. What is the highest level of school you have completed or the highest degree you have received?
   o Less than high school degree
   o High school degree or equivalent (e.g. GED)
   o Some college but no degree
   o Associate degree
   o Bachelor degree
   o Graduate degree

3. Which of the following best describes your current relationship status?
   o Now married
   o Widowed
   o Divorced
   o Separated
   o Never married

4. How many children under the age of 18 do you have?

5. Which race/ethnicity best describes you? (Please choose only one.)
   o American Indian or Alaskan Native
   o Asian/Pacific Islander
   o Black or African American
   o Hispanic
   o White/Caucasian
   o Other

6. Have you ever served in a branch of the United States military, or not?
   o Yes, I have
   o No, I have not

7. On a scale of 1 (strongly disagree) to 5 (strongly agree), please rate how much you agree or disagree with the following statements.

|  | 1- Strongly disagree | 2- Disagree | 3- Neither agree nor disagree | 4- Agree | 5- Strongly agree |
|---|---|---|---|---|---|
| In life, people usually get what they deserve and deserve what they get |  |  |  |  |  |
| Life is simply not fair for many people |  |  |  |  |  |
| Overall, minorities have been mistreated by society |  |  |  |  |  |
| Overall, women have been mistreated by society |  |  |  |  |  |

254

| | | | | | |
|---|---|---|---|---|---|
| A sensible person avoids activities that are dangerous | | | | | |
| I would like to try parachute jumping | | | | | |
| When I go on a trip, I like to plan my route and timetable fairly carefully | | | | | |
| I like to be in control of the conversation | | | | | |
| When I am with my friends, I do most of the talking | | | | | |
| I like to take charge in social situations | | | | | |
| I like action, not talking | | | | | |
| I believe that this agency treats its employees the same regardless of race | | | | | |
| I believe that this agency treats its employees the same regardless of gender | | | | | |
| I believe that I am a good fit for this position | | | | | |

8.  Which of the following factors worries you about a career in law enforcement? (Check all that apply)
    o   Insufficient salary
    o   Insufficient health insurance benefits
    o   Long hours
    o   Shift work
    o   Personal health or medical limitations
    o   Difficulty meeting fitness requirements
    o   Difficulty meeting family obligations (e.g. child care, elder care)
    o   Threat of injury
    o   Threat of death
    o   Family members' negative views regarding law enforcement
    o   Friends' negative views regarding law enforcement
    o   Negative portrayal of law enforcement in the media
    o   Military-like qualities such as use of rank and command structure
    o   Paramilitary environment of the training academy
    o   Length of the training academy
    o   Corruption within law enforcement agencies
    o   Favoritism within law enforcement agencies

BARAO000255