UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DONNA GAVIN, | ) |
| Plaintiff, | ) |
| v. | ) Civil No. 18-10819-LTS |
| CITY OF BOSTON and MARK HAYES, | ) |
| Defendants. | ) |

ORDER ON MOTIONS (DOC. NOS. 283, 284, 289, 291, 293, 296, 298, 300, 319, 321)

March 22, 2022

SOROKIN, J.

On November 15, 2021, the jury in this case awarded Donna Gavin a total of $2 million in damages to compensate her for the gender-based discrimination, retaliation, and hostile work environment an impartial jury unanimously determined she suffered at the hands of Defendants. The jury returned its verdict after hearing eleven days of testimony by twenty-three witnesses, including Gavin and her direct supervisor, Defendant Mark Hayes. During its deliberations, the jury asked questions of the Court demonstrating its focus on, and adherence to, the Court's legal instructions. Defendants, in a series of post-trial motions, now seek to undo the jury's verdict and escape liability for the damages awarded. All of their challenges, however, rest on flawed legal positions previously considered and rejected by the Court and on a selective recitation of the record which ignores evidence presented at trial that plainly and persuasively supports the jury's verdict.

The Court will address below why Defendants' motions fail and then will proceed to explain why Gavin is entitled under the law to recover nearly all of the attorneys' fees and costs

she incurred in connection with this action.  These rulings are rendered after deliberate

consideration of the many motions filed by the parties throughout all phases of this case, close

attention to the myriad of issues that arose during this vigorously contested trial, and review of

the trial record informed by the Court's firsthand observation of the entire trial.  At the outset,

though, some general points merit emphasis given the Defendants' persistent adherence to

certain positions.

First, the jury had before it credible and powerful evidence that Gavin—the highest-

ranking female officer outside the Boston Police Department's ("BPD") Command Staff at the

relevant time and a recognized expert in human trafficking—was singled out for harassment and

retaliation because of her gender.  The most obvious example of such evidence was the 46-page,

single-spaced log Hayes kept in which he secretly chronicled his criticisms of Gavin.  That one

extraordinary exhibit, standing alone (and it did not stand alone),[1] supports an inference that

Hayes targeted Gavin for adverse treatment based on her gender.  See, e.g., Ex. C at 2-3

(describing as one of Hayes's first actions after arriving at the Family Justice Center his

elimination of a private locker room for female supervisors because no such facility existed for

male supervisors, and his belief, notwithstanding other evidence adduced at trial demonstrating

the dominant culture at BPD, that these circumstances were evidence showing Gavin "was an

*active participant* in . . . overt gender discrimination against all the sworn male employees"

working at the FJC, giving her "'***unclean hands***' to . . . complain she is a victim of any type of

discrimination" (emphasis in original)).

---

[1] Other examples of evidence supporting the jury's finding of gender-based discrimination
included testimony describing numerous ways in which Hayes treated Gavin differently than the
male Lieutenant Detectives who oversaw the other units within the Family Justice Center.

Second, though the City wishes it were otherwise, Gavin supported her claim that, but for the Defendants' discrimination, she would have been promoted to the Command Staff with her own testimony corroborated by other credible evidence.  For example, multiple witnesses testified that Gavin's expertise in human trafficking, an area of law enforcement with rising importance that was of concern to then-Mayor Walsh, was recognized both within and beyond the BPD, see, e.g., Doc. No. 270 at 121-24; that Mayor Walsh had sought Gavin's advice in that area previously;[2] that Gavin was known by the Mayor and by important community organizations to foster an attitude toward victim services that differed from the "babysitting" approach and more traditional policing strategies preferred by some other officers, see, e.g., id. at 141-42; Doc. No. 375 at 133-36; that selection for the Command Staff had a political dimension requiring the Mayor's approval; and that other officers had leaped directly to Command Staff from Lieutenant or even lower positions during the relevant time period.  See, e.g., Doc. No. 279 at 76.  No speculation was required for the jury to conclude that Gavin, the highest-ranking female officer below the Command Staff, was on an upward trajectory and potentially headed for the Command Staff (a group in which women and members of other minority groups were underrepresented) before the events that were at issue in this case.  See Pl.'s Ex. 6.

Finally, a theme advanced by Defendants in more than one of their motions is that Gavin overly and/or improperly litigated this case.  As noted, this Court presided over every phase of this action.  While Gavin's Counsel certainly was vigorous in seeking to vindicate her legal rights, it was the Defendants' litigation conduct that consumed most of this Court's time.  A

---

[2] Mayor Walsh had designated Gavin Co-Chair of Collaborative Efforts Against Sexual Exploitation, Doc. No. 276 at 24, and she worked directly with the Mayor's office in this capacity, building connections with others close to the Mayor and the Mayor himself as well as members in the community such as Ambassador Swanee Hunt who supported Gavin.  See, e.g., Doc. No. 272 at 57; Doc. No. 277 at 153; Doc. No. 279 at 34.

perfect example of this occurred during jury selection.[3]  When the individual voir dire process

was nearing its end, with nearly enough jurors cleared to seat the desired number and allow for

the allotted peremptory challenges, the Court noted that the next few jurors in number order had

cited circumstances that were likely to require excusals for cause.  The Court asked the parties

whether they would agree to include as the final cleared juror one listed slightly later, who had

not responded "yes" to any of the questions likely to pose scheduling or fairness issues in this

case.  The City would not agree, though it could cite no legal authority requiring selection to

proceed through each juror in the order they appeared on the Court's randomly generated list.

And so, the process continued in the usual course, with the end result being that the juror

identified by the Court was cleared after those preceding that person were (predictably) excused

for cause.

   With these preliminary matters addressed, the Court proceeds to resolve the pending

motions which include Gavin's Motion to Amend Judgment to Include Interest and Taxable

Costs (Doc. No. 283) and Motion for Attorneys' Fees and Expenses (Doc. No. 284).  The City

opposes these two motions (Doc. No. 312), and Hayes filed a Motion for Joinder to the City's

Opposition (Doc. No. 319).  Gavin opposes Hayes's Motion for Joinder (Doc. No. 322).

Subsequently, Gavin filed a Supplemental Motion for Attorneys' Fees and Expenses resulting

from the post-trial motions (Doc. No. 321).  The City and Hayes oppose this motion as well

(Doc. No. 323).

---

[3] This is not the only example.  One of the City's lawyers made an authenticity objection to the
signature on a medical record offered by Gavin because the signature on the certification
accompanying the records was affixed digitally.  The lawyer withdrew the objection after the
Court asked him to cite a factual or legal basis supporting the position he was taking (because
there is no such authority).  Defendants also filed, and the Court reviewed, several motions in
limine that, had they conferred with Gavin's counsel as the Local Rules require, would have
been unnecessary, as they challenged evidence Gavin did not intend to offer at trial.

The City and Hayes then filed the following motions separately: Motions for New Trial (Doc. Nos. 289, 298), Motions for Judgment as a Matter of Law (Doc. Nos. 293, 296), and Motions to Alter Judgment (Doc. Nos. 291, 300).  The Court required no response from Gavin as to the former two motions, Doc. No. 302, but did as to the latter, and Gavin accordingly opposed the Motions to Alter Judgment.  Doc. No. 315.  The aforementioned motions are fully briefed, and the Court begins with Defendants' various motions and then turns to Gavin's motions.

I.   DEFENDANTS' MOTIONS

A.  Motions for Judgment as a Matter of Law (Doc. Nos. 293, 296)

The City moves for judgment as a matter of law (Doc. No. 293) pursuant to Fed. R. Civ. P. 50(b).  The Court evaluates this motion by examining the evidence admitted at trial as a whole and construes the facts in light most favorable to the jury verdict, with any inferences drawn in favor of Gavin as the non-moving party.  Blomquist v. Horned Dorset Primavera, Inc., 925 F.3d 541, 546 (1st Cir. 2019).  The Court may only allow the motion if the record reveals no sufficient evidentiary basis for the verdict.  See id.  After careful consideration, the Court concludes that the attentive jury meticulously and properly applied the law to reach a verdict well supported by the evidence that is lawful, just, and fair.  Accordingly, the City's Motion for Judgment as a Matter of Law (Doc. No. 293) is DENIED.  Although the Court need go no further, several brief comments are warranted because the City's motion does not fairly summarize the trial record which must necessarily form the foundation of any ruling on a motion filed under Rule 50(b).  The following evidence was credible, powerful, and, importantly, clearly supported the jury's verdict.

In May of 2016, Hayes wrote a glowing letter nominating Gavin for an award just a few weeks into her tenure as a permanent Lieutenant in charge of the Human Trafficking Unit

("HTU") and Crimes Against Children Unit ("CACU") at BPD.  Doc. No. 273 at 36; Ex. E.  This

letter extolled her virtues as a "leading trainer[] and recognized expert[] in the field of human

trafficking" and described that her "competence, professional attitude, high ethical standards, and

work ethic are fantastic."  Ex. E.  This reference letter was no mere puffery.  Hayes himself

reiterated the reference under oath on the witness stand at trial saying the letter was "true" when

he wrote it.  Doc. No. 273 at 36.  Yet a mere two months later when Lieutenant Gavin still lacked

both a Sergeant Detective to run the HTU and a private office in which to conduct her command

role, a stark contrast to every other officer of her rank in the entire BPD, Hayes wrote to

Superintendent Long that Gavin should be transferred out of the HTU because she did not follow

directives and harassed another Detective.  Ex. C at 8.  The jury could infer that what Hayes saw

in Gavin was a _female_ rising star headed for substantial law enforcement, public, and career

success and could not abide by that.  This, of course, was not the only inference to draw from the

evidence, but it was a permissible inference.  The jury could also conclude that this was the

beginning of a campaign by Hayes to discriminate against and undermine Gavin at every turn

including (1) advocating for the transfer of detectives in whom she had faith; (2) making little to

no effort to fill the position of Sergeant Detective in command of the HTU while simultaneously

criticizing Gavin for performing these Sergeant Detective responsibilities and not giving enough

attention to the CACU, Ex. 1 at 3; (3) conducting case reviews of the HTU with little notice to

Gavin while not doing the same for male Lieutenant Detectives' units, Doc. No. 273 at 98; (4)

disrupting the chain of command; and (5) elongating the process and putting up barriers for

Gavin to get a private office.[4]

---

[4] The City argues that Gavin failed to offer competent comparator evidence on these issues.  The
City is wrong.  Gavin provided evidence that two other male Lieutenant Detectives, Juliano and
Harrington, held the same rank as her and had private offices in the Family Justice Center.  The

The foregoing was not the only evidence of adverse actions nor did the evidence of discrimination depend merely on the reasonable inference available to the jury from the foregoing evidence.  In May of 2017, Hayes filed a 46-page single spaced Internal Affairs ("IA") complaint against Gavin which included the aforementioned "log" charting all of her alleged missteps that he had been compiling over a period of time.  Ex. C.  Entries from Hayes's log include statements that Gavin should be terminated or have her Detective rating removed, that she was a "congenital liar," and that BPD's psychologist should evaluate her to "determine her fitness for duty."  Id. at 43, 46.  The jury could reasonably infer from this evidence that Hayes seethed with hostility toward women in positions of leadership both generally and specifically towards Gavin, especially considering her seemingly rapid rise up the ranks.[5]

In response to this 46-page IA complaint and Gavin's one paragraph discrimination complaint via email, Ex. G, BPD directed that Gavin report to Hayes's superiors instead of Hayes himself, but that Hayes nonetheless remained in command of Gavin's subordinates resulting in sidelining, undermining, and demeaning Gavin by disrupting the chain of command.  Pl.'s Ex. 2.  This situation remained in place for approximately two years when Gavin was transferred from the Family Justice Center ("FJC")[6] to the Boston Police Academy.[7]  The jury could reasonably infer these actions, such as disrupting the chain of

_____

trial record also shows that Hayes conducted quarterly case reviews of the HTU but did not do so for the units these male Lieutenant Detectives oversaw whom Hayes let conduct their own reviews.  See Doc. No. 273 at 98.  Nor did Hayes ever keep a log on these male Lieutenant Detectives the way he did for Gavin.  Id. at 34.  Accordingly, Gavin provided competent comparator evidence.

[5] Indeed, there was other contrary evidence presented at trial regarding Hayes's treatment of women.  But the jury was free to reject that evidence entirely or find it outweighed by other evidence.  The verdict shows they did just that.

[6] The FJC oversees the HTU and CACU as well as other units.

[7] The City contends that Gavin failed to offer evidence that her transfer was caused by her protected conduct, but the trial record shows otherwise.  Between her filing her formal IA

command, transferring Gavin, or even Hayes filing an IA complaint, were in retaliation for Gavin engaging in protected conduct of making discrimination complaints to IA, Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC").  Moreover, a reasonable jury could have found, as they did, that Gavin was subjected to a hostile work environment from the aforementioned evidence coupled with additional facts showing that Hayes repeatedly admonished Gavin, directly or indirectly, on email chains including her subordinates and superiors.  See, e.g., Exs. M, CC; Pl.'s Exs. 2, 4-5, 9, 13, 17.

These facts, along with the remainder of the trial evidence, support the Court's ruling. Having heard all of the evidence firsthand and reviewed the entire record as well as drawing all inferences in favor of the verdict, the City's Motion for Judgment as a Matter of Law (Doc. No. 239) is DENIED.

Hayes also filed a Motion for Judgment as a Matter of Law (Doc. No. 296) which parallels many of the City's arguments and is therefore DENIED.  Two points bear further mention.  First, Hayes argues that Gavin's transfer to the Boston Police Academy was not an adverse action because her rank and salary remained the same.  Even so, the First Circuit has struck the notion that a transfer that does not result in a "diminution in salary or a loss of benefits" cannot constitute an adverse employment action.  Caraballo-Caraballo v. Corr. Admin., 892 F.3d 53, 61 (1st Cir. 2018).  Instead, "the fact that a transfer leaves an employee with "significantly different responsibilities," may make the transfer actionable."  Id.  Here, the trial

---

complaint to Superintendent Long and her transfer out of the FJC, Hayes filed his IA complaint, BPD superiors disrupted Gavin's chain of command, Gavin filed complaints with the MCAD and EEOC, Gavin filed suit in state court, and the IA investigation continued.  These facts establish repeated protected conduct and temporal proximity to Gavin's eventual transfer out from the HTU where she had subject matter expertise into the Boston Police Academy.

record shows that Gavin was transferred out of the BPD's Detectives' Bureau and into the Police

Academy where she could largely no longer use her human trafficking expertise nor could she

engage in detective work as she had done for years.  A reasonable jury could find that she had

"significantly different responsibilities" through overseeing the cadets' exam process and

preparing E-learning materials instead of commanding two units, being in the field, conducting

investigations on human traffickers, and supporting victims.  See, e.g., Doc. No. 271 at 138-39,

141.  In contrast to multiple detectives reporting to Gavin in her prior role, no one reported to

Gavin at the Police Academy aside from a civilian.  Id. at 140.  Additionally, a permissible

inference from the trial record is that a position at the Police Academy, even if holding the rank

of Lieutenant Detective, was less prestigious than being in the Detectives' Bureau.  Although

Hayes further argues a lack of causation related to these adverse actions, Hayes expressly

requested in his IA complaint to have Gavin transferred out of the FJC, terminated, or stripped of

her Detective Rating, and began to make such requests only two months after Gavin joined the

FJC as a permanent Lieutenant Detective.  Ex. C; Doc. No. 276 at 31, 98, 102 (showing that

Gavin was transferred out in part because of problems with Hayes).[8]

Second, Hayes continues to argue that Gavin did not plead any claim or theory of

discrimination or hostile work environment against him specifically so he cannot be liable under

such theories.  He is wrong.  At summary judgment, the Court correctly construed Gavin's

Interference with the Right to be Free from Discrimination claim against Hayes to include

discrimination and hostile work environment.  Doc. No. 130 at 5-6 (describing that "[t]he Second

Amended Complaint expressly alleges that Hayes discriminated against Gavin based on her

---

[8] These facts from the record also refute Hayes's argument that his IA complaint did not
materially disadvantage Gavin.

gender in several ways" and "that Gavin's protected conduct, which gave rise to the retaliation she alleges, was undertaken in response to Hayes's discriminatory actions."). Thus, considering the trial record and drawing all reasonable inferences in favor of the verdict, Hayes's Motion for Judgment as a Matter of Law (Doc. No. 296) is DENIED.

      B.  <u>Motions for a New Trial (Doc. Nos. 289, 298)</u>

Beginning with the City's Motion for a New Trial (Doc. No. 289), the City argues that "there was a) no evidence presented to support any award for promotional damages; b) the experts testimony, specifically Kimberly Hassell and Norman Stamper was improper and prejudicial; c) evidence presented about the events after the Plaintiff's transfer to the Boston Police Academy was too remote and tenuous; d) Plaintiff did not suffer an adverse employment action; e) some of the jury instructions were improper and prejudicial to the City; and f) there were multiple instances in the record in which Plaintiff either elicited hearsay statements from witnesses or asked impermissible questions." Doc. No. 290 at 1. As to the first argument, the Court has described in detail <u>supra</u> the evidence from which a reasonable jury could draw the permissible inference that Gavin would have been promoted.

As to the second argument regarding experts Hassell and Stamper, the City contends that "there was no other evidence other than [their expert testimony on] . . . the code of silence and an inherent bias against females within the department." <u>Id.</u> at 7. This is incorrect. When Gavin's Counsel asked a female detective if it was "difficult to come here today to provide the opinion you provided here today, about how Captain Hayes treated Lieutenant Detective Gavin as a woman," she responded "[i]t's extremely difficult" while tearing up. Doc. No. 272 at 205. Similarly, when another employee was asked about statements others at BPD had made, she responded visibly distressed "I still have to work there, so I really don't want to get into the

whole name-calling, you know, like calling out people."  This was evidence of a code of silence. The jury could also infer the code of silence from other evidence in the record.  Moreover, the experts' testimony as limited by the Court was permissible, appropriate, and in conformity with the law.

The City also states that Hassell should not have been allowed to testify as to Dr. Barao's report and "that the law enforcement agency which was the subject of Dr. Bareo's [sic] report was the Boston Police Department[.]"  Doc. No. 290 at 7.  This argument is DENIED for the same reasons the Motion in Limine (Doc. No. 141) on this issue was denied.[9]  See also Doc. No. 159.

As to the third argument that any conduct that predates July 29, 2016 when the MCAD complaint was filed should have been precluded is DENIED for the same reasons the Motion in Limine (Doc. No. 152) on this issue was denied.  See also Doc. No. 185.

As to the fourth argument that there was no evidence of an adverse employment action, this is DENIED for the reasons described in the Court's analysis supra of the Defendants' Motions for New Trial (Doc. Nos. 293, 296).

As to the fifth argument that the jury instructions were improper, to the extent the City reiterates objections it asserted at the charge conference, the motion is DENIED for the same reasons the Court overruled the objections when they were made.  To the extent the City raises

---

[9] Insofar as the City's implies that the police department studied in Dr. Barao's report was not BPD, the Court finds this objection borderline disingenuous.  Gavin's Counsel described that Gavin was a part of the study, and so BPD was the subject of the study. Doc. No. 277 at 27-28. The City has provided no good-faith basis for challenging that understanding, and the Court finds such a challenge particularly suspect given the City's implication that it has no way of finding out whether its own client was a part of Dr. Barao's study.

new objections it did not assert before the Court delivered the instructions, those objections are waived.

Finally, the City's sixth argument complains that the record is "replete with instances of impermissible hearsay and/or improper questions posed to witnesses."  Doc. No. 290 at 11. Where the City fails to point to specific questions and identify the specific reasons the testimony or questions were improper, the Court declines to conduct such a review sua sponte.  Making a general complaint of this nature followed by a string cite to pages of testimony from several witnesses and two days of trial transcripts, id. at 12, is not "well-developed argument."  Thus, this argument is waived.  The Court merely adds that it addressed carefully every argument raised by the City at every stage of this case, meticulously explained its rulings, and whenever called for, limited evidence.  Therefore, the City's Motion for a New Trial (Doc. No. 289) is DENIED.

Turning now to Hayes's Motion for a New Trial (Doc. No. 298), he first argues that the jury could not find against him on the discrimination or hostile work environment theories.  This is DENIED for the reasons described supra in the Court's analysis of Hayes's Motion for Judgment as a Matter of Law (Doc. No. 296).  Next, Hayes argues that FBI Agent Russ Brown should have been allowed to testify.  As the Court has repeatedly explained, it did not allow Brown to testify because Hayes neglected to disclose him in the initial disclosures or supplemental initial disclosures.[10]  Doc. No. 208.  The Court consistently applied this rule across all witnesses.  Id.  Hayes responds that Brown should have been allowed at least as a rebuttal witness since Gavin was allowed to testify that "Hayes deliberately excluded her from the May

---

[10] Hayes contends that Gavin was allowed to call witnesses who were not timely disclosed.  Doc. No. 299 at 12 n.5.  Not so.  The Court allowed those witnesses because Gavin supplemented her initial disclosures which Hayes failed to do with Brown.

2017 FBI operation." Doc. No. 299 at 7. According to Hayes, it was Brown who did not want Gavin involved in the operation, not him. Id. at 8. But just as Gavin testified that, in her understanding, Hayes excluded her from the FBI operation, Hayes testified that it was not his decision to exclude Gavin but the FBI's. Doc. No. 273 at 192. The Court did not prevent Hayes's own testimony in rebuttal. In any event, the exact reasons for Gavin's exclusion from the FBI operation was a collateral issue and neither Gavin nor Hayes were accordingly provided the opportunity to prove up their arguments on this issue.

Insofar as Hayes argues that it was improper for Gavin's Counsel to thereafter comment during closing arguments that Defendants never called Brown as a witness, the Court reminded the jury multiple times that "closing arguments are . . . arguments from the lawyers, . . . not evidence." See, e.g., Doc. No. 305 at 34, 58, 61, 63, 87. Accordingly, even assuming Gavin's Counsel made an isolated and improper comment in the case, the Brown issue neither standing alone or in combination with other issues is significant enough to warrant a new trial in light of the other evidence presented at trial.

Finally, Hayes argues that he should have been allowed to introduce evidence about the outcome resulting from his IA complaint against Gavin. Doc. No. 299 at 13. Specifically, he argues that because Gavin was permitted to "elicit testimony from . . . Commissioner Long that Hayes had engaged in misconduct," he should have been allowed to introduce the IA outcome reaching the opposite conclusion. Id. at 14. This is DENIED for the same reasons the Court overruled the objection when it was made. Doc. No. 208 at 3 (excluding the IA investigations and outcome under Fed. R. Evid. 403 and as a collateral issue). This is also DENIED because Long was not allowed to comment on the IA specifically and allowing the IA investigation and outcome in would have opened the door to collateral issues, not to mention the likelihood of

confusion for the jury as to the standards they should apply in this case.  Accordingly, Hayes's

Motion for a New Trial (Doc. No. 298) is DENIED.

      C.  <u>Motions to Alter Judgment (Doc. Nos. 291, 300)</u>

The City moves for remittitur (Doc. No. 291) pursuant to Fed. R. Civ. P. 59.  The jury

awarded Gavin $1 million in emotional distress and/or reputation damages, $940,000 in lost

promotion damages, and $60,000 in lost overtime, sick time, and medical expenses.  Doc. No.

265.  As to the emotional distress and/or reputation damages, the City argues that the award

should be reduced from $1 million to $200,000-$250,000.

The First Circuit eleven years ago in <u>Tuli v. Brigham & Women's Hosp.</u> upheld

emotional distress damages in the amount of $1.6 million for a plaintiff who succeeded in her

gender discrimination, hostile work environment, and retaliation claims.  656 F.3d 33 (1st Cir.

2011).  The plaintiff in <u>Tuli</u> testified in relevant part that:

> her day-to-day existence . . . [w]as "hell," with the looming threat of losing her
> credentials acting "like a gun to [her] head." She could not eat or sleep and lost ten
> pounds. She experienced anxiety, anger, fear, and nervousness, which included physical
> manifestations of abdominal pain and nausea.

<u>Id.</u> at 44.  The Circuit noted that although "the total award of $1.6 million is higher than some

awards where remittitur has been allowed, . . . it is on par with—and noticeably lower when

intervening inflation is considered than—significant emotional injury awards that have been

upheld under Massachusetts law."  <u>Id.</u> at 45 (collecting cases); <u>Toussant v. Brigham & Women's</u>

<u>Hosp.</u>, Doc. No. 315-3 (awarding $2.75 million in emotional distress damages for discrimination

and retaliation claims under Massachusetts law).

Indeed $1 million is a large sum, but the evidence presented during trial supports this as a

permissible award.  To begin, the impact of Defendants' actions on Gavin were exacerbated not

in small part because of the trajectory she was on and how integral her career was to her life.

Gavin was a rising star, both as an expert in human trafficking specifically and at the BPD generally.  She was the highest-ranking woman under the Command Staff at BPD.  She was also part of a close-knit community at BPD, which not only made up her professional life, but also her personal life, with several family members and close friends currently or formerly at BPD.  See, e.g., Doc. No. 270 at 112; Doc. No. 275 at 88-89, 286-87.  Thus, her career was an important aspect of her life, and the jury could conclude it was the source of emotional satisfaction, self-worth, and confidence for much of her adult years.  But during and after the underlying events, most of this was taken away from Gavin.  She thought she would lose her job and was completely removed from detective work.  She testified several times that she felt humiliated and embarrassed by the underlying events and the hostile work environment which spanned years, not months.  See, e.g., Doc. No. 271 at 48, 51, 81, 101, 105.  Her husband and therapist confirmed Gavin felt this way.  Like the plaintiff in Tuli, Gavin experienced a severe and pervasive hostile work environment, discrimination, and retaliation across many years and her emotional distress manifested in physical symptoms as well.  See, e.g., id. at 118-19 (describing shingles, eczema, headaches, teeth grinding, etc.).  The City provides the Court no reasons why Tuli, a case from eleven years ago with a larger emotional distress damages award, should not control.

Moreover, the City directs its arguments for remittitur overwhelmingly towards emotional distress damages.  Notably, however, the jury awarded $1 million for emotional distress and/or reputation damages, the latter of which the City fails to address.  Although the Court cannot speculate whether and how much of the $1 million is attributed to reputation damages, the evidence at trial shows that a reasonably jury could draw the permissible inference that Gavin's reputation was tarnished.  As a powerful woman leader with connections in the

community, the Mayor's office, and other political leaders like Ambassador Hunt, Gavin had cultivated a strong reputation, both inside and outside BPD.  The jury could conclude the Defendants shattered Gavin's reputation.  Accordingly, for the foregoing reasons, the Court declines to reduce the emotional distress and/or reputation damages award.[11]

Finally, the City asks the Court to reduce the lost promotion damages because there "was no competent evidence that Plaintiff was going to be promoted to the Command Staff."  Doc. No. 292 at 6.  The Court has addressed in detail _supra_ and does not repeat here the evidence supporting a lost promotion claim.  As to the City's argument that the award was not reduced to present value because $940,000 "was the amount requested by [Gavin] during her closing . . . assuming she would have been promoted," id. at 7, the Court is not persuaded.  The chalk Gavin presented during closing argument shows that the jury could have determined that nearly $1.5 million was the proper award.  See Doc. No. 305 at 30-33.  And that the jury asked questions about how to calculate present day value does not necessarily mean that the jury did not calculate the appropriate deductions given that much more than $940,000 could have been awarded.  The sequence of events also supports the presumption that the jury followed the Court's instructions to reduce to present value.  The jury asked, "what is the present value of $1,000,000 [and] $1,500,000" and the Court instructed them to determine the discount rate and apply it.  Doc. No. 259.  The jury then returned with an award of $940,000 which is below the amounts they

---

[11] The City separately argues, in a conclusory fashion, that the reputational harm and lost promotion damages allowed for a double recovery.  Doc. No. 292 at 6.  The City is, yet again, incorrect.  The jury instructions were carefully crafted to prevent any confusion and risk of double recovery.  Doc. No. 253 at 26, 28 (instructing the jury that for Question 6A on emotional distress and/or reputation damages, "[d]o not include . . . lost promotion damages. . . within this amount" and the reverse in the lost promotion damages section).

revealed in their question.  Accordingly, the Court DENIES the City's Motion to Alter Judgment (Doc. No. 291).

The Court also DENIES Hayes's Motion to Alter Judgment (Doc. No. 300) for the foregoing reasons.  Two further points bear mention.  First, Hayes argues that Gavin did not adequately disclose her lost earnings claim, including for lost future pension damages.  Doc. No. 301 at 10.  This is DENIED for the reasons stated in Doc. No. 315 at 20.  Second, Hayes requests that the $60,000 award for lost overtime, sick, and vacation pay be reduced because it was based on speculation.  Id. at 12.  The Court disagrees and DENIES this request for the reasons stated in Doc. No. 315 at 20-21.

II.   GAVIN'S MOTIONS

A.   Motions for Attorneys' Fees and Expenses (Doc. Nos. 284, 321)

Gavin now moves for attorneys' fees and costs pursuant to Mass. Gen. Laws ch. 151B, § 9.  The City opposes (Doc. No. 312), and Hayes moves to join the City's opposition (Doc. No. 319) which the Court ALLOWS.  Gavin's Counsel bears the burden to establish entitlement to an award.  Hensley v. Eckerhart, 461 U.S. 424, 437 (1983).  In determining the reasonableness of a fee award, courts apply the "lodestar method," which begins by determining "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  Id. at 433.  Then, courts consider other relevant factors that may "adjust the fee upward or downward, including the important factor of the 'results obtained.'"  Id. at 434.  Those factors can include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Diaz v. Jiten Hotel Mgmt., Inc., 741 F.3d 170, 177 n.7 (1st Cir. 2013) (citing Hensley, 461 U.S. at 430).

Defendants begin by contending that the fees "reflect excessive, duplicative, and/or unnecessary work performed" as it relates to the IA entries.  Doc. No. 312 at 5.  First, Gavin "is willing to reduce the amount of fees" spent by Ms. Proctus, a paralegal, "by 75% and seeks instead $7,062."  Doc. No. 320 at 2.  Further, Attorney Carter agrees to "exclude the 6.7 hours he attended the [Ludwick Bartkiewicz] deposition."  Id. at 3.  Insofar as Defendants request further reduction in the fees on this ground, their request is DENIED.  Although the IA investigation and outcome was ultimately excluded at trial, it was a relevant issue to research and consider, especially because Hayes has pressed throughout the litigation and continues to press that much or all of those IA documents should have been admitted.  See, e.g., Doc. No. 299 at 13; Doc. No. 182.  It follows that Gavin's Counsel had to review all of the IA evidence to determine their position and prepare a response, and so the Court finds that the amount of time Gavin's Counsel spent on the IA matters was not excessive, duplicative, or unnecessary.

Second, Defendants argue that the hourly rates are excessive.  Doc. No. 312 at 6.  Attorney Carter seeks an hourly rate of $500 as a partner at Todd & Weld LLP, and Defendants request this rate be reduced to $400.  Id. at 7.  Defendants point to Pineda v. Skinner Servs., Inc. where another session of this Court awarded a $400 hourly rate to an experienced employment law partner.  No. CV 16-12217-FDS, 2021 WL 5882596 (D. Mass. Dec. 13, 2021).  In assessing the reasonableness of the $500 hourly rate, the Court considers Attorney Carter's expertise and experience of more than two decades of trial experience, fourteen years more than the attorney in Pineda who also worked at a firm smaller than Todd & Weld.  See Doc. No. 320 at 4; Tuli v. Brigham & Women's Hosp., Inc., No. 07CV12338-NG, 2009 WL 10693567, at *2 (D. Mass.

18

June 8, 2009) (finding in a case decided eleven years ago that hourly rates of $570-735 for partners, $250-495 for associates, and $255-275 for career paralegals were reasonable in the context of the litigation); Fronk v. Fowler, No. 02-1216, 2007 WL 1130381, at *1 (Mass. Super. Feb. 23, 2007) (finding hourly rates of $450-575 for partners, $195-360 for associates, and $110-195 for paralegals over four years of litigation were reasonable).  This case was complex and aggressively litigated over several years, warranting the expertise Attorney Carter brought.

Attorneys Passanisi and Scully seek an hourly rate of $370 and $380, respectively, and Defendants request a reduction for both rates to $250 an hour.  Doc. No. 312 at 7.  The Court DENIES Defendants' request in light of the cases cited previously.  See also Roggio v. Grasmuck, 18 F. Supp. 3d 49, 58 (D. Mass. 2014) (awarding a $290 hourly rate to a Todd & Weld associate approximately seven years before the date of this trial with similar experience to Passanisi).  Considering intervening inflation and experience, the hourly rates of $370 and $380 for Attorneys Passanisi and Scully is reasonable.

The paralegals billed between $240 to $270 an hour, and Defendants' request that this be reduced to $100 an hour.  The Court finds that Gavin's agreement to reduce the "hours and total fees of paralegals Vanessa Bitto, Hudson Rowland, and Sridevi Dayanandan by 20%" is appropriate, reasonable, and sufficient.  Doc. No. 320 at 6.  Gavin has also agreed to a 75% reduction in fees by paralegal Ms. Proctus discussed supra.  As to paralegal Melissa Nutter, Gavin's Counsel describes that she is a career paralegal and so her hourly rate of $250 is reasonable and on par with Tuli.  No further reduction in the paralegals' rate is warranted.

Third, Defendants argue that the failure of Gavin's Counsel to distinguish between core and non-core work warrants a reduction in attorneys' fees.  Doc. No. 312 at 9.  The Court declines to distinguish between core and non-core work in determining reasonable attorneys'

fees.  See Matalon v. Hynnes, 806 F.3d 627, 639 (1st Cir. 2015) (describing that the First Circuit has "never imposed a rigid requirement that a district court employ a core/non-core analysis when adjudicating a fee petition" and that the discretion of whether to apply that distinction remains with the district court).  Furthermore, there is nothing in the record that sufficiently suggests that Gavin's Counsel were doing the work of paralegals.  Blanket statements that telephone conferences with opposing counsel and the like are necessarily non-core without a detailed analysis showing what exactly was non-core in those communications is unpersuasive. That said, the Court agrees that travel time should not be charged at the full hourly rate and accordingly reduces that rate by 50%.[12]

Fourth, Defendants request the Court reduce the expert fees.  Doc. No. 312 at 13.  As to Dr. Kimberly Hassell, Gavin agrees to reduce her lodging and meal expense rate to $264.  For her fees, Dr. Hassell billed her work by the month instead of maintaining contemporaneous records.  For that reason, the Court reduces Dr. Hassell's rate by 25%.  As to Thomas Stack, Gavin similarly agrees to reduce his lodging and meal expense rate to $264.  The Court finds his rate of $100 reasonable given that it is a relatively low rate for an expert of his stature with the kind of experience he had.  Finally, as to Dr. Norman Stamper, Defendants request that his $450 hourly rate be reduced by 75%.  Considering his expertise and experience, the Court agrees on balance that Dr. Stamper's experience and expertise warrant a higher rate than the other experts.

---

[12] The Court recognizes Defendants' contention that because the travel entries were not separately entered, the entire fee should be reduced by 5%.  Doc. No. 312 at 17.  The Court declines to do so.  Assuming Gavin's attorneys walked to and from the Court, as they say typically occurred, their roundtrip time would be approximately thirty minutes.  The Court instructs Gavin's attorneys to reduce thirty minutes from every entry involving travel to the courthouse and calculate their travel fee by multiplying that time with the 50% deduction on their hourly rate.

That said, the Court finds the $450 rate too high, and so the Court reduces Dr. Stamper's rate by 20% which is more appropriate in this case.

Fifth, Defendants request a reduction in fees for time Gavin's Counsel spent consulting with other attorneys. Id. at 15. To begin, the Court agrees with Defendants that billing for communications with a Boston Globe reporter is not reasonable and strikes that entry entirely. Doc. No. 312-1 at 3. Next, Attorney Carter has "agreed to exclude his time on April 17, 2019." As to the remaining conferrals with other attorneys, the Court finds these communications reasonable to litigate this case. The First Circuit held recently that a "district court may award attorneys' fees to a prevailing plaintiff for time reasonably expended in connection with a separate but related case" as long as the time is devoted to "work that is useful" and "ordinarily considered necessary to the matter at hand." See Perez-Sosa v. Garland, 22 F.4th 312, 324 (1st Cir. 2022). Communications Gavin's Counsel had with other attorneys about the Payne-Callender litigation and IA matter were reasonable given that those matters were related to this case and Counsel appropriately explored them. Thus, the Court DENIES Defendants' request to further reduce fees on this ground.

Finally, Defendants raise several minor issues. The Court DENIES Defendants' request to eliminate Attorney Zic's fees for the reasons stated in Gavin's Reply (Doc. No. 320 at 11-12). The extensions of time sought were reasonable. The Court declines to reduce the fees for the work performed by Attorneys Bair and Lippiello for the reasons stated supra that the IA matter was intimately related to this litigation. See id. Defendants, additionally, have not cited any caselaw holding that work done by Gavin's prior attorneys on issues related to this case should not be compensated.

Gavin also filed a Motion to Supplement her Motion for Attorneys' Fees and Expenses (Doc. No. 321).  That Motion is ALLOWED to the extent it conforms with the Court's adjudication of Gavin's initial Motion for Attorneys' Fees (Doc. No. 284).

      B.  <u>Motion to Amend Judgment to Include Interest and Taxable Costs (Doc. No. 283)</u>

Gavin's Motion to Amend Judgment to Include Interest and Taxable Costs (Doc. No. 283) is ALLOWED[13] with the following adjustment for a calculation error: the printing cost is listed in the Bill of Costs (Doc. No. 281) as $12,138.93, however, the exhibits attached to the bill detailing the printing costs show that the actual cost for printing was $12,950.06 at the time the Bill of Costs (Doc. No. 281) was submitted.

III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES Defendants' Motions for Judgment as a Matter of Law (Doc. Nos. 293, 296), Defendants' Motions for a New Trial (Doc. Nos. 289, 298), and Defendants' Motions to Alter Judgment (Doc. Nos. 291, 300).  The Court ALLOWS Gavin's Motions for Attorney Fees and Expenses (Doc. Nos. 284, 321) and Gavin's Motion to Amend Judgment to Include Interest and Taxable Costs (Doc. No. 283) both to the extent described herein.  The Court ALLOWS Hayes's Motion for Joinder (Doc. No. 319).  Gavin shall submit a status report to the Court within seven days detailing the final fees and costs in conformity with the reductions in this Order for the Court's approval.

                                 SO ORDERED.
                                 /s/ Leo T. Sorokin
                                 Leo T. Sorokin
                                 United States District Judge

---

[13] Defendants request the Court reserve ruling on this Motion (Doc. No. 283) given their then pending motions. <u>Id.</u> at 18.  The Court declines to do so as Defendants have provided no other reason other than waiting for their then pending motions to be resolved, which the Court finds to be an insufficient reason to reserve ruling.  Defendants' arguments are therefore waived as to this Motion.  They were provided an opportunity to respond and did not do so.